# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAOL REXMARK UNION STATION LLC; and KOOKMIN BANK CO., LTD., in its capacity as trustee of KTB CRE DEBT FUND NO. 8, a Korean Investment Trust, by its agent in Korea DAOL FUND MANAGEMENT CO. and by its agent in United States REXMARK HOLDINGS LLC d/b/a REXMARK, <br><br> Plaintiffs, <br> v. <br><br> UNION STATION SOLE MEMBER, LLC, <br><br> Defendant. | Case No. _____ <br><br> **COMPLAINT** |

Daol Rexmark Union Station LLC ("Union Station Sub") and Kookmin Bank Co., Ltd. ("Kookmin"), in its capacity as trustee ("Trustee") of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), by its agent on behalf of the Trust in Korea, Daol Fund Management Co. ("Daol") and by its agent on behalf of the Trust in the United States, Rexmark Holdings LLC d/b/a Rexmark ("Rexmark," and collectively with Union Station Sub, Trustee, the Trust, and Daol, "Lender"), by and through their undersigned counsel, as and for their complaint against Defendant Union Station Sole Member, LLC ("USSM"), allege as follows:

## NATURE OF CASE

1.      This case arises from two loans made by Lender to USSM and nonparty Union Station Investco, LLC ("USI") in connection with the ground lease of Washington Union Station ("Union Station"). These loans have been in default since May 2020 and now exceed $560 million in due and unpaid debt. To protect its interest in the collateral, Lender exercised its rights and remedies under the loan documents, by, among other things, foreclosing on the mezzanine loan

made to USSM after more than 2 years of nonpayment.  On June 14, 2022, at a duly-noticed Uniform Commercial Code ("UCC") foreclosure sale (the "Foreclosure Sale"), Lender purchased USSM's membership interests in USI (the "USI Equity") for more than $140 million and assigned such interests to Union Station Sub.

2.      USSM has no remaining interest in USI, all of which is owned and controlled by Lender.  USI owns the entity currently with the right to possession and control over the leasehold interest in Union Station.

3.      Since the Foreclosure Sale, however, USSM has refused to acknowledge Lender's purchase of the USI Equity or exercise of other rights.  Instead, USSM, through its beneficial owner Ben Ashkenazy, has been interfering with Lender's rights to operate and manage Union Station.  USSM and Ashkenazy have directed the current property management company to withhold information from Lender and report directly to Ashkenazy even though he no longer has any interest or role in the management of Union Station.  This continued interference prevents Lender from exercising its rightful control over USI.  Such misconduct threatens to prevent Lender from meeting its obligations to safely operate and manage Union Station.  Lender is entitled to a declaratory judgment that Lender has attorney-in-fact rights over USSM and that all of USSM's right, title, and interest in and to USI have been extinguished by the June 14 Foreclosure Sale.

## PARTIES

4.      Plaintiff Union Station Sub is a limited liability company organized under the laws of the State of Delaware.  Union Station Sub is wholly owned by the Trust, based in Korea.  The sole member of Union Station Sub is the Trust.

5.      Plaintiff Kookmin is a Korean bank serving as the Trustee of KTB CRE Debt Fund No. 8 (i.e. the Trust), a Korean investment trust.  The Trust's agent in South Korea is Daol.  The

Trust's agent in United States is Rexmark, which oversees the day-to-day management of the loans. The beneficial owners of the Trust are citizens of Korea.

6.     Union Station Sub, Rexmark, Trustee, the Trust, and Daol are referred to collectively as Lender.

7.     Lender is the holder of two loans made in 2018, a mortgage loan and a mezzanine loan, in connection with the leasehold interest in Union Station.

8.     Defendant USSM is a limited liability company organized under the laws of the State of Delaware. USSM is wholly owned by Ashkenazy Union Station Holdings LLC, a limited liability company organized under the laws of the State of Delaware.

9.     Nonparty Ashkenazy Union Station Holdings LLC is owned by BA Union Station Manager LLC, a limited liability company organized under the laws of the State of Delaware; Ben Ashkenazy, an individual residing in the State of New York; and Union DC MDA, LLC, a limited liability company organized under the laws of the State of Delaware.

10.    Ashkenazy serves as the CEO and Chairman of the Ashkenazy Acquisition Corporation ("AAC"), a real-estate investment firm that lists Union Station within its portfolio of assets.

11.    Nonparty BA Union Station Manager LLC is wholly owned by Ashkenazy.

12.    Nonparty Union DC MDA, LLC is wholly owned by JSER Group, LLC, a limited liability company organized under the laws of the State of Delaware.

