UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAOL REXMARK UNION STATION LLC; and KOOKMIN BANK CO., LTD., in its capacity as trustee of KTB CRE DEBT FUND NO. 8, a Korean Investment Trust, by its agent in Korea DAOL FUND MANAGEMENT CO. and by its agent in United States REXMARK HOLDINGS LLC d/b/a REXMARK,<br><br>                     Plaintiffs,<br>    v.<br><br>UNION STATION SOLE MEMBER, LLC,<br><br>                     Defendant. | Case No. _____ |

**DECLARATION OF MICHAEL REBIBO IN SUPPORT OF LENDER'S ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

1. I am the Founder and Managing Principal of Rexmark Holdings LLC d/b/a Rexmark ("Rexmark"), a real-estate-investment management firm focused on debt and equity investments throughout the United States and Europe. I make this declaration on behalf of Plaintiffs Daol Rexmark Union Station LLC ("Union Station Sub") and Kookmin Bank Co., Ltd., individually and in its capacity as trustee ("Kookmin" or "Trustee"), of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"). The Trust's agent in Korea is Daol Fund Management Co. ("Daol"), and the Trust's agent in United States is Rexmark (together with Union Station Sub, Trustee, the Trust, and Daol, "Lender").

2. This declaration is submitted in support of Lender's order to show cause for a preliminary injunction (the "Order to Show Cause"). I am over 18 years of age and have personal knowledge of the facts set forth herein.

**Lender's Need for Urgent Relief**

3. This case boils down to some basic facts: A lender entered into a mezzanine loan agreement with a mezzanine borrower, who subsequently defaulted. The lender foreclosed on the mezzanine loan, purchased the collateral at the foreclosure sale, and the mezzanine borrower's rights in the collateral were terminated. Unable to face the facts, the mezzanine borrower is refusing to relinquish control over the collateral, forcing the lender to seek judicial adjudication.

4. Here, Defendant Union Station Sole Member, LLC ("USSM") is a borrower that defaulted on a $100 million mezzanine loan (the "Mezz Loan") and was foreclosed upon at a duly advertised public auction pursuant to the Uniform Commercial Code (the "UCC"), but refuses to relinquish control of the collateral to Lender who purchased the collateral at the sale on June 14, 2022.

5. Rexmark has an obligation to Lender to recover its investment made to USSM and non-party Union Station Investco, LLC ("USI"). As of the date of this filing, Lender is owed more than $560 million in connection with the certain mortgage loan agreement between USI and Lender's predecessor (the "Mortgage Loan Agreement") and the certain mezzanine loan agreement between USSM and Lender (the "Mezz Loan Agreement"). To protect its interests and financial investment, Lender foreclosed on the Mezz Loan, but USSM refuses to cede control.

6. With each day that USSM ignores Lender's rights, Lender suffers irreparable harm. Lender is entitled to its bargained-for rights to control the management of USI. USI, in turn, currently has the right to possession and control over the leasehold interest in Washington Union Station ("Union Station"), thereby having obligations to manage and operate the station. Lender has an obligation to fund the operating expenses of Union Station through USI, but USSM and Ashkenazy have directed the property-management company and other third parties to cease communication with and withhold information from Lender. USSM and Ashkenazy have

demanded that all payments continue to flow through an Ashkenazy-related entity as it had done pre-exercise of Lender's rights. But neither USSM nor Ashkenazy have any remaining right, title, or interest in or to USI or Union Station. Lender requires and has demonstrated the urgent need for injunctive relief enjoining USSM and those acting on its behalf from interfering with Lender's rights under the loan documents and Lender's ownership of USI as specifically delineated in the Order to Show Cause. Given the urgency of this untenable situation, Lender requests that the Court expedite the briefing schedule to ensure that Lender's rights are adjudicated with the least damage caused from USSM's interference.

**The Loan Documents**

7. Lender holds two loans made with respect to the ground lease of Union Station. True and correct copies of the Mortgage and Mezz Loan Agreements are attached hereto as Exhibits A and B, respectively.

