**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAOL REXMARK UNION STATION LLC and KOOKMIN BANK CO., LTD., in its capacity as trustee of KTB CRE DEBT FUND NO. 8, a Korean Investment Trust, by its agent in Korea DAOL FUND MANAGEMENT CO. and by its agent in United States REXMARK HOLDINGS LLC d/b/a REXMARK, <br><br>              Plaintiffs, <br><br> v. <br><br> UNION STATION SOLE MEMBER, LLC, <br><br>              Defendant. | Case No. _____ |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS DAOL REXMARK UNION STATION LLC'S AND KOOKMIN BANK CO., LTD'S ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

MORRISON COHEN LLP
Y. David Scharf
Brett Dockwell
Kristin T. Roy
Latisha V. Thompson
Amber R. Will
909 Third Avenue
New York, New York 10022
(212) 735-8600
dscharf@morrisoncohen.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ..................................................................................................... 3

ARGUMENT ...................................................................................................................... 11

I.     LENDER IS ENTITLED TO A PRELIMINARY INJUNCTION...................................... 12

    A.    Absent Injunctive Relief, Lender Will Suffer Irreparable Harm .................................. 12

    B.    Lender Is Likely To Succeed on the Merits ................................................................. 16

        1.    Even Pre-Foreclosure, Lender had Exclusive Authority Under the Mezz
             Loan Agreement To Act as Attorney-In-Fact............................................................ 16

        2.    The Foreclosure Sale Transferred Ownership of USI to Lender............................... 17

        3.    Lender's Rights Under the Mezz Loan Documents Are Cumulative........................ 18

        4.    The Mezz Loan Agreement and Pledge Agreement Provide Separate
             Rights and Remedies to Lender................................................................................. 21

        5.    The Anti-Assignment Act Does Not Void the Foreclosure....................................... 23

    C.    The Balance of Equities Favors Lender ...................................................................... 24

    D.    Any Damage to USSM Would Be Speculative, so No Bond is Required ..................... 25

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alto v. Sun Pharm. Indus., Inc.*,
No. 19 Civ. 09758 (GHW), 2021 U.S. Dist. LEXIS 198390
(S.D.N.Y. Oct. 13, 2021) ............................................................................22

*Atlas MF Mezzanine Borrower, LLC v. Macquarie Tex. Loan Holder LLC*,
174 A.D.3d 150 (1st Dep't 2019) ...............................................................18

*Bank of Am., N.A. v. Yi*,
294 F. Supp. 3d 62 (W.D.N.Y. 2018) ..........................................................25

*Bass v. Richardson*,
338 F. Supp. 478 (S.D.N.Y. 1971) ..............................................................26

*Croce v. Kurnit*,
737 F.2d 229 (2d Cir. 2007)........................................................................22

*In re Energy Future Holdings Corp.*,
842 F.3d 247 (3d Cir. 2016)...........................................................19, 20, 22

*In re Enron Corp.*,
No. 01-16034 (AJG), 2005 WL 3873890, 2005 Bankr. LEXIS 3469
(Bankr. S.D.N.Y. June 16, 2005) .................................................................18

*Gramercy Warehouse Funding I LLC v. Colfin JIH Funding LLC*,
No. 11 Civ. 9715 (KBF), 2012 WL 75431 (S.D.N.Y. Jan. 6, 2012) ...................17

*Harasek v. Nat'l R.R. Pass. Corp.*,
334 F. Supp. 3d 309 (D.D.C. 2018) .............................................................24

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*
, 407 F. Supp. 2d 483 (S.D.N.Y. 2005) ........................................................12

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................11, 12

*Kamine/Besicorp Allegany L.P. v. Rochester Gas & Elec. Corp.*,
908 F. Supp. 1180 (W.D.N.Y. 1995) ...........................................................25

*MPEG LA LLC v. Samsung Elecs. Co. Ltd.*,
166 A.D.3d 13, 86 N.Y.S.3d 4 (1st Dep't 2018),
*mot. for leave to appeal denied*, 32 N.Y.3d 912 (2018) ...........................22

*Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*,
  582 F. Supp. 2d 616 (S.D.N.Y. 2008)......................................................................12

*Paneccasio v. Unisource Worldwide, Inc.*,
  532 F.3d 101 (2d Cir. 2008).............................................................................19, 22

*Post Broadway Assocs. v. Minskoff Grant Realty & Mgmt. Corp.*,
  No. 600217/2008, 2008 N.Y. Misc. LEXIS 8706
  (Sup. Ct. N.Y. Cnty. March 21, 2008)...................................................................15

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990)...................................................................................11

*Sweeney v. Bane*,
  996 F.2d 1384 (2d Cir. 1993)..................................................................................11

*Toles v. United States*,
  371 F.2d 784 (10th Cir. 1967) ................................................................................24

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
  1 N.Y.3d 470, 807 N.E.2d 876 (2004)..............................................................19, 21

*W.W.W. Assoc. v. Giancontieri*,
  77 N.Y.2d 157, 566 N.E.2d 639 (1990)..................................................................16

*Wallace v. 600 Partners Co.*,
  86 N.Y.2d 543, 658 N.E.2d 715 (1995)........................................................16, 19, 21

*Weaver v. Schiavo*,
  750 Fed. App'x 59 (2d Cir. 2019)...........................................................................11

*Whitecap (U.S.) Fund I, LP v. Siemens First Capital Commercial Finance LLC*,
  121 A.D.3d 584 (1st Dep't 2014) ...........................................................................25

*Whole Foods Mkt. Grp. v. Wical L.P.*,
  288 F. Supp. 3d 176 (D.D.C. 2018).........................................................................25

*Wilson Evans 50th LLC v. 936 Second Ave. L.P.*,
  No. 156514/2018, 2019 N.Y. Misc. LEXIS 5401
  (Sup. Ct. N.Y. Cnty. Oct. 10, 2019)........................................................................15

*Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*,
  339 F.3d 101 (2d Cir. 2003)...................................................................................12

*Yemini v. Goldberg*,
  60 A.D.3d 935 (2d Dep't 2009) ..............................................................................12

*YL Sheffield LLC v. Wells Fargo Bank,*
    No. 601782/09, 2009 WL 6408598 (Sup. Ct. N.Y. Cnty. July 29, 2009) ..............................17

**Statutes**

31 U.S.C. § 3727...........................................................................................................................23

