```
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  DAOL REXMARK UNION STATION
   LLC,
4
                 Plaintiff,
5
            v.                          22 Civ. 6649 (GHW)
6
   UNION STATION SOLE MEMBER,
7  LLC,

8                Defendant.

9  ------------------------------x
                                       New York, N.Y.
10                                     August 23, 2022
                                       2:05 p.m.
11
   Before:
12
                   HON. GREGORY H. WOODS,
13
                                       District Judge
14
                           APPEARANCES
15
   MORRICON COHEN LLP
16      Attorneys for Plaintiff
   BY:  YEHUDA DVID SCHARF
17       LATISHA VERNON THOMPSON
         AMBER RAE WILL
18
   KASOWITZ BENSON TORRES & FRIEDMAN LLP
19      Attorneys for Defendant
   BY:  DAVID EVAN ROSS
20       DAVID J. MARK
         ANDREW BRELAND
21

22

23

24

25
```

1              (Case called)

2              THE DEPUTY CLERK:  Counsel, please state your

3     appearance for the record.

4              MR. SCHARF:  Yahuda David Scharf of Morrison Cohen for

5     the plaintiff along with Latisha Thompson and Amber Will.

6              THE COURT:  Thank you.  Good afternoon.

7              MR. ROSS:  Good afternoon, your Honor.  David Ross

8     from Kasowitz Benson Torres.  I'm here with my colleagues David

9     Mark and Andrew Breland and also a client representative Joe

10    Press who runs Union Station.

11             THE COURT:  Good.  Thank you very much.

12             Counsel, I scheduled this proceeding as an opportunity

13    for a hearing with respect to the application for preliminary

14    injunctive relief with respect to this case.

15             I've reviewed the materials that have been submitted

16    by the parties, including the recent submission by nonparty,

17    Amtrak, and I'm prepared to proceed.

18             Before I do, let me just ask each of the parties

19    whether or not you anticipate that you'd like to present any

20    additional evidence to the Court in connection with these

21    proceedings, apart from the evidence presented to the Court

22    through your affidavits.

23             Counsel first for plaintiff.

24             MR. SCHARF:  We do not, your Honor.  We rest on the

25    submissions that we've made to the Court.

1          THE COURT:  Thank you.

2          Counsel for defendants?

3          MR. ROSS:  Your Honor, we rest on the submissions

4     we've made to the Court.

5          THE COURT:  Very good.  Thank you very much.

6          So before I turn to the parties' arguments, I just

7     want to ask a couple of brief framing questions, a question,

8     which may be answered by the fact that this case is here, which

9     is, recognizing that there are mandatory venue clauses in the

10    underlying agreements, whether the parties had considered

11    stipulating to bring these issues to the district court in the

12    District of Columbia.

13         Just a question.  I'm not advocating for you to do

14    anything in that regard, but it seems as though it's a useful

15    threshold question for me to ask the parties about.

16         Counsel first for plaintiffs.

17         MR. SCHARF:  Yes, your Honor.  We gave some

18    consideration to that.  As your Honor might know, there is a

19    prior pending action between the lender and the guarantors that

20    was brought here before this Court.

21         And in looking at the issues that are before this

22    Court in this case, as well as in the guarantee action, we felt

23    that all of the loan document issues, including the guarantee

24    issues, were more appropriately brought before the Court where

25    there was mandatory venue, in particular, because that would

1   not occasion any delay in discussion about the important issues

2   that we're here before this Court on.

3                THE COURT:  Thank you.

4                MR. ROSS:  Your Honor, this is the first that I've

5   heard of some consideration by the plaintiffs regarding this

6   case being conducted in D.C.  We're agreeable to it being

7   conducted before Judge Mehta in Washington D.C.

8                Obviously he's got fundamental issues that relate to

9   the subject matter.  And some of the relief that's being sought

10  here we think, as we've said in our papers, treads on his

11  jurisdiction, either directly or implicitly, and issues in the

12  case.  And I think Amtrak touches upon that in their filing.

13               There is no mandatory jurisdiction as regards Daol,

14  the lead plaintiff in this case, which was not created until

15  recently and isn't a party to any agreement that has a

16  mandatory jurisdiction clause.  So if your Honor is so minded

17  to have Judge Mehta decide these issues or transfer the case,

18  we're agreeable to that.

19               THE COURT:  Understood.  Thank you.

20               I'm not going to transfer it on my own recognizance.

21  I think that the parties would have to likely agree, given the

22  nature of the venue clauses in the underlying contracts.

23               Counsel, since we're here, I understand the parties

24  don't want to work any further towards an amicable resolution

25  of the issues presented.  Again, I'm not pressing for it.  I'm

 1    happy to take up the issues presented.

 2           But you're all here in the room together.  So I just

 3    want to ask whether there is anything I can do at this point

 4    that might facilitate an amicable resolution before I take up

 5    the application.

 6           Counsel for plaintiff, is there anything I can do

 7    first?

 8           MR. SCHARF:  We are of the unfortunate belief that we

 9    have tried to do everything up to this point to try to avoid

10    and necessitate the filing of this action.  As your Honor saw

11    in our original application, we believe the divide is too large

12    to bridge and this requires the Court's intervention.

13           THE COURT:  Fine.  Good.

14           So, Counsel, again, as I've said, I've read the

15    parties' submissions in connection with this application.

16           Do either of you wish to present any argument to the

17    Court in support of your position?

18           I'll begin with counsel for plaintiff, again, with the

19    reminder that I've reviewed the materials submitted by the

20    parties on the docket.  That said, I'm happy to hear any

21    arguments that you'd like to present to focus the issues

22    presented to the Court or to highlight issues that may have

23    been presented to the Court in your respective submissions.

24           Counsel for plaintiff?

25           MR. SCHARF:  Yes.  I would be very brief, your Honor,

1   and I would address truly what I believe to be a remarkable

2   proposition that is being raised by the defendant and to try to

3   address it in the context of longstanding precedent.  And I

4   don't believe my presentation should take longer than

5   ten minutes, unless your Honor would have questions.

6           THE COURT:  Please proceed.

7           MR. SCHARF:  Thank you, your Honor.

8           So this case starts with an unremarkable proposition

9   of a real estate developer borrowing a lot of money, taking on

10  a lot of leverage and, in this particular case, pledging two

11  pieces of collateral.  One is the leasehold interest of Union

12  Station and a mortgage loan to a senior lender, the mortgage

13  lender — that is one borrower — and then the mezzanine lender

14  lending another $100 million which, as we've seen, the borrower

15  takes and puts in his pocket.  And a short while later, there

16  is a default and a failure to perform.

17          The rights of the mezzanine lender are clear;

18  unequivocal; and mostly, they are cumulative.  Where this case

19  takes a slightly different left turn to the perhaps not most

20  regular circumstances is in the context of the exercise of the

21  mezzanine lender's remedies, there is a condemnation, an

22  eminent domain.

23          But the most important thing, as your Honor knows from

24  reading our papers, is that eminent domain touches the senior

25  loan collateral, the leasehold interest.  The mezzanine lender

1     has an interest in the ownership of the tenant.

2             And we set forth in Exhibit B to my reply declaration,

3     we walk your Honor through the progression of what happens as

4     the mezzanine lender begins to exercise its remedies.  The

5     collateral is different than the taking.  And Amtrak is very

6     clear that its eminent domain does not touch upon the ownership

7     interest of USI, which is the senior borrower and its

8     membership interests which are the mezzanine, which is the

9     mezzanine borrower.

10            Now, when I say what becomes remarkable about this

11    case is in every other mezzanine foreclosure conducted under

12    the Article 9 of the UCC, there is a foreclosure.  There is

13    advertising.  There's everything that goes on.  And all of that

14    happens here.  And at the conclusion of it, the mezzanine

15    lender's designee, Daol Rexmark, becomes the owner of USI.

16            And unlike any other situation, the prior owners of

17    USI crossed their arms and say, we know you did all of these

18    things.  They're a nullity.  You did all of these things.  We

19    didn't challenge them in court.  We didn't go and seek an

20    injunction and claim that we are being irreparably harmed; that

21    there is some interest that requires an adjudication

22    beforehand.  They just simply sat back and said there's a

23    nullity.

24            Well, the law is clear, and precedent on that is clear

25    that a failure by a mezzanine borrower to go to a courthouse

1   and seek and obtain an injunction to stop the sale under

2   Article 9 -- Article 9 provides a remedy, which is damages.

3           Well, they're not seeking damages.  What the borrower,

4   the mezzanine borrower, is effectively doing is it has

5   arrogated for itself a nonjudicial injunction by crossing its

6   arms and saying nothing has happened.

7           But the law is clear that something has happened.

8   Ownership has transferred of USI.  And as a consequence of

9   that, the new owners of USI are being hampered, hindered, and

10  prevented from exercising their rights as owners of USI.

11          And those rights as owners of USI include the

12  obligation to repay the senior loan.  Currently it is the right

13  to control the management and possession of Union Station, as

14  well as deal on behalf of USI with Amtrak's claim in the

15  eminent domain proceeding.

16          We have come to this Court because Ashkenazy -- I will

17  refer to him generally -- or Mr. Ashkenazy and his companies

18  are continuing to exercise control over an entity over which

19  they no longer have an ownership interest.

20          Now, despite the fact that they didn't challenge that

21  in a courthouse before it happened, they are saying two things

22  have happened here which they believe support their proposition

23  that nothing has truly happened.

24          Number one, they say because the eminent domain, the

25  condemnation, occurred, the mezzanine lender's rights were

1    limited.  They were truncated, despite the fact that the

2    section that they rely upon, Section 5.2.2 of the loan

3    documents, does not have the magic language that the courts

4    interpreting New York law say it needs to have which is if

5    sophisticated parties intend to limit rights and remedies, they

6    better say it.  And it doesn't say it.

7         There is no provision in 5.2.2 which deals with

8    eminent domains and condemnations that says, in any way, shape,

9    or form, that the lender's rights, all of which are set forth

10   in other sections of the loan documents or in the pledge

11   agreement, for instance, which otherwise all provide that the

12   rights are cumulative but that in the situation of eminent

13   domain, that somehow all of the rights that are otherwise out

14   there are truncated and limited to the power of attorney, the

15   irrevocable power of interest, the irrevocable power of

16   attorney with an interest which gives the lender the right to

17   act as if it were the borrower.

18        And that brings us to the second element of our

19   requested relief.  We thought it was an unremarkable

20   proposition that once the eminent domain was started, we as

21   lender raised our hand and said, we have the rights under 5.2.2

22   to act with Amtrak.

23        And if you look at the papers that have been before

24   Judge Mehta -- and we've submitted some of them and

25   cross-referenced others -- it didn't appear that the mezz

1   borrower was contesting the lender's rights to exercise and

2   utilize that power of attorney, which is why, when we were

3   before Judge Mehta and we were going back and forth on those

4   stipulations, we put in a provision of what we believed to be

5   the unremarkable proposition that we have these rights, and it

6   was stricken.

7          And Ashkenazy is taking the position that we have a

8   seat that does not give us the rights that we have under

9   Section 5.2.2.  And they are saying that they have the right to

10  control the litigation.  We only have a right to settle and get

11  money.

12         But that's not what 5.2.2 says.  5.2.2 says they grant

13  us an irrevocable power of attorney with an interest, and it

14  then enumerates certain powers that we have.  But those powers

15  are not a limitation.

16         And as a consequence of that, Ashkenazy is taking the

17  position that they can continue to act, despite the fact that

18  they have been foreclosed, despite the fact that we have

19  exercised our power of attorney under 5.2.2.

20         And in so doing, they are causing irreparable harm to

21  the lender, irreparable harm as has been recognized by numerous

22  courts in New York.  Both in the federal and in the state court

23  system in interpreting New York law, irreparable harm is when

24  somebody has management rights, control rights, that are being

25  interfered with.

1       And that's exactly what's going on.  It's exactly

2   what's been happening.  The vendors are unsure who to answer

3   to.  The managing agent is being prevented from dealing with

4   the true owner of the property.  Ashkenazy continues to hold

5   out to Amtrak that it is a party that needs to be addressed.

6   The other argument that they make is that there's an

7   anti-assignment provision that prohibits this foreclosure from

8   happening.

9       Two quick points to that which are in our papers:

10  Number one, Amtrak -- and the law is clear that the

11  anti-assignment provision, as it relates to eminent domain and

12  condemnation, does not apply to Amtrak because Amtrak is not a

13  governmental agency as defined under the anti-assignment

14  provision.

15      But importantly, going back to that distinction

16  between the different types of collateral that are being

17  addressed here, we might be having a different conversation if

18  the senior lender were foreclosing on the leasehold interests.

