IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAOL REXMARK UNION STATION LLC and KOOKMIN BANK CO., LTD., in its capacity as trustee of KTB CRE DEBT FUND NO. 8, a Korean Investment Trust, by its agent in Korea DAOL FUND MANAGEMENT CO. and by its agent in United States REXMARK HOLDINGS LLC d/b/a REXMARK, <br><br> Plaintiffs, <br><br> v. <br><br> UNION STATION SOLE MEMBER, LLC, <br><br> Defendant. | Case No. 1:22-cv-06649-GHW |

## DECLARATION OF BEN ASHKENAZY

BEN ASHKENAZY, being duly sworn, deposes and says:

1. I am the founder and Chief Executive Officer ("CEO") of Ashkenazy Acquisition Corporation ("AAC"), which is an affiliate of Defendant Union Station Sole Member LLC ("USSM"). I am also indirectly the majority owner of Ashkenazy Union Station Holdings LLC ("Union Station Holdings"), which wholly owns USSM. Until the issuance of a preliminary injunction order on August 25, 2022, AAC, through USSM and Union Station Investco LLC ("USI"), managed and operated Washington Union Station ("Union Station").

2. I make this Declaration in support of USSM's opposition to the Motion for Summary Judgment, pursuant to Federal Rules of Civil Procedure Rule 56(d), filed by Plaintiffs Daol Rexmark Union Station LLC ("Daol") and Kookmin Bank Co., Ltd. ("Kookmin" or "Lender").

3. In my role as CEO of AAC, I am familiar with the real estate financing transactions undertaken in connection with Union Station and the day-to-day management of Union Station.

As such, I am fully familiar with the facts and circumstances sworn to in this affidavit based upon my own personal knowledge, except to those matters stated herein upon information and belief.

4. As discussed below, Lender's predecessor-in-interest acted in violation of its contractual obligations and in bad faith to prevent Union Station Holdings from closing a substantial cash investment that would have allowed USSM and USI to become current on their loan obligations and payoff the Mezzanine Loan (defined below).

## Background On The Mortgage And Mezzanine Loans

5. On May 8, 2018, USI and lenders Citi Real Estate Funding Inc. ("Citi") and Natixis Real Estate Capital LLC ("Natixis," and together with Citi, the "Original Mortgage Lenders") entered into a loan agreement (the "Mortgage Loan Agreement"), a deed of trust, and other loan documents (the "Mortgage Loan Documents"), pursuant to which Original Mortgage Lenders provided a loan (the "Mortgage Loan") to USI in the aggregate original principal amount of $330 million secured by a leasehold mortgage on Union Station. A true and correct copy of the Mortgage Loan Agreement is attached to the Declaration of Yossi Preiserowicz, a/k/a Joe Press, which I understand is being filed alongside this Declaration.

6. Following the execution of the Mortgage Loan Documents, the Mortgage Loan was securitized and, Wilmington Trust, N.A., in its capacity as Trustee of the US 2018-USDC, Commercial Mortgage Pass-Through Certificates, Series 2018-USDC ("Second Mortgage Lender"), became the successor-in-interest to the Original Mortgage Lenders. The Mortgage Loan was serviced by Wells Fargo Bank, N.A. ("Mortgage Loan Special Servicer") until October 22, 2021, when it was replaced by another servicer.

7. Securitization of the Mortgage Loan created commercial mortgage backed securities ("CMBS") that are held by various certificate holders (the "CMBS Holders"). The CMBS Holders were led by a controlling class representative (the "CCR").

8. On January 5, 2022, Lender purchased the Mortgage Loan from Second Mortgage Lender.

9. Also on May 8, 2018, USSM and Lender entered into an agreement (the "Mezzanine Loan Agreement"), a pledge and security agreement, and other loan documents (the "Mezzanine Loan Documents," and together with the Mortgage Loan Documents, the "Loan Documents"), pursuant to which Lender provided a loan to USSM in the aggregate principal amount of $100 million secured by USSM's membership interests in USI (the "Mezzanine Loan," and together with Mortgage Loan, the "Loans"). The Mezzanine Loan is serviced by Lender's agent, Rexmark Holdings LLC ("Rexmark").