13.    Nonparty JSER Group, LLC is owned by Michele Jacobs as Trustee of The Alpert Trust (A) and Michele Jacobs and Debbie Alpert as Trustees of The Alpert Trust (B). The beneficial owners of the Alpert Trust (A) and Alpert Trust B are citizens of the United States.

14.     Nonparty USI is a limited liability company organized under the laws of the State of Delaware.  Ashkenazy was USI's manager until replaced in May 2022.  Prior to the Foreclosure Sale, USI was wholly owned by USSM.  Post-foreclosure, USI is wholly owned by Union Station Sub.

15.     An organizational chart for USSM is attached hereto as Exhibit A.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a)(2) for diversity jurisdiction. The parties are completely diverse because Plaintiffs are citizens of Korea and Defendant's members are citizens of the United States.  The amount in controversy when considering the value of the declaratory and injunctive relief sought is over the $75,000.00 statutory threshold.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2).  The loan documents at issue were negotiated and accepted in the State of New York, and the proceeds of the loan governing the relationship of the parties were disbursed from the State of New York.

## STATEMENT OF FACTS

**The Loan Documents**

18.     Lender is the holder of two loans made in 2018 with respect to the ground lease of Union Station.

19.     USI is the entity that currently has the right to possession and control of the leasehold interest in Union Station, thereby having obligations to manage and operate the station (hereafter referred to as "USI's leasehold management and possession rights").

20.     USI's leasehold management and possession rights in Union Station was encumbered by a Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents, Financing Statement and Fixture Filing, dated as of May 8, 2018 (the "Mortgage").

21.     The Mortgage secures a loan in the original principal amount of $330 million (the "Mortgage Loan") made to USI on or about May 8, 2018, by Lender's predecessor ("Original Mortgage Lender").

22.     In addition to the Mortgage, USI executed a Loan Agreement, dated May 8, 2018, between USI and the Original Mortgage Lender (the "Mortgage Loan Agreement," and together with Mortgage and all other documents executed in connection with the Mortgage Loan, the "Mortgage Loan Documents").

23.     Prior to the Foreclosure Sale, USI was wholly owned by USSM.

24.     USSM's ownership interest in USI was encumbered by a pledge securing a $100 million loan made to USSM by Lender (the "Mezz Loan").  The terms of the Mezz Loan are set forth in, among other documents, a Mezzanine Loan Agreement, dated May 8, 2018, between USSM and Lender (the "Mezz Loan Agreement").

25.     The terms of USSM's pledge of its ownership interest in USI to Lender are set forth in a Pledge and Security Agreement, dated May 8, 2018, between USSM and Lender (the "Pledge Agreement," and together with the Mezz Loan Agreement and all other documents executed in connection with the Mezz Loan, the "Mezz Loan Documents").

26.     Under the Pledge Agreement, USSM gave Lender a first priority security interest in "all Pledged Company Interests, including, without limitation, the status as a member of Mortgage Borrower [i.e., USI] and all economic, voting and managerial rights and powers of Pledgor [i.e., USSM] in Mortgage Borrower."

27.     "Pledged Company Interests" are defined as:

>       the limited liability company interests of Pledgor in Mortgage Borrower listed on Schedule 1 hereto, together with all limited liability company interest certificates evidencing ownership of such interests and all options or rights of any nature whatsoever which

may be issued or granted by Mortgage Borrower to Pledgor while this Agreement is in effect.

**Both USI and USSM Default Under Their Respective Loans**

28.     In May 2020, USI and USSM both defaulted under their respective loans.

29.     In response, Lender and the Original Mortgage Lender provided USSM and USI with the opportunity to cure their defaults.  The parties agreed to a forbearance period in which Lender would not take action against USSM and extended millions of dollars in protective advances to provide USSM an opportunity to bring the Mezz Loan back into good standing.

30.     Pre-exercise of Lender's rights, Ashkenazy, as USI's then-manager, worked with the property-management company, Jones Lang LaSalle Americas, Inc. ("JLL"), to submit a funding request to Lender on a monthly basis along with a summary of expenses.

31.     When Ashkenazy served as manager for USI (pre-May 13, 2022), AAC had a Master Management Agreement with JLL (the "Master Agreement").  AAC served as "asset manager" for a number of properties in which Ashkenazy had an interest, and the Master Agreement allowed Ashkenazy to retain JLL to perform property-management functions at a number of different Ashkenazy-owned properties around the country, including the leasehold position at Union Station.

32.     If Lender required additional information about particular bills or expenses, that information was provided.  If Lender had questions about the property management, those questions were answered.

33.     Lender would then fund the request.

34.     Lender would deposit the funds into a bank account for Union Station that was controlled jointly by Ashkenazy and JLL.