8. Lender entered into the Mezz Loan with USSM for the original principal amount of $100 million that was secured by one piece of collateral: USSM's membership interest in USI (the "USI Equity"). In conjunction with the Mezz Loan Agreement, USSM and Lender entered into a pledge and security agreement (the "Pledge Agreement") that provided, among other things, various rights to Lender if USSM defaulted on the Mezz Loan, including foreclosure on the USI Equity. A true and correct copy of the Pledge Agreement is attached hereto as Exhibit C.

9. Under the Pledge Agreement, USSM gave Lender a first priority security interest in USSM's interests in USI, "including, without limitation, the status as a member of [USI] and all economic, voting and managerial rights and powers of [USSM] in [USI]." Ex. C at § 2(i).

10. USI had separately taken out a mortgage loan in the original principal amount of $330 million, secured by its ground lease for Union Station (the "Mortgage Loan"). That mortgage

loan is also in default. In January of 2022, Lender purchased the Mortgage Loan from the original lender for approximately $358 million.

**USSM and USI Default on Their Loans, and Lender Properly Exercises its Rights**

11. In May 2020, both USSM and USI defaulted on their loans. Lender initially agreed on a forbearance period in which Lender would not take action against USSM and extended millions of dollars in protective advances to provide USSM an opportunity to bring the Mezz Loan back into good standing.

12. For the past two years, Lender has funded the continuing obligations for the management of Union Station by providing advances necessary to discharge the operating expenses of the station. Neither USSM nor USI have made a single payment on their debt owed to Lender since May 2020.

13. On April 14, 2022, without warning to Lender, Amtrak filed a quick take proceeding in the U.S. District Court for the District of Columbia. (*Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Interest Pertaining to Described Leasehold Interests at Washington Union Station, et al.*, 1:22-cv-01043-APM (D.D.C.), the "Condemnation Action.") Amtrak asserted that it had taken over the titular ownership of USI's leasehold interest.

14. Under the Mortgage and Mezz Loan Agreements, Lender has the exclusive right to make any compromise or settlement in a condemnation proceeding. Exs. A and B at § 5.2.2. Lender sent notice to all relevant parties that Lender was in charge of settlement discussions.

15. USSM and its beneficial owner, Ben Ashkenazy (who also served as manager for USI before being replaced in May 2022), ignored Lender's exclusive rights to settle the Condemnation Action.

16. On May 13, 2022, Lender sent notices that Lender was exercising its rights under the Pledge Agreement. True and correct copies of three notice letters exercising rights under

4

Sections 8(a), 9(a), and 13 are attached hereto as Exhibits D-F. Among other rights, Lender exercised its rights under Section 13 that allowed Lender to act as the attorney-in-fact. Ex. C at § 13; Ex. F.

17. USSM and Ashkenazy again ignored Lender's exercise of rights and instead claimed to the court in the Condemnation Action that all of Lender's rights not included within the provision addressing condemnations – Section 5.2.2 – were extinguished as of the date of Amtrak's purported taking. *See* Condemnation Action, ECF Doc. No. 55-1 at 12-17.

18. Nothing in Section 5.2.2 addresses a limitation on Lender's additional rights:

> Condemnation. USSM shall provide Lender with copies of any written notice received by Borrower or Mortgage Borrower of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all notices or papers served in connection with such Condemnation or related proceedings promptly upon obtaining knowledge thereof (Lender acknowledging that Borrower shall have complied with this covenant with respect to any Condemnation that is not a Material Condemnation if Borrower delivers or causes Mortgage Borrower to deliver such written notice to Lender by no later than the end of the calendar quarter in which Borrower or Mortgage Borrower first obtained such knowledge). <u>Borrower may settle and compromise or may permit Mortgage Borrower to settle and compromise any Material Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall from time to time deliver or shall cause Mortgage Borrower from time to time to deliver to Lender all instruments reasonably requested by Lender to permit such participation.</u> Borrower shall, at its cost and expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, <u>Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to</u>

> collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents and the Debt shall not be reduced until any Net Liquidation Proceeds After Debt Service shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by any Governmental Authority, but shall be entitled to receive out of the Net Liquidation Proceeds After Debt Service interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by any Governmental Authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of Section 5.3 of the Mortgage Loan Agreement. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.