31 U.S.C. § 3727(a)......................................................................................................................24

49 U.S.C. § 24301(3)....................................................................................................................24

49 U.S.C. § 24301(a)(3)................................................................................................................24

UCC § 9-625(b) ............................................................................................................................18

**Other Authorities**

Fed. R. Civ. P. 65(c) ....................................................................................................................25

Daol Rexmark Union Station LLC ("Union Station Sub") and Kookmin Bank Co., Ltd., in its capacity as trustee ("Trustee") of KTB CRE Debt Fund No. 8, a Korean Investment Trust (the "Trust"), by its agent on behalf of the Trust in Korea, Daol Fund Management Co. ("Daol") and by its agent on behalf of the Trust in the United States, Rexmark Holdings LLC d/b/a Rexmark ("Rexmark," and collectively with Union Station Sub, Trustee, the Trust, and Daol, "Lender"), respectfully submit this memorandum of law in support of their motion, brought by order to show cause, seeking a preliminary injunction enjoining Defendant Union Station Sole Member, LLC ("USSM") and those acting on its behalf from interfering with Lender's attorney-in-fact rights and Lender's ownership and management of Union Station Investco, LLC ("USI").

## PRELIMINARY STATEMENT

USSM is a borrower that defaulted on a $100 million mezzanine loan (the "Mezz Loan") that was foreclosed at a duly advertised public auction pursuant to the Uniform Commercial Code (the "UCC"). Despite this incontrovertible reality, USSM refuses to relinquish control of the collateral. Lender brings this action and this motion to enforce the well-established rights that it bargained for and that it has enforced as a secured lender.

The relationship between Lender and USSM is defined by the Mezz Loan, which was secured by one primary asset: USSM's ownership interest in USI (the "USI Equity"). An essential part of the Mezz Loan was USSM's agreement that if USSM defaulted on the loan, Lender could exercise various rights and remedies, including foreclosure on the USI Equity. USI is the entity that currently has the right to possession and control of the leasehold interest in Washington Union Station ("Union Station"). USI had separately taken out a mortgage loan for $330 million, secured by its ground lease in Union Station. That mortgage loan is also in default.

Control of the USI Equity is critical because it controls USI, and thus Union Station. Both USSM and USI defaulted on their loans, and Lender proceeded to exercise its rights under the loan

1

documents. On April 14, 2022, without warning, Amtrak filed a quick take proceeding in the U.S. District Court for the District of Columbia and asserted that it had taken over titular ownership of USI's leasehold interest. Lender, USSM, and USI all dispute whether Amtrak has properly exercised its limited authority to condemn the Union Station leasehold. Whether or not Amtrak's taking and condemnation action was proper, the mortgage and mezzanine loan agreements give Lender certain rights in a condemnation, including the right to act as attorney-in-fact with the exclusive power to make any compromise or settlement with the condemnor. Accordingly, Lender notified all relevant parties that Lender was in charge of opposing Amtrak's purported condemnation.

Despite this, USSM and its beneficial owner, Ben Ashkenazy (who had previously served as manager for USI), ignored Lender's rights under the loan documents. Lender then exercised rights under the pledge and security agreement for the Mezz Loan (the "Pledge Agreement") and lawfully took control of USSM, but again USSM and Ashkenazy refused to acknowledge Lender's rights under the loan documents. USSM and Ashkenazy asserted falsely that Amtrak's purported taking froze all of Lender's rights and remedies, thereby nullifying Lender's attempts to protect its interests.

In the face of USSM's efforts to frustrate Lender's exercise of rights and USSM's continuing default, on June 14, 2022, Lender foreclosed on the Mezz Loan. At a fully marketed and duly noticed UCC foreclosure sale (the "Foreclosure Sale"), Lender purchased the entirety of the USI Equity, extinguishing USSM's right, title, and interest in and to USI. USSM did not challenge the Foreclosure Sale or seek any judicial relief, either before or since. Nonetheless, USSM and Ashkenazy continued to deny reality, taking the absurd position that Amtrak's condemnation of the Union Station leasehold somehow eliminated Lender's right to foreclose on

the USI Equity – an asset that is completely unaffected by Amtrak's condemnation. To support its absurd position, USSM resorts to arguments that are just frivolous. In particular, USSM posits blatant misreadings of the plain language of the loan documents – ignoring numerous provisions that squarely contradict USSM's position – and misstates, and then misapplies, a principle of contract interpretation. USSM also attempts to invoke the Anti-Assignment Act, despite the fact that Amtrak's enabling statute expressly excludes the Act's application to Amtrak.

USSM and Ashkenazy have no legal basis for their obstruction of Lender's rights. If USSM and Ashkenazy are allowed to continue interfering with Lender's right to control and manage USI, Lender will be irreparably harmed. Lender has the bargained-for contractual right to oppose the condemnation in court, settle the condemnation proceeding with Amtrak directly and without interference by USSM or Ashkenazy, act as power of attorney, and foreclose on the USI Equity. To permit otherwise would turn settled jurisprudence on its head by allowing the private rights of a borrower and lender to be abrogated by a condemnation proceeding that does not involve the collateral at issue – the USI Equity. If USSM has suffered any damages (it has not), USSM can seek monetary damages. But no amount of damages can substitute for the declaratory and injunctive relief sought here. The requested declaratory and injunctive relief sought here is necessary to end this farce and allow Lender – the lawful owner of USSM – to manage USI without the former equity owner's interference.

## STATEMENT OF FACTS[1]

### The Loan Documents Governing Lender's Rights

Lender holds two loans made with respect to the ground lease of Union Station. (Rebibo Decl. ¶ 7.) The first loan is the Mezz Loan that Lender entered into with USSM for the original

---

[1] The following recitation of facts incorporates information from Lender's Complaint ("Compl.") and the Declaration of Michael Rebibo, dated August 4, 2022 ("Rebibo Decl."), submitted herewith.

principal amount of $100 million that was secured by the USI Equity (the "Mezz Loan Agreement"). (*Id.* at ¶ 8.) In conjunction with the Mezz Loan Agreement, USSM and Lender entered into the Pledge Agreement that provided, among other things, various rights to Lender if USSM defaulted on the Mezz Loan, including foreclosure on the USI Equity. (*Id.*) The second loan is the mortgage loan with USI in the original principal amount of $330 million (the "Mortgage Loan") that was secured by USI's ground lease for Union Station (the "Mortgage Loan Agreement"). (*Id.* at ¶ 10.) In January 2022, Lender purchased the Mortgage Loan from the original lender for approximately $358 million. (*Id.*)

**USSM Defaulted on the Loan, and Lender Exercised its Rights**

In May 2020, both USSM and USI defaulted on their loans. (*Id.* at ¶ 11.) Lender initially agreed on a forbearance period in which Lender would not take action against USSM and extended millions of dollars in protective advances to provide USSM an opportunity to bring the Mezz Loan back into good standing. (*Id.*) Since defaulting on their loans, neither USSM nor USI has paid down their debt. (*Id.* at ¶ 12.)