19      The lender here is the true owner of USI, and we have

20  foreclosed on an upper-tier interest.  USI remains as a party

21  that will be in the eminent domain condemnation proceeding.  It

22  will be a recipient of condemnation proceeds, the fair value as

23  that is determined by Judge Mehta.

24      But what we are talking about is a level above,

25  different collateral.  This is not an assignment of a claim of

1   eminent domain.  This is an issue that relates to who owns and

2   controls USI.

3           Your Honor, the conflation of the collateral, the

4   conflation of the cases, continues in the request that has been

5   made by the borrower for a $150 million plus bond.  And that

6   will be the last point that I will address before I sit down,

7   unless your Honor has questions.

8           And that is it is true that the underlying merits of

9   this case, our claim for declaratory judgment, is that we have

10  succeeded in a foreclosure of all of Ashkenazy's equity in this

11  project, but that is not what we're here for today.

12          What we're here for today is much more limited, and

13  that is until this case is decided, that Ashkenazy be prevented

14  from interfering with our ownership of USI and Ashkenazy be

15  prevented from interfering with our power of attorney that it

16  granted us because as commercial parties to commercial

17  agreements between sophisticated parties, they must be held

18  sacrosanct, and Ashkenazy must be held to its bargain.  And as

19  a consequence of that, we are entitled to an injunction with no

20  bond or a minimal, nominal bond at most.

21          THE COURT:  Good.  Thank you.

22          Let me turn to counsel for defendant.

23          Counsel, what would you like to offer?

24          MR. ROSS:  Your Honor, David Ross from Kasowitz,

25  Benson, Torres.

1      There are a number of I think obvious propositions

2   that the Court is confronted with in handling this application.

3   Number one is have they shown irreparable harm.  Is there

4   anything urgent before the Court that must be done right now

5   because, otherwise, something terrible will happen.

6      The answer is absolutely not.  Nothing that has been

7   presented to your Honor is imminent.  For example, with respect

8   to the operation of Union Station, which my client has been

9   continuously operating for 15 years.  And since April when the

10  condemnation occurred, they have been continuously, safely, and

11  properly operating Union Station.

12      The only problem that is currently existing is that

13  the lender is laying in the way of getting bills paid because

14  it doesn't like the fact that Ashkenazy entities have control

15  of the bank account that pays the bills.  That's all that's

16  going on.  They are interfering with our ability to continue to

17  manage the station while Amtrak is litigating its possession

18  motion.

19      So, number one, a key element of the relief that they

20  seek is to interfere with the status quo.  Your Honor has not

21  been presented with one iota of proof that there is anything

22  urgent in that regard.

23      In the reply papers that were filed by Mr. Rebibo, he

24  has come up with one bill from a company called Cinatas.  It's

25  a $700 bill that Mr. Rebibo says has not been paid from

1    February.

2              We're talking about multimillion dollar, complex

3    operations, and what plaintiff is offering to you is a $700

4    bill that has not been paid since February.  In fact, it has

5    been paid.

6              We checked with Cinatas.  It has been paid.  The only

7    bills that have not been paid are what Mr. Scharf's client

8    refuses to pay in order to procure the very urgency or

9    emergency which they present to you today.  A party cannot in

10   equity come with dirty hands or unclean hands to you and tell

11   you must help them for a problem of their own creation.

12             Number two, the relief that they're seeking in part B

13   of their preliminary injunction is that you should declare that

14   plaintiff and plaintiff alone has the sole authority to settle

15   with Amtrak a case that was just filed in April.

16             Well, there is absolutely no urgency to that, nor any

17   presented to you.  First, we are not even close to settlement.

18   Indeed, Mr. Scharf told Judge Mehta that he intends to contest

19   the validity of the condemnation.  He wants to conduct

20   discovery in Washington D.C.  It's going to take quite some

21   time.  He opposes any effort by Amtrak to gain possession while

22   his client is contesting the validity of the condemnation

23   itself.

24             And therefore, we are so far from there being a

25   decision point as to a settlement with Amtrak that it borders

1    on, again, a self-created emergency for which your Honor has

2    really been presented with nothing to indicate that you need to

3    do something on that urgently while this hotly contested case

4    proceeds.

5         Let me also note that Amtrak -- while it says that it

6    really doesn't take a position on what the parties have sought

7    here, Amtrak, the current owner of the leasehold interest in

8    the station by reason of the condemnation says that your Honor

9    should do nothing precipitous concerning the management or

10   affecting the management of the station itself; and second,

11   that because Amtrak's possession motion is being briefed, you

12   shouldn't do anything from the standpoint of public interest

13   and safety, which is one of the elements that is to be

14   considered on a preliminary injunction; that you should do

15   nothing to upset the status quo with respect to the operations

16   and management of Union Station.

17        Well, as I told you, my client has been operating it

18   continuously for 15 years and continuously since April 14 or

19   the date that the actual condemnation was filed and the quick

20   take took effect under the law.

21        So my client -- he used the same metaphor that I used

22   with Judge Mehta.  My client is an expert pilot in operating a

23   complex aircraft like a 747.  They've been doing it

24   continuously.  They know what they're doing.  It doesn't simply

25   involve what any average person or any management company or

1     any bank based in Korea or New York City knows how to do.

2           Mr. Press deals with complex issues, including safety

3     and security, of the nation's biggest transit hub and also one

4     that is a landmark and that involves coordination with federal

5     authorities.

6           So it's not simply that you're being asked to decide

7     who has what rights to what equity in what mezzanine-level debt

8     but what's going to happen between now and when Amtrak's

9     possession motion is decided if a Korean bank takes over the

10    operation of Union Station.

11          Now, they keep telling you in the papers that there's

12    a company called Jones Lang LaSalle that really knows what it's

13    doing.  And if they kick Ashkenazy out, don't worry.  Jones

14    Lang LaSalle will know what to do.

15          Well, that's not so, your Honor.  Jones Lang LaSalle

16    handles back-room operations and contacts.  They make payroll.

17    They take orders from the man sitting behind me, Joe Press.  He

18    tells them what to do and when to do it.  He is the man

19    handling the critical operations of that building day in and

20    day out.  He's the one who meets with people regarding

21    infrastructure and safety.

22          So the prospect that you needn't worry about that,

23    Judge.  You just take care of plaintiff's claim that they're

24    entitled to run the show and they'll take it from there, that

25    doesn't meet the standard of a preliminary injunction for

1    emergency relief.  And in fact, it's the opposite.  You should

2    not upset the status quo while a declaratory judgment case that

3    is hotly contested is before you.

4            Let me talk about the merits of this claim because

5    Mr. Scharf says it's remarkable, remarkable that my client

6    refuses to acknowledge the validity of a paper transaction that

7    he and elements of the plaintiff banks decided to do on a

8    tabletop somewhere and then tell you that changes the entire

9    complexion of this case.

10           All they did is prepare papers, your Honor, and then

11   tell us, guess what.  We have just eaten your lunch.  You no

12   longer own any equity in Union Station.  You, who have been

13   running it for 15 years and paying debt service until COVID hit

14   and stopped all traffic and income to Union Station, you have

15   nothing, Mr. Ashkenazy and his companies.  We're entitled to

16   take that completely from you and leave you with nothing,

17   absolutely nothing.

18           Why?  Well, even though the credit agreement says they

19   should get repaid the amount of the debt and interest and

20   whatever fees they're entitled to under the contract, they say,

21   because we did this paper transaction on a tabletop, we get to

22   close you out completely.  And even if there is $150 million or

23   $200 million or $300 million above the debt, guess what.  We

24   get to keep that.

25           Why?  Because we say so, because we decided, after the

condemnation, remove the property that was the actual holding

of the mortgage loan and also the actual holding of Investco,

so Investco, a company with no employees and no assets except a

former interest in -- a former interest in the lease and the

leaseholder, even though there is no property any more and even

though there is nothing to fight over regarding Investco except

who is going to get what condemnation proceeds, they say, no.

Because of this paper transaction, we can take $300 million,

$150 million or $300 million or whatever it is above the value

of the debt.

          Now, Judge, I don't know anywhere where that's okay,

whether in equity or at law, where the lender gets to

basically, after a -- let me just note this -- I'm sorry.  Let

me withdraw that last statement.

          They have not cited to you a single case anywhere that

supports the proposition that they're asking you to buy here.

They haven't found one case in the condemnation context where a

post-condemnation foreclosure affects the relief that they

seek.

          They haven't cited a single case to you.  Though they

have the burden of proof, they have not cited a single case to

you that relies on the language of an agreement of the kind we

have here.

          And let's talk about the actual credit agreement, your

Honor, because, after all, it's the contract between the

1    parties.  And Mr. Scharf keeps telling us how sophisticated the

2    parties are.

3            Well, his client decided to go into this contract on

4    the basis of their sophistication.  And Section 5.2.2 has about

5    11 sentences to it.  And basically, in sum and substance, it

6    describes a crucial event in the life of a property that is the

7    subject of a loan.

8            In one case, you could have a fire.  It burns down the

9    property completely, a casualty.  That's an important event for

10   both owner and lender.  In this case, we have a different kind

11   of critical event in the life of a loan.  We have a party with

12   eminent domain power which has taken not just a small interest,

13   the entire interest in the entire investment.  And this

14   contract and Section 5.2.2 tells us what happens in that event.

15           And the lender, a crucial part of their argument, is,

16   well, some part of their credit agreement that's hundreds of

17   pages long says that the lender can exercise any remedies they

18   want.  They're cumulative.  They're not selective.

19           I agree with that.  That's what it says.  But we all

20   know that it's important to actually read the document.  And in

21   this particular case, 5.2.2 not only says that my client, the

22   property operator, needs to litigate the case against Amtrak,

23   they're obligated to do that.

24           They have to litigate it, and they have to cooperate

25   with the lender at the front table, and they have to tell them

1   what's going on.  And they can't settle the case without the

2   lender's consent.

3          And also, if they're in default -- and really there's

4   no dispute that they're in default on the loan.  That's not

5   disputed.  What happens in that event.  Well, it says that:

6   "If there's an event of default --" sorry, your Honor.  Let me

7   just find it.  "Subject to the rights of mortgage lender and

8   under the mortgage loan documents --" that's the senior credit

9   agreement -- "lender is hereby irrevocably appointed to act

10  after the occurrence and during the continuance of an event of

11  default as borrower's attorney in fact, coupled with an

12  interest, with exclusive power to collect, receive, and retain

13  any award and make any compromise or settlement."

14         Now, what else does it say in this agreement, which

15  Mr. Scharf doesn't want to talk about?  Well, in the last

16  sentence of this agreement, it says that regardless of any

17  foreclosure, should one occur, that the lender can only receive

18  up to the amount sufficient to pay the debt in full.

19         So the parties themselves, in the drafting of this

20  very document section that they rely on, say that the most they

21  can get is the amount of the debt.  That's not what they're

22  asking you to rule on, Judge.

23         They're asking you to rule that they get everything

24  completely forever and we get zero and that they control the

25  litigation even though it says that we're supposed to litigate

1  the case.

2          So the actual words of the document are contrary to

3  the provisions that the lender argues.  Then your Honor has to

4  deal with the typical issue --

5          THE COURT:  Sorry.  What's the defined term "property"

6  mean in that clause?

7          MR. ROSS:  "Property" means the leasehold interest.

8          THE COURT:  Thank you.

9          So are we talking about a sale of the leasehold

10  interest here?

11          MR. ROSS:  No.  We're not talking about it, your

12  Honor.

13          THE COURT:  Thank you.

14          MR. ROSS:  However, it does confirm that what the

15  intent here is that it's limited to the value of the debt.  So,

16  your Honor, the other typical contract construction issue that

17  you're confronted with is, well, how do I square the fact that

18  there are these limited remedies and also grants of rights in

19  5.2.2 with the general provision --

20          THE COURT:  What are the limited remedies, Counsel?

21  You've described all of the things that the borrower must do.

22          But as counsel for plaintiff points out, there's

23  nothing in this clause that says that they shall not do

24  anything.