**Second Mortgage Lender Precludes Mortgage Borrower From
Closing A Substantial Investment In Union Station Holdings**

10. Prior to the COVID-19 pandemic, USSM and USI were current on all of their obligations under the Loan Documents, including their payment obligations. The pandemic had devastating consequences to Union Station's revenue. Among other things, lockdowns and travel restrictions led to an enormous reduction in the number of travelers, shoppers, and other visitors to Union Station. As a result, many of Union Station's tenants went out of business or were otherwise unable to pay rent, or paid reduced rents, to USI.

11. As a result of this lost income, beginning with the payment due on or before May 9, 2020, USSM and USI were unable to make full monthly debt service payments pursuant to the Loans. On May 13, 2020, Second Mortgage Lender and Lender declared Events of Default for

failure to make the May 2020 payment. Following this declaration, the parties to the Loans entered into extensive negotiations and forbearance agreements.

12.    Although the parties believed that USSM and USI's financial difficulties brought about by COVID-19 were temporary, I and others at AAC engaged in substantial efforts to raise additional capital. These efforts bore fruit and in December 2020, Union Station Holdings, the parent company of USSM and USI, entered into a confidential agreement with a large and well-capitalized sovereign wealth fund (the "Investor") providing for the Investor to purchase approximately 50% ownership stake in Union Station Holdings in exchange for an investment that valued USI's sub-leasehold interest in Union Station at over $700 million (the "Investment"). Not only would the Investment allow USSM and USI to come current under the Loans and make future payments, but it would also provide for tens of millions of dollars in additional funds that USI would use to add new tenants to Union Station and to pay off the Mezzanine Loan.

13.    In furtherance of the Investment, the Investor deposited the extraordinarily large sum of $100 million into an escrow account as a purchase price deposit, demonstrating its intention to complete this crucial funding solution.

14.    The Mortgage Loan Agreement requires USI to seek and obtain the consent of the mortgage lender for changes to USI's organizational structure. Section 4.2.12 of the Mortgage Loan Agreement provides that the mortgage lender's "consent shall not be unreasonably withheld or delayed."

15.    Similarly, the Mortgage Loan Agreement requires USI and its owners to seek and obtain the mortgage lender's consent before engaging in a "Transfer," which is defined to include the addition of a limited partner or member to Union Station Holdings. Mortgage Loan Agreement

§ 8.1(b). Section 8.2 of the Mortgage Loan Agreement provides that Mortgage Lender's consent for a Transfer "shall not be unreasonably withheld."

16. The Investment would have entailed a change in USI's organizational structure and a Transfer. Accordingly, on April 12, 2021, USI, through its attorneys, sent a letter (the "April 12 Letter") to the Mortgage Loan Special Servicer requesting that it begin the process for granting consent to the change in USI's structure to facilitate the Investment (the "Proposed Transactions"). A true and correct copy of the April 12 Letter is annexed hereto as **Exhibit 1**.

17. The April 12 Letter described the Investment in detail. It stated that "[a] definitive contribution agreement, setting forth the terms of the transaction with the Investor, has been executed by the parties" (the "Contribution Agreement"), and further that "[a]ll material closing documents, and $100,000,000 of Investor's capital contribution, have been deposited in escrow, subject to [Second Mortgage Lender's] approval and closing" of the Investment.

18. The April 12 Letter also stated that, upon closing, the Investor will make an additional capital contribution "in excess of $100,000,000" to Union Station Holdings and, further, that "the [mortgage] Loan will be brought current and [Union Station] Holdings will have significant dollars set aside to make further investments in the operations of [Union Station], including tenant improvements, leasing commissions, capital expenditures and shortfalls."

19. In other words, the April 12 Letter made Mortgage Loan Special Servicer aware that the Investment would make Second Mortgage Lender whole by bringing the Loans current, and further allow USI to make future Mortgage Loan payments and substantial investments in Union Station.