35.     JLL would then issue the checks, and Ashkenazy would sign and pay the expenses from the funds advanced by Lender.

36.     These expenses included cleaning, payroll, ground rent, and utilities.

37.     Ultimately, Lender agreed to provide USSM with a forbearance on the Mezz Loan until September 2022, provided that USI resumed making payments to the Original Mortgage Lender in March 2021.

38.     Although USI and USSM agreed to the terms of forbearance, they failed to live up to their obligations.  USI and USSM never made any of the agreed-upon payments, including reimbursing Lender for its legal fees by December 2020 in an amount totaling $110,000.

39.     As a result of USSM's failure to cure the defaults and otherwise satisfy the terms of forbearance, on November 12, 2021, Lender accelerated the Mezz Loan.

40.     USI similarly failed to cure its default on the Mortgage Loan.

41.     On November 19, 2021, the Original Mortgage Lender noticed a foreclosure sale under the Mortgage.

42.     On November 22, 2021, Lender noticed a foreclosure sale of the Mezz Loan to be held on January 4, 2022.

43.     Neither USI, USSM, nor Ashkenazy objected to either of the noticed foreclosure sales.

44.     In January 2022, to protect its position, Lender purchased the Mortgage Loan for approximately $358 million to cover the full amount of outstanding principal and reimburse the original lender for operating expenses that it covered after USI ceased funding the property in May 2020.  Lender thereby assumed the rights and obligations of the Original Mortgage Lender under the Mortgage Loan Agreement.

45.     Lender voluntarily cancelled the pending foreclosure sales, even though USI and USSM remained in default.

46.     Indeed, at the time that the Foreclosure Sale on the Mezz Loan proceeded in June of 2022, neither USI nor USSM had made a full payment on either the Mortgage Loan or the Mezz Loan since May 2020.

**The Pledge Agreement Provided Lender Expansive Remedies**

47.     In the event that USSM defaulted on the Mezz Loan, the Pledge Agreement entitled Lender to, among other remedies, have all of USSM's interests in USI registered in Lender's name; exercise all voting, managerial, and other rights pertaining to those interests; exercise all voting, managerial, and other powers of ownership pertaining to USI as if Lender were the sole and absolute owner thereof; and serve as the attorney-in-fact for USSM.

48.     Section 8(a) of the Pledge Agreement provides, in relevant part, that:

> If an Event of Default shall occur and be continuing, then all such Pledged Company Interests at Lender's option and in accordance with an exercise of remedies pursuant to the terms of this [Pledge Agreement], shall be registered in the name of Lender or its nominee (if not already so registered), and Lender or its nominee may thereafter exercise (i) all voting, managerial, limited liability company and other rights pertaining to the Pledged Company Interests and the business and affairs of [USI] . . . .

49.     Section 9(a) of the Pledge Agreement provides, in relevant part, that:

> If an Event of Default shall occur and be continuing, Lender may, in addition to all other rights and remedies granted in this [Pledge Agreement] and in any other instrument or agreement securing, evidencing or relating to the Debt: (i) exercise all rights and remedies of a secured party under the Code (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, managerial, consensual and other powers of ownership pertaining to the Collateral under [USI]'s

Operating Agreement as if Lender were the sole and absolute owner thereof (and [USSM] agrees to take all such action as may be appropriate to give effect to such right) . . . .

50.    Section 13 of the Pledge Agreement provides, in relevant part, as follows:

Attorney-in-Fact.  Without limiting any rights or powers granted by this [Pledge Agreement] to Lender, Lender is hereby appointed, . . . the attorney-in-fact of Pledgor for the purpose of carrying out the provisions of this [Pledge Agreement] and taking any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes hereof including, without limitation: (a) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral . . . (d) to register all Pledged Company Interests in the name of Lender or its nominee (if not already so registered) in connection with the election of Lender to do so as provided for in Section 8 [of this Pledge Agreement]. . . .

## Amtrak Filed a Declaration of Taking on the Leasehold Interest of Union Station

51.    On April 14, 2022, Amtrak filed a declaration of taking, claiming to exercise its limited statutory authority to condemn the leasehold interest in Union Station held by USI (the "Condemnation Action").  *See Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Interest Pertaining to Described Leasehold Interests at Washington Union Station, et al.*, 1:22-cv-01043-APM (D.D.C.).

52.    USI, USSM, and Lender were named as defendants in the Condemnation Action.

53.    Lender filed an answer objecting to Amtrak's purported taking, challenging Amtrak's authority to condemn the entirety of the leasehold as necessary for intercity passenger rail transportation and Amtrak's estimated just compensation as being inadequate.