Ex. B at § 5.2.2 (emphasis added).

19. Rather, each of the Mortgage Loan Agreement, Mezz Loan Agreement, and Pledge Agreement contain explicit provisions that Lender's rights are cumulative.

20. Section 10.4 of the Mezz Loan Agreement states in relevant part (emphasis added):

> The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower [i.e., USSM] pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.

Ex. B at § 10.4 (emphasis added); *see also* Ex. A at § 10.4.

21. Section 9(a)-(b) of the Pledge Agreement states in relevant part (emphasis added):

> (a) If an Event of Default shall occur and be continuing, Lender may, in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt:

> (i) exercise all rights and remedies of a secured party under the [Uniform Commercial] Code (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted . . .
>
> (b) Without limiting the generality of the foregoing, if an Event of Default shall occur and be continuing, Lender . . . may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales. . . . Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor [i.e., USSM], which right or equity of redemption is hereby waived or released.

Ex. C at § 9(a)-(b) (emphasis added).

22. USSM and Ashkenazy rely on Section 5.2.2 to support their misguided position. Yet, they refuse to recognize the express rights that provision affords to Lender. USSM and Ashkenazy refuse to concede that Section 5.2.2 provides Lender with the right to act as USSM's attorney-in-fact in the Condemnation Action. With that authority, Lender has the "exclusive power . . . to make any compromise or settlement in connection with" the Condemnation Action. Ex. B at § 5.2.2.

**Lender Forecloses on the Mezz Loan and Purchases the USI Equity**

23. On May 13, 2022, Lender also provided notice to the relevant parties that Lender would foreclose on the Mezz Loan. A true and correct copy of the Notice of Disposition of Collateral via a Public Foreclosure Sale under Article 9 of the UCC and Reservation of Rights to USSM is attached hereto as Exhibit G. The foreclosure sale was scheduled for June 14, 2022 (the "Foreclosure Sale").

24. Lender made reference to the upcoming Foreclosure Sale in its answer in the Condemnation Action. *See* Condemnation Action, ECF Doc. No. 35 at ¶ 19.

25. The Foreclosure Sale was conducted by Cushman & Wakefield, as the marketing and sales agent, in a commercially reasonable manner that included extensive marketing in publications like the *New York Times*, the *Washington Post*, and various commercial real estate news sources. Leading up to the sale, 134 confidentiality agreements were approved to view the documents. Of the parties signing confidentiality agreements, 70 viewed materials on the data site. A true and correct copy of the Foreclosure Sale Status Report is attached hereto as Exhibit H.

26. On June 14, 2022, Lender was the only qualified purchaser at the Foreclosure Sale. Lender purchased the USI Equity for $140,535,334.53 and assigned the rights to Union Station Sub. A true and correct copy of the memorandum of sale is attached hereto as Exhibit I, and the transcript of the Foreclosure Sale, and referenced exhibits, is attached hereto as Exhibit J.

27. USSM never objected to the sale even though it had been duly noticed and allowed to participate in the auction.

28. The Foreclosure Sale clearly extinguished all of USSM's right, title, and interest in and to USI. As of June 14, 2022, Lender became the sole owner of USI's membership interests. The following day, Lender notified all relevant parties about the change in management and control. A true and correct copy of the notice letter sent to USSM is attached hereto as Exhibit K.

**USSM and Ashkenazy Refuse to Cede Control**

29. Remarkably, USSM and Ashkenazy continue to refuse to step aside. In the Condemnation Action, USSM and Ashkenazy argued that Amtrak's filing of the declaration of taking extinguished all of Lender's rights and remedies in the loan documents except for those provided in Section 5.2.2. *See* Condemnation Action, ECF Doc. No. 55-1 at 12-17.

30. USSM demands that Lender continue to operate as if the foreclosure never occurred. Before Lender exercised its various rights, Ashkenazy was the manager of USI and USSM directed USI's functions as its sole owner. Since USSM and USI defaulted in May 2020, neither entity has paid a dollar into Union Station.