On April 14, 2022, without warning to Lender, Amtrak filed a quick take proceeding in the U.S. District Court for the District of Columbia (the "Condemnation Action"). Amtrak asserted that it had taken over the titular ownership of USI's leasehold interest. (*Id.* at ¶ 13.) Under the Mortgage and Mezz Loan Agreements, Lender has the exclusive right to make any compromise or settlement in a condemnation proceeding. (*Id.* at ¶ 14, Exs. A and B at § 5.2.2.) Lender sent notice to all relevant parties that Lender was in charge of settlement discussions. (*Id.* at ¶ 14.) USSM and its beneficial owner, Ashkenazy, ignored Lender's exclusive rights to settle the Condemnation Action. (*Id.* at ¶ 15.)

On May 13, 2022, Lender sent notices that Lender was exercising its rights under the Pledge Agreement. (*Id.* at ¶ 16, Exs. D-F.) Among other rights, Lender exercised its rights under Section 13 that allowed Lender to act as the attorney-in-fact. (*Id.* at ¶ 16, Ex. F.) USSM and Ashkenazy again ignored Lender's exercise of rights and instead claimed to the court in the Condemnation Action that all of Lender's rights not included within the provision addressing condemnations – Section 5.2.2 – were extinguished as of the date of Amtrak's purported taking. (*Id.* at ¶ 17.)

But nothing in Section 5.2.2 addresses a limitation on Lender's additional rights or extinguishes Lender's other rights upon the occurrence of a condemnation. Section 5.2.2 provides:

> Condemnation. USSM shall provide Lender with copies of any written notice received by Borrower or Mortgage Borrower of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all notices or papers served in connection with such Condemnation or related proceedings promptly upon obtaining knowledge thereof (Lender acknowledging that Borrower shall have complied with this covenant with respect to any Condemnation that is not a Material Condemnation if Borrower delivers or causes Mortgage Borrower to deliver such written notice to Lender by no later than the end of the calendar quarter in which Borrower or Mortgage Borrower first obtained such knowledge). <u>Borrower may settle and compromise or may permit Mortgage Borrower to settle and compromise any Material Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall from time to time deliver or shall cause Mortgage Borrower from time to time to deliver to Lender all instruments reasonably requested by Lender to permit such participation.</u> Borrower shall, at its cost and expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings. Subject to the rights

of Mortgage Lender under the Mortgage Loan Documents, <u>Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation.</u> Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents and the Debt shall not be reduced until any Net Liquidation Proceeds After Debt Service shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by any Governmental Authority, but shall be entitled to receive out of the Net Liquidation Proceeds After Debt Service interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by any Governmental Authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of Section 5.3 of the Mortgage Loan Agreement. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.

(*Id.* at ¶ 18, Ex. B at § 5.2.2 (emphasis added).)

Moreover, the Mezz Loan Agreement makes clear that all rights are cumulative to Lender's other rights provided in the loan documents. Section 10.4 provides that:

> The rights, powers and remedies of Lender under this Agreement <u>shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower [i.e., USSM] pursuant to this Agreement or the other Loan Documents</u>, or existing at law or in equity or otherwise.

(*Id.* at ¶ 20, Ex. B at § 10.4 (emphasis added).)

Consistent with Section 10.4, Section 9(a)-(b) of the Pledge Agreement similarly emphasizes that Lender's rights – including that of UCC foreclosure – are cumulative. Section 9(a)-(b) provides that:

> (a)    If an Event of Default shall occur and be continuing, Lender may, <u>in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt</u>:
>
> > (i)    <u>exercise all rights and remedies of a secured party under the [Uniform Commercial] Code</u> (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted . . .
>
> (b)    <u>Without limiting the generality of the foregoing</u>, if an Event of Default shall occur and be continuing, <u>Lender . . . may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales</u>. . . .  Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor [i.e., USSM], which right or equity of redemption is hereby waived or released.

(*Id.* at ¶ 21, Ex. C at § 9(a)-(b) (emphasis added).)

Even though USSM and Ashkenazy rely on Section 5.2.2, they refuse to accept it as written.  Section 5.2.2 – in no uncertain terms – provides that Lender is appointed as USSM's attorney-in-fact during an event of default.  (*Id.* at ¶ 22, Ex. B at § 5.2.2.)  With that authority, Lender has the "exclusive power . . . to make any compromise or settlement in connection with" the Condemnation Action.  (*Id.*)  USSM and Ashkenazy have refused to recognize Lender's exclusive rights.  (*Id.* at ¶ 22.)

**Lender Foreclosed on the Mezz Loan**

On May 13, 2022, Lender provided notice to the relevant parties that Lender would foreclose on the Mezz Loan at a public UCC foreclosure sale scheduled for June 14, 2022. (*Id.* at ¶ 23, Ex. G.) The Foreclosure Sale was conducted by Cushman & Wakefield, as the marketing and sales agent, in a commercially reasonable manner that included extensive marketing in publications like the *New York Times*, the *Washington Post*, and various commercial real estate news sources. (*Id.* at ¶ 25.) Leading up to the sale, 134 confidentiality agreements were approved to view the documents. (*Id.* at ¶ 25, Ex. H.) Of the parties signing confidentiality agreements, 70 viewed materials on the data site. (*Id.*)

On June 14, 2022, Lender was the only qualified purchaser at the Foreclosure Sale and purchased the USI Equity for $140,535,334.53, subsequently assigning the rights to Union Station Sub. (*Id.* at ¶ 26, Exs. I, J.) USSM did not object or seek to block the sale from proceeding. (*Id.* at ¶ 27.) As of June 14, 2022, Lender became the sole owner of USI's membership interests and notified the relevant parties about the change in management and control. (*Id.* at ¶ 28, Ex. K.)