25          So what are the limitations that you're pointing me

```
 1   to?

 2          MR. ROSS:  Well, for example, Judge, it says that we

 3   have to get their consent to settle, but that means that we

 4   actually are the ones participating in it.  Their argument now

 5   is I can use foreclosure or other remedies to wipe out any

 6   rights you have completely, but that's not what's here.

 7          And in fact, Judge, it would have been very easy for

 8   them to affirmatively say in the event of a foreclosure, in the

 9   event of a condemnation of the entire interest, you, borrower,

10   have no rights any more.  We stand completely in your shoes,

11   and the collateral is ours.  That's all it would have to say.

12   They don't provide that too.

13          THE COURT:  Why does it not say that because --

14          MR. ROSS:  Well, because the power of attorney --

15          THE COURT:  Counsel, we cannot both speak at the same

16   time.

17          MR. ROSS:  Apologies, your Honor.

18          THE COURT:  I don't recall if you recall this, but it

19   would be polite if you would let me speak, and then you can

20   respond.  Indeed, as you may know, that's the only way that the

21   court reporter can transcribe what we're saying.

22          Is that clear?

23          MR. ROSS:  Yes, it is.  And I apologize, your Honor.

24          THE COURT:  Thank you.

25          So why does it not say exactly that when it says that
```

1    during the continuance of event of default, the lender can

2    foreclose on the collateral?

3        Why is there a provision in the contract, as

4    plaintiff's counsel argues, that says that during specific

5    circumstances, namely, the continuance of event of default,

6    they can take the collateral?

7        MR. ROSS:  Because there is no provision in this

8    section which changes the rights and responsibilities of the

9    parties as of a condemnation.  It is a signal event in the life

10   of this property and this loan.

11       THE COURT:  Thank you.  You can proceed.

12       MR. ROSS:  So, your Honor, I also want to try to

13   address a few other key provisions here.  There is at best,

14   your Honor, at best, a hotly disputed -- we think that the

15   words of this section are clear and that they override any

16   general other rights because they are specific and because a

17   foreclosure would effectively undo every section of 5.2.2.

18       If it were intended that they could completely wipe

19   out this provision, it would say that, and it doesn't.  It's

20   the absence of any affirmative statement, your Honor, and also

21   the general contract construction principles, under New York

22   law, which apply here, that every part of the contract is meant

23   to be given effect and that no part of the contract should be

24   written to be inconsistent with the other.

25       So at best, your Honor, there are hotly --

1          THE COURT:  Let me just pause you on that.

2          Section 5.1 requires the borrower to get insurance.

3          Are you saying that so long as the borrower needs to

4   get insurance, the lender cannot foreclose?

5          MR. ROSS:  No, your Honor.

6          THE COURT:  Thank you.

7          So why is 5.2.2 in the event of a casualty any

8   different than the insurance covenant or any other covenant in

9   this or any other loan agreement?

10          MR. ROSS:  Because the property has been completely

11   taken.  It's a very different event in the life of the loan

12   where there's no property any more.

13          THE COURT:  Thank you.  I've heard enough.

14          What else would you like to tell me?

15          MR. ROSS:  Your Honor, otherwise what I'd like you to

16   know is that there's a direct conflict in the papers, number

17   one, on whether there is any urgency at all; number two, that

18   the burden of proof is on the plaintiff.

19          And it's very high here because they're seeking

20   essentially the ultimate relief in the case.  While Mr. Scharf

21   has told you that he's not trying to affect anything about the

22   management of Union Station, at the same time, that is exactly

23   what the relief is that they're seeking in part A of the

24   injunction order that they have drafted.

25          And part B seeks the ultimate relief as to who

1  ultimately gets the proceeds in this case.  And they're asking

2  you, as a preliminary matter, before you have heard any other

3  evidence, before any discovery, or before anything else, you

4  should go to the final conclusion and determine that the lender

5  wins.

6        That is essentially the relief that they have sought,

7  and your Honor should deny it for the reasons set forth in our

8  papers and what I have just said, your Honor.  Thank you.

9        THE COURT:  Very good.  Thank you very much.

10        So I'm prepared to rule on the application now.

11  Please bear with me as I review my conclusion and reasoning.

12  Apologies.  I'm going to spend a little bit of time reading

13  this decision into the record for the sake of time since the

14  parties have brought this to me as an issue of urgency.

15        I.  Introduction

16        I called this hearing to discuss Plaintiffs' August 4,

17  2022 motion for a preliminary injunction.  This action was

18  filed on August 4, 2022.  The Plaintiffs in this action are

19  Daol Rexman Union LLC ("Union Station Sub") and Kookmin Bank

20  Co., Ltd., individually and in its capacity as trustee

21  ("Kookmin" or "Trustee"), of KTB CRE Debt Fund No. 8, a Korean

22  Investment Trust (the "Trust").

23        The Trust's agent in Korea is Daol Fund Management Co.

24  ("Daol"), and the Trust's agent in United States is Rexmark

25  (together with Union Station Sub, Trustee, the Trust, and Daol,

1  "Lender").

2         On August 4, 2022, Plaintiffs made an application for

3  the injunctive relief that is the subject of this hearing.  In

4  support of the application, in addition to their memorandum of

5  law, Dkt. No. 8 (the "MIS"), Plaintiffs submitted a declaration

6  by Michael Rebibo, Dkt. No. 7 ("Rebibo Decl.").

7         I accepted the case as related to a previously filed

8  case on August 8, 2022, and issued an order to show cause why

9  the relief requested by Plaintiffs should not be granted on

10 August 10, 2022, Dkt. No. 19 (the "Order to Show Cause").

11        Defendants filed an opposition on August 15, 2022,

12 Dkt. No. 27 (the "Opposition").  In support of the Opposition,

13 Defendants filed two declarations:  the declaration of Yossi

14 Preiserowicz, Dkt. No. 28 ("Press Decl."), and the declaration

15 of David Ross, Dkt. No. 29 ("Ross Decl.").  Plaintiffs replied

16 on August 19, 2022, Dkt. No. 30 (the "Reply").

17        On August 22, 2023, Amtrak requested leave to file an

18 amicus brief in this case.  Dkt. No 33.  I have considered

19 Amtrak's brief (the "Amicus Brief").

20        This case is somewhat complicated by the ongoing

21 condemnation proceedings in the District of Columbia, and

22 questions regarding the ongoing management of Union Station.

23        But as the Amicus Brief points out, the Court can

24 resolve the issues presented here without wading into those

25 issues.  Fundamentally, the issues presented here are

relatively straight forward.

I have a secured lender who was not paid when due, and who, after a lengthy forbearance executed its rights as a secured creditor to seize its collateral.  On the other hand, I have a borrower, who apparently believes that it can fail to pay its debts for years, ignore a foreclosure proceeding, snidely, sneeringly refer to that as "preparing papers" and continue to act as though there were no consequences for its failure to meet its obligations.

Because Plaintiffs have demonstrated a substantial, clear likelihood of success on the merits, and irreparable harm, I am going to grant Plaintiffs' request for injunctive relief.

We will talk about the scope of the injunctive relief after I have provided an overview of the relevant facts and an outline of my analysis of the issues.

II.  Facts:

The fundamental facts at issue here are undisputed. Defendant Union Station Sole Member ("USSM") owned the equity interests of Union Station Investco, LLC ("USI").  Rebibo Decl. 8-9.  Ashkenazy Union Station Holdings LLC ("Ashkenazy Holdings") is a parent company to USSM.  Press Decl. 23.  I understand that that entity is ultimately controlled by Ben Ashkenazy.

At the time that the loans at issue here were entered

1  into, USI had a contractual right to possession and control

2  over a leasehold interest in Washington Union Station ("Union

3  Station").  Id. 6.  I am not taking any position over who has

4  control over the leasehold interest in Union Station today.

5          Lender holds two loans that are relevant to this

6  discussion.  USI took out a mortgage loan in the principal

7  amount of $330 million, secured by its ground lease for Union

8  Station (the "Mortgage Loan").  Rebibo Decl. 10.

9          The Mortgage Loan is documented by a Loan Agreement,

10  dated as of May 8, 2018, between USI and the prior lender.

11  Rebibo Decl. Ex. A.  In January 2022, Lender purchased that

12  loan from the original lender for approximately $358 million.

13  Id.

14          USM borrowed a separate mezzanine loan from Lender.

15  Rebibo Decl. 8.  That mezzanine loan is documented by a

16  Mezzanine Loan Agreement, dated as of May 8, 2018, between USM

17  and Kookmin Bank Co. Ltd., as trustee (the "Mezz Loan

18  Agreement").  Rebibo Decl. Ex. B.

19          The original principal amount of that loan was $100

20  million.  In conjunction with the Mezz Loan Agreement, USM

21  entered into a pledge and security agreement, Rebibo Decl. Ex.

22  C (the "Pledge Agreement").

23          Pursuant to the Pledge Agreement, USM pledged all of

24  the interests in the so-called "Pledged Company Interests"-the

25  limited liability company interests of USI then-owned by USSM.

Pledge Agreement §2.

The Pledge Agreement provided the Lender substantial rights to enforce its security interest.  Id. §9.  Among those rights, was the right, following an Event of Default, to "exercise all rights and remedies of a secured party under" the Uniform Commercial Code, including, without limitation, to "sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best in its sole discretion, for cash or on credit or for future delivery without assumption of any credit risk."  Id. §§9(a)(i), 9(b).

The COVID-19 pandemic had a devastating impact on Union Station.  Press Decl. 20.  There was a reduction in foot traffic through Union Station, and, as a result, many of USI's tenants went out of business or were unable to pay rent.  Id. That caused a reduction in USI's, and, thus USSM's revenues. Id.

As a result, since May 9, 2020, USSM and USI have not made their full monthly debt service payments.  Id.  21; Rebibo Decl.  11.  Failure to pay monthly debt service when due constitutes an "Event of Default" under the Mezz Loan

Agreement.  Mezz Loan Agreement §10.1(a).

Lender initially agreed to a forbearance period in which Lender would not take action against USSM, and extended advances to provide USSM an opportunity to bring the loans under the Mezzanine Loan Agreement into good standing.  Rebibo Decl.  11; Press Decl.  21.

I understand that during the forbearance period, USSM took steps to try to bring the loan current, including through efforts to secure a third party equity investor.  Press Decl. 25.  That investment fell through.

In the Press declaration, Defendants attribute that failure to Lender's choice not to consent to the change of control.  While described as "misconduct with respect to this Investment" in the Press declaration, id.  25, nothing in the declaration explains why the exercise of Lender's contractual rights to approve changes in the equity structure of the company constituted "misconduct."

Following the failure of that investment, USI and USSM attempted to negotiate with the lenders regarding a further forbearance arrangement.  Id.  26.  However, before any forbearance agreement was documented, foreclosure sales were noticed with respect to the loans.  Those sales did not come to pass at the time, as instead, on January 5, 2022, the mortgage loan was acquired by Kookmin, the lender of the mezzanine loan. Id.  27.

1          Reading between the lines, it seems that all of the

2    parties to this action were "blindsided," Press Decl.  31, when

3    on April 14, 2022, Amtrak began a condemnation proceeding with

4    respect to the station in the District Court in the District of

5    Columbia (the "D.C. Action").  Rebibo Decl.  13.  In it, Amtrak

6    asserted that it had taken over the titular ownership of USI's

7    leasehold interest.  Id.  (As an aside, I don't know why Amtrak

8    decided to act without notice to any of the players, all of

9    whom had potentially hundreds of millions of dollars at stake.)

10         As a result of the condemnation, Lender sent notice to

11    the relevant parties that it was asserting its right pursuant

12    to Section 5.2.2 of the Mezz Loan Agreement to make a

13    compromise or settlement of any condemnation proceeding.  Id.

14    14.  According to Lender, USSM and Mr. Ashkenazy "ignored

15    Lender's exclusive rights to settle the Condemnation Action."

16    Id.  15.

17         Given the significance of the condemnation proceeding,

18    and with Lender apparently believing that Mr. Ashkenazy and his

19    affiliates were disregarding their rights with respect to the

20    condemnation proceeding, Lender sent notice that it was

21    exercising its rights under the Pledge Agreement, including its

22    asserted right to act as attorney-in-fact in connection with

23    any condemnation proceeding.  Id.  16.  USSM and Mr. Ashkenazy

24    claimed in the condemnation proceeding that Lender's rights not

25    included in Section 5.2.2 were extinguished as of the date of

1   the condemnation.  Id.

2          Lender then commenced a process to foreclose on the

3   mezzanine loan's security.  On May 13, 2022, Lender sent out

4   notice that it would conduct an Article 9 foreclosure sale.

5   Id. 23.

6          The foreclosure sale was conducted by Cushman &

7   Wakefield, as marketing and sales agent.  They sent out emails

8   to lots of potentially interested persons.  Id.  25.  The sale

9   was publicized broadly.  Id.  134 confidentiality agreements

10  were approved to view the relevant documents; 70 parties

11  reviewed materials in the data site.  Id.

12          At the date of the sale on June 14, 2022, Lender was

13  the only qualified purchaser who appeared.  Id.  I have

14  reviewed the transcript of the sale proceedings.  Rebibo Decl.