20. Mortgage Loan Special Servicer and Second Mortgage Lender had no valid reason whatsoever to refuse to consent to the Proposed Transactions because the Investment would have

solved all of the funding issues, while USI would have remained in control of Union Station and there would be no change in the management of USI.

21. Shortly after USI sent the April 12 Letter, I learned from Rexmark's principal, Michal Rebibo, that the CCR would never authorize Second Mortgage Lender to grant consent to the Proposed Transactions unless the CCR received a portion of the proceeds from the Investment. Mr. Rebibo informed me that he had many such conversations with the manager of the CCR, whom Mr. Rebibo referred to as a "predatory lender" because of this demand. Mr. Rebibo continued that if the CCR would not get a portion of the Investment, the CCR's manager would force a foreclosure. Upon information and belief, the CCR's manager expected Mr. Rebibo to communicate his objective to me so that I would consider his attempt to obtain an interest in the Investment—something I never considered. Upon information and belief, the CCR's manager did not communicate this directly to me himself, as he wished to create distance from his extortionate demand.

22. In other words, despite USSM and USI successfully obtaining financing that would have brought the Loans current and provide for future payments—which included the $100 million escrow deposit—the CCR would not even consider, let alone grant, the consent necessary for USSM and USI to cure their default unless the CCR could profit from the Investment. And, if it could not receive that profit, the CCR would force a foreclosure, otherwise stripping USSM and USI of their equity and interests in Union Station.

23. On April 26, 2021, Mortgage Loan Special Servicer, through counsel and acting on behalf of Second Mortgage Lender, and, upon information and belief, at the direction of the CCR, replied to the April 12 Letter (the "April 26 Letter"). A true and correct copy of the April 26 Letter is annexed hereto as **Exhibit 2**. In the April 26 Letter, Mortgage Loan Special Servicer informed

USI that Second Mortgage Lender would not consider the Proposed Transactions until USI paid a substantial portion of USI's repayment obligations under the Mortgage Loan (at that time over $16 million).  In other words, the Second Mortgage Lender rejected the Proposed Transaction without even considering it, which is completely inconsistent with its obligations under the Mortgage Loan Agreement. Upon information and belief, this demand was pretextual and a means by which to activate the CCR manager's scheme.

24.     Acting on Second Mortgage Lender's behalf, Mortgage Loan Special Servicer refused to take any steps to consider, let alone grant, the consent requested by USI in the April 12 Letter as was required by the Mortgage Loan Agreement and Second Mortgage Lender's obligations to exercise commercial good faith.  The Investment was the culmination of tireless, good faith efforts by USSM and USI to bring the Loans current and make future investments in the Union Station.  I, and others at AAC, believed that Second Mortgage Lender would enthusiastically grant consent to the Proposed Transaction, thereby clearing the way for the Investment, so that they could be made whole and have confidence that the Investment would allow USI to remain current on the Mortgage Loan.  Moreover, the $100 million escrow deposit—a fraction of the entire Investment—demonstrated to Second Mortgage Lender that the Mortgage Loan would become current immediately upon closing of the Investment.  Mortgage Lender had no reasonable basis on which to refuse to consent to the Proposed Transactions and has never stated such a reason.

25.     Based on the proposed Investment valuing the Property at over $700 million and a $1.24 billion valuation prior to the pandemic, Second Mortgage Lender had at all times been significantly oversecured.  The Proposed Transactions also would not have changed the day-to-

day management or operation of Union Station or any of the parties under any of the Loan Documents. As such, there was no valid reason to withhold consent.

26. On May 10, 2021, as a result of Second Mortgage Lender and Mortgage Loan Special Servicer's refusal to consent to the Proposed Transactions, the Investor informed Union Station Holdings, AAC, and other relevant parties that it was terminating the Contribution Agreement and it also withdrew the $100 million deposit it had made into the escrow account. The Investor expressly stated that it was terminating the Contribution Agreement because Second Mortgage Lender had not granted its consent to the transaction.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Ben Ashkenazy

Dated:   December 14, 2022