54.    Two answers were filed on behalf of USI, as discussed below.

55.    Section 5.2.2 of the Mezz Loan Agreement addresses the possibility of a condemnation.  It reads as follows (emphasis added):

Condemnation. USSM shall provide Lender with copies of any written notice received by Borrower or Mortgage Borrower of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all notices or papers served in connection with such Condemnation or related proceedings promptly upon obtaining knowledge thereof (Lender acknowledging that Borrower shall have complied with this covenant with respect to any Condemnation that is not a Material Condemnation if Borrower delivers or causes Mortgage Borrower to deliver such written notice to Lender by no later than the end of the calendar quarter in which Borrower or Mortgage Borrower first obtained such knowledge). Borrower may settle and compromise or may permit Mortgage Borrower to settle and compromise any Material Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall from time to time deliver or shall cause Mortgage Borrower from time to time to deliver to Lender all instruments reasonably requested by Lender to permit such participation. Borrower shall, at its cost and expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents and the Debt shall not be reduced until any Net Liquidation Proceeds After Debt Service shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by any Governmental Authority, but shall be entitled to receive out of the Net Liquidation Proceeds After Debt Service interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by any Governmental Authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of Section 5.3 of

the Mortgage Loan Agreement. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.

## After USI and USSM Defaulted, Lender Properly Exercised its Available Remedies

56.     Section 5.2.2 is additive to Lender's rights, not restrictive.  Indeed, nowhere does it say that condemnation extinguishes any rights granted to Lender.

57.     Specifically, Sections 10.4 of the Mezz and Mortgage Loan Agreements reads as follows (emphasis added):

> Remedies Cumulative. <u>The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole and absolute discretion.</u> No delay or omission to exercise any right, power or remedy accruing upon an Event of Default shall impair any such right, power or remedy or shall be construed as a waiver thereof, but any such right, power or remedy may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any right, power or remedy consequent thereon.

58.     Similarly, Sections 9(a) and (b) of the Pledge Agreement provide that (emphasis added):

> (a)     If an Event of Default shall occur and be continuing, Lender may, <u>in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt</u>:
>
> (i)     exercise all rights and remedies of a secured party under the [Uniform Commercial] Code (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and

> remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted . . .
>
> (b)      Without limiting the generality of the foregoing, if an Event of Default shall occur and be continuing, Lender . . . may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales. . . .  Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor [i.e., USSM], which right or equity of redemption is hereby waived or released.

59.     Accordingly, Lender was free to exercise its other rights and remedies provided under the Loan Documents based on the continuing default by USI and USSM – regardless of Amtrak's attempt to condemn the leasehold interest.

60.     On May 13, 2022, Lender sent USSM three separate letters exercising its rights under Sections 8(a), 9(a), and 13 of the Pledge Agreement.

61.     Specifically, Lender notified USSM that it was exercising its rights under Section 9(a) of the Pledge Agreement and automatically became vested with the right to act as owner of USI.

62.     The letter exercising Lender's rights under Section 9(a) of the Pledge Agreement stated in part:

> [Lender] hereby notifies You and confirms that [Lender], pursuant to Section 9(a)(i) of the Pledge Agreement, has exercised its right "to exercise all voting, managerial, consensual and other powers of ownership pertaining to the Collateral under Mortgage Borrower's Operating Agreement as if Lender were the sole and absolute owner thereof[.]"
>
> In accordance with its rights under Section 9(a)(i) of the Pledge Agreement, [Lender] hereby advises You that, effective immediately, it has amended the Second Amended and Restated Limited Liability Company Agreement of USI as in effect on the

date hereof ("Operating Agreement") to eliminate the second sentence in Section 9(a) of the Operating Agreement, and to appoint William H. Henrich of Getzler Henrich & Associates as the new manager under the Operating Agreement ("New Manager").

[Lender] hereby (i) notifies Ben Ashkenazy ("Ashkenazy") that you are no longer the manager, and accordingly, you are prohibited from taking any actions in the capacity as manager on behalf of USI, and (ii) demands and directs You to turn over all corporate books and records to the New Manager immediately, with copies to Morrison Cohen.

63. Included with the letter was an amendment to the Operating Agreement, described above. By amendment to the Operating Agreement, William Henrich became the new manager for USI.

64. By exercising its rights under Section 9(a), Lender automatically acquired the full control rights over USI.

65. Lender also notified the relevant parties that it was exercising its rights under Section 8(a) of the Pledge Agreement.

66. Lender's notice stated in relevant part:

[Lender] is exercising its rights pursuant to Section 8(a) of the Pledge, and hereby exercises [Lender]'s option to have all Pledged Company Interests (as defined in the Pledge Agreement) registered in [Lender]'s name. [Lender] hereby directs USI immediately to register all Pledged Company Interests in [Lender]'s name, so that [Lender] is the sole member of USI. This instruction must be complied with by USI with no further instruction from Pledgor under Section 18(h) of the Pledge Agreement.