31. Pre-exercise of Lender's rights, Ashkenazy worked with the property-management company, Jones Lang LaSalle Americas, Inc. ("JLL"), to submit a funding request to Lender on a monthly basis along with a summary of expenses. If Lender required additional information about particular bills or expenses, that information was provided. If Lender had questions about the property management, those questions were answered. Lender would then fund the request by depositing funds into a bank account that was controlled jointly by Ashkenazy and JLL. JLL would then issue the checks, and Ashkenazy would sign and pay the expenses from the funds advanced by Lender.

32. Post-foreclosure, this process no longer makes sense. Ashkenazy has no control in USI and no basis to demand involvement in the management or operation of Union Station. It defies logic that Lender would deposit hundreds of thousands – sometimes millions – of dollars into a bank account jointly owned and controlled by Ashkenazy and Ashkenazy's agent, JLL, when Ashkenazy is no longer involved in the property.

33. Moreover, Lender had asked JLL to open a separate and independent bank account to fund the operating expenses of Union Station post-foreclosure and enter into a direct contract with USI for property-management services. In response, Ashkenazy directed JLL to cease communication and withhold information from Lender. The lack of communication led to service providers and other vendors issuing shutoff notices to USI for failure to remit payment.

34. Ashkenazy and JLL sent Lender various notices from vendors that threatened to shut off services. Lender, however, developed workarounds to pay service providers, even though Ashkenazy and JLL refused to provide Lender timely information, and was able to pay all vendors directly thanks to its own diligence. *See* Exs. L-N.

35. We took this fight to the court in the Condemnation Action to seek a judicial adjudication that the Foreclosure Sale was valid and extinguished USSM's right, title, and interest in and to USI. *See* Condemnation Action, ECF Doc. Nos. 59, 61-62, 63-68, 70-71, 73. In conjunction with a motion filed by USSM to strike the answer filed by USI under Henrich's direction, the issue of which entity controlled USI was fully briefed before that court. *See* Condemnation Action, ECF Doc. Nos. 55-58, 60.

36. Citing limited jurisdiction based on the federal question raised by Amtrak's condemnation authority, the court declined to rule on the effect of the Foreclosure Sale and the resulting control over USI, instead advising the parties to bring a lawsuit elsewhere.

37. The court directed the parties to meet and confer over how to address the pending motions by way of stipulation.

38. Lender spent the last week negotiating with USSM in good faith over the language used in the stipulations to submit to the court in the Condemnation Action.

39. In the proposed stipulation regarding Lender's emergency motion, Lender proposed language regarding the management and operations of Union Station that reflected the effect of the Foreclosure Sale, and USSM and Ashkenazy flatly refused. Rather, USSM and Ashkenazy continue to claim that JLL should provide property-management services under the direction of AAC, without Lender's involvement. A true and correct copy of a draft stipulation sent by USSM, showing the rejection of Lender's proposed language, is attached hereto as Exhibit O.

40. In the proposed stipulation regarding the motion to strike, USSM and Ashkenazy refused to acknowledge that Lender had the authority under Section 5.2.2 of the Mortgage and Mezz Loan Agreements – the provision USSM and Ashkenazy rely upon in their arguments – to act as the attorney-in-fact with the exclusive power to make any compromise or settlement in connection with the Condemnation Action. USSM and Ashkenazy also refused to agree to not interfere in Lender's efforts to settle the Condemnation Action. A true and correct copy of a draft stipulation sent by USSM, showing the rejection of Lender's proposed language, is attached hereto as Exhibit P.

41. The parties were unable to come to an agreement and ceased exchanging proposals. The parties filed a joint status report with the court stating that the parties were unsuccessful in coming to a resolution. *See* Condemnation Action, ECF Doc. No. 76. Lender subsequently withdrew its emergency motion without prejudice. *Id.* at ECF Doc. No. 77.

42. With this impasse, Lender was left no other choice than immediately filing this action under the diversity jurisdiction of this Court to determine the effect of Lender's exercise of rights and remedies provided under the Mezz Loan Documents.