**USSM Refuses to Accept the Foreclosure, Causing Lender Irreparable Harm**

USSM and Ashkenazy refused to cede control of USI and acknowledge the Foreclosure Sale. (*Id.* at ¶ 29.) Indeed, USSM and Ashkenazy took the position in the Condemnation Action that Amtrak's filing of the declaration of taking extinguished all of Lender's rights and remedies in the Mezz Loan and Pledge Agreements except for the rights provided under Section 5.2.2. (*Id.*) Since the Foreclosure Sale, USSM has repeatedly misrepresented to JLL, vendors, the court in the Condemnation Action, and other third parties that USSM has the authority to speak on behalf of USI. (*Id.* at ¶ 44.)

USSM demands that Lender continue to operate as if the foreclosure never occurred and has interfered with Lender's obligations to fund the operating expenses of Union Station. (*Id.* at ¶¶ 30-34.) Practically, before Lender exercised its rights, Ashkenazy as the then-manager of USI and the property management company, Jones Lang LaSalle Americas, Inc. ("JLL"), would work together to submit a funding request to cover operating expenses of the station to Lender. (*Id.* at ¶ 31.) If Lender required additional information, that information was provided. (*Id.*) Lender would then deposit the requested funds in a bank account jointly controlled by Ashkenazy and JLL. (*Id.*) JLL would issue the checks, and Ashkenazy would sign and pay the expenses from the funds advanced by Lender. (*Id.*)

Post-foreclosure, Lender asked JLL to open a separate and independent bank account to fund the operating expenses of Union Station and enter into a direct contract with USI to continue property-management services. (*Id.* at ¶ 33.) In response, Ashkenazy directed JLL to cease communication and withhold information from Lender. (*Id.*) When Lender requested backup information on the funding requests, including the bills and invoices, Ashkenazy refused to provide and directed others to withhold the information from Lender. (*Id.* at ¶ 33-34, 46.) Lender has had to develop workarounds to pay service providers, vendors, and even USI's landlord directly to avoid missing payments. (*Id.* at ¶¶ 34, 45.) On July 19, July 20, and July 22, Ashkenazy and JLL sent Lender three different notices from vendors that threatened to shut off services for delinquent payments. (*Id.* at ¶¶ 34, 45, Exs. L-N.) Lender, however, had already paid each of these bills thanks to its own diligence. (*Id.*)

Unable to resolve these issues regarding ownership and control, Lender brought an emergency motion in the Condemnation Action to seek a judicial adjudication that the Foreclosure Sale was valid and extinguished USSM's right, title, and interest in and to USI. (*Id.* at ¶ 35.) In

conjunction with a motion filed by USSM to strike the answer filed by USI under Henrich's direction, the issue of which entity controlled USI was fully briefed before that court. (*Id.*) Citing limited jurisdiction based on the federal question raised by Amtrak's condemnation authority, the court declined to rule on the effect of the Foreclosure Sale and the resulting control over USI, instead advising the parties to bring a lawsuit elsewhere. (*Id.* at ¶ 36.)

The court directed the parties to meet and confer over how to address the pending motions by way of stipulation. (*Id.* at ¶ 37.) In the proposed stipulation regarding the emergency motion, Lender proposed language regarding the management and operations of Union Station that reflected the effect of the Foreclosure Sale, and USSM and Ashkenazy flatly refused. (*Id.* at ¶ 39, Ex. O.) Rather, USSM and Ashkenazy continue to claim that JLL should provide property management services under the direction of AAC, without Lender's involvement. (*Id.*) In the proposed stipulation regarding the motion to strike, USSM and Ashkenazy refused to acknowledge that Lender had the exclusive authority under Section 5.2.2 of the Mortgage and Mezz Loan Agreements – the provision USSM and Ashkenazy rely upon in their arguments – to act as the attorney-in-fact with the power to make any compromise or settlement in connection with the Condemnation Action. (*Id.* at ¶ 40, Ex. P.) USSM and Ashkenazy also refused to agree to not interfere in Lender's efforts to settle the Condemnation Action. (*Id.*) The parties were unable to come to an agreement and ceased exchanging proposals. (*Id.* at ¶ 41.) The parties filed a joint status report with the court to inform that the parties were unsuccessful, and Lender subsequently withdrew its emergency motion. (*Id.*)

USSM and Ashkenazy refuse to abide by the contractual rights afforded to Lender regarding management and control of USI, and such interference causes Lender irreparable harm. With this impasse, Lender was left no other choice than immediately filing this action under the

diversity jurisdiction of this Court to determine the effect of Lender's exercise of rights and remedies provided under the Mezz Loan Documents.

## ARGUMENT

To obtain a preliminary injunction, "the movant must show: (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 531 (S.D.N.Y. 2004) (citing *Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir. 1993)). "Irreparable harm is 'the single most important prerequisite' for relief." *Weaver v. Schiavo*, 750 Fed. App'x 59, 60 (2d Cir. 2019). The determination of whether an injunction should issue is left to the sound discretion of the district court. *Johnson Controls*, 323 F. Supp. 2d at 531 (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

Because Lender has demonstrated its entitlement to injunctive relief, Lender respectfully requests that the Court enter an order restraining, enjoining, and prohibiting USSM, its officers, directors, members, employees, agents, and all those acting in concert with any of them (the "Restrained Parties"), during the pendency of this action, from interfering with Lender's rightful ownership of USI, including from (i) holding itself out as the owner of USI or otherwise having an interest in the management or operation of Union Station, (ii) collecting bills and invoices from utilities, vendors, and other third parties with regard to Union Station, (iii) directing the current property-management company, JLL, in regards to the management, operation, and funding of Union Station, (iv) writing checks for the operation or funding of Union Station, (v) negotiating renewal leases with or terminating leases of current tenants of Union Station, (vi) negotiating new leases with prospective tenants of Union Station, and (vii) informing third parties to direct matters and concerns about Union Station to USSM rather than Lender. Lender also requests that the

Court restrain, enjoin, and prohibit the Restrained Parties, during the pendency of this action, from interfering with Lender's rights under Section 5.2.2 of the Mezz Loan Agreement to act as attorney-in-fact for USSM, with Lender having the exclusive power to collect, receive, and retain any condemnation award and having the exclusive power to make any compromise or settlement in connection with the Condemnation Action.