15  Ex. J.

16          Among other things, the participants understandably

17  checked before and after the completion of the sale to see if

18  USSM had done what many creditors do when they fail to pay

19  their debts when due and want to keep control of the company

20  pending resolution-file for bankruptcy.

21          For reasons unknown to me, USSM chose not to file for

22  bankruptcy, and, instead, despite due notice of the sale,

23  permitted it to proceed without objection, or any effort to

24  obtain injunctive relief with respect to the sale from any

25  court.  Rebibo Decl. 27.  At the foreclosure sale, Lender bid

1   a very large amount for USSM's equity interests in

2   USI--$140,535,334.53.

3           Following closing of the sale, "[r]emarkably, USSM and

4   Ashkenazy continue to refuse to step aside."  Id.  29.  Before

5   the exercise of the Lender's rights, USSM worked with Jones

6   Lang LaSalle Americas, Inc. ("JLL") to operate the station.

7           I understand that Ashkenazy Acquisition Corporation

8   ("AAC"), an affiliate of USSM, operated Union Station.  Press

9   Decl.  1.  According to the Press declaration, JLL was retained

10  by AAC as property manager for the facility.

11          I understand that employees are hired at the direction

12  of AAC and are supervised by AAC, but are employed by JLL and

13  report to the JLL employee GM, who reports to Mr. Press, as an

14  officer of AAC.

15          The current GM is apparently an employee of AAC.  (I

16  flag that this arrangement as described is sort of

17  weird-namely, that the property management agreement was

18  entered into with an affiliate of USSM and USI, rather than one

19  of those entities.

20          This is weird because, as I understand Mr. Press'

21  declaration, it is USSM and USI that have the responsibility to

22  run the station.  That leads to some complexity that I will not

23  try to unwind today.

24          I do not know what the basis is for AAC to assert any

25  rights with respect to the management and operations of Union

1   Station, and what relation that has, if any, to the ownership

2   of USI's equity.

3          It may be, for example, that USM has entered into a

4   contract with AAC to do that work.  It may be that they are

5   acting in this way simply because Mr. Ashkenazy controls both

6   companies without any kind of corporate formalities to document

7   the relationship and authority of AAC.

8          I just don't know, and I am not resolving questions

9   related to the direct management of Union Station now; I

10  understand that those issues are being litigated in the D.C.

11  Action and they are not presently presented to me.)

12         There is some dispute regarding who has the

13  responsibility for controlling the operations of Union Station

14  and its cash flow following the exercise of Lender's remedies.

15  Defendants charge that Kookmin is jeopardizing the operations

16  of the station because it is refusing to permit "AAC to sign

17  new or renewal leases for space in the Station."

18         Mr. Press asserts that Kookmin's "actions over the

19  last few months appear designed to manufacture an emergency

20  where otherwise none would exist."  Press Decl.  42.  Lender

21  says that Ashkenazy and JLL refuse to provide it with important

22  information.  Rebibo Decl.  34.  I understand that this series

23  of disagreements grows out of a disagreement regarding the

24  effect of the exercise of Lender's rights as a secured

25  creditor-the issue presented here.

1          Plaintiffs presented the question of whether the

2    foreclosure sale was valid to the district court in the D.C.

3    Action.  Id.  That court declined to entertain the question,

4    and suggested that the action be brought elsewhere or that the

5    parties work out the issue by stipulation.  Id. 35-37.  The

6    parties were unable to resolve the issue by stipulation, which

7    led to the filing of this action by Plaintiffs.

8          III.  Legal Standard:

9          "The purpose of a preliminary injunction is to

10   maintain the status quo pending a final determination on the

11   merits."  Diversified Mortg. Inv'rs v. U.S. Life Ins. Co. of

12   New York, 544 F.2d 571, 576 (2d Cir. 1976).  "A preliminary

13   injunction is an extraordinary remedy never awarded as of

14   right."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24

15   (2008); see also Grand River Ent. Six Nations, Ltd. v. Pryor,

16   481 F.3d 60, 66 (2d Cir. 2007) (per curiam) (noting that a

17   preliminary injunction "is an extraordinary and drastic remedy,

18   one that should not be granted unless the movant, by a clear

19   showing, carries the burden of persuasion.") (internal

20   quotation marks omitted).

21         Generally, a party seeking a preliminary injunction

22   must demonstrate "(1) either (a) a likelihood of success on the

23   merits or (b) sufficiently serious questions going to the

24   merits to make them a fair ground for litigation and a balance

25   of hardships tipping decidedly in the movant's favor, and (2)

irreparable harm in the absence of the injunction."  Faiveley

Transport Malmo AB v. Wabtec Corp., 559 F.3d 110, 116 (2d Cir.

2009) (citation and internal quotation marks omitted).

"The burden is even higher" when a party seeks "a

mandatory preliminary injunction that alters the status quo by

commanding some positive act, as opposed to a prohibitory

injunction seeking only to maintain the status quo."  Cacchillo

v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011) (quoting

Citigroup Global Markets, Inc. v. VCG Special Opportunities

Master Fund Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010)).

To meet that higher burden, a party seeking a

mandatory injunction must show a "'clear' or 'substantial'

likelihood of success on the merits."  Doninger v. Neihoff, 527

F.3d 41, 47 (2d Cir. 2008) (quoting Sunward Elecs., Inc. v.

McDonald, 362 F.3d 17, 24 (2d Cir. 2004)).  "A heightened

standard has also been applied where an injunction–whether or

not mandatory–will provide the movant with substantially 'all

the relief that is sought.'"  Tom Doherty Assoc., Inc. v. Saban

Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995) (quoting Abdul Wali

v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)).

IV.  Analysis

A.  Irreparable Harm

"The showing of irreparable harm is the 'single most

important prerequisite for the issuance of a preliminary

injunction.'"  Grand River Enterprise Six Nations, Ltd. v.

1    Pryor, 481 F.3d 60, 66 (2d Cir. 2007).  An injury that is

2    remote or speculative will not suffice.  Id.

3         Further, a party seeking a preliminary injunction

4    "must show that it is likely to suffer irreparable harm if

5    equitable relief is denied.'  Thus, a mere possibility of

6    irreparable harm is insufficient to justify the drastic remedy

7    of a preliminary injunction.'"  Costello v. McEnery, 767

8    F.Supp. 72, 76 (S.D.N.Y. 1991) (citation omitted).

9         The Second Circuit has defined "irreparable harm" as

10   "certain and imminent harm" for which a monetary award cannot

11   adequately compensate.  Wisdom Import Sales Co., LLC v. Labatt

12   Brewing Co., Ltd., 339 F.3d 101, 113 (2d Cir. 2003).

13        Where there is no indication that the plaintiff has

14   been hurt or is in imminent danger of being hurt, there is not

15   sufficient factual basis to show irreparable harm.  Jackson v.

16   Johnson, 962 F.Supp. 391, 393 (S.D.N.Y. 1997) (no irreparable

17   harm in prison context from fear of future physical injury

18   without past injury or indication of imminent injury).

19        Here Plaintiffs have demonstrated that irreparable

20   harm will result in the absence of the entry of injunctive

21   relief.  As I will address in a few moments, Plaintiffs have

22   demonstrated a substantial likelihood of success on the merits

23   with respect to their claim that Lender is now the rightful

24   owner of the stock of USI.

25        Defendants are refusing to recognize that ownership

1    interest, and are, instead proceeding as if Mr. Ashkenazy still

2    had an indirect ownership interest in USI.  To the extent that

3    Defendants are asserting rights as owners of USI, or control

4    rights over USI notwithstanding their failure to pay the loans

5    when due, and the resulting default and foreclosure, they are

6    interfering with Lender's ability to operate the company that

7    they have a strong likelihood of showing they now own.

8          The Second Circuit has recognized that the "right to

9    participate in the management of [an entity] has intrinsic

10   value."  Wisdom Imp. Sales Co. v. Labatt Brewing Co., 339 F.3d

11   101, 114 (2d Cir. 2003).

12         Similarly, "[c]onduct that unnecessarily frustrates

13   efforts to obtain or preserve the right to participate in the

14   management of a company may also constitute irreparable harm."

15   Id. at 114-115.  "Other courts in this Circuit have similarly

16   recognized that the loss of a bargained-for 'voice' in the

17   management of a company can constitute irreparable harm."

18   Woods v. Bos. Sci. Corp.,  2006 WL 4495530, at *22 (S.D.N.Y.

19   Nov. 1, 2006), report and recommendation adopted, 2007 WL

20   754093 (S.D.N.Y. Feb. 9, 2007) (collecting cases).

21         In Wisdom, the Second Circuit upheld a preliminary

22   injunction granted to an entity that had entered into a joint

23   venture agreement to form a beer distribution entity.  That

24   agreement gave plaintiff a minority veto over important areas

25   of the joint venture's decision-making.  Id. at 104-105.

1          However, the defendants had approved the integration

2     of new brands of beer into the joint venture even though the

3     plaintiff had attempted to exercise its minority veto.  Id. at

4     105, 107.

5          The district court granted a preliminary injunction to

6     prevent the defendant from frustrating plaintiff from

7     exercising its minority veto, and the Second Circuit affirmed.

8     Id.  In its opinion, the Second Circuit commented that "the

9     denial of bargained-for minority rights, standing alone, may

10    constitute irreparable harm, for purposes of obtaining

11    preliminary injunctive relief where such rights are central to

12    preserving an agreed-upon balance of power . . . in corporate

13    management."  Id. at 114.

14         Wisdom cautioned that "not . . . all bargained-for

15    contractual provisions provide a basis for injunctive relief

16    upon breach or threatened breach," since "such a broad holding

17    would eviscerate the essential distinction between compensable

18    and non-compensable harm."  Id. at 114.

19         Thus, Wisdom held "only that the denial of

20    bargained-for minority rights, standing alone, may constitute

21    irreparable harm for purposes of obtaining preliminary

22    injunctive relief where such rights are central to preserving

23    an agreed-upon balance of power (e.g., preserving the

24    management role of the minority directors) in corporate

25    management."  Id.

1           In Oracle Real Est. Holdings I LLC v. Adrian Holdings

2    Co. I, LLC, a court in this district relied on Wisdom Sales to

3    grant a preliminary injunction where the plaintiff had entered

4    into an agreement with the defendant that entitled the

5    plaintiff to take control of the defendant–a real estate

6    investment venture–if an "event of default" occurred.  582 F.

7    Supp. 2d 616, 626 (S.D.N.Y. 2008).

8           That court commented that "the value of control over

9    defendant is almost entirely a function of the skill and

10   resources of the party who exercises control."  Id; see also

11   Yemini v. Goldberg, 60 A.D.3d 935, 937 (2d Dep't 2009)

12   ("[B]ecause control and management of [the company] and its

13   holdings were at stake, money damages were not sufficient").

14          Here, as in Wisdom and Oracle, Plaintiffs have

15   sufficiently shown irreparable harm because the Defendant has

16   unnecessarily frustrated Lender's efforts to participate in the

17   management of USI.

18          By refusing to acknowledge the foreclosure proceeding,

19   and Lender's control of the management of USI, USSM and

20   Ashkenazy have upset the balance of power that came to pass

21   when Lender became the owner of USI–a balance of power that

22   puts Lender in control of USI's management.

23          As the court in Oracle held, the value of control is a

24   function of the skills and resources of the party in control.

25   Here, Defendants are undermining that value, which I do not

1    believe is capable of being compensated through money damages.

2           As one example of the manner by which Defendant is

3    frustrating Lender's management efforts, Plaintiffs point out

4    that, after the foreclosure, Lender asked JLL, the property

5    management company that is responsible for certain limited

6    account issues and all human resources and payroll issues for

7    employees at Union Station, in order to pay JLL's expenses.

8    Dkt. No. 28 ("Preiserowicz Decl.")  31; Dkt. No. 7 ("Rebibo

9    Decl.")  31.

10          Doing so would alter the funding arrangement that

11   existed prior to the foreclosure, where JLL was paid out of an

12   account jointly managed by Ashkenazy and Plaintiffs.  Rebibo

13   Decl. 31.

14          But when Lender asked JLL to open the bank account,

15   Ashkenazy directed JLL "to cease communication and withhold

16   information" from Plaintiffs.  Id.  33.  That "lack of

17   communication led to service providers and other vendors

18   issuing shutoff notices to USI for failure to remit payment."

19   Id.

20          Though Lender was able to find "workarounds" to

21   mitigate Defendants' interference in that case, Plaintiff avers

22   that Defendant has continued its efforts to "interfere with

23   Lender's obligations by undermining Lender's authority, [and]

24   instructing others to ignore Lender's requests."  Id.  34, 48.