67. Finally, Lender provided notice that it was exercising its rights under Section 13 of the Pledge Agreement. Under this provision, Lender is entitled to act as attorney-in-fact for USSM following an Event of Default. Lender has the express authority not only to sue, but also to register all ownership interests in USI in connection with Lender's exercise of its rights under Section 8 of the Pledge Agreement.

68.     Under each section of the Pledge Agreement set out above, Lender validly exercised its rights, assumed voting and management control of USI as if it were the owner of USI, became the attorney-in-fact, and amended the Operating Agreement to replace Ashkenazy with Henrich as manager of USI.  By virtue of Lender's exercise of its rights under the parties' loan documents, USSM ceased to have any control over USI, and all voting and control rights were vested in Lender.

69.     USSM ignored each of these exercises, refusing to acknowledge that Lender had voting and management control of USI, Ashkenazy had been replaced as manager, and Lender could act as the attorney-in-fact.

**On June 14, 2022, Lender Foreclosed on the Mezz Loan**

70.     In response to USSM's continuing default on the Mezz Loan, on May 13, 2022, Lender provided its Notice of Disposition of Collateral via a Public Foreclosure Sale under Article 9 of the UCC and Reservation of Rights to USSM ("Notice of Disposition of Collateral").  The Foreclosure Sale was marketed and scheduled for June 14, 2022.

71.     When Lender filed its answer in the Condemnation Action on May 17, 2022, Lender also made reference to the upcoming sale.

72.     The Foreclosure Sale was conducted by Cushman & Wakefield, as the marketing and sales agent, in a commercially reasonable manner that included extensive marketing in publications like the *New York Times*, the *Washington Post*, and various commercial real estate news sources.  Leading up to the sale, 134 confidentiality agreements were approved to view the documents.  Of the parties signing confidentiality agreements, 70 viewed materials on the data site.

73.     Lender was the only qualified purchaser at the Foreclosure Sale.  Lender purchased the USI Equity for $140,535,334.53 and assigned the rights to Union Station Sub.

74.     Lender now owns all the right, title, and interest in and to USI.

75.     USSM continues to exist, but it no longer has any legal or beneficial interest in USI.

76.     No one contested the Foreclosure Sale.  USSM neither sought to enjoin the Foreclosure Sale in a court of law, nor challenged the validity or propriety of the Foreclosure Sale.

77.     As a result of an uncontested foreclosure of the USI Equity on June 14, 2022, USSM no longer has any stake in USI.  The Foreclosure Sale also terminated USSM's right to any condemnation proceeds.  USSM was only entitled to collect proceeds left over from the Foreclosure Sale, of which there were none.  The loans remain unpaid, and USSM's interest has been fully extinguished.

78.     On June 15, 2022, Lender informed USSM, Ashkenazy, and other relevant parties that USSM's ownership interest in USI was disposed of by a public foreclosure sale under Article 9 of the UCC.

**USSM, through Ashkenazy, Continues to Interfere With and Hinder Lender's Rights**

79.     Although USSM had agreed to the rights and remedies provided to Lender under the Pledge Agreement in connection with a default of the Mezz Loan, USSM and Ashkenazy have refused to recognize – and instead have actively frustrated and hindered – Lender's proper exercise of those rights.

80.     Pursuant to Section 9(a) of the Pledge Agreement and the revised Operating Agreement, Lender properly appointed Henrich to assume the management of USI from Ashkenazy.

81.     USSM and Ashkenazy have refused to acknowledge Henrich as the authorized manager of USI.

82.     On May 19, 2022, at the direction of Henrich, USI filed an answer challenging Amtrak's declaration of taking in the Condemnation Action.

83.     USSM, at Ashkenazy's direction, ignored Henrich's authority, and sowed confusion by filing an answer on May 19, 2022, purportedly on behalf of both USSM and USI through Ashkenazy.

84.     The USSM Answer incorrectly purports to represent USI when Ashkenazy no longer has any management control over USI's actions.

85.     On April 28, 2022, Lender terminated JLL as property manager pursuant to its rights under the loan documents.  USI, through Henrich, intended to engage Cushman & Wakefield ("C&W") with a new property-management agreement to replace JLL and to ensure that the property manager took direction from USI, not Ashkenazy or AAC.

86.     USI, through Henrich, proceeded to work with JLL and C&W on the transition of property management.

87.     In the course of the Condemnation Proceeding, Lender agreed to rescind its notice to terminate JLL, and USI joined with Lender in agreeing not to take action to replace or terminate JLL at that time.