**USSM's Interference Causes Lender Irreparable Harm, Requiring Urgent Relief**

43. The current situation with USSM and Ashkenazy refusing to cede control over a company in which neither has a legal interest is untenable. USSM's position is antithetical by contract law and cannot be supported by the facts. If USSM and Ashkenazy are allowed to continue interfering with Lender's management and control over USI – and effectively Union Station – Lender will suffer imminent irreparable harm.

44. Even though Lender foreclosed on the Mezz Loan and extinguished USSM's interests in USI, USSM has repeatedly represented to JLL, vendors, the court in the Condemnation

Action, and other third parties that USSM has the authority to speak on behalf of USI. It does not. As the sole owner of the USI Equity, Lender is the only entity in this position.

45. USSM and Ashkenazy have interfered with Lender's attempts to fund the operating expenses at the station. Ashkenazy has unreasonably demanded that Lender continue to deposit necessary funds into a bank account jointly controlled by Ashkenazy and its agent, JLL. This process provides Ashkenazy with access to hundreds of thousands of dollars when Ashkenazy has no role in the management of Union Station. And Ashkenazy has not contributed any money into the station's management in more than two years. Lender has had to develop workarounds to pay service providers, vendors, and even USI's landlord directly to avoid missing payments. On July 19, July 20, and July 22, Ashkenazy and JLL sent Lender three different notices from vendors that threatened to shut off services for delinquent payments. Lender, however, had already paid each of these bills thanks to its own diligence. *See* Exs. L-N.

46. In one breath USSM demands that Lender finance the operation of the station as it had done prior to Lender exercising its rights and remedies under the Loan Documents, and in the other breath USSM and Ashkenazy direct JLL and other third parties to not share customary and necessary information with Lender.

47. Ashkenazy has directed JLL to cease communications with and withhold financial information from Lender. But Lender needs to work with JLL – or if JLL refuses to engage, then another property-management company – to effectively manage and fund the operations of Union Station.

48. Lender is the sole owner of the USI Equity and thus has an obligation to operate and manage Union Station effectively. USSM is directly interfering with Lender's obligations by

undermining Lender's authority, instructing others to ignore Lender's requests, and demanding the driver's seat of a vehicle it no longer owns.

49. USSM is also directly interfering with Lender's exclusive power to settle the Condemnation Action with Amtrak. Because USSM and Ashkenazy refuse to acknowledge the power provided to Lender under Section 5.2.2, Lender is impeded from pursuing meaningful settlement conversations with Amtrak because USSM is essentially demanding a seat at the table it willingly contracted away. This uncertainty prevents the settlement discussions from moving forward.

50. This situation is untenable and requires urgent relief because neither USSM nor Ashkenazy has any stake in Union Station anymore. USSM still exists as an entity, but USSM no longer has any right, title, or interest in or to USI. Lender's ability to manage Union Station is being actively undermined by Ashkenazy and USSM who, having lost their stake in Union Station, now seek to sabotage Lender's legal and contractual rights, even if it means disrupting the management of the property.

51. Lender has no adequate remedy at law and will continue to suffer substantial and irreparable harm unless USSM is enjoined as requested below.

52. Greater injury will be inflicted upon Lender by the denial of the requested relief than will be inflicted on USSM by the granting of this relief.

53. No prior request for the relief sought in the Order to Show Cause has been previously made by Lender.

54. As is more fully addressed in the corresponding memorandum of law, Lender has demonstrated its urgent need for preliminary injunctive relief during the pendency of this action. The current situation is untenable, and Lender requests an expedited briefing schedule to ensure

that Lender's rights are adjudicated with the least damage caused by USSM's interference. Accordingly, Lender respectfully requests that the Court grant its Order to Show Cause and issue injunctive relief enjoining USSM from interfering with Lender's attorney-in-fact rights and Lender's rightful ownership of USI, as is fully delineated in the Order to Show Cause.

I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Executed this 4th day of August, 2022.

_____
Michael Rebibo, Managing Principal
Rexmark Holdings LLC d/b/a Rexmark