## I.    LENDER IS ENTITLED TO A PRELIMINARY INJUNCTION

### A.    Absent Injunctive Relief, Lender Will Suffer Irreparable Harm

USSM and Ashkenazy refuse to cede control of USI, thereby causing Lender irreparable harm by denying Lender its bargained-for rights of management and control over USI. The imminence of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Johnson Controls, Inc.*, 323 F. Supp. 2d at 531 (internal quotation marks and citation omitted). Irreparable harm may be found in the "denial of a controlling interest in a corporation" as well as "conduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company." *Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.¸* 407 F. Supp. 2d 483, 496 (S.D.N.Y. 2005). There is "intrinsic value" in the right to manage a company that cannot be compensated by monetary damages. *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 114 (2d Cir. 2003) (finding that "denial of bargained-for minority rights" constitutes irreparable harm as it changes the "agreed-upon balance of power" in managing the company); *see also Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I, LLC*, 582 F. Supp. 2d 616, 626 (S.D.N.Y. 2008) (finding irreparable harm where party sought to enforce "a bargained-for right to corporate control [] that is difficult if not impossible to value, which [] could be meaningless or substantially diminished in value by the end of litigation absent injunctive relief"); *Yemini v. Goldberg*, 60 A.D.3d 935, 937 (2d Dep't 2009)

("[B]ecause control and management of [the company] and its holdings were at stake, money damages were not sufficient.").

Lender's irreparable harm fits squarely within this criteria, as the harm stems from USSM's refusal to cede control of USI after Lender purchased the USI Equity at the Foreclosure Sale. USSM's improper hold on USI has rendered Lender unable to control the management of USI and the Union Station leasehold at a particularly critical time, in the midst of Amtrak's condemnation proceeding. USSM and Ashkenazy have refused, despite repeated requests, to recognize Lender's bargained-for rights. USSM and Ashkenazy have misrepresented to JLL, vendors, the landlord, Amtrak, and the court in the Condemnation Proceeding that USSM controls and can speak on behalf of USI. But only Lender has the authority to do so.

Additionally, USSM and Ashkenazy have interfered with and hindered Lender's efforts to fund the operations of Union Station. Now that Lender has foreclosed on the USI Equity, Lender and USI are entitled to contract directly with JLL, but USSM and Ashkenazy have repeatedly obstructed Lender's efforts to obtain control of the station. Ashkenazy has interfered at every turn, demanding that all funding expenses for the property's operation continue to run through Ashkenazy as it had done before Lender exercised its rights under the Loan Documents. Ashkenazy has also directed JLL to cease communicating with Lender and withhold financial information that Lender needs to fund the operating expenses. Lender has managed to navigate the obstacles that USSM and Ashkenazy have tried to erect by paying utilities, vendors, and even the landlord directly, but critical information is still being withheld from Lender. Ashkenazy has been in receipt of final notices from utility providers, advising that utility services were about to be cut off for nonpayment. Because Lender has been able to identify many of these vendors

unilaterally, these invoices have been paid. Union Station remains operating today in spite of Ashkenazy, not because of Ashkenazy.

These issues regarding the ownership and management of USI were brought before the court in the Condemnation Action by emergency motion. The court declined to rule on the effect of the Foreclosure Sale, citing limited federal question jurisdiction, and directed the parties to meet and confer to address the pending motions by way of stipulation. Lender proposed language that reflected the effect of the Foreclosure Sale and Lender's role in the management of Union Station, which USSM and Ashkenazy flatly rejected. (Rebibo Decl. at ¶ 39, Ex. O.) USSM and Ashkenazy even refused to acknowledge that Lender had the exclusive authority under Section 5.2.2 of the Mortgage and Mezz Loan Agreements – the provision USSM and Ashkenazy rely upon in their arguments – to act as the attorney-in-fact with the power to make any compromise or settlement in connection with the Condemnation Action. (*Id.* at ¶ 40, Ex. P.)

Absent injunctive relief, USSM will continue with its false narrative and create unnecessary chaos. Ashkenazy is no longer the manager of USI, and following Lender's foreclosure on the USI Equity, neither Ashkenazy nor USSM has any interest in USI or Union Station. Even pre-foreclosure, Lender had the authority to act as USSM's attorney-in-fact with the exclusive power to make any compromise or settlement in the Condemnation Action. USSM and Ashkenazy refuse to recognize any of Lender's actions taken pursuant to the governing contracts. USSM cannot be allowed to force itself into a seat at the table it has been unable or unwilling to pay for. USSM defaulted on the Mezz Loan, giving Lender the authority to act as the attorney-in-fact in a condemnation proceeding. Separately, Lender properly foreclosed on the Mezz Loan after USSM's default and properly purchased the USI Equity, extinguishing USSM's role in Union Station. USSM's interference and rejection of Lender's bargained-for management

and control rights generates irreparable harm to Lender.  If allowed to continue to interfere, USSM jeopardizes the effective management of Union Station and Lender's ability to resolve the Condemnation Action by settlement.

Injunctive relief such as is sought here has been granted in substantially similar circumstances.   In *Post Broadway Assocs. v. Minskoff Grant Realty & Mgmt. Corp.*, No. 600217/2008, 2008 N.Y. Misc. LEXIS 8706, at *9-11 (Sup. Ct. N.Y. Cnty. March 21, 2008), the plaintiff terminated the defendant as the managing and leasing agent of certain properties.  When the defendant refused to cede control to the successor agent, as USSM has done here, plaintiff sought a preliminary injunction enjoining the defendant from continuing to act as agent and directing him to turn over management records.   *Id.*   In granting the preliminary injunction, the court found that:

> in the absence of injunctive relief, irreparable harm may result because Plaintiffs show that it will lose managing and leasing control over its Properties pending trial.  With management and leasing control over the Properties [the defendant] could bind the Partnerships to undesirable arrangements, including leases with extended terms, low rental rates and/or other unfavorable terms.