25          The intrinsic value of Lender's ability to manage USI

1   lies in its ability to make decisions that are charged to USI.

2   Thus, the frustration of Lender's decision-making abilities is

3   sufficient to show irreparable harm.

4          Plaintiffs have also sufficiently established that

5   such harm is imminent.  As the aforementioned example

6   illustrates, USSM and Ashkenazy's attempts to frustrate

7   Plaintiff's managerial decision-making has already damaged the

8   intrinsic value of Lender's ability to manage USI.

9          Absent a preliminary injunction, there remains a

10  concrete threat of continued harm from Defendant's refusal to

11  acknowledge Plaintiff's controlling role in USI's management.

12  That is particularly true given that USSM and Ashkenazy

13  rejected the Lender's proposed stipulation that would have

14  acknowledged the change in control of USI.  Id.  40.

15         It is clear that Ashkenazy and USSM are committed to

16  continue their management of the USI regardless of their

17  failure to pay their loans when due and the clear language of

18  the contracts at issues.

19         Defendants argue that "Plaintiffs are not being harmed

20  because . . . Union Station has been condemned by Amtrak" such

21  that "none of the parties to this action have any economic

22  interest in the property."  Opp'n at 13.  But that argument

23  misses the mark.

24         Amtrak's condemnation may entitle Amtrak to financial

25  or property interests in Union Station, that does not undermine

1   Lender's ability to manage USI to maximize whatever value the

2   equity interests in USI may have.

3          The harm that Plaintiffs have shown is not in the loss

4   of revenues or other economic harm to which Amtrak may have

5   some claim; it is the irreparable harm that emanates from the

6   frustration of Lender's ability to control the management and

7   operation of USI.

8          In other words, the question is not, as Defendant

9   suggests, solely which entity is entitled to the economic

10  benefits associated with the management of Union Station.  The

11  question is whether Lender has been harmed by the fundamental

12  inability to exercise its rights to control the management of

13  USI.  Here, as discussed, Plaintiffs have shown that Lender

14  faces irreparable, imminent harm.

15         Defendant also attempts to distinguish this case from

16  Wisdom, but that attempt is unavailing.  Defendant argues that

17  Wisdom "presupposes that the movant has an economic interest in

18  the property at issue."  Opp'n at 15.

19         This is true to an extent, but, I believe that

20  Plaintiffs have a clear and substantial likelihood of success

21  on the merits with respect to their declaratory judgment claim

22  regarding the ownership of USI.

23         Similarly unpersuasive is Defendant's argument that

24  there can be no irreparable harm because Ashkenazy continues to

25  "provide information" to Lender, and provide "Lender notice and

an opportunity to comment and approve of other major actions."

Opp'n at 15.  Again, the irreparable harm stems from the

frustration of Lender's right to serve as the controlling

manager of USI.

Indeed, Defendant's argument that Lender has a

subordinate role to Defendant only highlights the nature of the

irreparable harm claimed-namely, the harm here is that Lender

is forced to play second-fiddle to Defendant in USI's

management, despite the foreclosure proceeding.

Defendant fails to successfully argue that the

purported harm is not imminent.  Defendant argues that JLL's

continuous role as property manager means that the status quo

for the management of the property would remain in place.

This argument lacks merit because it disregards the

changes resulting from Defendants' failure to honor their

payment obligations and the effect of the change of control

over USI effectuated by the foreclosure of the interests in

USI.

Let me use a quick analogy to illustrate the flaw in

Defendants' reasoning.  Imagine that someone was living in a

home but failed to pay their debt and the bank foreclosed,

selling the home to a third party.

Imagine that the prior owners failed to leave the

property that had been foreclosed, arguing that there was no

imminent harm because their continued presence in the

1    foreclosed home was just a continuation of the status quo.

2           Their argument would ignore the change in their

3    status.  Yes, they are still in the house, but before they were

4    there as home owners, but now they are there as trespassers.

5    Defendants' argument is much the same-they say that there is no

6    imminent harm because keeping them in control maintains the

7    status quo, but they ignore the change in their status as a

8    result of the foreclosure.

9           Using my analogy, they have gone from homeowner to

10   trespasser.  It is not the same for a trespasser to stay in the

11   home and to make alterations to as it is for the homeowner to

12   do so and to make such decisions.

13          In addition, Defendant does not successfully argue

14   that Lender is "estopped" from arguing harm because Plaintiff's

15   counsel agreed in the Washington D.C. Condemnation Action that

16   it would not seek to change the management of USI, and also

17   stated that the management of USI was not "something that

18   need[ed] to be decided today" at a recent hearing.  Opp'n at

19   16-17.  "Because judicial estoppel is invoked to protect the

20   integrity of the judicial process from the threat of

21   inconsistent results, there must be a true inconsistency

22   between the statements in the two proceedings."  Simon v.

23   Safelite Glass Corp., 128 F.3d 68, 72-73 (2d Cir. 1997).  "If

24   the statements can be reconciled there is no occasion to apply

25   an estoppel."  Id.

1          Here, the positions are reconcilable.  Yes, both

2   Lender and Ashkenazy have an interest in maximizing the return

3   in the condemnation proceeding.  Their goals may not be

4   different in the condemnation proceeding in that regard–but

5   that is all that I understand the comment to mean.

6          I do not understand that by making that statement

7   regarding litigation posture in the D.C. case the Plaintiffs

8   conceded that the defendants' conduct ignoring their ownership

9   interest in USI was not causing them harm.  Plaintiffs are not

10  estopped from making this argument.

11         Moreover, those statements do not undermine the

12  conclusion that there is irreparable harm.  This is for

13  substantially the same reason I do not construe Plaintiff's

14  counsel's comments as a concession that there was no

15  irreparable harm resulting from the defendants' frustration of

16  their ownership interest in USI.

17         Accordingly, Plaintiffs have shown irreparable harm.

18         B.  Likelihood of Success on the Merits

19         I.  Procedural Arguments

20         1.  Joinder

21         Defendants' argument that Plaintiffs cannot show a

22  likelihood of success on the merits because Amtrak is a

23  necessary party and must be joined here does not lead me to

24  conclude either that I should defer ruling on this motion or

25  that the fact that Amtrak is not present as a party in this

1    case undermines the conclusion that Plaintiffs have shown a

2    likelihood of success on the merits.

3              Defendants have not shown that Amtrak has an interest

4    in the ownership or management of USI.  And even if Amtrak was

5    a necessary party, Defendants have not shown what the bar would

6    be to joining them here.

7              "Courts apply a two-part test to determine whether an

8    action must be dismissed for failure to join an indispensable

9    party.  First, the court must determine whether an absent party

10   belongs in the suit, i.e., whether the party qualifies as a

11   'necessary' party under Rule 19(a).

12             If a party does not qualify as necessary under Rule

13   19(a), the Court does not need to make any further decision

14   with respect to the motion to dismiss.  If a party does qualify

15   as necessary, the Court looks to whether it is feasible to join

16   that party; if it is not feasible to join the necessary party,

17   the Court determines whether the party is 'indispensable.'"

18   Washington v. City of New York, 2019 WL 2120524, at *11

19   (S.D.N.Y. Apr. 30, 2019) (citing Int'l, Inc. v. Kearney, 212

20   F.3d 721, 724-25 (2d Cir. 2000) (internal citations and

21   quotation marks omitted)).  "A party is 'necessary' under Rule

22   19(a)(1) if '(A) in that person's absence, the court cannot

23   accord complete relief among existing parties; or (B) that

24   person claims an interest relating to the subject of the action

25   and is so situated that disposing of the action in the person's

absence may:  (i) as a practical matter impair or impede the

person's ability to protect the interest; or (ii) leave an

existing party subject to a substantial risk of incurring

double, multiple, or otherwise inconsistent obligations because

of the interest.'"  Id. (quoting Fed. R. Civ. P. 19(a)(1)).

      If any one of these scenarios is present, the absent

party constitutes a required party.  Id.  "If a person has not

been joined as required, the court must order that the person

be made a party.  A person who refuses to join as a plaintiff

may be made either a defendant or, in a proper case, an

involuntary plaintiff."  Fed. R. Civ. P. 19(a)(2).

      "At the heart of Rule 19 are the dual interests of

achieving judicial economy and minimizing prejudice,

particularly to the defendant and the absent party, by joining

all interested parties in one action."  Errico v. Stryker

Corp., 2010 WL 5174361, at *3 (S.D.N.Y. Dec. 14, 2010).  The

rule does not set forth a rigid or mechanical formula for

decision.  See Provident Tradesmen Bank & Trust Co. v.

Patterson, 390 U.S. 102, 116 n.12 (1968).  Rather, it is

designed to allow courts to apprise themselves of the

"practical considerations" of each case in light of the

policies underlying the rule.  Id.; see also Global Discount

Travel Svcs., LLC v. Trans World Airlines, Inc., 960 F. Supp.

701, 709 (S.D.N.Y. 1997) ("This determination is an equitable

one and is left to a court's discretion.").

1          The burden is on the party requesting dismissal under

2     Rule 19 "to show the nature of the unprotected interests of the

3     absent individuals . . . and the possibility of injury to them

4     or that the parties before the court will be disadvantaged by

5     their absence."  United States v. Sweeny, 418 F. Supp. 2d 492,

6     499 (S.D.N.Y. 2006) (quoting 5C Charles A. Wright & Arthur R.

7     Miller, Fed. Prac. & Proc. §1359 (3d ed. 2005)).

8          In order to meet this burden "it may be necessary to

9     present affidavits of persons having knowledge of these

10    interests as well as other relevant extra-pleading evidence."

11    Id.; see Mattera v. Clear Channel Commc'ns, Inc., 239 F.R.D.

12    70, 74 (S.D.N.Y. 2006) (in conducting a Rule 19 analysis, "the

13    court may consider matters outside the pleadings.").

14         If an initial assessment reveals the possibility that

15    an unjoined party is required to be joined under Rule 19, the

16    burden shifts to the opposing party to negate this conclusion.

17    See 7 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc.

18    §1609 (3d ed. 2005).

19         Defendant has not shown that Amtrak is a necessary

20    party with respect to the issues presented to me-namely an

21    adjudication of the rights of Lender and Defendants under the

22    loan agreements-particularly the Mezz Loan Agreement and the

23    Pledge Agreement.

24         Subsection (A) of Rule 19(a)(1) asks whether in that

25    person's absence, complete relief can be granted among the

1    existing parties.  Defendants have not shown why I cannot

2    resolve the contractual issues presented here in Amtrak's

3    absence.

4          Amtrak is not a party to those agreements.  "A

5    nonparty to a commercial contract ordinarily is not a necessary

6    party to an adjudication of rights under the contract."

7    ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc., 102

8    F.3d 677, 682 (2d Cir. 1996).

9          Similarly, Defendants have not shown that Amtrak is a

10   required party under Rule 19(a)(1)(B).  The threshold inquiry

11   under subsection (B) is whether the absent party has claimed an

12   interest in the subject of the litigation.  See Am. Trucking

13   Ass'n, Inc. v. N.Y. State Thruway Auth., 795 F.3d 351, 356-57

14   (2d Cir. 2015); Fed. R. Civ. P. 19(a)(1)(B).  To "claim an

15   interest" for purposes of Rule 19(a)(1)(B), however, a party

16   need not move to intervene in the pending litigation or

17   otherwise assert a claim in the litigation itself.

18         Instead, the Second Circuit has suggested that the

19   absent party's prior conduct may be evidence of any claim that

20   it asserts with respect to the subject of the litigation.

21   Here, Amtrak has an interest in the management and operations

22   of Union Station and the leasehold interest in it, but I am not

23   aware that it has asserted an interest in the ownership of the

24   equity interests of USI.  To the contrary, "Amtrak confirmed to

25   the Court in the Condemnation Action that it is agnostic as to

 1    who controls USI."  Reply at 4.

 2           And in its Amicus Brief, Amtrak has asserted that

 3    "Amtrak takes no position on the Lender's claims or request for

 4    preliminary injunctive relief relating to the management or

 5    ownership of [USI]."  Amicus Brief at 1.

 6           I think that Plaintiffs' argument that Defendants are

 7    trying to conflate the mezzanine loan and Lenders' security

 8    interest in the stock of USI and the mortgage loan and the

 9    mortgage interest in the leasehold property that secures that

10    loan is apt.