88.     JLL subsequently prepared a contract to enter into with Henrich directly as the newly appointed manager of USI.  Henrich ceased discussions with C&W.

89.     Ashkenazy objected to JLL contracting with USI directly and directed JLL to cease discussions of the contract.

90.     Post-foreclosure, USSM has similarly ignored Lender's rights to manage and control USI as the sole member of the entity.

91.     In its June 15 notice to USSM and interested parties about the Foreclosure Sale and the change in ownership, Lender requested that JLL execute a new property-management agreement with USI directly to continue managing Union Station.

92.     JLL responded that it would "review internally" and revert back.

93.     When Lender reached out again, JLL stated that it was "still operating under the existing management agreement" with Ashkenazy and that it was "receiving conflicting information, direction and instruction from the parties to the foreclosure proceedings and the eminent domain proceedings."

94.     Lender attempted to work out a practical solution with JLL, but JLL refused to engage substantively with Lender's requests.

95.     A few days before the Foreclosure Sale, Lender received a funding request from Ashkenazy for June expenses amounting to approximately $600,000.  After the Foreclosure Sale, Lender learned from JLL that the immediate need for funding was actually $1.2 million to cover the property expenses and currently due bills.  JLL also informed Lender that the checks had been prepared by JLL but not issued because the bank account did not have sufficient funds.

96.     Lender requested additional information about these funding needs from JLL because USSM and Ashkenazy no longer had control over USI or the management of Union Station.  Rather than fund hundreds of thousands of dollars into a bank account controlled by an individual who no longer had any interest in the asset, Lender worked to pay the vendors directly.

97.     JLL refused to give Lender any information at the direction of Ashkenazy.

98.    Ashkenazy continued to hold himself out as the manager of USI and directed JLL and other third parties to report only to Ashkenazy (or his affiliated entities).  Ashkenazy directed JLL to not provide Lender any information or continue communicating with Lender about the station.

99.    On June 23, 2022, Lender's counsel received a letter from counsel for USSM and purportedly USI under Ashkenazy's direction.  In the letter, counsel demanded that Lender continue to fund for the property's operations through Ashkenazy as if the foreclosure had not taken place.  Counsel demanded that Lender cease communications with JLL because JLL would continue to "take direction from AAC."

100.    On June 23, 2022, Lender demanded that Ashkenazy cease its interference with Lender's rights.  In a letter from Lender's counsel, Lender informed Ashkenazy that it was "endeavoring to maintain JLL as a manager, but that requires JLL to enter into a contract with Lender since, following the foreclosure, Ashkenazy has no right to manage or retain a manager for the property."  (Scharf Decl. at ¶ 9, Ex. C).  Ashkenazy has ignored Lender's demand.

101.    On June 29, 2022, counsel for Lender emailed JLL to propose another workaround solution involving a JLL-controlled bank account in which Lender could deposit the requested funds.

102.    By email on July 1, 2022, JLL advised Lender that it will only continue to work via the existing management agreement that it has with Ashkenazy.

103.    As a result of this interference, Lender was forced on its own to locate payment information for utility accounts and vendors and make the payments directly.

104.    Lender has also made payments due to the landlord directly, including charges for ground rent, reserves, and water and sewer reimbursement.  USI, under Lender's direction, is current with its landlord.

105.    On July 11, 2022, counsel for USSM and Ashkenazy sent Lender's counsel an email with a spreadsheet listing Union Station's cash needs for July.  At this point, Lender still had not received supporting documentation for June expenses that were originally requested on June 9.

106.    Needing supporting documentation to verify the requested expenses, Lender asked USSM and Ashkenazy again to provide the invoices supporting the listed expenses.  On July 12, Lender received supporting invoices for July expenses.

107.    Lender again requested information supporting the June funding request, which USSM and Ashkenazy finally provided.  The supporting invoices for June should have been provided more than a month prior.

108.    On July 19, 2022, JLL sent Lender an email claiming that the power supplier PEPCO was going to disconnect service at the station and trying to blame Lender for the late payment.  In reality, Lender had already paid the PEPCO bills based on the information it had obtained on its own directly from the provider.

109.    On July 20, 2022, JLL sent Lender an email regarding Washington Gas threatening to shut off services.  Lender already paid those bills, again acting on its own initiative.

110.    On July 22, 2022, counsel for USSM sent Lender's counsel disconnect notices received by Ashkenazy regarding gas service for Union Station.  Lender's counsel confirmed that these invoices were already paid because of Lender's diligence in finding ways to make payments to vendors directly.