*Id.* at *10 (internal citations omitted).  Similarly, in *Wilson Evans 50th LLC v. 936 Second Ave. L.P.*, No. 156514/2018, 2019 N.Y. Misc. LEXIS 5401 (Sup. Ct. N.Y. Cnty. Oct. 10, 2019), the court granted a preliminary injunction enjoining a tenant from continuing to manage and control the premises and directing the tenant to turn over to the landlord documents and information necessary to manage the property.  The court reasoned that the tenant's refusal to turn over information threatened irreparable harm to the proper management of the property.  *Id.*

The situation here is substantially similar as USSM has refused to cede control and Ashkenazy has directed agents and third parties to withhold vital information about the funding

needs of Union Station from the Lender. The failure of USSM and Ashkenazy to comport with reality demands judicial intervention by way of injunctive relief.

### B. Lender Is Likely To Succeed on the Merits

Lender is likely to succeed on the merits of its declaratory judgment claim. The plain language of Mezz Loan documents and the duly noticed and conducted UCC Foreclosure Sale – which neither USSM nor Ashkenazy has challenged in any forum – establish that Lender lawfully controls USI and that USSM's right, title, and interest in and to USI have been extinguished.

### 1. *Even Pre-Foreclosure, Lender had Exclusive Authority Under the Mezz Loan Agreement To Act as Attorney-In-Fact*

USSM relies upon Section 5.2.2 for each of its arguments as to why Lender's rights were frozen at the time Amtrak filed its declaration of taking, but in the same breath, USSM refuses to concede Lender's authority granted under that provision. Section 5.2.2 is clear that upon an event of default – which undeniably has occurred – "Lender is hereby irrevocably appointed to act . . as [USSM's] attorney-in-fact." (Rebibo Decl. at ¶ 18, Ex. B § 5.2.2.) With this authority, Lender has the "exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation." (*Id.*)

Remarkably, USSM and Ashkenazy have refused to acknowledge the clear expressions of that statement. In the proposed stipulations exchanged by the parties, USSM removed the reference to Section 5.2.2 and Lender's authority to settle the Condemnation Action. (Rebibo Decl. at ¶ 40, Ex. P.) USSM's refusal to acknowledge the obvious is not supported by law. *See, e.g.*, *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 658 N.E.2d 715, 717 (1995) ("[C]lear, complete writings should generally be enforced according to their terms." (citation omitted)). By signing the Mezz Loan Agreement, USSM agreed to giving Lender certain rights in the event of a default, and Lender merely seeks to act on those rights. *See W.W.W. Assoc. v. Giancontieri*, 77 N.Y.2d

157, 566 N.E.2d 639, 643 (1990) ("By ignoring the plain language of the contract, plaintiff effectively rewrites the bargain that was struck.").

### 2. *The Foreclosure Sale Transferred Ownership of USI to Lender*

USSM's ownership of USI was extinguished by virtue of the June 14, 2022 UCC Foreclosure Sale. Under New York law, a foreclosure on equity interests in a company wipes out the equity-holder's ownership and control rights over the company. "To put it most bluntly, the Mezz Loan II foreclosure means that 100% of the membership interests in Mezz Borrower I will be offered for sale. If a sale is successfully closed, [Mezz Borrower I]'s interests will effectively be wiped out because its [interests] will no longer exist. The basic point is that if [lender] proceeds with the foreclosure sale, [Mezz Borrower I] will no longer be an active participant in the mezzanine loan structure or have any direct or indirect ability to impact or affect in any way any of the pending bankruptcy proceedings." *Gramercy Warehouse Funding I LLC v. Colfin JIH Funding LLC*, No. 11 Civ. 9715 (KBF), 2012 WL 75431, at *2 (S.D.N.Y. Jan. 6, 2012).

The Foreclosure Sale extinguished USSM's ownership of USI and its right to manage Union Station. "[T]he consequences of [a UCC foreclosure] sale for the LLC entity [with an interest in the property owner], whether undesirable to that entity, do not entitle the LLC entity to any relief." *YL Sheffield LLC v. Wells Fargo Bank*, No. 601782/09, 2009 WL 6408598, at *2-3 (Sup. Ct. N.Y. Cnty. July 29, 2009). The Foreclosure Sale was noticed and marketed in publications such as the *New York Times*, the *Washington Post*, and various commercial real estate news sources. Over 100 interested parties signed confidentiality agreements to review the data and information relating to USSM's interest. At the auction, Lender was the only qualified bidder, submitting a winning bid of $140,535,334 and assigning the rights to Union Station Sub. All of USSM's equity in USI was conveyed to Lender. Lender, not USSM nor Ashkenazy, has ownership and control over USI and the Union Station leasehold.

Significantly, USSM did not object to the Foreclosure Sale. Lender gave notice of the sale on May 13, 2022, and stated its intent to foreclose on the Mezz Loan in its answer in the condemnation action. USSM did not seek any judicial relief prior to the Foreclosure Sale. Given that USSM did not object to or challenge the Foreclosure Sale before it occurred – which USSM had every opportunity to do – USSM's sole remedy should it seek to challenge the sale in the future is money damages, to the extent any harm occurred. Because the Foreclosure Sale occurred without any objection from USSM, USSM cannot now unwind the sale. *See In re Enron Corp.*, No. 01-16034 (AJG), 2005 WL 3873890, at *10, 2005 Bankr. LEXIS 3469 (Bankr. S.D.N.Y. June 16, 2005) (rejecting request to unwind sale because the sale of the collateral had already occurred in the case before it and "the aggrieved party's remedy would be an action for damages under section 9-625(b) of the UCC and not an invalidation of the sale"); *see also Atlas MF Mezzanine Borrower, LLC v. Macquarie Tex. Loan Holder LLC*, 174 A.D.3d 150, 163 (1st Dep't 2019) (finding that debtor cannot "after dissolution and conclusion of the [UCC foreclosure] sale, unwind the sale" because the only available remedy is money damages). If USSM chooses to challenge the validity or propriety of the Foreclosure Sale at this juncture, USSM's only remedy is damages. The outcome of the Foreclosure Sale is fully settled, and Lender indisputably holds the right, title, and interest in and to USI.

### 3. *Lender's Rights Under the Mezz Loan Documents Are Cumulative*

In the condemnation action, USSM has claimed that Section 5.2.2 of the Mezz Loan Agreement provides Lender's sole remedy in the event of a condemnation. But that claim ignores the multiple provisions in the Mezz Loan Agreement and the Pledge Agreement that explicitly refer to the rights, powers, and remedies as being cumulative to other rights, powers, and remedies Lender may have.