11           I am not confused on that point-the mezz lender's

12    security interest in the equity of USI is a different beast

13    than the mortgage lender's interest in the leasehold.  This

14    decision is about the managerial control over USI, not control

15    over the leasehold.  Plaintiffs, Amtrak and I understand the

16    difference.  Defendants' attempt to muddy the water here with

17    this argument is unpersuasive.

18           So, on the record that I have before me, I cannot

19    conclude that Amtrak is a necessary party.  I emphasize that I

20    am making this decision based on the present record.  Moreover,

21    even if Amtrak were a necessary party, to dismiss the case, as

22    Defendants suggest here, I would need to find that joinder was

23    infeasible.

24           Joinder is typically found to be infeasible when it

25    would deprive the court of subject matter jurisdiction, the

1   court could not exercise personal jurisdiction over the absent

2   person, or where joinder would cause venue to be improper.  See

3   Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 131-32 (2d Cir.

4   2013).

5           Defendants have not given me reason to think that if

6   Amtrak was a necessary party that joinder of it in an action in

7   the Southern District of New York, where Amtrak operates, and

8   just filed a brief would be infeasible.

9           In sum, Defendants' arguments that the joinder

10  doctrine bars a determination now that Plaintiffs have a

11  likelihood of success on the merits warranting the entry of

12  injunctive relief are simply not supported by the law or the

13  facts of this case as they have been presented to me.

14          2.  First-filed Rule

15          Defendants' next procedural argument, namely that

16  Plaintiffs do not have a likelihood of success on the merits

17  because the first filed rule counsels in favor of the dismissal

18  of this action also lacks merit.  "The first-filed rule states

19  that, in determining the proper venue, '[w]here there are two

20  competing lawsuits, the first suit should have priority.'"  New

21  York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d

22  102, 112 (2d Cir. 2010).  "The rule 'embodies considerations of

23  judicial administration and conservation of resources' by

24  avoiding 'duplicative litigation and honoring the plaintiff's

25  choice of forum.'"  Employers Ins. of Wausau v. Fox Entm't

Group, Inc., 522 F.3d 271, 275 (2d Cir. 2008).  "Proper

application of the 'first-filed' rule requires that the first

and subsequently filed case(s) have either identical or

substantially similar parties and claims.

Importantly, application of the rule does not require

identical parties, but merely requires substantial overlap."

Wyler-Wittenberg v. MetLife Home Loans, Inc., 899 F. Supp. 2d

235, 244 (E.D.N.Y. 2012).

There are two exceptions to the first-filed rule:  (1)

where "special circumstances" warrant giving priority to the

second suit, and (2) where the "balance of convenience" favors

the second-filed litigation. Wausau, 522 F.3d at 275; see also

New York Marine & Gen. Ins. Co., 599 F.3d at 112.

"Special circumstances include manipulative or

deceptive behavior on the part of the first-filing plaintiff."

New York Marine & Gen. Ins. Co., 599 F.3d at 112.  Such

"special circumstances" are not alleged to be present in this

case.  "Where special circumstances are not present, a

balancing of the conveniences is necessary."  Wausau, 522 F.3d

at 276.

The factors relevant to the balance of convenience

analysis are essentially the same as those considered in

connection with motions to transfer venue pursuant to 28 U.S.C.

§1404(a).  Id.  "Among these factors are:  (1) the plaintiff's

choice of forum, (2) the convenience of witnesses, (3) the

location of relevant documents and relative ease of access to
sources of proof, (4) the convenience of the parties, (5) the
locus of operative facts, (6) the availability of process to
compel the attendance of unwilling witnesses, [and] (7) the
relative means of the parties."  Id. at 275 (internal
quotations and citations omitted).

        Where the first-filed rule is applicable, the decision
to stay, dismiss or transfer a proceeding rests within the
district court's discretion.  Wyler-Wittenberg, 899 F. Supp. 2d
at 247-48.  "The Court should take whichever action it deems
proper to 'avoid duplication of judicial effort, avoid
vexatious litigation in multiple forums, achieve comprehensive
disposition of litigation among parties over related issues,
and eliminate the risk of inconsistent adjudication." Id.
(citing Regions Bank v. Wieder & Mastroianni, P.C., 170 F.
Supp. 2d 436, 439 (S.D.N.Y. 2001)).  This disposition is not a
"rigid test, but require[s] instead the district court consider
to the equities of the situation when exercising its
discretion."  Id. (quoting Curtis v. Citibank, N.A., 226 F.3d
133, 138 (2d Cir. 2000)).

        Generally, the court with the first-filed action makes
the determination regarding which forum will hear the case.
See, e.g., MSK Ins., Ltd. v. Emps. Reinsurance Corp., 212 F.
Supp. 2d 266, 267-68 (S.D.N.Y. 2002) ("The court before which
the first filed action was brought determines which forum will

1  hear the case.") (collecting cases).

2          However, in New York Marine & Gen. Ins. Co., the

3  Second Circuit clarified that it was within the discretion of

4  the court with the second filed action to make the

5  determination regarding whether to transfer venue of an action.

6          It does not appear that the first-filed rule applies

7  in this case.  While there is an overlap in several of the

8  parties, there is not complete overlap.  Significantly, Amtrak

9  is not a party here.

10          Most importantly, this case involves different issues

11  than the case filed in the District of Columbia.  This case

12  involves the resolution of contractual issues arising under the

13  loan agreements.

14          The case in the District of Columbia involves Amtrak's

15  condemnation proceeding, which Amtrak asserts must be brought

16  in the District of Columbia, not here.  See 49 USC

17  §24311(b)(1).  Moreover, the Mezz Loan Agreement and the Pledge

18  Agreement both contain mandatory choice of forum provisions.

19  Mezz Loan Agreement §11.3; Pledge Agreement §18(j).  So,

20  barring agreement by the parties, it is unclear how either

21  party could have brought an action to adjudicate their

22  contractual rights in the District of Columbia.

23          As I noted, typically, it is the judge in the first

24  filed case who makes determinations regarding whether the

25  first-filed case rule applies.  Judge Mehta does not appear to

1   have been presented this question, but Plaintiffs reasonably

2   argue that "Judge Mehta recognized this Court's jurisdiction

3   over the contractual issues" based on his comment at a prior

4   conference noting the existence of this litigation and a desire

5   not to get ahead of the decision of this Court with respect to

6   those issues.

7          So, in sum, Defendants' arguments regarding the

8   applicability of the first-filed rule as a bar to a conclusion

9   that Plaintiffs have a likelihood of success on the merits

10  itself has no merit.

11         There is not a sufficient overlap in the parties, or

12  the issues presented in each of the two cases.  And there are

13  contractual barriers to the presentation of the issues raised

14  here in the D.C. Action—namely, the mandatory forum selection

15  clauses in all of the relevant loan documents.

16         Ii.  Effect of Foreclosure

17         Having disposed of the procedural smoke screen raised

18  by Defendants, let me turn to the real merits argument.

19  Plaintiffs have a substantial and clear likelihood of success

20  on the merits with respect to their assertion that they

21  effectively foreclosed on USSM's equity interests in USI and

22  that the lender under the Mezz Loan Agreement is now the owner

23  of the equity interests in USI.

24         At the outset, Defendants do not contend that the

25  method by which Lender conducted the foreclosure sale of the

1    interests in USI was improper.  Their decision not to challenge

2    the procedures used is understandable given the facts presented

3    to me.  Section 9-610 of the Uniform Commercial Code provides

4    the following:

5              (a) Disposition after default. After default, a

6    secured party may sell, lease, license, or otherwise dispose of

7    any or all of the collateral in its present condition or

8    following any commercially reasonable preparation or

9    processing.

10              (b) Commercially reasonable disposition.  Every aspect

11    of a disposition of collateral, including the method, manner,

12    time, place, and other terms, must be commercially reasonable.

13    If commercially reasonable, a secured party may dispose of

14    collateral by public or private proceedings, by one or more

15    contracts, as a unit or in parcels, and at any time and place

16    and on any terms.

17              (c) Purchase by secured party. A secured party may

18    purchase collateral:

19              (1) at a public disposition

20              N.Y. U.C.C. Law §9-610 (McKinney).

21              It is undisputed that the mezzanine loan was in

22    default, and that USSM had not paid its monthly debt payments

23    for approximately 2 years at the time that the foreclosure sale

24    took place.

25              Plaintiffs provided notice to debtor of the sale.

1    They hired a commercial real estate firm to advertise the sale.

2    Many people were notified of the sale and considered a possible

3    investment, as evidenced by their review of the materials and

4    their signature on confidentiality agreements.

5          The borrower did not object to the sale.  The borrower

6    did not do what many do in this situation, which is declare

7    bankruptcy.  The borrower did not seek relief from any court.

8          The borrower merely the ignored the process that its

9    counsel disclaims because it involved the use of paper around a

10   table.  The lender purchased the interests at a public

11   disposition after bidding a very substantial amount to purchase

12   the equity interests.

13         Having reviewed the record of the sale and the build

14   up to it, I conclude that Plaintiff has a substantial and clear

15   likelihood of success to show that its sale complied with

16   Article 9 and that the lender under the Mezz Loan Agreement is

17   the owner of the USI equity interests.

18         Indeed, Defendants present no argument to the contrary

19   based on the nature of the Article 9 sale.  They argue only

20   that Section 5.2.2 of the Mezz Loan Agreement prohibited the

21   lender from exercising its rights as a secured party.

22         Having reviewed the text of all of the agreements, I

23   do not think that the argument has merit, or rather, let me say

24   for these purposes, that I think that Plaintiffs have a

25   substantial, clear likelihood of success on the merits with

respect to the issue.

Both the Mezz Loan Agreement and the Pledge Agreement are governed by New York law.  "When interpreting a contract, our 'primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.'"  Chesapeake Energy Corp., 773 F.3d at 113–14 (ellipsis omitted) (quoting Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 232 F.3d 153, 157 (2d Cir. 2000)).  "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions."  Id. at 114 (brackets omitted) (quoting Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous."  Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  Orlander, 802 F.3d at 294 (quoting W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990)).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources."  CVS Pharmacy, Inc. v. Press Am., Inc., 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009)); see also Brad H. v. City of New York,

1   17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the

2   four corners of the document; it cannot be created by extrinsic

3   evidence that the parties intended a meaning different than

4   that expressed in the agreement . . . .").

5          First let me say that I do not believe that the

6   contract is ambiguous regarding the issue that I am about to

7   discuss.

8          I will not read Section 5.2.2 of the Mezz Loan

9   Agreement into the record because it is fairly lengthy and I

10  know that the parties have the text.  I have considered the

11  text of the Mezz Loan Agreement in its entirety, including

12  Section 5.2.2.

13         Rather than reciting the language of 5.2.2 in its

14  entirety, I just want to summarize again the effect that

15  Defendants argue it has.  They argue that it effectively gives

16  rise to a standstill, such that, during the pendency of a

17  condemnation, Lender may not take any action with respect to an

18  Event of Default, including a payment default, and in

19  particular that the provision deprives the lender of the

20  ability to exercise its rights as a secured creditor.  The

21  language of 5.2.2, the Mezz Loan Agreement in its entirety and

22  the Pledge Agreement do not support that extraordinary

23  position.

24         Section 5.2.2 contains language that establishes some

25  rules regarding the parties' conduct in the event of a

1    condemnation.  It requires the borrower to provide certain

2    information regarding condemnations.

3          It limits the borrower's ability to settle

4    condemnations only with the prior written consent of the

5    lender.  It also provides the lender the right to participate

6    in any litigation, proceeding or settlement discussions

7    regarding condemnation.

8          So Section 5.2.2 imposes many obligations on the

9    borrower, and it provides the lender with a number of rights,

10   including the power of attorney that has been raised here.

11         One thing that I want to highlight is that no words in

12   Section 5.2.2 prohibit the lender from taking any action.

13   Defendants argue that Section 5.2.2 limits the lenders'

14   exercise of its rights as a secured creditor.

15         But the first important textual cue here is that there

16   are no words in Section 5.2.2 that actually state that it

17   limits the lenders' rights in any way.  Defendants' arguments

18   do not rest on the text of the contract, but on a weak argument

19   that because this provision talks about condemnation that by

20   implication it supersedes all other provisions of the contract

21   when a condemnation exists.

22         But the text of the provision does not state that it

23   prevents the lender from exercising any of its rights. The

24   argument is refuted by other text in the relevant agreements,

25   and by the fact that there is more specific language describing

1    the rights of the lender in the event of a default, which

2    controls.