111.    Apart from the interference with JLL and the funding of the station's operations, Ashkenazy has also directed others to not discuss the management of the station with Lender. Specifically, Ashkenazy falsely informed USI's landlord that Lender was not authorized to act on USI's behalf.  USSM and Ashkenazy have made similar misrepresentations to the court in the Condemnation Action.

**The Continued Interference Threatens Lender With Irreparable Harm**

112.    USI remains in control of the Union Station leasehold management and possession rights, as Lender and the other defendants fight against Amtrak's attempt to condemn the property interest in the Condemnation Action.

113.    Under the remedies provided by the Loan Documents, upon an Event of Default – which has indisputably occurred and has been continuing since May 2020 – Lender is entitled to exercise its bargained-for control over USI.

114.    Lender properly exercised its contractual remedies, culminating in the Foreclosure Sale of the Mezz Loan.  Absent declaratory and injunctive relief, USSM refuses to cede control of the Union Station leasehold management and possession rights, and Ashkenazy continues to interfere with Lender's obligation to manage and operate the station.

115.    Because USSM pretends that the Foreclosure Sale did not occur or had no effect, USSM continues to demand that Lender fund the operating expenses through a bank account controlled by Ashkenazy, who has no remaining interest in Union Station.  In one breath USSM demands that Lender finance the operation of the station as it had done prior to Lender exercising its rights and remedies under the Loan Documents, and in the other breath USSM and Ashkenazy direct JLL and other third parties to not share customary and necessary information with Lender.

116.    Lender is the sole owner of the USI Equity and thus has an obligation to operate and manage Union Station effectively.  USSM is directly interfering with Lender's obligations by undermining Lender's authority, instructing others to ignore Lender's requests, and demanding the driver's seat of a vehicle it no longer owns.

117.    Even pre-foreclosure, Lender had the authority to act as USSM's attorney-in-fact under Section 5.2.2 of the Mezz Loan Agreement.  USSM and Ashkenazy refuse to recognize that Lender has the exclusive authority to make any compromise or settlement in a condemnation proceeding, impeding Lender's ability to resolve the Condemnation Action by settlement.

118.    This situation is untenable and requires urgent relief because neither USSM nor Ashkenazy has any stake in Union Station anymore.  USSM still exists as an entity, but USSM no longer has any right, title, or interest in or to USI.  Lender's ability to manage Union Station is being actively undermined by Ashkenazy and USSM who, having lost their stake in Union Station, now seek to sabotage Lender's legal and contractual rights, even if it means disrupting the management of the property.

119.    Exacerbating this situation, USSM and Ashkenazy have not paid any of the costs of operating Union Station.  Lender is thus being asked to fund Union Station's operations, while being denied transparency into and control over Union Station's management.

120.    As a result of the continued interference by USSM (through Ashkenazy), Lender brought an emergency motion in the Condemnation Action to seek approval to contract directly with JLL or, in the alternative, permission to contract with C&W.  In conjunction with a motion filed by USSM to strike the answer filed by USI under Henrich's direction, the issue of which entity controlled USI was fully briefed before that court.

121.    Citing limited jurisdiction based on the federal question raised by Amtrak's condemnation authority, the court declined to rule on the effect of the Foreclosure Sale and the resulting control over USI, instead advising the parties to bring a lawsuit elsewhere.

122.    The Court directed the parties to meet and confer over how to address the pending motions by way of stipulation.

123.    Lender spent the week negotiating with USSM in good faith over the language used in the stipulations to submit to the court in the Condemnation Action.

124.    In the proposed stipulation regarding Lender's emergency motion, Lender proposed language regarding the management and operations of Union Station that reflected the effect of the Foreclosure Sale, and USSM and Ashkenazy flatly refused.  Rather, USSM and Ashkenazy continue to claim that JLL should provide property management services under the direction of AAC, without Lender's involvement.

125.    In the proposed stipulation regarding the motion to strike, USSM and Ashkenazy refused to acknowledge that Lender had the exclusive authority under Section 5.2.2 of the Mortgage and Mezz Loan Agreements to act as the attorney-in-fact with the power to make any compromise or settlement in connection with the Condemnation Action.  USSM and Ashkenazy also refused to agree to not interfere in Lender's efforts to settle the Condemnation Action.

126.    The parties were unable to come to an agreement and ceased exchanging proposals.

127.    The parties filed a joint status report with the court stating that the parties were unsuccessful in resolving the disputes.

128.    Lender subsequently withdrew its emergency motion without prejudice.

129.    With this impasse, Lender was left no choice other than immediately filing this action under the diversity jurisdiction of this Court to determine the effect of Lender's exercise of rights and remedies provided under the Mezz Loan Documents.

130.    Lender has no adequate remedy at law and will continue to suffer substantial and irreparable harm unless USSM is enjoined as requested below.