"It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed." *Wallace*, 86 N.Y.2d at 548 (internal citations omitted); *In re Energy Future Holdings Corp.*, 842 F.3d 247, 254 (3d Cir. 2016) (summarizing New York law). This rule has even greater force "where, as here, the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length." *Wallace*, 86 N.Y.2d at 548. "In such circumstances, 'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 807 N.E.2d 876, 879 (2004). "The rules of contract construction require [the court] to adopt an interpretation which gives meaning to every provision of the contract." *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 111 (2d Cir. 2008). The Mezz Loan Agreement and the Pledge Agreement were executed in connection with the same transaction and must be read together, giving effect to all of their terms. *See id.* at 111.

USSM's contention that Section 5.2.2 of the Mezz Loan Agreement pertaining to condemnations provides Lender's sole remedy is squarely contradicted by the documents. Both the Mezz Loan Agreement and the Pledge Agreement explicitly state that Lender's rights are cumulative. Section 10.4 of the Mezz Loan Agreement states in relevant part (emphasis added):

> The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower [i.e., USSM] pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.

Likewise, Section 9 of the Pledge Agreement states as follows (emphasis added):

> (a)    If an Event of Default shall occur and be continuing, Lender may, in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt:

(i)  exercise all rights and remedies of a secured party under the [Uniform Commercial] Code (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted . . .

(b)  Without limiting the generality of the foregoing, if an Event of Default shall occur and be continuing, Lender . . . may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales. . . .  Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor [i.e., USSM], which right or equity of redemption is hereby waived or released.

In addition, Section 5.2.2 does not state, or even remotely suggest, that it nullifies other provisions of the loan documents, including Lender's right to foreclose on the USI Equity under Section 9 of the Pledge Agreement.  This silence is fatal to USSM's argument, as illustrated by a borrower bringing a similar argument in *Energy Future Holdings*.  In that case, the borrower argued that a provision of its indenture agreement – Section 6.02 – which made its debt immediately due and payable upon the filing of a bankruptcy petition, overrode the provision of the indenture – Section 3.07 – containing the prepayment premium.  842 F.3d at 256 (applying New York law).  The Third Circuit Court of Appeals noted that Section 6.02 of the indenture made no mention of Section 3.07, and held that this silence required the Court to give effect to both sections.  *Id.*  "It surpasses strange to hold that silence in § 6.02 supersedes § 3.07's simple script." *Id.* at 257.

The same is true here.  It "surpasses strange" to claim that Section 5.2.2, which makes no mention of Section 9 of the Pledge Agreement (or of any other contract provision), supersedes Section 9 of the Pledge Agreement.  Adopting such an unnatural reading of Section 5.2.2 would

violate the court's obligation to "to give effect to the intention of the parties as expressed in the unequivocal language employed," *Wallace*, 658 N.E.2d at 717, and would amount to interpreting the Mezz Loan Agreement "as impliedly stating something which the parties have neglected to specifically include," *Vermont Teddy Bear Co.*, 807 N.E.2d at 879. If Lender and USSM, both sophisticated and well-counseled, had intended Section 5.2.2 of the Mezz Loan Agreement to countermand all of Lender's rights and remedies under the Mezz Loan Agreement and the Pledge Agreement, they would have said so. But they did not, and settled contract law requires the loan documents to be enforced as written. *Id.* at 880 ("The parties could have negotiated and included an explicit notice requirement regarding completion of restoration within the time period set forth in paragraph 3 of the rider. They did not do so. We therefore conclude that the lease was not terminated. . . .").

Because Lender's rights and remedies are cumulative under the Mezz Loan documents, Section 5.2.2 does not preclude Lender from exercising its rights under Section 9 of the Pledge Agreement, including the foreclosure on USSM's ownership interests in USI.

### 4. *The Mezz Loan Agreement and Pledge Agreement Provide Separate Rights and Remedies to Lender*

In the condemnation action, USSM also argued that specific language in Section 5.2.2 of the Mezz Loan Agreement regarding condemnation controlled over the general provisions of Lender's rights and remedies found in the Pledge Agreement, thereby nullifying Lender's purchase of the USI Equity at the Foreclosure Sale. USSM claimed that the specific provision on condemnation applied and limited Lender's rights because it was in tension with the general provisions of additional rights. This misguided interpretation of contractual construction misstates the law.

The principle that specific contractual provisions control over general ones applies only when the provisions at issue are inconsistent and cannot be harmonized. *See Alto v. Sun Pharm. Indus., Inc.*, No. 19 Civ. 09758 (GHW), 2021 U.S. Dist. LEXIS 198390, at *130 (S.D.N.Y. Oct. 13, 2021) ("Under New York law, 'where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls." (emphasis added)).

Where, as here, there is no inconsistency between two contractual provisions, there is "no factual predicate for application of the principle that where a specific contract provision conflicts with a more general provision, the specific provision controls." *Paneccasio*, 532 F.3d at 111 (*citing Croce v. Kurnit*, 737 F.2d 229, 237 (2d Cir. 2007)). There is no inconsistency between two contract provisions that apply to different situations, and therefore the principle that specific provisions control general ones does not apply. Thus, in *MPEG LA LLC v. Samsung Elecs. Co. Ltd.*, 166 A.D.3d 13, 86 N.Y.S.3d 4 (1st Dep't 2018), *mot. for leave to appeal denied*, 32 N.Y.3d 912 (2018), a contract provision pertaining to the defendant's right to unilaterally terminate the contract after January 1, 2017, did not nullify a separate contract provision regarding the defendant's right to terminate prior to January 1, 2017. As the New York Appellate Division found, there was no inconsistency between the two provisions; they "simply appl[ied] to different situations." *Id.* at 19; *see also In re Energy Future Holdings*, 842 F.3d at 247 (rejecting borrower's argument that Section 6.02 controlled Section 3.07 because "[t]he two sections simply address different things. . . . Rather than 'different pathways,' together they form the map to guide the parties through a post-acceleration redemption.").

Here, Section 5.2.2 of the Mezz Loan Agreement is not inconsistent with Section 9 of the Pledge Agreement and cannot be read as superseding the rights under Section 9. The two provisions are simply different, and intentionally so, because they serve different purposes.

Section 5.2.2 states that USSM may not settle or compromise any condemnation action without Lender's prior consent and that Lender has the right to participate in condemnation proceedings and settlement discussions, at USSM's cost. These Lender rights apply whether or not the Mezz Loan is in default. Section 5.2.2 further provides that, if the Mezz Loan is in default, Lender is entitled to act as USSM's attorney-in-fact with the exclusive right to collect and retain any condemnation award and to compromise or settle the condemnation. Section 5.2.2 provides rights to Lender in the event of a condemnation and takes immediate effect.