3           Contrary to Defendant's argument that Section 5.2.2

4    should be read as a mandatory forbearance provision, Section

5    5.2.2 contains specific language that says that

6    "Notwithstanding any Condemnation, Borrower shall continue to

7    pay the Debt at the time and in the manner provided for in this

8    Agreement . . . ."  Mezz Loan Agreement §5.2.2.  Ad lib.

9           Defendant's argument also runs contrary to express

10   language in the remainder of the agreement.  Section 10.2 of

11   the Mezz Loan Agreement describes the remedies available to the

12   lender upon and during the continuance of an event of default.

13   Section 10.2(a) states that " (a) Upon the occurrence of an

14   Event of Default . . . and at any time thereafter while any

15   such Event of Default is continuing, Lender may, in addition to

16   any other rights or remedies available to it pursuant to this

17   Agreement and the other Loan Documents or at law or in equity,

18   take such action, without notice or demand, that Lender deems

19   advisable to protect and enforce its rights against Borrower

20   and in and to the Collateral, including, without limitation,

21   declaring the Debt to be immediately due and payable, and

22   Lender may enforce or avail itself of any or all rights or

23   remedies provided in the Loan Documents and may exercise the

24   rights and remedies of a secured party under the UCC against

25   Borrower and the Collateral, including, without limitation, all

1   rights or remedies available at law or in equity . . . ."  Mezz

2   Loan Agreement §10.2(a).

3          In addition.  Section (b) of that Section states that

4   "Upon the occurrence of any Event of Default and at any time

5   thereafter while any Event of Default is continuing, all or any

6   one or more of the rights, powers, privileges and other

7   remedies available to Lender against Borrower under this

8   Agreement or any of the other Loan Documents executed and

9   delivered by, or applicable to, Borrower or at law or in equity

10  may be exercised by Lender at any time and from time to time .

11  . . ."  Id. §10.2(b).

12         The provision continues:  "Any such actions taken by

13  Lender shall be cumulative and concurrent and may be pursued

14  independently, singly, successively, together or otherwise, at

15  such time and in such order as Lender may determine in its sole

16  and absolute discretion, to the fullest extent permitted by

17  law, without impairing or otherwise affecting the other rights

18  and remedies of Lender permitted by law, equity or contract or

19  as set forth herein or in the other Loan Documents."  Id.

20         The language of Section 10.2 makes it quite clear that

21  during the continuance of an Event of Default, the lender's

22  rights under the loan documents are not exclusive.  This

23  fundamentally undermines Defendant's argument that during a

24  condemnation proceeding, the lender's rights were limited

25  notwithstanding the continuance of an event of default.  The

1    agreement expressly says that is not the case.

2         If there was any doubt that the lender's rights were

3    cumulative, and not limited to engaging in constrained

4    communications about the terms of a condemnation during the

5    pendency of a condemnation as Defendants argue, Section 10.4 of

6    the Mezzanine Loan Agreement states that the "rights, powers

7    and remedies of Lender under this Agreement shall be cumulative

8    and not exclusive of any other right, power or remedy which

9    Lender may have against Borrower pursuant to this Agreement or

10   the other Loan Documents, or existing at law or in equity or

11   otherwise . . . ."

12        That lender has the right to engage in the

13   condemnation process pursuant to Section 5.2.2 does not limit

14   its other rights, including those set forth in the other

15   provisions of the Mezz Loan Agreement, such as Section 10.2.

16   And Section 10.4 makes it clear that the provisions of the

17   Pledge Agreement that also authorize the lender to take action

18   against the collateral upon the occurrence and during the

19   continuance of an event of default, are also not limited.

20        The Pledge Agreement also contains language

21   authorizing the lender to take action to enforce its interests

22   in the collateral during the pendency of an event of default.

23   Those rights are not limited by Section 5.2.2 of the Mezz Loan

24   Agreement.  See, for example, Section 8(b), which states that

25   "The rights of Lender under this Agreement shall not be

conditioned or contingent upon the pursuit by Lender of any

right or remedy against Pledgor . . . ."  Pledge Agreement

§8(b).

        So the Pledge Agreement makes plain that the lender's

exercise of its rights under the Pledge Agreement is not

conditioned upon the exercise of any rights that it might have

under Section 5.2.2 of the Mezz Loan Agreement.

        And the Pledge Agreement provides that "If an Event of

Default (as defined in the Loan Agreement) shall occur and be

continuing, Lender shall have the right to receive any and all

income, cash dividends, distributions, proceeds or other

property received or paid in respect of the Pledged Company

Interests and make application thereof to the Debt, in such

order as Lender, in its sole discretion, may elect, in

accordance with the Loan Documents."  Id. §8(a).

        Again, during the continuance of an Event of Default,

the lender is expressly authorized to take action to protect

its interests in and to the collateral and to collect on it.

        Defendant argues that the condemnation provision is

the more specific provision of the Mezz Loan Agreement, and

that it should take precedence over every other provision,

principally the rights afforded to the lender upon default.

        To the contrary, if any provision describes a specific

circumstance, it is the remedies provisions of the Mezz Loan

Agreement, including Section 10.2, which outlines the rights of

1    the lender during the occurrence of an event of default.

2          As I said, there is nothing in Section 5.2.2 that

3    contradicts the express authority provided to the Lender in

4    Section 10.2 of the Mezz Loan Agreement.  The Pledge Agreement

5    too contains specific, non-exclusive language regarding the

6    rights of the lender during the pendency of an event of

7    default.

8          Defendant's argument that Section 5.2.2 somehow

9    overrides these express grants of authority lacks textual

10   support.  And the argument that it prevails by implication

11   ignores the specific language in the agreements addressing the

12   lender's rights during the continuance of an event of default,

13   and, in my view logic.  It does not make sense that a lender

14   would agree to standstill notwithstanding a payment default in

15   the face of a condemnation.  And the agreements in my view make

16   it clear that the lender did not do so.

17         So in sum, I conclude that Plaintiffs have a

18   substantial, clear likelihood of success on the merits.

19         Because Plaintiffs have a substantial, clear

20   likelihood of success on the merits with respect to the

21   effectiveness of their foreclosure action, I need not

22   separately analyze the alternative argument regarding the power

23   of attorney granted to it under Section 5.2.2.

24         Just as an aside, the parties do not address in their

25   briefing at all the question of what continued rights if any

the borrower has under the Mezz Loan Agreement.  Normally, when

a loan is repaid, I do not think that such covenants have much

vigor-the loan has been repaid.  I may be interested in hearing

about this at a later stage, out of interest.

C.  Balance of the Equities & Public Interest

Finally, Plaintiffs must demonstrate that "the balance

of the equities tips in [their] favor," and that "an injunction

is in the public interest."  Winter, 555 U.S. at 20.  In

assessing these factors, courts must "balance the competing

claims of injury and must consider the effect on each party of

the granting or withholding of the requested relief," as well

as "the public consequences in employing the extraordinary

remedy of injunction," Winter, 555 U.S. at 24 (citations

omitted).

Here the balance of the equities and considerations of

public interest weigh in favor of granting the requested

injunctive relief.  Lender expended hundreds of millions of

dollars in connection with a secured loan that provides it with

well-documented rights as a secured creditor.

There is a substantial public interest in ensuring the

functioning of the finance markets.  Permitting Defendants to

borrow millions of dollars and then to just pretend that they

did not default is not in the public interest.

I believe that Defendants' substantive arguments

regarding the merits are weak.  I do not think that Defendants

should be rewarded for presenting marginal arguments to ignore
the rights of their creditors.  The equities do not weigh in
favor of a defaulted borrower who fails to pay or even
recognize the documented consequences of its non-payment.

I have considered the impact of this injunctive relief
on the management of Union Station; and its potential impact on
the ongoing proceedings in the district court in the District
of Columbia.

There is certainly a substantial public interest in
ensuring that the facility is properly administered.  I believe
that we can carefully craft the scope of the scope of the
relief here to strike the appropriate balance, such that this
factor does not weigh against the grant of injunctive relief
here.  Amtrak's amicus brief has provided some useful bumpers,
which I expect to follow in crafting the scope of the
injunctive relief that I will grant.

While the question of who controls USI will, have some
impact on the discussions relating to the condemnation
proceeding and the effective management of Union Station; I am
not intruding into the scope of the litigation pending before
the District of Columbia.

On balance, the public interest in vindicating the
rights of secured creditors, which broadly encourages capital
deployment, weighs in favor of this grant.  I have considered
Defendants' desire to continue to operate the asset without any

1    need to comply with their financial or other obligations to

2    their creditors, but I find that to merit relatively little

3    weight.  I conclude that the equities weigh strongly in favor

4    of Plaintiffs.

5            D.  Scope of Injunctive Relief

6            So I am granting Plaintiffs' request for the entry of

7    preliminary injunctive relief.  And I am not impugning the

8    management expertise of Mr. Press in reaching this decision.

9    But their desire to operate an asset without the need to comply

10   with their financial obligations to their creditors has, in my

11   view, relatively little weight.

12           And as a result, I conclude that the equities weigh

13   strongly in favor of plaintiffs.  So I am granting plaintiffs'

14   request for the entry of preliminary injunctive relief.

15           I'd like to talk now about the scope of that relief.

16           I've looked at the proposed language by counsel for

17   plaintiffs on this issue.  And I'm inclined to modify somewhat

18   the language that's been proposed to me.  I'm going to see if I

19   can ask my staff to print out for you what I'm about to read to

20   you because that might make this a little easier.

21           Bear with me for just a moment as I try to get a copy

22   of this to my staff.

23           As we're doing that, let me just read to you what I'm

24   going to propose.  Again, this is not set in stone.  The

25   principal thing that I was trying to do in crafting this

1    language was to try to keep in mind the bumpers that I

2    described Amtrak as having suggested in their amicus brief

3    which I think were very helpful.

4            The purpose of this is to try to make it clear that

5    I'm not trying to decide now complex issues related to how

6    in fact things are managed.  There are a lot of details I don't

7    know.

8            So let me just read this to you.  Again, I'm going to

9    print out a copy of it for you.  As you're having the chance to

10   digest it, we'll turn to the next issue, which is the amount of

11   any bond.

12           Let me read to you what I was going to propose:

13   "Pursuant to Rule 65 of the Federal Rules of Civil Procedure

14   the Court enjoins USSM, its officers, directors, members,

15   employees, agents, and all those acting in concert with any of

16   them (the "Restrained Parties"), during the pendency of this

17   action, from (1) holding itself out as the owner of Union

18   Station Investco, LLC ("USI"); (2) exercising or purporting to

19   exercise any contractual or other legal right of USI; (3)

20   collecting, transferring, seizing, or directing the transfer of

21   any assets or liabilities of USI; (4) impeding the collection

22   or transfer of any assets to USI that are owed to it; or (5)

23   otherwise interfering with Lender's rightful ownership and

24   control of USI.

25           Pursuant to Rule 65 of the Federal Rules of Civil

1      Procedure the Court enjoins USSM, its officers, directors,

2      members, employees, agents, and all those acting in concert

3      with any of them (the "Restrained Parties"), during the

4      pendency of this action, from (1) holding itself out as the

5      owner of Union Station Investco, LLC ("USI"); (2) exercising or

6      purporting to exercise any contractual or other legal right of

7      USI; (3) collecting, transferring, seizing, or directing the

8      transfer of any assets or liabilities of USI; and (4) impeding

9      the collection or transfer of any assets to USI that are owed

10     to it."

11          So hopefully momentarily, you'll have a physical copy

12     of that.  But you can see I'm not using the specific language

13     suggested by plaintiff which speaks to specific communications

14     with vendors and the like at the station.

15          Instead, as framed, this is intended to really try to

16     protect the management rights of lender with respect to USI

17     managing it as a result of the equity interest.  So I hope that

18     we'll have that for you momentarily.

19          Let's talk about the amount of the bond.  Counsel for

20     plaintiff, you suggested no bond or minimal bond.

21          When you say "minimal bond," what number do you have

22     in mind?

23          MR. SCHARF:  $110,000, your Honor.

24          THE COURT:  Thank you.

25          Counsel for defendant, let me hear from you on that.

1          Why is a substantial bond appropriate?  Again, I

2     welcome any arguments on this.

3          What's your view?  In particular, let me just note I'm

4     not now adjudicating one of the agreements that you raised,

5     namely, the effect of that last sentence in 5.2.2 about the

6     amount of the property.  I'm not taking a position on that now.

7          So I just want to say that clearly because it may be

8     an issue later here.  I'm not taking that up.

9          What do you think the right amount of the bond is and

10    why?

11         MR. ROSS:  Your Honor, for clarification, are you

12    granting any part of part B of the requested relief?

13         THE COURT:  All I'm granting -- all I am proposing now

14    to do is to do what I just said.  It does vary substantially

15    from what they asked for?