131.    Greater injury will be inflicted upon Lender by the denial of the requested relief than will be inflicted on USSM by the granting of this relief.

**FIRST CLAIM FOR RELIEF**
**(Declaratory Judgment)**

132.    Lender repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

133.    The Mezz Loan Agreement and the Pledge Agreement are valid and enforceable contracts governing the relationship of Lender and USSM.

134.    In May 2020, USSM defaulted on the Mezz Loan.

135.    Under Section 5.2.2 of the Mezz Loan Agreement, during an event of default, Lender is entitled to act as the attorney-in-fact for USSM and Lender has the exclusive power to collect, receive, and retain a condemnation award and make any compromise or settlement in connection with the Condemnation Action.

136.    After USSM failed to cure its default, on May 13, 2022, Lender duly noticed a UCC public foreclosure sale for the USI Equity to be held on June 14, 2022.

137.    The Foreclosure Sale was conducted by Cushman & Wakefield, as the marketing and sales agent, in a commercially reasonable manner that included extensive marketing with publication in the *New York Times*, the *Washington Post*, and other commercial real estate news sources.  Leading up to the sale, 134 confidentiality agreements were approved to view the

documents.  Of the parties signing confidentiality agreements, 70 viewed materials on the data site.

138.   On June 14, 2022, the Foreclosure Sale was held as planned.

139.   Lender was the highest bidder at the public auction, purchasing the USI Equity for $140,535,334.53 and assigning the rights to Lender's nominee, Union Station Sub.

140.   A justiciable controversy exists because USSM refuses to acknowledge both Lender's exclusive rights under Section 5.2.2 of the Mezz Loan Agreement entitling Lender to act as USSM's attorney-in-fact in the Condemnation Action and Lender's ownership of the USI Equity entitling Lender to manage Union Station.

141.   Lender is entitled to a judgment declaring that:  (a) Lender is entitled under Section 5.2.2 of the Mezz Loan Agreement to act as USSM's attorney-in-fact with exclusive power to collect, receive, and retain any condemnation award and with exclusive power to make a compromise or settlement in connection with the Condemnation Action; and (b) all of USSM's right, title, and interest in and to USI have been extinguished by the foreclosure sale, and Lender is now the sole owner of USI.

142.   Monetary damages are insufficient to remedy the irreparable harm caused to Lender.  Permanent injunctive relief enjoining USSM, its officers, directors, members, employees, agents, and all those acting in concert with any of them from interfering with Lender's attorney-in-fact rights and Lender's right, title, and interest in and to USI is warranted.

**WHEREFORE,** Lender respectfully requests judgment in its favor as follows:

(a) Declaring that under Section 5.2.2 of the Mezz Loan Agreement, Lender is entitled to act as USSM's attorney-in-fact and that on the basis of the

Foreclosure Sale, all of USSM's right, title, and interest in and to USI have been extinguished, and Lender is now the sole owner of USI;

(b) Restraining, enjoining, and prohibiting USSM, its officers, directors, members, employees, agents, and all those acting in concert with any of them (the "Restrained Parties"), during the pendency of this action, from:

    a.  Holding itself out as the owner of USI or otherwise having an interest in the management or operation of Union Station;

    b.  Collecting bills and invoices from utilities, vendors, and other third parties with regard to Union Station;

    c.  Directing the current property-management company, JLL, in regards to the management, operation, and funding of Union Station;

    d.  Writing checks for the operation or funding of Union Station;

    e.  Negotiating renewal leases with or terminating leases of current tenants of Union Station;

    f.  Negotiating new leases with prospective tenants of Union Station;

    g.  Informing third parties to direct matters and concerns about Union Station to USSM rather than Lender; and

    h.  Otherwise interfering with Lender's rightful ownership of USI.

(c) Restraining, enjoining, and prohibiting the Restrained Parties (as defined above), during the pendency of this action, from interfering with Lender's rights under Section 5.2.2 of the Mezz Loan Agreement to act as the attorney-in-fact for USSM, with Lender having the exclusive power to collect, receive, and

retain any condemnation award and having the exclusive power to make any compromise or settlement in connection with the Condemnation Action; and

(d) Granting Lender such other relief as the Court deems just and proper.

Dated: New York, New York
       August 4, 2022

                                MORRISON COHEN LLP

                                By: */s/ Y. David Scharf*          
                                      Y. David Scharf
                                      Brett Dockwell
                                      Kristin T. Roy
                                      Latisha V. Thompson
                                      Amber R. Will
                              909 Third Avenue
                              New York, New York 10022
                              (212) 735-8600
                              dscharf@morrisoncohen.com