Section 9 of the Pledge Agreement, on the other hand, empowers Lender to exercise each and every remedy available under the loan documents or at law upon an event of default. Unlike Section 5.2.2, it is not self-executing and its express purpose is to provide Lender with as many legal and equitable pathways as possible to recover the entirety of the Mezz Loan debt. These remedies, which are "in addition to all other rights and remedies granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt," may be exercised whether or not the Union Station leasehold has been condemned. The leasehold is not part of the collateral for the Mezz Loan; a condemnation is not an event of default under the loan documents; and Lender has not asserted that there is a default because of the condemnation. The condemnation had no effect on Lender's ability to foreclose on USSM's ownership interest in USI, as Lender did on June 14, 2022. USSM's ownership interests in USI were not condemned by Amtrak; the Union Station leasehold was. The principle that specific contract provisions control over general ones has no application here.

### 5. *The Anti-Assignment Act Does Not Void the Foreclosure*

In the condemnation action, USSM made a last-ditch effort to avoid the consequences of the Foreclosure Sale by claiming that the Anti-Assignment Act (the "Act") precluded Lender's exercise of rights given Amtrak's purported taking. The Act, codified at 31 U.S.C. § 3727, applies

to the "transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or the authorization to receive payment for any part of the claim." 31 U.S.C. § 3727(a). It has long been recognized that the Act "does not render the assignment void as between the parties." *Toles v. United States*, 371 F.2d 784, 786 (10th Cir. 1967).

However, Amtrak's organizing statute expressly excludes application of Title 31, in which the Act is codified. The statute states: "Amtrak . . . is not a department, agency, or instrumentality of the United States Government, **and shall not be subject to title 31**." 49 U.S.C. § 24301(a)(3) (emphasis added); *cf. Harasek v. Nat'l R.R. Pass. Corp.*, 334 F. Supp. 3d 309 (D.D.C. 2018) (unambiguous language of 49 U.S.C. § 24301(3) precludes Amtrak employee from bringing suit under the False Claims Act, also found in Title 31). Amtrak has admitted that it is not a government agency that would be subject to the Act. *See Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Interest Pertaining to Described Leasehold Interests at Washington Union Station, et al.*, 1:22-cv-01043-APM (D.D.C.), ECF Doc. No. 58-1, at 3. Thus, not only does the Act not apply to a claim against Amtrak, but it would not govern the relationship between Lender and USI in any event and would not render void Lender's exercise of its contractual remedies under the Pledge Agreement.

### C. The Balance of Equities Favors Lender

The balance of the equities overwhelmingly favors Lender here. There is no dispute that Lender is the holder of the Mezz Loan. There is no dispute that USSM defaulted on the Mezz Loan in May 2020 and has not made a payment on its debt since. There is no dispute that USSM's interest in USI has been foreclosed, without objection from USSM or Ashkenazy, at a duly noticed foreclosure sale. Finally, there is no dispute that USSM and Ashkenazy were well aware of the terms of their respective loan agreements including the terms granting Lender the right to take over control of USI.

By executing the Pledge Agreement and other Loan Documents, USSM consented to every one of the remedies that Lender has exercised to date. *See Whitecap (U.S.) Fund I, LP v. Siemens First Capital Commercial Finance LLC*, 121 A.D.3d 584, 592 (1st Dep't 2014) (dismissing borrower's complaint against lender and finding that lender properly exercised rights under pledge agreement after default to vote borrower's shares and replace directors); *see also 286 Rider Ave*, Aug. 30, 2021 Hr'g Tr. at 67:22–68:7 (denying motion to dismiss Chapter 11 filing brought by borrower's equity). USSM can suffer no hardship by being ordered to comply with the terms of the contracts into which they willingly entered, i.e. the Loan Documents. *See Whole Foods Mkt. Grp. v. Wical L.P.*, 288 F. Supp. 3d 176, 190 (D.D.C. 2018) (party suffers no harm where injunctive relief would merely require it to comply with terms of its contract).

Lender, on the other hand, will lose the entire benefit of its bargain with USSM if injunctive relief is denied. Lender loaned USSM $100 million under the Mezz Loan, and since May 2020, USSM has been in continuous default of the loan. Lender has properly exercised its rights afforded it under the Pledge Agreement and loan documents based on USSM's continuing default. Absent injunctive relief, Lender is prevented from exercising its management and control over USI, and thereby Union Station, even though Lender now owns USI.

Granting injunctive relief here would serve the "well-recognized public interest in enforcing contracts and upholding the rule of law." *Bank of Am., N.A. v. Yi*, 294 F. Supp. 3d 62, 81 (W.D.N.Y. 2018) (collecting cases). By contrast, there can be no public interest in allowing a party, particularly a sophisticated party such as USSM, to escape the consequences of its failure to honor its contractual obligations after having already received the benefit of its bargain.

**D.    Any Damage to USSM Would Be Speculative, so No Bond is Required**

Rule 65(c) of the Federal Rules of Civil Procedure provides the Court "discretion to waive the bond [requirement] entirely" when issuing a preliminary injunction. *Kamine/Besicorp*

*Allegany L.P. v. Rochester Gas & Elec. Corp.*, 908 F. Supp. 1180, 1193 (W.D.N.Y. 1995). Such discretion is particularly warranted in a case where the costs and damages sustained by the enjoined party for a wrongfully entered injunction would be speculative. *Bass v. Richardson*, 338 F. Supp. 478, 490 (S.D.N.Y. 1971). Any damage here would be entirely speculative, so Lender should not be required to post a bond.

## **CONCLUSION**

For the foregoing reasons, Lender respectfully requests that the Court grant Lender's Order to Show Cause, grant the preliminary injunction against USSM, and grant such other relief the Court deems just and proper.

Dated: New York, New York
August 4, 2022

MORRISON COHEN LLP

By: ___/s/ Y. David Scharf___
     Y. David Scharf
     Brett Dockwell
     Kristin T. Roy
     Latisha V. Thompson
     Amber R. Will
909 Third Avenue
New York, New York 10022
(212) 735-8600
dscharf@morrisoncohen.com