16         MR. ROSS:  Your Honor, can we take a five-minute break

17    so we can consult?

18         THE COURT:  Yes.  That's fine.  I'm going to hand you

19    a document that has been described as "Rider A" for discussion

20    purposes.  This is really just for discussion purposes so that

21    you have something concrete to look at as we're having this

22    conversation.

23         I welcome any comments on this.  My goal here is what

24    I've expressed to you, which is to try to protect the interest

25    of lenders.  I've found them here to be -- or found that they

1    have a likelihood of success on the merits to be -- and also

2    not to intrude only areas that Amtrak suggested I should not

3    intrude.

4           So please take a look at that.  We'll take a break.

5    Why don't we make it a ten-minute break.  You've all been very

6    patient with me.  I appreciate that.

7           So let's make it a ten-minute break.  I'll see you

8    back here at 4:32.  Thank you very much.  See you shortly.

9           (Recess)

10          THE COURT:  Thank you.  You may be seated.

11          Counsel, thank you.  We're back on the record after a

12   recess, a longer recess than the ten minutes that I suggested.

13          Counsel, let's start with the language related to the

14   scope of injunctive relief.

15          Counsel for plaintiff, let me start with you.

16          MR. SCHARF:  Your Honor, we have requests for two

17   minor changes.  Maybe it's wrong for me to characterize them as

18   "minor."  So I won't characterize them.  In item number 3 where

19   it talks about "collecting, transferring, seizing, or directing

20   to transfer off any assets," I would add the words "or

21   liabilities."

22          THE COURT:  Thank you.

23          MR. SCHARF:  And in item number 5, our second

24   requested change -- and this comes from the transcript where

25   Ms. Lambert said that she is neutral on who is controlling USI,

1    item number 5 we would suggest:  "Otherwise interfering with

2    lender's rightful ownership and control of USI."

3              THE COURT:  Thank you.

4              MR. SCHARF:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              Counsel for defendants, let me hear from you about the

7    language generally and also your reactions to the two proposed

8    modifications suggested by counsel for plaintiffs.

9              MR. ROSS:  Your Honor, as we read the language that

10   you've distributed in draft, it likely will directly interfere

11   with any continued management of Union Station by our client.

12   I think it's not what your Honor wanted to accomplish, though I

13   understand --

14             THE COURT:  May I just pause.  Can you expand on that

15   a little bit.  I think that the question is if your client

16   doesn't have USI, what right does he have to manage or control.

17             The reason why this is written as it is is to try to

18   make it clear that to the extent that there are some other

19   authorities or rights to be involved, not derivative of the

20   ownership of USI, that this is not constraining them.

21             So, for example, I noted that during my decision, that

22   Mr. Press' declaration says it's AAC that's entered into the

23   arrangements with JLL.  I don't know anything about that beyond

24   what Mr. Press has said.

25             As I said, I don't know why AAC has done that.  So

1  what I'm trying to do here is to not touch rights that aren't

2  germane to I'll call it the ownership and control of USI or

3  directly related to those things.

4          There are consequences, however, for failing to pay

5  debt.  So this may have some effect on your client's ability to

6  manage Union Station.  My question is if there are specific

7  comments that you'd like to make regarding this language and if

8  there is anything else that I should understand about how this

9  will affect their ability to do so and why.

10          MR. ROSS:  Well, your Honor, what I'm saying is

11  that -- I apologize if this is not directly responsive to your

12  question.  But what I'm saying is as a practical matter, in

13  order to avoid violating this order, the day-to-day conduct

14  that my client has been engaged in in the management of Union

15  Station could be seen to violate the rightful ownership or

16  control of USI.  And that can be the lender's position in the

17  next lawsuit or for damages or for something else.

18          And so the fact that we have an agreement between AAC

19  and Jones Lang LaSalle, for example, may be seen as violating

20  USI's rights tomorrow in the way that lender views it.  Or

21  lender may take the position that the assertion of any acts by

22  our client to manage Union Station violates their ownership and

23  control of USI.

24          So because a typical injunction says thou shalt not do

25  this directly or indirectly and I don't want my client to be in

1   a position of being seen to violate your Honor's order --

2              THE COURT:  Thank you.

3              Can I just ask:  What is the source of his -- I should

4   say the Ashkenazy Group's, what's the source of their asserted

5   authority to take actions with respect to the station, apart

6   from their interest as owners and managers of USI?

7              MR. ROSS:  Well, they continue to have rights in U.S.

8   Sole Member.  That's number one.  U.S. Sole Member continues to

9   have an interest in Union Station as recognized by Judge Mehta.

10             THE COURT:  Thank you.

11             Let me just pause on that, and I appreciate the

12  administrative issue.  Let me just reframe the comment.

13             Your concern is that this language would prevent USSM

14  from exercising its rights.

15             How so?

16             MR. ROSS:  Because there may be the contention that

17  doing so with respect to exercising any dominion and control,

18  management, or any authority of any kind is a violation of this

19  order.  If your Honor says it shall not be construed to be

20  such, that would be useful for us to know.

21             THE COURT:  Sorry to take a step back.

22             So the corporate structure, USSM, USI, opposite co,

23  what rights does it I'll call it USSM have with respect to the

24  management of the station but for its interest in USI?

25             MR. ROSS:  Your Honor, what I was going to say to

1    your Honor is I don't have all the people from my client who I

2    need to consult with to address either the scope issue and

3    whether they are prepared to proceed to do anything to continue

4    to manage the station in the light of this language or what the

5    quantum of damage is in order to evaluate the bond.

6           And what I was going to ask your Honor is to give us

7    24 hours to consult and be able to make an informed response to

8    your Honor rather than speculate.

9           THE COURT:  Thank you.

10          Let me turn back to counsel for plaintiff.  I think

11   that the -- I'm going to translate counsel's comments to

12   something more tangible, which is a potential concern about the

13   sweep of clause 5 that I sent to you, that is from your

14   original proposed order.

15          I'm construing defense counsel's argument as an

16   argument that the "otherwise interfering with" language might

17   limit the ability of USSM or Mr. Ashkenazy or affiliated

18   entities from -- let me use the term "restrained parties" --

19   from exercising rights that indeed belong to them because it

20   would invite an argument that the exercise of their rights

21   "interfered with," using the words of the order, the rightful

22   ownership and control of USI.

23          So I'm going to construe the argument as that, in

24   other words, an argument that subsection 5 of this language,

25   which is derived from the original language, is overbroad and

1    makes it difficult for the restrained people to know whether or

2    not conduct that might otherwise be lawful is violating the

3    terms of my injunction.  So I'm reframing somewhat counsel's

4    comments.

5           Counsel for plaintiff, what do you think about that

6    concern?  Is 5 overbroad?

7           MR. SCHARF:  I understand the way your Honor is

8    reframing it.  But what is very concerning to me is that I've

9    heard defense counsel suggest that today's decision somehow

10   permits Ashkenazy and its affiliates and its entities from

11   having rights of management, possession, and control of Union

12   Station.  And I think it's important -- and I think this is

13   what you are asking Mr. Ross.  And if it was, I'll try to

14   answer the question.

15          Ashkenazy does not have any rights to manage or be

16   involved in Union Station that are not derivative of its former

17   ownership in USI.  And what I am hearing Ashkenazy continue to

18   try to do is carve out rights for itself.

19          So the only thing that I can say that -- and I've said

20   this to Judge Mehta -- is we are not looking, at this juncture,

21   to say that USSM does not have a seat at the table in the

22   litigation.

23          And that's part of what I thought I heard also being

24   expressed.  And we certainly think that there may be impacts

25   down the road as to when we expect that we will win on the

1    declaration that we have validly foreclosed and get a final

2    judgment with respect to that.  But that's not for today, and

3    that's not what we're looking to impact.

4            But I believe the language that says:  "Otherwise

5    interfering with lender's rightful ownership and control of

6    USI" is not only spot on, it is necessary to preclude the

7    confusion that the Ashkenazy parties continue to attempt to

8    sow.

9            And it is directly important and critical to have that

10   language, and of course we would accept a carve-out.  As I

11   said, if they have any rights, if USSM is to continue to have

12   rights, your Honor is not adjudicating that.  Nor are we

13   looking to enjoin that.  That is simply a separate issue that

14   we'll have to deal with Judge Mehta at some later point in

15   time.

16           THE COURT:  Good.  Thank you.

17           Let me say a couple of things:  First, no, I'm not

18   going to defer entering relief.  Further application of course

19   can be made to modify the conditions of the injunctive relief

20   that the Court is going to enter today.

21           I'm happy to consider applications to modify this.  As

22   I said earlier, I believe the plaintiffs have shown irreparable

23   and imminent harm.  So I believe that they're entitled to the

24   entry of an injunction.

25           I think that what I have construed could be

1  defendants' argument regarding the difficulty of enforcing

2  clause 5 of this proposed order is meritorious.  I think that

3  it gives rise to some potential I'll call it enforceability

4  issues.  I am not sure at this point that language of such

5  broad sweep is required in order to vindicate the interest that

6  I've described.

7          And in particular, I note plaintiff's acknowledgment

8  that USSM, among other things, may be entitled to a seat at the

9  table in connection with the condemnation proceeding.  I'm not

10  taking a position on that issue.

11          But it does foreshadow the kind of disputes that could

12  be brought to me.  If the injunction contains broad language

13  prohibiting them from interfering broadly with lenders'

14  ownership and control of USI, it might be that actions taken by

15  USM or the affiliated entities to vindicate their own interests

16  rather than to subvert the interests of USI could be viewed as

17  violating that subclause.  So I'm going to strike that and at

18  clause 4.

19          So, Counsel for defendant, let me come back to the

20  question with which I left you at the break, namely, your view

21  regarding the size of a bond and what the rationale is for your

22  perspective.

23          MR. ROSS:  Your Honor, I'm not in a position give you

24  a number at this time without picking it out of a hat, and I

25  don't want to do that.  I would like to consult with my client

1    to talk about the financial impact of your order.

2            So perhaps you could hold that part in abeyance until

3    24 hours from now.

4            THE COURT:  Can I just pause you on this.

5            MR. ROSS:  Yes.

6            THE COURT:  In terms of the money here, it's $348

7    million at Opt Co.  Amtrak has put in $250 million.  There is

8    $148 million of debt here.

9            At what point does any equity squeeze up to anyone

10   here?  Don't you need to get Amtrak up to above they are now?

11           MR. ROSS:  Last year, there was a valuation of Union

12   Station during the course of the pandemic at above $700

13   million.  I don't know if that answers your question, but there

14   is a potential for a very sizable delta.

15           THE COURT:  Yes.  Thank you.

16           That covers the debt and then some.  So I appreciate

17   the argument.  So I'm going to impose a bond of $500,000.  I'm

18   going to request now that plaintiff's counsel propose a form of

19   order for the Court to enter consistent with my rulings here.

20           I'm adopting your proposed change to subclause 3 of

21   the language that you provided, but I'm not going to include

22   clause 5.  I think that the defense has raised reasonable

23   arguments about the potential inadvertent consequences of that

24   language on the ability of restrained parties to vindicate

25   rights that are not derivative of an ownership in Investco.

1          And as a result, at this point, I'm not going to take

2     that step.  I'm reaching this conclusion without prejudice to

3     reconsidering it at a later time in the event that more issues

4     of the type suggested by counsel for plaintiff materialize that

5     are not captured by what I believe to be the very clear

6     language of 1 through 4.

7          Good.  Anything else for us to take up here before we

8     adjourn?  Again, thank you very much for being so patient

9     throughout this proceeding as I took the time to put my quick

10    take on this issue on to the record.

11         Anything else for us to take up before we adjourn?

12    First counsel for plaintiff?

13         MR. SCHARF:  Yes, your Honor.  I hope this isn't out

14    of order.

15         THE COURT:  Thank you.

16         MR. SCHARF:  I was trying to get your attention as it

17    relates to the holding itself out as the owner of Union Station

18    Investco.  And I was wondering if the Court would consider

19    adding in the words "or in control of Union Station Investco"

20    to pick up that control language that Amtrak was okay with and

21    putting that up in item number one.

22         THE COURT:  Yes.  That's fair.

23         MR. ROSS:  Thank you, your Honor.

24         MR. SCHARF:  I have nothing else other than that

25    point.  Thank you.

1            THE COURT:  Very good.

2            Counsel for defendants, anything else from you?

3            MR. ROSS:  No, your Honor.

4            THE COURT:  Very good.  Thank you very much.  I'm

5    going to eschew my editorial.  I appreciate that everyone is

6    doing the very best for their clients that they can.  This

7    proceeding is adjourned.  Thank you.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25