# SCHARF EXHIBIT G

1

2     IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF NEW YORK
3     Case No. 1:22-CV-06649-GHW
      ---------------------------------------x
4     DAOL REXMARK UNION STATION LLC and
      KOOKMIN BANK CO., LTD., in its capacity as
5     trustee of KTB CRE DEBT FUND NO. 8, a
      Korean Investment Trust, by its agent in
6     Korea DAOL FUND MANAGEMENT CO. and by its
      agent in United States REXMARK HOLDINGS
7     LLC d/b/a REXMARK,
8                         Plaintiffs,
9             - against -
10

      UNION STATION SOLE MEMBER, LLC,
11

                        Defendant.
12    ---------------------------------------x
13                   September 21, 2023
                     10:03 a.m.
14

15

16          VIDEOTAPED DEPOSITION of MICHAEL
17    REBIBO, held at the offices of Kasowitz
18    Benson & Torres LLP, located at 1633
19    Broadway, New York, New York 10019, before
20    Anthony Giarro, a Registered Professional
21    Reporter, a Certified Realtime Reporter and
22    a Notary Public of the State of New York.
23

24

25

1
2       A P P E A R A N C E S :
3
4       MORRISON COHEN LLP
          Attorneys for Plaintiffs
5         909 Third Avenue
          New York, New York 10022
6
        BY:  Y. DAVID SCHARF, ESQ.
7             MAHNOOR MISBAH, ESQ.
8
9
        KASOWITZ BENSON TORRES LLP
10        Attorneys for Defendant
          1633 Broadway
11        New York, New York 10019
12      BY:  DAVID J. MARK, ESQ.
              ANDREW W. BRELAND, ESQ.
13
14
15
16
17
18      ALSO PRESENT:
19                    PHIL GLAUBERSON, Videographer
20
21
22
23
24
25

1

2                    **S T I P U L A T I O N S**

3

4           IT IS HEREBY STIPULATED AND AGREED,

5      by and among counsel for the respective

6      parties hereto, that the filing, sealing

7      and certification of the within deposition

8      shall be and the same are hereby waived;

9           IT IS FURTHER STIPULATED AND AGREED

10     that all objections, except as to form of

11     the question, shall be reserved to the time

12     of the trial;

13          IT IS FURTHER STIPULATED AND AGREED

14     that the within deposition may be signed

15     before any Notary Public with the same

16     force and effect as if signed and sworn to

17     before the Court.

18               *      *      *

19

20

21

22

23

24

25

1

2          THE VIDEOGRAPHER:  Good

3     morning.  We are going on the record

4     at 10:03 on 9/21/2023.  Please note

5     that the microphones are sensitive

6     and may pick up whispering and

7     private conversations.  Please mute

8     your phones at this time and place

9     them away from the microphones as

10    they can interfere with the audio.

11    Audio and video recording will

12    continue to take place unless all

13    parties agree to go off the record.

14          This is Media Unit 1 of the

15    video-recorded deposition of Michael

16    Rebibo in the matter of Daol Rexmark

17    Union Station, LLC., et al. versus

18    Union Station Sole Member, LLC filed

19    in the United States District Court

20    for the Southern District of New

21    York, 1:22-CV-06649-GHW.  The

22    location of this deposition is

23    Kasowitz Benson Torres LLP, 1633

24    Broadway, New York, New York.

25          My name is Phil Glauberson

1

2          representing Veritext.  And I am the

3          videographer.  The court reporter is

4          Anthony Giarro from Veritext.

5                    I am not authorized to

6          administer an oath, I am not related

7          to any party in this action, nor am I

8          financially interested in the

9          outcome.

10                    If there are any objections

11         to proceeding, please state them at

12         the time of your appearance.

13                    Counsel will now state their

14         appearances and affiliations for the

15         record, beginning with the noticing

16         attorney.

17                    MR. MARK:  David Mark,

18         Kasowitz Benson Torres, for the

19         defendant.

20                    MR. BRELAND:  Andrew

21         Breland, also Kasowitz Benson Torres,

22         for the defendant.

23                    MR. SCHARF:  David Scharf

24         and Mahnoor Misbah for the

25         plaintiffs.

1  MICHAEL REBIBO
2  THE VIDEOGRAPHER:  Will the
3  court reporter please swear in the
4  witness.
5  M I C H A E L   R E B I B O, after having
6  first been duly sworn by a Notary Public of
7  the State of New York, was examined and
8  testified as follows:
9  EXAMINATION BY
10  MR. MARK:
11  Q      Good morning.  We've been
12  briefly introduced.
13  Can you please state your
14  name and address for the record?
15  A      Michael Rebibo.  My home
16  address?
17  Q      Business address would be
18  fine.
19  A      My business address is 295
20  Madison Avenue, Suite 1200, New York, New
21  York 10017.
22  Q      As I'm sure you know by now,
23  I'll be asking you questions today.
24  Please listen carefully.  But if you
25  don't understand any of my questions,

1                    MICHAEL REBIBO
2     please ask me to clarify, and I'll be
3     happy to do so.
4                    Also, as I think was briefly
5     mentioned before, if at any point you'd
6     like to take a break, just let us know.
7     If we're in the middle of a question and
8     answer, I'd like to finish the question
9     and let you answer, and then you'll be
10    able to take a break.
11         A       Got it.
12         Q       Are you currently employed?
13         A       Yes.
14         Q       By whom?
15         A       Rexmark Holdings LLC.
16         Q       What is your position?
17         A       I'm the managing principal.
18         Q       How long have you been with
19    Rexmark?
20         A       About 12 years.
21         Q       Can you briefly describe
22    your education, post high school, and
23    your prior employments before you joined
24    Rexmark?
25         A       Prior to founding Rexmark, I

1               MICHAEL REBIBO
2       was employed by a large privately-owned
3       real estate company based here in New
4       York called the Moinian Group.  I was
5       there for a number of years, from 2006, I
6       believe, until 2011 as a vice president
7       of asset management for a company that
8       has about 20 million square feet of
9       various real estate properties globally.
10      And prior to that, I was in Yeshiva
11      University for undergraduate school.
12           Q       Do you have a degree from
13      Yeshiva University?
14           A       I do not have a completed
15      degree from Yeshiva University.
16           Q       How much time did you spend
17      there?
18           A       I spent four and a half
19      years there.  And in order to get a
20      degree, you need to do something post
21      finishing.  So I got the full education.
22      But I did not complete a post school
23      assignment.
24           Q       Any other education, post
25      graduate?

```
 1                    MICHAEL REBIBO
 2        A         Beyond high school?
 3        Q         Beyond high school.
 4        A         No.
 5        Q         Now, do you understand that
 6   you're appearing here pursuant to two
 7   notices?
 8        A         Can you clarify the
 9   question?
10        Q         Sure.
11                  Do you understand that
12   you're individually noticed for a
13   deposition, and in addition, you're
14   appearing here as a corporate
15   representative?
16        A         Yes.
17        Q         And specifically, you're
18   appearing as the corporate representative
19   of Kookmin Bank.  You understand that?
20        A         Yes.
21        Q         Now, let me just show you
22   what we'll mark as Exhibit 1 to your
23   deposition.
24                  (The above-referred-to
25        document was marked as Defendant's
```

1                    MICHAEL REBIBO

2          Exhibit 1 for identification, as of

3          this date.)

4          Q        I'm handing you Defendant's

5     Exhibit 1.  The question very simply is

6     whether you're familiar with this

7     document.

8          A        Yes.  I'm familiar with the

9     document.

10         Q        Now, this is a Notice of

11    Deposition directed to Plaintiff Kookmin

12    Bank.  And it has at the end of it, a

13    list of deposition topics.  Do you see

14    that?

15         A        Yes.

16         Q        Have you reviewed these

17    deposition topics?

18         A        Yes.

19         Q        Are you able to testify

20    about each of these deposition topics?

21         A        Yes.

22         Q        Now, what did you do to

23    prepare for the deposition today?

24         A        I reviewed the deposition

25    topics.  I reviewed the -- some of the

MICHAEL REBIBO

1
2     materials in the discovery that were
3     provided by my attorneys.  I reviewed
4     some of the declarations that were
5     provided by your client, as well as
6     myself.  And I refreshed my memory on
7     some of the prior circumstances which
8     took place over the last few years.
9          Q       How did you go about
10    refreshing your memory?
11         A       I reviewed various notices,
12    e-mails, text messages.
13         Q       To the best of your
14    knowledge, have the documents you
15    reviewed all been produced in this case?
16         A       I'm sorry?
17         Q       To the best of your
18    knowledge, have all the documents you've
19    reviewed been produced in this case?
20         A       To the best -- yes.  By my
21    side, yes.  By your client's side, I
22    don't know.
23         Q       The documents you reviewed,
24    were they documents created by Rexmark?
25         A       They were produced by

```
 1                    MICHAEL REBIBO
 2    Rexmark, yes.
 3         Q        And they were produced to
 4    the defendants in this case?
 5         A        Yes.
 6         Q        In addition to reviewing
 7    documents, did you speak to anybody?
 8         A        I spoke to my attorneys.
 9         Q        And who are those?
10         A        The attorneys at Morrison
11    Cohen:  Mr. Scharf, Ms. Misbah, Ms. Will,
12    Ms. James.  There's a lot of attorneys in
13    this case.  I can't recall all their
14    names.
15         Q        Besides speaking to your
16    attorneys, did you speak to anybody else
17    to help prepare for the deposition?
18         A        No.
19         Q        Have you ever been
20    previously deposed prior to today?
21         A        Deposed?
22         Q        Yes.  Have your deposition
23    taken.
24         A        No.  This is the first.
25         Q        Good for you.
```

1                    MICHAEL REBIBO

2              MR. MARK:  Off the record.

3              (A discussion was held off

4        the record.)

5              MR. MARK:  Let's go back on

6        the record.

7         Q         So what is the business of

8    Rexmark?

9         A         Rexmark is an investment

10   manager that invests in commercial real

11   estate throughout the United States and

12   Europe, throughout all asset classes,

13   office buildings, apartment buildings,

14   hospitality, industrial, infrastructure,

15   retail, medical, education.  We invest

16   primarily institutional capital and

17   throughout major gateway cities in the

18   United States and Europe.  And in certain

19   cases, we are the lender.  In certain

20   cases, we're the owner and own and

21   operate various real estate.

22        Q         Does Rexmark invest in any

23   of its own capital?

24        A         Yes, we do.

25        Q         Let's go through some of the

1                    MICHAEL REBIBO
2    other entities that are involved here.
3                    What is the relationship of
4    Rexmark to Kookmin Bank?
5         A         Kookmin Bank is a trustee on
6    behalf of an investment vehicle in South
7    Korea.  Rexmark is the agent on behalf
8    of the trustee, as well as on behalf of
9    the investment vehicle in the United
10   States.  Rexmark originated this loan.
11   And Rexmark is a member.  And I believe
12   I'm one of the members personally of Daol
13   Rexmark Union Station LLC.  So we're
14   essentially the party in charge of the
15   investment in the United States.
16        Q         What is the name of the
17   investment vehicle that you referred to?
18        A         I believe it's KTB CRE Debt
19   Fund No. 8.
20        Q         Now, is KTB CRE Debt Fund
21   No. 8 a legal entity under the laws of
22   South Korea?
23        A         Yes.  It's a single-purpose
24   vehicle, formed in South Korea, that
25   originated the investment back in 2018.

1          MICHAEL REBIBO

2          Q        Does it have shareholders or

3     members?  How is it organized?

4          A        It's made up of three

5     separate institutions that funded the

6     investment.  And there are designees such

7     as Kookmin.  Kookmin does not actually

8     have a financial investment in the

9     transaction.

10               But because of rules and

11     regulations and compliance, you have a

12     trustee, as well as a Korean servicer,

13     asset manager, which is KTB/Daol, that

14     administers the loan or the investment,

15     administers the investment in South

16     Korea.

17          Q        You said there are three

18     institutions?

19          A        That invested in the

20     vehicle.

21          Q        What are the names of those

22     institutions?

23          A        Kyobo Life Insurance, Hanhwa

24     and Hana Life Insurance.  But these

25     are -- just to be clear, it's a blind

1                MICHAEL REBIBO
2    trust.  So these are completely passive
3    investors.  They don't have any active
4    role.  Once the vehicle is formed, the
5    investors have no active role in the
6    management or administration or decision
7    making of the investment.
8        Q        Who does have the management
9    or decision making role?
10       A        Myself, as well as my
11   counterpart, the servicer in South Korea,
12   which is KTB, or what they're now called,
13   Daol.
14       Q        So what is -- what is Daol
15   Fund Management Co.?
16       A        Daol Fund is the service
17   manager in South Korea.
18       Q        Is it related to the Daol
19   Financial Group?
20       A        Yes.
21       Q        What is the relationship?
22       A        It's a subsidiary of Daol
23   Financial Group.  Daol Financial Group is
24   a conglomerate that's made up of
25   different sectors, venture capital,

1                    MICHAEL REBIBO

2    investment banking, asset management in

3    this case.  It's a large institution.

4         Q       Was Daol Financial Group

5    previously called KTB Financial Group?

6         A       Correct.

7         Q       When did that name change

8    take place?

9         A       I honestly don't know; in

10   the last couple of years.

11        Q       What is Rexmark's

12   relationship to the Daol Financial Group?

13        A       Rexmark co-originated the

14   loan back in 2018, along with KTB Asset

15   Management.

16        Q       Now, the other plaintiff in

17   this case is Daol Rexmark Union Station

18   LLC.

19                Who owns that entity?

20        A       That entity is a sub-entity

21   of the KTB CRE Debt Fund entity.  That's

22   an entity formed in the United States.  I

23   believe I'm one of the members of that

24   entity.  That entity was formed post

25   foreclosure or right around the time of

1                    MICHAEL REBIBO
2     the foreclosure.  2022, I believe.  But
3     it's a subsidiary of -- it's an
4     affiliate, I guess you would call it, of
5     the KTB CRE Debt Fund No. 8.
6          Q        Who are the other members?
7          A        I believe it's myself and
8     one other member from Daol.
9          Q        What's the name of that
10    member?
11         A        Jaesang Eum.
12         Q        Can you describe what
13    Mr. Eum's role is in this matter?
14         A        His role is he's my
15    counterpart in South Korea.  He
16    administers the investment from the South
17    Korean side.  So he oversees compliance,
18    facilitates approvals, if necessary, and
19    since I don't speak South Korean,
20    communicates to various parties in South
21    Korea in their native language.
22         Q        In one of your prior
23    answers, you mentioned a foreclosure that
24    took place in 2022.
25                  For the sake of the record,

1                    MICHAEL REBIBO

2       can you just clarify what foreclosure

3       you're referring to?

4            A        The foreclosure under the

5       mezzanine loan in June of 2022 by -- I

6       guess I would call it our party versus

7       your client.

8            Q        The foreclosure by the

9       mezzanine lender?

10           A        Yes.

11           Q        Of its collateral it's

12      leaned heavily on?

13           A        Yes.

14           Q        And, again, just to further

15      clarify, prior to the foreclosure,

16      Kookmin Bank as trustee was the lender

17      under a $100 million loan to Union

18      Station Sole Member; is that correct?

19           A        That's correct.  At the time

20      of the foreclosure, we also held the

21      senior loan.

22           Q        But you did not foreclosure

23      the senior loan?

24           A        No.

25           Q        Now, is it okay if I refer

```
 1                    MICHAEL REBIBO
 2      to Union Station Sole Member as USSM or
 3      something similar to that, so that we
 4      don't have to repeat that every time?
 5              A       Yes.
 6              Q       And it's okay if I refer to
 7      the loan that we're talking about as a
 8      mezzanine loan?
 9              A       Yes.
10              Q       Now, again, just so the
11      record is clear, USSM held a membership
12      interest in Union Station Investco LLC;
13      is that correct?
14              A       That's correct.
15              Q       Or USI for short?
16              A       Yes.
17              Q       USI held a leasehold
18      interest in Union Station, Washington,
19      D.C.?
20              A       Yes.  That's correct.
21              Q       That leasehold interest was
22      the subject of a separate mortgage;
23      correct?
24              A       That's correct.
25              Q       And prior to your firm's
```

1                    MICHAEL REBIBO
2      acquisition of that mortgage, it was held
3      by a CMBS trust; correct?
4           A        That's correct.
5           Q        Wells Fargo was the servicer
6      of that mortgage?
7           A        At the time that I acquired
8      the mortgage in January of 2022, the
9      special servicer was Green Loan Services,
10     an affiliate of SL Green.  And the master
11     servicer I believe may have been Wells
12     Fargo.  But the loan was not in master
13     servicing at that time.  So Wells Fargo
14     was previously the special servicer prior
15     to -- I believe it was November, October
16     of 2021.
17                    MR. MARK:  So let's mark as
18          Exhibit 2, an e-mail and an
19          attachment, both dated April 12th,
20          2021.  For identification purposes,
21          the Bates number is BLKUSI210 through
22          2016.
23               (The above-referred-to
24          document was marked as Defendant's
25          Exhibit 2 for identification, as of

1                    MICHAEL REBIBO
2        this date.)
3        Q        Let me show you what's been
4    marked as Defendant's Exhibit 2.  Please
5    take a moment to look at it.  And my
6    question will be simply whether you
7    recognize this document.
8        A        Yes.  I'm familiar with the
9    document.
10       Q        Now, you are not listed on
11   the document as one of the people who
12   received a copy.  I'm referring both to
13   the cover e-mail and to the actual
14   letter.
15                But did you, in fact, at
16   some point obtain a copy of the letter?
17       A        Yes.  Later on.
18       Q        Do you recall when?
19       A        No, but after the fact.
20       Q        Let me just try to pin that
21   down a little bit more.
22                When you say after the fact,
23   you mean after April 12th, 2021?
24       A        Yes.  After April 12th,
25   2021.

1              MICHAEL REBIBO

2         Q         Did you get it sometime in

3    April of 2021 or later than that?

4         A         I can't recall, but not

5    within a day or two of April 12th, 2021.

6    It was materially after April 12th, 2021.

7         Q         So did there come a time

8    when you became aware of the fact that

9    there was a potential equity investment

10   to be made in Ashkenazy Holdings?

11        A         Potential -- not in

12   Ashkenazy Holdings, but a potential

13   equity investment in the Union Station;

14   in USSM and USI, yes.

15        Q         When did you become aware of

16   that potential equity investment?

17        A         Sometime in early 2021,

18   perhaps even late 2020.  I can't recall.

19        Q         How did you become aware of

20   it?

21        A         The borrower had informed me

22   that they were in the process of

23   negotiating the potential joint venture

24   with a third-party.

25        Q         That was before you actually

```
 1                    MICHAEL REBIBO
 2   received a copy of the letter that we've
 3   marked as Exhibit 2?
 4        A        Yes.  I was aware that there
 5   was a potential transaction pending, not
 6   too many details, but I was aware of a
 7   potential transaction pending.
 8        Q        What details were you aware
 9   of when you first were talking about the
10   potential investment?
11        A        That there was a sovereign
12   involved.  I was not aware of specific
13   amounts, valuations, things like that,
14   that there were several approvals that
15   needed to be obtained, including CFIUS,
16   high-level.
17        Q        Were you aware of -- were
18   you aware of the general size of the
19   amount of the investment?
20        A        No.  I was aware that it was
21   for a partial interest and that there was
22   a substantial cash infusion being made.
23   But specifically how much, I was not
24   aware.
25        Q        At some point, did you
```

1          MICHAEL REBIBO
2   become aware that the proposed capital
3   contribution would result in the foreign
4   sovereign having a 50 percent interest in
5   USI?
6       A       I don't know that I was ever
7   aware of the exact percentage.  I don't
8   think I was ever aware of the exact
9   percentage.  I was aware that they were a
10  minority percentage, that they were not
11  going to acquire the majority share.  But
12  I was aware that it was material.
13      Q       Were you aware as to the
14  total of the investment, there would be
15  sufficient funds to bring the debt
16  current?
17      A       I was aware that there was a
18  significant capital injection.  I have
19  been told various things by your client.
20  I did not receive a breakdown of where
21  the investment was being allocated or
22  what would be done specifically with the
23  investment.
24      Q       Well, you did eventually
25  receive a copy of the letter that we've

1                    MICHAEL REBIBO

2    marked as Exhibit 2; correct?

3        A        I can't recall when I

4    received a copy or if I even received a

5    copy of this letter after from your

6    client.  I can't even recall.

7        Q        Just to clarify, I think you

8    previously testified that you did at some

9    point receive a copy of this letter.

10       A        I've seen the letter.

11   That's not what I said.  I've seen this

12   letter.  I can't recall if I ever got --

13   you saying did I ever receive it.  I

14   can't recall if it was through the

15   discovery or -- okay, I've seen this

16   letter.  But I can't recall if and when I

17   received it.  And I don't know if I

18   received it from your client.

19       Q        You don't recall how you

20   obtained the letter?

21       A        I don't recall how I

22   obtained this letter.

23                MR. MARK:  So let's mark as

24        Exhibit 3, an e-mail, dated

25        April 29th, 2021, and attached to

1                    MICHAEL REBIBO
2          that is a letter of the same date.
3          And the Bates number is USDCUSSM2872
4          through 2874.
5                    (The above-referred-to
6          document was marked as Defendant's
7          Exhibit 3 for identification, as of
8          this date.)
9          Q       Let me show you what's been
10    marked as Defendant's Exhibit 3.
11                   And do you recognize this
12    document?
13         A       Okay.
14         Q       Do you recognize this
15    document?
16         A       I haven't seen it in a
17    while.  But, yes, I do recognize the
18    document.
19         Q       The cover e-mail is from Jay
20    Jantz at Arnold & Porter to yourself.
21                   Do you see that?
22         A       Yes.
23         Q       And it's dated April 29th,
24    2021.
25         A       Yes.

1                    MICHAEL REBIBO

2         Q         Did you receive the e-mail

3    and its attachment on or about

4    April 29th, 2021?

5         A         I believe so.

6         Q         Now, if I tell you, you

7    received this letter, you are already

8    aware of the potential equity investment;

9    is that correct?

10         A         I was aware there was a

11    pending transaction.

12         Q         According to the letter,

13    100 million has been deposited in escrow.

14    Do you see that?

15         A         Yes.

16         Q         At the time that you

17    received this letter, were you already

18    aware the 100 million had been put into

19    escrow?

20         A         I've been told by the

21    borrower.  But I hadn't been provided

22    with any proof of funds or anything like

23    that or a copy of the contract or

24    anything.  So there have been no

25    documentation.

1                    MICHAEL REBIBO

2        Q        Did you ask for the

3    documentation?

4        A        Yes.

5        Q        Did you ever receive it?

6        A        I don't believe so.

7        Q        Now, who did you make the

8    request to?

9        A        Michael Alpert, Dan Levy,

10   Ben Ashkenazy.

11                 MR. MARK:  I'm going to ask

12        the reporter to mark as Defendant's

13        Exhibit 4, an e-mail, dated April

14        12th, 2021, and an attached letter,

15        dated April 5th, 2021, that bears the

16        Bates numbers BLKUSI219 through 222.

17                 (The above-referred-to

18        document was marked as Defendant's

19        Exhibit 4 for identification, as of

20        this date.)

21        Q        Mr. Rebibo, have you seen

22   this e-mail and attachments before?

23        A        I believe I've seen this,

24   yes.

25        Q        Do you recall when you first

1                  MICHAEL REBIBO

2     saw them?

3          A         No.

4          Q         Was it in or around April

5     and May 2021?

6          A         I can't recall the exact

7     time.  But I've seen the redacted letter.

8          Q         So were you aware in and

9     around April and May of 2021 that a

10    100 million escrow had been deposited and

11    that a CFIUS application had been made in

12    connection with the equity investment?

13         A         I was informed that, yes.

14         Q         So you were informed by?

15         A         By your client.

16         Q         Can you be specific as to

17    who provided the information?

18         A         Either -- I'm not sure which

19    one.  But either Michael Alpert --

20    definitely Michael Alpert and either Dan

21    Levy or Ben Ashkenazy.

22         Q         Are those the three

23    individuals from USI with whom you were

24    in regular contact?

25         A         I was in regular contact

1                    MICHAEL REBIBO
2       with Mr. Alpert and Mr. Levy as it
3       related to matters -- related to
4       high-level executive matters with respect
5       to the proposed investment.  Other
6       matters, I was in touch with Mr. Press
7       related to the property level.
8            Q        Now, were you also during
9       this time period in contact with
10      representatives of the senior lender?
11           A        Yes.
12           Q        With whom in particular did
13      you have contacts?  And I'm talking about
14      generally in April and May of 2021.
15           A        At that time, the point of
16      contact for the senior lender for the
17      special servicer was Roger Briggs at
18      Wells Fargo and Michael Mesard of
19      BlackRock.
20           Q        I think we've already
21      identified Wells Fargo as a special
22      servicer at the time.
23           A        Correct.
24           Q        What was BlackRock's role?
25           A        BlackRock owned the

1                    MICHAEL REBIBO
2    controlling class of the senior debt.  So
3    they had -- they had approval rights or
4    veto rights over major decisions
5    regarding the loan.
6                    MR. MARK:  I'm going to ask
7         the reporter to mark as Defendant's
8         Exhibit 5, an e-mail, an attachment,
9         both dated April 12th, 2021, and the
10        Bates numbers are BLKUSI229 through
11        232.
12                    (The above-referred-to
13        document was marked as Defendant's
14        Exhibit 5 for identification, as of
15        this date.)
16        Q        Do you recognize Exhibit 5?
17        A        Yes.  I recognize it.
18        Q        Now, the author of the
19    e-mail is Langston Su.
20                    Can you identify Langston
21    Su?
22        A        He was an employee for
23    Rexmark.
24        Q        What was his position at
25    Rexmark at this time?

1              MICHAEL REBIBO

2          A       He was the vice president.

3          Q       What did he do?

4          A       He oversaw asset management

5     on our debt portfolio.

6          Q       Is he still with Rexmark?

7          A       No.

8          Q       When did he leave?

9          A       I'm not exactly certain.

10    But I believe it was the end of 2021.

11         Q       The e-mail was sent to

12    Michael Mesard and Roger Briggs.  We've

13    already identified them.  It then lists a

14    number of CCs, including yourself, and a

15    number of people from the e-mail address,

16    it appears to be KL Gates.  You see that?

17         A       Yes.

18         Q       What was the role of KL

19    Gates at the time?

20         A       They represented us.

21         Q       Did there come a point when

22    they stopped representing you in

23    connection with this matter?

24         A       Yes.  There was a conflict

25    of interest because they also represented

1           MICHAEL REBIBO
2   Wells Fargo.
3        Q        Did they withdraw or did you
4   basically ask them to stop representing
5   you?
6        A        Once there was -- I don't
7   recall all the circumstances.  But once
8   there was the potential to become adverse
9   with another client of theirs, I believe
10  they withdrew, or we just agreed to part
11  ways.  I don't recall the circumstances
12  exactly.
13       Q        Now, the attachment is a
14  memorandum prepared by Rexmark; correct?
15       A        Yes.
16       Q        And the reference line says
17  "mezzanine foreclosure proposal."
18                Do you see that?
19       A        Yes.
20       Q        Does the memorandum contain
21  a proposal for the mezzanine lender to
22  foreclosure on its collateral?
23       A        That's one of the things
24  mentioned.  It's also a proposal to bring
25  the loan current.

1          MICHAEL REBIBO
2     Q      Now, for -- in order for the
3  mezzanine lender to foreclose at this
4  time, did you need the consent of the
5  senior lender?
6     A      You don't need the consent
7  of the senior lender to foreclose;
8  however, under the terms of the
9  intercreditor, you need to comply.  So
10  you do -- you do need various consents
11  from the senior lender.  You don't need
12  their consent necessarily to foreclose.
13  But you need to comply with them, which
14  requires their consent, including things
15  that are referenced later on in the
16  letter about qualified transfer and
17  things like that.
18     Q      Could you have foreclosed
19  without any communications with the
20  senior lender?
21     A      Theoretically, yes.  But
22  that would have been default under my
23  intercreditor agreements if I didn't
24  obtain any consents because I don't
25  naturally meet the qualifications under

1                    MICHAEL REBIBO

2      the intercreditor.

3          Q        Was the purpose of this

4      communication represented by the e-mail

5      and the attachment to obtain the senior

6      lender's consent to foreclose on your

7      collateral?

8          A        No.  The purpose of the

9      letter was to negotiate an outcome which

10     would result in the senior lender

11     bringing the loan back into good

12     standing.  The loan had been accelerated

13     in March of 2021 due to various defaults

14     and breached promises by your client.

15         Q        What did you propose in

16     order to persuade the senior lender to,

17     in effect, de-accelerate their loan?

18                   MR. SCHARF:  Object to form.

19         You can answer.

20         A        We had proposed bringing the

21     senior lender current on all their past

22     due interest, paying them a modification

23     fee and special servicing fee, which they

24     had previously requested, and then

25     funding projected shortfalls to the

1                    MICHAEL REBIBO
2       senior for a period of time since the
3       property was not producing enough cash
4       flow to pay the senior debt current.
5            Q       Is the total amount that
6       you're proposing to inject 15 million?
7            A       Yes.
8            Q       Now, how did it come about
9       that you made this proposal?
10           A       The loan had been in default
11      for a number of years at this point.  We
12      had executed a forbearance.  Both lenders
13      had executed a forbearance with your
14      client in late 2020.  Your client had
15      defaulted on those agreements and had
16      advised both lenders that they were not
17      going to fund their obligations in 2021
18      or inject capital.
19                   And the senior lender's
20      patience, I guess, had run out because
21      there was no -- there was no path towards
22      a resolution at that point in time.  The
23      senior lender had accelerated the loan in
24      late March.  Your client had no -- the
25      client had no credibility with any party.

1          MICHAEL REBIBO

2     Q          Now, we've already discussed

3     the potential equity investment that the

4     borrower had told you about; correct?

5     A          We've discussed it, yeah.

6     I'm not sure the correlation between that

7     and the loan being in default.

8     Q          Well, if the equity

9     investment had come to fruition, would

10    that have resulted in providing

11    sufficient funds to cure the existing

12    default?

13    A          Obliging by the loan

14    documents and complying with the loan

15    documents is not based on any potential

16    transactions.  Your client is obligated

17    to do that, regardless of whether there's

18    a pandemic or regardless whether there's

19    a pending transaction or anything.  It

20    doesn't negate the fact that he's

21    obligated to fund his responsibilities

22    under the loan documents.

23              And certainly, considering

24    the minimal amount of money that was

25    being talked about, relative to the size

```
1                    MICHAEL REBIBO
2     of the proposed investment, he should
3     have been more than willing.  If there
4     was, you know, sincerely, a pending
5     transaction, he should have been more
6     than willing to fund $4 million a month
7     in March and April.
8          Q        Let me go back to my
9     question.
10                   If the equity investment had
11    closed, would that have provided
12    sufficient funds to cure the existing
13    default?
14         A        I don't know.  I would
15    assume so.  But I don't know for a fact
16    because the loan had been accelerated.
17    So I don't know.
18         Q        As part of your proposal,
19    you were asking the lender, in effect, to
20    reinstate the loan; correct?
21         A        Correct.
22         Q        And would you expect a
23    borrower to make a similar request in
24    connection with the equity investment?
25                   MR. SCHARF:  Objection to
```

```
 1                    MICHAEL REBIBO
 2         form.  You could answer.
 3         A        Would I expect?  I didn't
 4    know what to expect of your borrower, to
 5    be honest.  Nobody did.  As I said, the
 6    borrower had not fulfilled his
 7    obligations and had made numerous broken
 8    promises.  So in the credit department,
 9    he was significantly lacking.
10         Q        Sorry.
11                  When you referred to the
12    credit department, what department are
13    you referring to?
14         A        I mean that no party could
15    take what he said at face value.  We
16    weren't sure of the circumstances around
17    the pending transaction.  And the
18    borrower had means to cure the various
19    defaults, regardless of whether there was
20    a pending transaction or not, and elected
21    not to and told us she was not going to
22    commit any funds to the property.
23                  So the senior lender's and
24    all the lenders could not rely upon a,
25    you know, proposed transaction that had
```

1                    MICHAEL REBIBO
2     been going on for a significant amount of
3     time.
4          Q        When you say a proposed
5     transaction had been going on for a
6     significant amount of time, what are you
7     referring to?
8          A        The pending transaction.
9          Q        Which pending transaction?
10         A        The proposed joint venture
11    with PIF.
12         Q        Sorry.
13                  PIF, what does that refer
14    to?
15         A        The Public Investment Fund
16    of Saudi Arabia.
17         Q        Do you know for how long
18    that had been pending?
19         A        I don't know the exact
20    timelines.  I believe the -- what I found
21    out later on was that the transaction
22    was done sometime in late 2020 and funded
23    sometime in early 2021 and had still not
24    been consummated by May of 2021.  So at
25    least six months.

1          MICHAEL REBIBO

2      Q      Now, turning back to the

3  proposal contained in Exhibit 5, when did

4  you first discuss with the senior lender

5  the concept that you would do a

6  foreclosure and bring the loan current?

7      A      I can't recall the exact

8  dates.

9      Q      How long prior to April 12th

10  of 2021 when this exhibit was written did

11  you first discuss that with them?

12      A      Couldn't have been too long.

13  But I can't recall the exact dates.

14      Q      Now, whose idea was it?  Was

15  it your idea or was it their idea?

16      A      I honestly don't recall.

17          MR. MARK:  I'm going to ask

18      the reporter to mark as Defendant's

19      Exhibit 6, an e-mail and attachment,

20      dated April 15th, 2021, with the

21      Bates numbers BLKUSI235 through 238.

22          (The above-referred-to

23      document was marked as Defendant's

24      Exhibit 6 for identification, as of

25      this date.)

1              MICHAEL REBIBO

2      Q        Can you take a look at what

3  we've marked as Defendant's Exhibit 6 and

4  let me know if you recognize this

5  document?

6      A        Yes.  I'm familiar with the

7  document.

8      Q        Is this an updated version

9  of the proposal for mezzanine foreclosure

10  that we've previously discussed?

11      A        Yes.

12      Q        Were the changes made in

13  Exhibit 5 the result of conversations you

14  had with BlackRock?

15      A        Some of the changes, yes.

16      Q        Which changes?

17      A        I believe the numbers were

18  rounded.  Perhaps we got into more

19  specifics.  Certainly the list in No. 3,

20  the concept discussed.  There had been

21  some discussions between the first

22  proposal and the updated proposal.

23      Q        Did Wells Fargo participate

24  in these discussions or were they solely

25  with BlackRock?

1                    MICHAEL REBIBO

2        A        I believe Wells Fargo -- I

3   participated in some discussions with

4   Wells Fargo.  I can't recall if they were

5   all on the phone at the same time.

6                    MR. MARK:  I'm going to ask

7           the reporter to mark as Defendant's

8           Exhibit 7, an e-mail and attachment,

9           dated April 21st, 2021, with the

10          Bates numbers BLKUSI663 through 666.

11                    (The above-referred-to

12          document was marked as Defendant's

13          Exhibit 7 for identification, as of

14          this date.)

15       Q        Do you recognize this

16   document?

17       A        Yes.  I recognize the

18   document.

19       Q        Does Exhibit 7 contain an

20   updated version of the proposal we have

21   discussed?

22       A        Yes.

23       Q        And are the updates the

24   result of conversations that you were

25   having with BlackRock?

1                    MICHAEL REBIBO

2       A         And Wells Fargo, yes.

3       Q         Now, the cover e-mail on the

4    first page of the exhibit says, among

5    other things, "In addition, we will

6    address and discuss your proposal on the

7    profit participation concept and help to

8    potentially structure it."

9                  Do you see that?

10      A         Yes.

11      Q         What was the profit

12   participation concept?

13      A         Conceptually, they were

14   proposing that if the value of the asset

15   was ever recovered beyond the senior

16   lender's principal and interest that

17   there would be some sort of a premium

18   concept above a certain threshold.

19      Q         Who made that proposal?

20      A         BlackRock.

21      Q         And who would get the

22   benefit of that premium?

23      A         I don't know what the

24   internal split was.

25      Q         A split among whom?

1          MICHAEL REBIBO

2          A          The senior lender parties, I

3      guess.  I don't know.  Certainly not

4      myself.

5          Q          Let me just make sure I

6      understand your answer.

7                     Did you anticipate that the

8      premium would be divided equally among

9      all the senior lenders?

10         A          That was not my impression.

11     But I don't know.

12         Q          What was your impression?

13                    MR. SCHARF:  Objection to

14        form.  You could answer.

15         A          They were seeking a premium

16     to reinstate the loan.  And I didn't ask

17     what's the split or who's getting what.

18         Q          When you say they, you're

19     referring to BlackRock?

20         A          Yes.

21         Q          Was it your understanding

22     that BlackRock was seeking a premium for

23     themselves?

24         A          Potentially.

25         Q          What was that understanding

                    MICHAEL REBIBO

1
2    based on?

3         A         Well, they had made the

4    request.  Initially, it did not come from

5    Wells Fargo.  And if you pull up the next

6    exhibit you're about to show me, you'll

7    see that they removed Wells Fargo from

8    the response on the reply.

9         Q         Thank you for anticipating

10   my next exhibit.

11        A         No problem.  You want me to

12   tell you how this case is going to go?

13        Q         Sure.

14                  MR. MARK:  Let's mark as

15        Exhibit 8, an e-mail chain in which

16        the first e-mail is dated -- when I

17        say first, I mean the e-mail on top,

18        which is the latest in time, is dated

19        April 23, 2021 and has the Bates

20        numbers BLKUSI683 through 688.

21                  (The above-referred-to

22        document was marked as Defendant's

23        Exhibit 8 for identification, as of

24        this date.)

25        Q         Can you identify Exhibit 8?

1                    MICHAEL REBIBO

2          A          You're missing the parties.

3    You see?  You missed that.  Exhibit 8 is

4    the same e-mail chain; however, you're

5    missing the parties on the response.

6    It's not in your e-mail.

7          Q          It was the way it was

8    produced to us.  I didn't pick anything

9    out.

10          A          I don't think that's

11    accurate.

12          Q          Can you just for the record

13    be specific as to what you're referring

14    to?

15          A          This is a further updated

16    e-mail chain between myself and the

17    senior lender party, BlackRock.  But what

18    you could see here is that the parties on

19    the e-mail chain have been changed.  And

20    Wells Fargo is removed.  And somebody

21    senior at BlackRock has been added.

22          Q          So let's try to be specific

23    in what you're referring to.

24                    So if you turn to page 2 of

25    the document, the first full e-mail from

1                    MICHAEL REBIBO
2        Langston Su on April 21, 2021 is the same
3        e-mail that was the top e-mail, the
4        previous exhibit; correct?
5             A        Yes.
6             Q        And above that, you got an
7        e-mail from Michael Mesard, also dated
8        April 21, 2021?
9             A        Yes.
10            Q        And I think what you're
11       pointing out is that you cannot tell just
12       looking at this e-mail who exactly the
13       addressees were; correct?
14            A        Correct.
15            Q        But if you look at the next
16       e-mail, which is dated April 23rd from
17       yourself, did you respond to whomever had
18       sent you the previous e-mail?
19            A        Yes, I did.
20            Q        And it's clear from your
21       e-mail that Wells Fargo is not on that
22       e-mail; correct?
23            A        Correct.
24            Q        And is it your testimony
25       that the e-mail from Michael Mesard,

1                    MICHAEL REBIBO
2      which is at the very bottom of the first
3      page, did not include Wells Fargo as an
4      addressee?
5           A        That is my testimony, yes.
6           Q        Did you have an occasion to
7      ask Mr. Mesard why he did not include
8      Wells Fargo on his e-mail to you?
9           A        No.
10          Q        So let's look at
11     Mr. Mesard's e-mail which begins at the
12     bottom of page 1 and then continues on
13     the top of page 2.
14                   So did you understand that
15     Mr. Mesard's e-mail was in response to
16     the proposal that we've already looked at
17     that was in Rexmark's April 21 e-mail?
18          A        Yes.
19          Q        Now, first point is that the
20     CMBS trust needs to be made current.  You
21     see that?
22          A        Yes.
23          Q        Is it fair to say that was
24     not a controversial point?
25          A        Correct.

1                    MICHAEL REBIBO

2        Q        Next, Mr. Mesard asks for a

3    cushion against future shortfalls.  You

4    see that?

5        A        Yes.

6        Q        And, again, in concept,

7    that's something you were already

8    proposing; correct?

9        A        In concept.

10       Q        However, he's now proposing

11   to increase that amount; is that correct?

12       A        Yes.

13       Q        From 5 million to

14   10 million?

15       A        Yes.

16       Q        Was that increase something

17   that was acceptable to you?

18       A        I don't recall if it was

19   acceptable or not.  But we were not that

20   far apart, a few million bucks, I think,

21   between what he proposed and what I

22   proposed.

23       Q        Let's look at your e-mail

24   which is the first e-mail on page 1.

25       A        We never had a finalized

MICHAEL REBIBO

1
2      term sheet to answer your question.
3      There was no finalized agreement.  We
4      never even went to our committees.
5           Q       We'll get to that.
6                   But just breaking down on
7      this point, was this one point you did
8      not agree upon which was the amount that
9      you were willing to put up for future
10     shortfalls?
11          A       It was a point that we were
12     still discussing.
13          Q       And his third point was a
14     need for a reasonable profit
15     participation?
16          A       Yes.
17          Q       Which we've already
18     discussed.
19                  Now, in your response to
20     Mr. Mesard's e-mail, which is on page 1,
21     you write that, "Regarding the profit
22     participation, I don't have a formal
23     response to you yet, as it is largely
24     affected by what deal we strike with
25     potential operators/JV partner."

1              MICHAEL REBIBO

2              Do you see that?

3       A       Yes.

4       Q       What were you referring to

5    when you mentioned a potential

6    operator/JV partner?

7       A       We were referring to, we

8    didn't know what type of deal we were

9    going to make with any third-party,

10   whether it was the borrower or potential

11   other third-party.  So we couldn't commit

12   to something based on something we didn't

13   know.

14      Q       Was Rexmark's willingness to

15   enter into an agreement with the senior

16   lender of that type that we were

17   discussing contingent upon Rexmark

18   finding a JV partner?

19      A       No.  I don't believe so; in

20   fact, one thing you're not looking at

21   here is one of the prior e-mail

22   correspondences or lists between these

23   proposals, I think we included the

24   borrower as an eligible party.  That was

25   conveniently skipped in your production.

1              MICHAEL REBIBO

2         Q        Can you elaborate on that?

3    What was the concept?

4         A        You have a list of

5    preapproved JV partners or operators in

6    there.  One of the prior e-mail

7    correspondences I believe had a list that

8    included Ashkenazy.  It's not in the

9    production you just gave me.

10        Q        Do you know which document

11   contains that?

12        A        I don't know if it was a

13   document or an e-mail because there had

14   been communications between the parties.

15   But we could get that for you if you

16   don't already have it.  But I believe you

17   have it.

18        Q        So just to clarify, what

19   you're referring to -- so if you look at

20   Exhibit 6, it contains a list of

21   preapproved third-party operators.  Do

22   you see that?  I'm looking at the last

23   page of Exhibit 6 under Item No. 3.  Is

24   that what you're referring to?

25        A        Yes.

1                    MICHAEL REBIBO

2       Q        And it lists various

3    third-parties?

4       A        Yes.

5       Q        What was the prospective

6    role of these third-parties listed here?

7       A        Under the intercreditor

8    agreement, Rexmark did not qualify by

9    itself as a party that could take over

10   operation of Union Station under the

11   intercreditor agreement with the senior

12   loan.

13                So we would need to bring in

14   a third-party that did qualify or meet

15   the terms.  I shouldn't say qualified.

16   But I should say meet the terms of the

17   intercreditor.  And those were just a

18   list of well-known parties that in our

19   opinion would qualify.

20       Q        So is it your testimony that

21   you were considering having Ashkenazy act

22   as a role as such a party?

23       A        There was a potential, yes.

24   There was a potential party, yes.

25       Q        But you did not list him in

1                    MICHAEL REBIBO
2       that list?
3            A       It's not in that exhibit.
4       But it's in one of the other
5       correspondences.
6            Q       Can you provide any more
7       details as to which correspondence that
8       is in?
9            A       As I said, we could get you
10      that information.  But it's in some
11      correspondence in April of 2021.
12           Q       So just so I understand, you
13      did advise BlackRock that one of the
14      parties you made joint venture with, if
15      you did this transaction, would be
16      Ashkenazy?
17           A       Yes.
18           Q       Did they have any reaction
19      to that?
20           A       Yes.
21           Q       What was their reaction?
22           A       They were concerned about a
23      defaulted borrower who wasn't maintaining
24      the asset properly and as I said earlier,
25      had no credibility in keeping their word,

1                    MICHAEL REBIBO

2    continuing the role because essentially

3    over two years, we had been trying to

4    work with the borrower and made numerous

5    accommodations to them.  Those

6    accommodations and good will by the

7    lenders had never been reciprocated by

8    the borrower.  The borrower had been very

9    vocal about his unwillingness to commit

10   capital to the project.

11              So they were not so keen on

12   the idea to keep a difficult party who

13   had breached numerous obligations

14   continuing in the role if we were to

15   restructure the loan.  The loan had been

16   accelerated at that point.

17        Q       What you're telling me now,

18   these are all things that Mr. Mesard said

19   to you in April of 2021?

20        A       I'm not saying all of those

21   things.  Certainly, the credibility

22   thing, I'm saying.  But people were

23   generally fed up with them.

24        Q       I'm trying to separate what

25   was in your mind now and then versus what

1                    MICHAEL REBIBO
2    Mr. Mesard may have told you.
3         A        Well, what I'm saying to you
4    is that there was a list of preapproved
5    names that included Ashkenazy and a later
6    list that you're showing here
7    selectively.  It's out.  And the reason
8    is because I had a conversation with the
9    senior lenders.
10                   And they had expressed
11   concern about if the loan were to be
12   reinstated and restructured, doing so
13   with Ashkenazy, they were expressing
14   concerns.  So we removed their name from
15   the future proposals.
16                   MR. SCHARF:  David, we've
17       been going an hour and 15.  Would now
18       be a convenient time for a short
19       five-minute break?
20                   MR. MARK:  That would be
21       fine.
22                   THE VIDEOGRAPHER:  This will
23       end Media Unit 1, going off the
24       record at 11:18.
25                   (A short recess was taken.)

1          MICHAEL REBIBO

2              THE VIDEOGRAPHER:  We're

3       back on the record at 11:31.  This

4       will begin Media Unit 2.

5          Q        I think we already started

6    discussing.

7              But what happened with this

8    foreclosed proposal after this e-mail

9    exchange we've just been talking about?

10        A        I don't recall the exact

11   dates.  But sometime in May of 2021, the

12   transaction had died in sometime late May

13   of 2021.  And discussions with the senior

14   lender had ceased.

15        Q        Did you lose interest in the

16   concept of doing a foreclosure at that

17   time?

18        A        I don't think we had any

19   interest in doing a foreclosure, per se.

20   I think we were interested in finding a

21   resolution to reinstate the loan that

22   didn't involve us getting wiped out.  We

23   never started a foreclosure until

24   November of 2021.

25        Q        I'm just trying to get a

1           MICHAEL REBIBO

2      sense whether these discussions just

3      died, or was there any particular reason

4      why I guess they stopped?

5           A        I think they took a hiatus

6      as a result of things that took place

7      between the borrower and the senior

8      lender and the prospective deal.  But

9      certainly, there was no -- your prior

10     comment about, did we lose interest in

11     foreclosure, I don't think we ever had

12     particular interest in a foreclosure.  We

13     were trying to resolve and reinstate the

14     loan at that time.

15          Q        In Mr. Mesard's e-mail to

16     you of April 21, which we've already

17     discussed, which is on page 2 of

18     Exhibit 8, Mr. Mesard says at the end of

19     the e-mail, "Most importantly as you

20     know, we are running out of patience and

21     time on this.  And we are dual tracking

22     multiple approaches."

23                   You see that?

24          A        Yes.

25          Q        And did Mr. Mesard tell you

1              MICHAEL REBIBO
2    what other approaches he was tracking?
3        A      He had commenced and sent us
4    and the borrower notices that he was in
5    the process of commencing a foreclosure
6    action.  He hadn't officially commenced
7    the foreclosure.  But I believe he had
8    sent a notice as part of those
9    preliminary steps that a lender would
10   take as part of commencing an action.
11       Q      Just to clarify, was any
12   foreclosure action commenced in May of
13   2021?
14       A      No.
15              MR. MARK:  I'm going to ask
16       the reporter to mark as Exhibit 9, an
17       e-mail chain in which the top e-mail
18       is dated May 10th, 2021, and it has
19       the Bates numbers BLKUSI1463 through
20       1467.
21              (The above-referred-to
22       document was marked as Defendant's
23       Exhibit 9 for identification, as of
24       this date.)
25       Q      Mr. Rebibo, can you identify

```
 1                    MICHAEL REBIBO
 2     Exhibit 9?
 3          A        Yes.  I'm familiar with this
 4     e-mail.
 5          Q        The first sentence of the
 6     top e-mail, which is from you to Michael
 7     Mesard, among others, you say, "As a
 8     follow-up to our conversation Thursday, I
 9     want to point out that despite the photos
10     we sent you being thorough, we highly
11     recommend that you take a trip to the
12     property as it is difficult to grasp the
13     situation without physically touring
14     everything."
15                   Do you see that?
16          A        Yes.
17          Q        What were you trying to
18     convey to Mr. Mesard in that sentence?
19          A        CMBS lenders and bondholders
20     typically aren't as familiar with the
21     assets themselves.  And I thought it
22     would be beneficial to all parties to see
23     the asset personally versus looking at
24     pictures online.  And I didn't think
25     that -- I thought it would be educational
```

MICHAEL REBIBO

1

2      and informative for them to do so.

3          Q        Why was that?

4          A        Because we were discussing a

5      loan modification.  And they were

6      exploring various options.  I didn't

7      think they fully understood the asset.

8          Q        What aspect of the asset do

9      you think they did not fully understand?

10         A        I don't think they fully

11     understood the market in Washington, D.C.

12     or the asset or the state of the asset,

13     any distress it had been experiencing.

14         Q        Were you trying to convey

15     that the asset required further

16     investment?

17         A        I think that was -- everyone

18     was aware of that.  I don't think they

19     understood the full extent of the nature

20     of the asset or what the asset was

21     dealing with.  I don't think anyone was

22     in denial that the asset required an

23     investment.

24         Q        I'm just trying to

25     understand, what do you think they did

MICHAEL REBIBO

1
2    not fully understand?
3        A        I think it's important for
4    everybody to be operating on the same
5    information when you're a lender dealing
6    with a distressed situation.  If one
7    party is not operating with the same
8    level of information as the other party,
9    it makes it difficult for people to see
10   eye to eye.
11       Q        Did you believe that you had
12   information that BlackRock did not have?
13       A        No.  I believe that I was
14   more familiar with it since my knowledge
15   of the asset was superior to theirs.  And
16   I had personally gone and seen the asset
17   which I thought was very helpful.
18       Q        Helpful in what respect?
19       A        I think I answered the
20   question.
21       Q        You said you've personally
22   gone and seen the asset, and I thought
23   that was very helpful.
24               So I'm trying to understand,
25   helpful in what respect?

1                    MICHAEL REBIBO

2        A        I think I answered the

3    question.  When an asset is in distress

4    and it's a complicated asset, such as

5    Union Station, it's helpful for the

6    parties involved in the decision making

7    to go and see the assets for themselves

8    versus looking at pictures or numbers on

9    a spreadsheet.

10       Q        You then go on to say, "It

11   has become increasingly clear after

12   touring the property that it's in

13   everyone's best interest (senior lender

14   and mezzanine lender) to do everything we

15   can to ensure this pending transaction

16   that the borrower has provided notice for

17   forecloses."

18                You see that?

19       A        Yes.

20       Q        Were you trying to persuade

21   BlackRock to support their proposed

22   equity investment?

23       A        I was.

24       Q        And why was that?

25       A        I thought at the time that

1                    MICHAEL REBIBO
2    it would be in the best interest of all
3    parties.
4         Q        When you say all parties,
5    are you including the borrower as among
6    the parties?
7         A        I was referring to myself
8    and the senior lender and the asset
9    potentially.
10        Q        Are you excluding the
11   borrower from the parties from whose
12   benefit it would be?
13        A        No.  There's no discussion
14   in this e-mail about doing a deal with
15   the party without the borrower.  It
16   specifically says it's in everyone's best
17   interest to ensure that this pending
18   transaction that the borrower has
19   provided notice for forecloses.
20        Q        I guess the reason I'm
21   asking the question, you say it's in
22   everyone's best interest, and then in
23   parentheses, you say "senior lender and
24   mezzanine lender."
25                  So were you intentionally

```
 1                    MICHAEL REBIBO
 2    excluding the borrower from the parties
 3    whose interest it would be in?
 4         A        No.  I specifically referred
 5    to the pending transaction that the
 6    borrower has provided notice for.  What
 7    you're inferring is not accurate.
 8         Q        I'm just trying to clarify
 9    what you had in mind.
10                   You agree with me that it
11    would be in the borrower's best interest
12    as well to close that transaction?
13         A        I said everyone, and I
14    specified the senior lender and mezzanine
15    lender to do everything to ensure that
16    this pending transaction, that the
17    borrower has provided notice for
18    forecloses.  I didn't say a separate
19    transaction.
20         Q        So you will agree with me
21    that among the parties who would have an
22    interest in foreclosing the transaction
23    would be the borrower?
24                   MR. SCHARF:  Objection to
25         form.  You could answer.
```

1          MICHAEL REBIBO

2          A          I agree that it was in the

3     best interest of all parties, including

4     the borrower.

5          Q          Did you have an

6     understanding at the time you wrote this

7     e-mail on May 10th as to what BlackRock's

8     position was with respect to the proposed

9     equity transaction?

10         A          Not entirely.

11         Q          What was your understanding?

12         A          My understanding was that

13    they had received the notice from the

14    borrower in late April or in mid-April to

15    consent and that they were frustrated

16    with the borrower for still being

17    unwilling to inject capital into the

18    transaction or be reasonable.

19         Q          What was your basis for that

20    understanding?

21         A          Can you clarify the

22    question?

23         Q          Sure.

24                    In your previous answer, you

25    said they were frustrated with the

1                    MICHAEL REBIBO
2    borrower.
3                    And I guess my question is,
4    what's the basis for your understanding
5    that they were frustrated with the
6    borrower?
7         A        Well, in hindsight --
8         Q        I'm not asking for
9    hindsight.  I'm asking your understanding
10   in May of 2021.
11        A        Well, if you have a
12   potential transaction with a third-party
13   to inject hundreds of millions of dollars
14   into an asset and while that potential
15   transaction is going on and you have a
16   hundred million deposit up in escrow,
17   your loan is in default, your loan's been
18   accelerated which was the case for your
19   client, and you can solve it for a
20   relatively insignificant amount of money,
21   a few million dollars, would have been a
22   show of good faith at the time.
23                    But your client said they
24   weren't willing to do, all while they had
25   the means to do it.  Your client is a

1                    MICHAEL REBIBO
2       multi-billionaire, or at least that's
3       what Forbes says.  And they have the
4       means to come up with that money but
5       won't do it.  It doesn't instill a lot of
6       confidence in the lender party which the
7       borrower who stands to benefit the most
8       from the transaction is not willing to
9       commit a few dollars of their own money.
10                     So because the borrower
11      wasn't acting appropriately, they were
12      frustrated and did not have a lot of
13      faith in the borrower.  Nobody did at
14      that point.
15           Q       But nevertheless, on May
16      10th, 2021, you were urging BlackRock to
17      support the equity investment
18      transaction; correct?
19           A       Correct.
20                     MR. MARK:  I'm going to ask
21           the reporter to mark as Defendant's
22           Exhibit 10, an e-mail, dated May 21,
23           2021, with an attachment, with the
24           Bates numbers USDCUSSM703 through
25           708.

1                MICHAEL REBIBO

2                (The above-referred-to

3        document was marked as Defendant's

4        Exhibit 10 for identification, as of

5        this date.)

6        Q        Mr. Rebibo, can you identify

7    Exhibit 10?

8        A        It's an e-mail from Dan Levy

9    to me in response to a request I made,

10   asking for a copy of the notices that

11   were exchanged between the senior lender

12   and the borrower back in April,

13   specifically a notice, dated April 26th,

14   where the senior lender responds to the

15   borrower's request for consent.

16       Q        When did you become aware

17   that Wells Fargo had responded to the

18   consent request?

19       A        I can't recall.

20       Q        Were you aware of such a

21   response when you sent your May 10th

22   e-mail that was Exhibit 9?

23       A        I can't recall.  I was

24   obviously aware in my e-mail that there

25   was some discussion or dialogue going on.

1                    MICHAEL REBIBO

2     But I can't recall the exact.

3         Q        Now, other than your

4     May 10th e-mail to Mr. Mesard, did you

5     have any discussions with BlackRock or

6     Wells Fargo, concerning their response to

7     the equity investment notice?

8         A        I don't recall any specific

9     discussions.  I imagine there were

10    discussions.  But I can't recall a

11    specific one.

12        Q        When you say you would

13    imagine there were discussions, what are

14    you referring to?

15        A        We were communicating

16    routinely.  So at that time in May of

17    2021, I can't recall a specific

18    discussion.

19                 MR. MARK:  Let's mark as

20         Exhibit 11, a letter and various

21         attachments with the Bates numbers

22         KTB0002424 through 2510.

23                 (The above-referred-to

24         document was marked as Defendant's

25         Exhibit 11 for identification, as of

1                  MICHAEL REBIBO
2      this date.)
3      Q        Mr. Rebibo, you're welcome
4    to look at the whole document.  But I'm
5    only going to ask you about the letter
6    that begins on the second page of the
7    document.
8                MR. SCHARF:  David, while I
9        noticed that the documents are
10       certainly in Bates order, there seems
11       to be an assemblage of multiple
12       separate documents.  Is there a
13       reason you're marking all of them or
14       is it just that you need certain
15       pages in here?
16                MR. MARK:  It was the way it
17       was produced to us.
18                MR. SCHARF:  Yes.  First
19       looking at the Bates range,
20       definitely, it's in sequence.
21                MR. MARK:  As I said, I'm
22       frankly just interested in the
23       letter.  It's just they're all part
24       of the same document.
25       A        Yes.  I'm familiar with the

                    MICHAEL REBIBO

1

2    document.

3        Q        Can you take a look at the

4    letter that begins on page 2, Kasowitz

5    Benson Torres letterhead?  You see that?

6        A        Yes.

7        Q        You see what I'm referring

8    to?

9        A        The one signed by the other

10   Mark, the one signed by the other Mark.

11       Q        Yes.

12                Signed by Mark Kasowitz, do

13   you see that?

14       A        Yes.

15       Q        Did you get a copy of this

16   letter on or about May of 2021?

17       A        Yes.

18       Q        I'm going to ask you to look

19   at the third-full paragraph on page 2 of

20   the letter.  You see that?

21       A        Yes.

22       Q        Which begins, "Among other

23   sources of our client's information."

24       A        Yes.

25       Q        And then mentions your name?

1                    MICHAEL REBIBO

2          A        Yes.

3          Q        I'm going to ask you to read

4     that paragraph and to tell me whether

5     this paragraph accurately describes

6     information that you provided to

7     Mr. Ashkenazy and his colleagues.

8          A        "Among other sources of our

9     client's information, Michael Rebibo of

10    Rexmark Holdings LLC, the servicer for

11    the mezzanine loan, has informed our

12    clients that on numerous occasions,

13    Mr. Mesard on behalf of the mortgage

14    lenders told Mr. Rebibo that the mortgage

15    lenders are requiring participation in

16    the -- quote on quote -- equity or upside

17    in order to consider consenting to the

18    investment transaction."

19         Q        Let me stop you there.

20                  What you've read so far,

21    that correctly describes information you

22    provided to Ashkenazy?

23         A        No.

24         Q        In what respect is it

25    incorrect?

1           MICHAEL REBIBO

2        A       The statement here is that I

3    indicated to the borrower that Mr. Mesard

4    had informed me that he would only

5    consent to the proposed transaction if he

6    had an equity upside or participation

7    interest in the asset.  That statement is

8    false.

9        Q       Can you continue reading?

10        A       "This conduct was further

11    confirmed and evidenced in an e-mail from

12    Mr. Mesard, dated April 21st, 2021, to

13    Mr. Rebibo, wherein Mr. Mesard reiterated

14    this unlawful demand.  Moreover,

15    Mr. Rebibo stated that Mr. Mesard also

16    attempted to create an alternative

17    arrangement with Mr. Rebibo, whereby the

18    mortgage lenders also sought to obtain

19    equity by having the mezzanine lender

20    initiate foreclosure proceedings.  This

21    bad faith and self-serving scheme is

22    further evidence by the mortgage lender's

23    refusal to engage in discussions

24    regarding consent of the investment

25    transaction."

1          MICHAEL REBIBO

2          Q          Does what you just read

3     accurately report information that you

4     provided to Mr. Ashkenazy and his

5     colleagues?

6          A          No.

7          Q          In what respect is it not

8     correct?

9               MR. SCHARF:  Why don't you

10          take it sentence by sentence like you

11          were doing before.

12          A          Well, the first sentence

13     says this conduct was further confirmed

14     in evidence in an e-mail by Mr.-- from

15     Mr. Mesard, dated April 21st, 2021, to

16     Mr. Rebibo, wherein Mr. Mesard reiterated

17     this unlawful demand.  The premise of the

18     sentence that we're talking about, the

19     proposed transaction in an April 21

20     e-mail, it's completely false.

21               There's no reference that

22     Mr. Mesard and I were discussing the

23     proposed transaction.  So the premise of

24     the sentence is completely false.

25          Q          What about the next --

1          MICHAEL REBIBO

2      A        "Moreover, Mr. Rebibo stated

3   that Mr. Mesard has also attempted to

4   create an alternative arrangement with

5   Mr. Rebibo, whereby the mortgage lenders

6   also sought to obtain equity by having

7   the mezzanine lender initiate foreclosure

8   proceedings."

9             That statement is

10  misleading.  The statement is basically

11  saying that the mortgage lender was

12  pressuring us to foreclose.  And that's a

13  misleading statement.  The mortgage

14  lender had sought to be brought current

15  and had given the borrower numerous

16  opportunities to do so.  The borrower

17  obviously didn't perform and didn't keep

18  their word.  And that's -- so the

19  statement is misleading.  The statement

20  indicates that the mortgage lender was

21  predatory.  And I don't believe that to

22  be the case at the time.  This bad faith

23  and self-serving scheme is further

24  evidenced by the mortgage lender's

25  refusal to engage in discussions

1                    MICHAEL REBIBO

2    regarding consent of the investment

3    transaction.  Well, I don't know if that

4    statement is entirely true.  I see the

5    dates in the various letters.  But I also

6    see in the letter, no response, that the

7    senior lender indicated that they're

8    willing to entertain the transaction.

9    But they would like the borrower to come

10   current on the past due amounts.  So I

11   don't know if that statement's true or

12   not.  But given the previous statements

13   are all false, I would imagine that

14   statement's false also.

15                    MR. MARK:  Let's mark as

16        Defendant's Exhibit 12, an e-mail

17        from Michael Mesard, dated June 3rd,

18        2021, which has the Bates number

19        BLKUSI1617.

20                    (The above-referred-to

21        document was marked as Defendant's

22        Exhibit 12 for identification, as of

23        this date.)

24        Q       Can you identify Exhibit 12?

25        A       Yes.  It's an e-mail from

1                    MICHAEL REBIBO
2      Michael Mesard to myself in response to
3      an e-mail I sent him on June 2nd.
4          Q       Let's turn first to your
5      e-mail which is the second e-mail on this
6      page.
7                    What prompted you to send
8      that e-mail?
9          A       Following the termination of
10     the pending transaction and the
11     borrower's letter, effectively
12     threatening litigation, there had been I
13     believe little to no dialogue.  I don't
14     know if there was any dialogue for almost
15     a ten-day span or 11 or 12-day span.  So
16     I was reaching out to Mr. Mesard to
17     reengage in discussions and find a
18     solution to move forward.
19         Q       And Mr. Mesard responds by
20     saying, "Please reach out to Wells to
21     discuss"; is that correct?
22         A       Correct.
23         Q       Did you subsequently reach
24     out to Wells Fargo to have the
25     discussion?

1                    MICHAEL REBIBO

2        A       Yes.

3        Q       Did you obtain any

4    understanding as to why Mesard declined

5    to speak to you directly?

6        A       I never got an official

7    response.  But I imagine when potential

8    litigation is involved and there's a

9    designated agent on behalf of the entire

10   senior lender, they wanted the agent to

11   speak and one party to be talking.

12       Q       What did you discuss with

13   Wells Fargo when you did reach out to

14   them?

15       A       Discussing a resolution on

16   reinstating the loan.  We brainstormed on

17   ideas about how to move forward, talked

18   about solutions involving avoiding

19   litigation with the borrower.

20       Q       Did you discuss any specific

21   potential solutions?

22       A       I can't recall if I

23   discussed, I don't recall, our proposals

24   at that point.  There were no more

25   proposals at that point.

1          MICHAEL REBIBO
2               MR. MARK:  Let's mark as
3          Exhibit 13, an e-mail with an
4          attachment.  The top e-mail is dated
5          June 15th, 2021, and the Bates
6          numbers are KTB19048 through 82.
7                    (The above-referred-to
8          document was marked as Defendant's
9          Exhibit 13 for identification, as of
10          this date.)
11          Q          Mr. Rebibo, I'll just ask
12     you to take a look at the end of this
13     document which contains a June 16th
14     letter.  You could look the whole thing,
15     if you want.  But my questions are really
16     going to be directed to the attachment
17     which is at the end of this document.
18          A          What am I looking for?
19               MR. SCHARF:  The attachment
20          at the very end of this e-mail chain.
21          It's the last four pages.
22                    THE WITNESS:  The last four
23          pages?
24               MR. SCHARF:  Yes.
25          Q          You have in front of you the

MICHAEL REBIBO

1

2    June 16th letter that I'm referring to?

3    My question is very simple.

4                What was the reason for

5    sending a Notice of Default at this

6    specific point in time?

7        A       I can't recall the reason to

8    send it at that point in time.  The

9    notice is explicit.  The legal fees, they

10   were six months overdo, seven months

11   overdo, eight months overdo.

12               MR. MARK:  I'm going to ask

13          the reporter to mark as Defendant's

14          Exhibit 14 an e-mail, dated June 2nd,

15          2021, that bears the Bates numbers

16          BLKUSI1612 through 1614.

17               (The above-referred-to

18          document was marked as Defendant's

19          Exhibit 14 for identification, as of

20          this date.)

21        Q       Mr. Rebibo, you're not

22   involved in this correspondence.  But

23   there's one specific question I want to

24   ask you about it.

25               You'll see in the bottom --

```
 1                  MICHAEL REBIBO
 2    beginning at the bottom of the first page
 3    and the very top of the second page,
 4    there's an e-mail from Michael Mesard to
 5    someone at Wells Fargo where he
 6    says, "Hi, Lisa.  Could you please call
 7    me tomorrow?"
 8              And it goes on to say, "We
 9    were disappointed with the way this
10    transaction was handled."
11              You see that?
12        A      Yeah.
13        Q      And he's referring to the
14    Union Station transaction; is that
15    correct?
16        A      Yes.
17              MR. SCHARF:  I was going to
18         say objection to form.  You can
19         answer.
20        A      Yes.  He's referring to the
21    administration of the loan.
22        Q      Did Mr. Mesard ever express
23    a similar view to you that he was
24    disappointed with the way Wells Fargo has
25    handled its administration of the loan?
```

1                    MICHAEL REBIBO

2          A          In June of 2021, I wasn't

3    even talking to him.

4          Q          Leaving aside the specific

5    date, did you have a conversation with

6    Mr. Mesard where he told you that he was

7    disappointed with the way Wells Fargo was

8    handling or has handled the

9    administration of the senior loan?

10         A          I can't recall.

11         Q          You don't recall, one way or

12   the other, or you don't recall having any

13   such conversation?

14         A          I don't recall having a

15   specific conversation.  I can't recall if

16   he ever expressed that.  I don't know.

17   He may or may not.  I don't know.  I

18   don't recall.

19         Q          Do you have an understanding

20   of what Mr. Mesard was referring to?

21         A          No, not specifically at this

22   point in time.  I don't.

23         Q          Do you have a general

24   understanding of what he was referring

25   to?

MICHAEL REBIBO

1
2          A          At this point in time, there
3     was the threat of litigation for the
4     borrower.  And the spotlight was on him.
5     He was named in a letter.  So I imagine
6     he wasn't too pleased with the situation.
7                     MR. MARK:  I'm going to ask
8          the reporter to mark as Exhibit 15,
9          an e-mail from Michael Rebibo, dated
10         June 28th, 2021, and it bears the
11         Bates numbers KTB4609 through 4614.
12                     (The above-referred-to
13         document was marked as Defendant's
14         Exhibit 15 for identification, as of
15         this date.)
16         Q          Can you identify this
17    document?
18         A          Yes.
19         Q          The e-mail and attachment
20    contains summaries of a meeting that you
21    attended; is that correct?
22         A          Yes.
23         Q          And this was a meeting held
24    on June 24th, 2021 and involved
25    representatives of Ashkenazy, Wells

                    MICHAEL REBIBO
1
2    Fargo, BlackRock and yourself; correct?
3         A      Yes.
4         Q      And the attachment in the
5    e-mail is titled "Meeting Summary."
6                You see that?
7         A      Yes.
8         Q      Did you prepare this meeting
9    summary?
10        A      Myself, along with someone
11   in my office.
12        Q      And that other person who
13   assisted you was Langston Su; is that
14   correct?
15        A      Correct.
16        Q      Was this summary intended to
17   be a comprehensive summary of the
18   meeting?
19        A      No.  General.
20        Q      Is there anything specific
21   that you can recall that you left out of
22   the summary?
23        A      Nothing specifically, no.
24        Q      What was the purpose of this
25   meeting?

1                    MICHAEL REBIBO

2        A        It was a meeting between all

3   parties to discuss a proposal by the

4   borrower and a resolution that avoided

5   litigation.

6        Q        What was the result of the

7   meeting?

8        A        The borrower's proposal was

9   not acceptable to any of the other

10  parties.  And there was some internal

11  processes that the senior lender needed

12  to -- that the senior needed to complete

13  in order to come back with a

14  counterproposal.

15       Q        Did the senior lender ever

16  come back with a counterproposal?

17       A        I can't recall if they ever

18  came back with a formal counterproposal.

19       Q        Were there any follow-up

20  discussions after the meeting?

21       A        Yes.

22       Q        What was the substance of

23  those discussions?

24       A        Discussions about potential

25  restructuring negotiations.

1                    MICHAEL REBIBO

2       Q       Anything more specific that

3    you could recall?

4       A       No.

5               MR. MARK:  Let's mark as

6       Exhibit 16, an e-mail chain in which

7       the top e-mail is from Michael

8       Rebibo, dated September 9th, 2021,

9       and it bears the Bates range KTB4557

10      through 4588.

11              (The above-referred-to

12      document was marked as Defendant's

13      Exhibit 16 for identification, as of

14      this date.)

15      Q       Mr. Rebibo, I'm not going to

16   ask you about each and every one of these

17   e-mails in this chain.

18              But do you generally

19   recognize this e-mail?

20      A       Yes.  I'm familiar with the

21   document.

22      Q       Leaving aside the first two

23   pages, most of these e-mails concerns

24   various requests for approval that

25   Rexmark sent to persons in South Korea;

```
 1                    MICHAEL REBIBO
 2     is that right?
 3          A        Yes.
 4          Q        So my general question is
 5     whether these e-mails are typical in the
 6     process, whereby Rexmark sought approval
 7     from KTB matters relating to Union
 8     Station.
 9                    MR. SCHARF:  Objection to
10          form.  You can answer.
11          A        It was common practice prior
12     to acquiring the senior loan in January
13     of 2022, I believe, not common practice,
14     post January of 2022 when we acquired the
15     senior loan.
16          Q        What changed in January 2022
17     regarding the practice?
18          A        We acquired the senior loan.
19     And we had more discretion on a
20     day-to-day basis over what took place.
21          Q        Looking at the first e-mail
22     on the very top of the first page of the
23     document, I think we've already
24     identified who Jaesang Eum is.  The other
25     person mentioned in the CC line is
```

1                    MICHAEL REBIBO

2      Yongsoo Park.  You see that.

3           A       Yes.

4           Q       Who is Yongsoo Park?

5           A       He is the head of Asia

6      Pacific for Rexmark.  He works at our

7      office in South Korea.

8           Q       Does Rexmark have offices

9      anywhere else, other than New York and

10     South Korea?

11          A       No.

12          Q       Is there a specific reason

13     why you have an office in South Korea?

14          A       We have a substantial

15     platform there.  We've raised money from

16     a large number of institutions in that

17     market.  And that's just our base for

18     Asia.

19          Q       Now, in the e-mail that

20     begins on the bottom of page 1 and

21     continues at the top of page 2, someone

22     named Seog asks for certain information.

23     You see that?

24          A       Yes.

25          Q       Who is Seog?

1                MICHAEL REBIBO

2        A        Seog was an employee at KTB

3     as I recalled at the time that worked

4     underneath Jaesang.  He was the

5     administrator for the loan.

6        Q        What's his full name?

7        A        Seog Cho.

8        Q        How do you pronounce his

9     last name?

10       A        Cho.

11       Q        I'm sorry.

12                How do you spell his last

13    name?

14       A        C-H-O.

15       Q        In your e-mail at the top of

16    the first page, you summarize a call with

17    Wells Fargo.  Do you see that?

18       A        At the top of the first

19    page?

20       Q        Yes.

21       A        Yes.

22       Q        Do you have a recollection

23    of that call, separate and apart from the

24    e-mail?

25       A        Vaguely.

1              MICHAEL REBIBO

2        Q        Is your e-mail an accurate

3   summary of that call?

4        A        Generally.

5        Q        Now, in the last paragraph

6   in the e-mail, you mentioned an e-mail

7   that Cushman & Wakefield sent you.  You

8   see that?

9        A        Yes.

10        Q        What role at the time of

11   this e-mail did Cushman & Wakefield have

12   with respect to Union Station?

13        A        They had no official role.

14   They had reached out to us to lobby for

15   us for their loan sale department.

16        Q        So at the time of this

17   e-mail on September 9th, 2021, Rexmark

18   had not retained Cushman & Wakefield; is

19   that correct?

20        A        I don't believe so.  I

21   believe we engaged them in October or

22   November of 2021.

23        Q        At this point in time, were

24   you considering --

25        A        I could be wrong.  I'm

1                  MICHAEL REBIBO

2    sorry.  We may have had discussions with

3    them.  I don't believe they were formally

4    engaged.  Certainly had discussions with

5    them.

6         Q       Well, at this time, you told

7    Cushman & Wakefield you had an interest

8    in possibly marketing them?

9         A       Yes.  There was --

10   certainly, the loan had been in default

11   for over a year and a half, almost a year

12   and a half at that time.  There was no

13   resolution on the horizon.  It was one of

14   the things we were considering.

15                  MR. MARK:  It's 12:30.  So

16        this might be a good time to break

17        for lunch.

18                  THE VIDEOGRAPHER:  This will

19        end Media Unit 2, going off the

20        record at 12:30.

21                  (A lunch recess was taken.)

22                  THE VIDEOGRAPHER:  We're

23        back on the record at 1:21.  This

24        will begin Media Unit 3.

25                  MR. MARK:  I'm going to ask

1           MICHAEL REBIBO

2        the reporter to mark as Exhibit 17,

3        an e-mail and attachment, dated

4        November 3, 2021, with the Bates

5        numbers KTB2196 through 2202.

6                (The above-referred-to

7        document was marked as Defendant's

8        Exhibit 17 for identification, as of

9        this date.)

10       Q        Mr. Rebibo, can you take a

11   look at what we've marked as Exhibit 17

12   and tell us if you can identify it?

13       A        Yes.  I'm familiar with the

14   document.

15       Q        Now, this is a letter

16   from -- well, the attachment is a letter

17   from Mayer Brown, dated November 3, 2021,

18   to Wells Fargo, BlackRock and Green Loan

19   Services; is that correct?

20       A        That's correct.

21       Q        And at the time of this

22   letter, Mayer Brown was your counsel;

23   correct?

24       A        Yes.  That's correct.

25       Q        And this letter was written

1                    MICHAEL REBIBO
2      on your behalf; is that correct?
3           A        Yes.  That's correct.
4           Q        Did you provide the
5      information that's contained in this
6      letter to Mayer Brown?
7           A        Yes.
8           Q        And to the best of your
9      knowledge, is the information contained
10     in this letter true and correct?
11          A        Yes.
12          Q        What was the purpose of
13     sending this letter at this point?
14          A        The background of the letter
15     is that SL Green had taken over as
16     special servicer for the loan.  They had
17     been in active litigation with your
18     client on a different high-profile deal
19     in New York, a different high-profile
20     property in New York.
21                   And it was our belief that
22     given their -- the nature of their
23     company, which is they're a New York
24     landlord that primarily invests and
25     operates real estate in New York, they're

1                    MICHAEL REBIBO

2    not really a national company, that they

3    had sought out and gotten involved in

4    this transaction to potentially have an

5    ax to grind with your client and that we

6    would become potentially collateral

7    damage.

8                    So that was the nature of

9    the letter, is we felt there was a breach

10   under the intercreditor by the senior

11   lender and the mezzanine lender.  And we

12   were putting them on notice because they

13   had only come into the transaction in

14   early November or late October of 2021.

15        Q         And I think you testified

16   earlier, but just to confirm, SL Green

17   replaced Wells Fargo as a special

18   servicer?

19        A         That's correct, yes.

20        Q         So let us turn to page 2 of

21   the letter and specifically to the

22   paragraph that begins, "As the senior

23   lender's aware."

24                   You see that?

25        A         Yes.

1                    MICHAEL REBIBO

2        Q        I've asked you in general.

3                 More specific about this

4    paragraph, is this paragraph based on

5    information you provided to Mayer Brown?

6        A        Generally.  The dates are

7    slightly off.  I mean they entered into

8    the agreement in late 2020, early 2021.

9    But, yes, generally, the contents of this

10   paragraph are accurate.

11       Q        You're anticipating my next

12   question which is, the information

13   contained in this paragraph, is it true

14   and correct to the best of your

15   knowledge?

16       A        The borrower entered into

17   the definitive contract in December of

18   2020.  And I don't know -- I have not

19   seen a copy of that contract.  But I

20   believe it became effective in early 2021

21   when the deposit was funded.  So I was

22   just commenting on the date.  The rest of

23   the -- the rest of the information in the

24   paragraph looks to be true and correct to

25   the best of my knowledge.

```
1                    MICHAEL REBIBO
2       Q        Let's turn to the next page.
3                I'm going to direct your
4    attention to the second full paragraph
5    that begins, "While senior lender was
6    ignoring the borrower's JV consent
7    request."
8                You see that?
9       A        Yes.
10      Q        Can you read that paragraph?
11   You don't have to read it out loud.  But
12   just read it and tell me if everything in
13   that paragraph is true and correct to the
14   best of your knowledge.
15               MR. SCHARF:  David, there
16       are facts in here.  There are
17       opinions in here.  Are you confining
18       your question to the facts as opposed
19       to the opinions?
20               MR. MARK:  I'm asking about
21       the facts contained in this
22       paragraph.
23               MR. SCHARF:  Okay.
24      A        I've read the paragraph.
25   Can you repeat the question?
```

```
1                    MICHAEL REBIBO
2         Q        Are the facts contained in
3    this paragraph true and correct to the
4    best of your knowledge?
5         A        A lot of it is opinion.  But
6    the facts -- the $15 million, the letter
7    referenced -- the e-mail referenced on
8    April 21st, that's a fact.  Could you be
9    more specific?
10         Q        Sure.  Let me read the
11    following sentence to you.  It begins
12    five lines down.
13                  It says, "As requested by
14    BlackRock and in response to pressure by
15    Mr. Mesard for the mezzanine lender to
16    initiate foreclosure on the mezzanine
17    loan, the mezzanine lender submitted to
18    special servicer and BlackRock, updated
19    foreclosure proposals."
20                  Do you see that?
21         A        Yes.
22         Q        Is that sentence true and
23    correct?
24         A        It's an opinion.  Yes.  It's
25    true and correct.  There's a portion of
```

1                    MICHAEL REBIBO
2      it that's opinion-related, but yes.
3           Q        What part of it is
4      opinion-related?
5           A        Well, in terms of they were
6      requesting proposals, that's accurate.  I
7      should say the majority of it, if not all
8      of it, is factually -- factually correct.
9      I'm sorry.
10          Q        Well, is there any part of
11     it that's not factually correct?
12          A        Dissecting it.  But it's all
13     correct, yes.  In my opinion, they were
14     pressuring us; in my opinion, they were
15     pressuring us to submit a proposal.
16     That's the opinion part.  And we had
17     submitted non-proposals.  That's the
18     factual part.
19          Q        It was your perception that
20     you were being pressured; is that
21     correct?
22          A        Yes.  That was my
23     perception.  Certainly, we had never
24     submitted any proposals before that
25     period of time.

1           MICHAEL REBIBO
2       Q       Let me ask you to look
3    further up the page.  There's a carryover
4    paragraph at the very top of this page.
5    You see that?
6       A       Yes.
7       Q       And the last sentence of
8    that, I'll just read it, "The senior
9    lender's failure to meaningfully and in
10   good faith engage with the borrower and
11   work towards providing the necessary
12   consents to the JV transaction caused
13   irreparable harm to the senior and
14   mezzanine loans."
15           Do you agree with that
16   statement?
17      A       That's an opinion.  It's
18   not -- that's my opinion.
19           MR. MARK:  I'm going to ask
20       the reporter to mark as Exhibit 18,
21       an e-mail chain that has on the first
22       page at the top, an e-mail, dated
23       November 25th, 2021, and it bears the
24       Bates numbers KTB2298 through 2312.
25           (The above-referred-to

MICHAEL REBIBO

1
2          document was marked as Defendant's
3          Exhibit 18 for identification, as of
4          this date.)
5          Q       Are you able to identify
6     Exhibit 18?
7          A       Yes.
8          Q       Let me ask you to look at
9     the e-mail from you that begins at the
10    very bottom of page 2 which is dated
11    Sunday, November 21st, 2021.  And it's to
12    folks at Mayer Brown and at KTB.  You see
13    that?
14         A       Yes.
15         Q       Was the purpose of this
16    e-mail to provide an update regarding the
17    status of Union Station?
18         A       Yes.
19         Q       Take a look at the e-mail
20    and just tell me whether to the best of
21    your knowledge, that e-mail is true and
22    complete and correct as of that date.
23         A       Yes.
24         Q       Now, at the beginning of the
25    e-mail, you report on efforts to have a

1                    MICHAEL REBIBO
2      meeting or a conversation with Fried
3      Frank.  You see that?
4           A        Yes.
5           Q        And Fried Frank was
6      representing SL Green; correct?
7           A        Yes.
8           Q        What was the problem in
9      getting in touch with Fried Frank and SL
10     Green?
11          A        They were not really
12     interested with communicating with us at
13     the time.
14          Q        You're saying in your view,
15     SL Green was not interested in
16     communicating with you; is that correct?
17          A        In my view, SL Green was not
18     interested in communicating with us at
19     the time because they had an agenda.  And
20     they didn't express any interest in
21     communicating with us.
22          Q        You said they had an agenda.
23                   Is that a reference to what
24     you testified previously about their
25     other disputes with Ashkenazy?

1                  MICHAEL REBIBO

2          A       Yes.

3          Q       Now, in the e-mail, you say

4     you have said they're not willing to

5     meet, unless you execute their form of

6     prenegotiation letter.  You see that?

7          A       Yes.

8          Q       What was the issue as you

9     understood it with regard to the

10    prenegotiation letter?

11         A       There was a provision in

12    there that we were waiving all claims,

13    past and future, to the senior lender.

14    And we were not comfortable at that time

15    with waiving claims because we felt that

16    the senior lender had breached some of

17    the covenants in our intercreditor

18    agreement.

19         Q       Did there come a time when

20    you became more comfortable with waiving

21    those claims?

22         A       I don't know if more

23    comfortable is the right way to describe

24    it.  But there was a time where we

25    elected to sign the prenegotiation letter

1                  MICHAEL REBIBO
2      because we wanted to commence discussions
3      with them and try and find out if there
4      was a resolution.
5            Q        And the reason you agreed to
6      do that because you became convinced that
7      if you do not sign the prenegotiation
8      letter, you would not be able to have
9      those discussions?
10           A        Correct.
11           Q        In the next paragraph, there
12     is a discussion of Cushman & Wakefield
13     loan sale.  Do you see that?
14           A        Yes.
15           Q        I asked you previously about
16     Cushman & Wakefield, and you were not
17     sure at what point you retained them?
18           A        Correct.
19           Q        Does looking at this e-mail
20     refresh your recollection as to when
21     Rexmark retained Cushman & Wakefield?
22           A        No, it does not.
23           Q        As of November 21, 2021, had
24     you retained Cushman & Wakefield?
25           A        Yes.

                    MICHAEL REBIBO

1
2          Q          But you don't recall exactly
3     when; is that correct?
4          A          Correct.
5          Q          Do you know how long before
6     November 21st that took place?
7          A          That I officially retained
8     them?  I don't recall if I officially
9     retained them in October, November, even
10    prior to that.  I don't recall.
11         Q          When you retained them, what
12    did you retain them to do?
13         A          To market the mezzanine loan
14    for Su and to -- in November of 2021, we
15    engaged them to run the UCC process.
16         Q          And by the UCC process, you
17    meant the foreclosure process?
18         A          Yes.
19         Q          Going down to the bottom of
20    that page, you see there's a No. 2, and
21    then it says, "Preparing a capital call
22    with investors, assume 50 million for the
23    moment."
24                    Do you see that?
25         A          Yes.

MICHAEL REBIBO

1

2      Q        What does that refer to?

3      A        A capital call with the

4   investors and assuming 50 million.

5      Q        Well, under the relevant

6   agreements, were investors required to

7   respond to a capital call or was it just

8   voluntary?

9      A        Voluntary.

10     Q        And you go on to say, "We

11   will need these funds, whether we make a

12   deal with the senior, or refinance them

13   with another lender at a lower amount."

14               You see that?

15     A        Yes.

16     Q        Can you explain how you came

17   up with that $50 million number?

18     A        I was evaluating various

19   scenarios.  And given the amount that was

20   owed for the existing loan in one

21   scenario, was working with the existing

22   lender to reinstate the loan, bring it

23   current and put out reserves.  And I just

24   estimated a number conservatively.

25               In a different scenario

```
 1                    MICHAEL REBIBO
 2      where we would refinance with another
 3      lender, I estimated that I would need
 4      to -- need those funds potentially to --
 5      also for reserves or to de-leverage my
 6      senior loan, things of that nature.
 7           Q        Now, did such a capital
 8      call, in fact, take place?
 9           A        For 50 million, no.  I think
10      it was 380 million, one took place, much
11      larger.
12           Q        So if I understand what
13      you're saying correctly, the investors
14      put up all the money necessary to buy out
15      the senior loan?
16           A        That's correct.
17                    MR. MARK:  I'm going to ask
18           the reporter to mark as Exhibit 19,
19           an e-mail and attachment in which the
20           top e-mail is dated December 24th,
21           2021, and the Bates range is KTB4152
22           through 4162.
23                    (The above-referred-to
24           document was marked as Defendant's
25           Exhibit 19 for identification, as of
```

```
 1                MICHAEL REBIBO
 2       this date.)
 3       Q        Can you identify Exhibit 19?
 4       A        Yes.
 5       Q        Let me ask you about the
 6  second e-mail on the first page.  It's
 7  from someone named Robert Verrone, if I'm
 8  pronouncing it correctly, to you.
 9                Who is Robert Verrone?
10       A        He is an advisor/consultant
11  who was acting on behalf of SL Green.
12       Q        What was his role?
13       A        He was acting as their
14  advisor and middleman, I guess, between
15  the mezzanine lender and the special
16  because we were not talking directly to
17  each other earlier on.  And he has a
18  history or has done business with both
19  parties.
20       Q        So it was like a friendly
21  mediator?
22       A        I wouldn't call it a
23  friendlily -- certainly, he's more
24  friendly than SL Green.  But he was
25  technically their advisor.  But I've
```

1                MICHAEL REBIBO
2     known him for many years and done
3     business with him.  So we had -- I don't
4     recall.  He was a representative for the
5     mezz lender and SL Green.  I don't recall
6     if we engaged him, if they engaged them.
7     But he has a relationship with both
8     parties.  And they were taking his phone
9     calls.
10               So I forget who engaged him,
11    if it was us or them.  It may have been
12    us, even.  But he is someone that's done
13    numerous transactions with them.  And
14    I've known him as well.
15        Q        Now, at this time, I'm
16    talking about December 23 when this
17    e-mail was written, were you seeking an
18    adjournment of the mortgage foreclosure?
19        A        We were trying to get an
20    extension of the mortgage foreclosure to
21    either pursue various options.
22        Q        Now, at this time, had you
23    reached an agreement with the mortgage
24    lender and the amount of the par purchase
25    price?

1                    MICHAEL REBIBO

2        A        That's not the way it works.

3    There's no agreement on the amount of the

4    par purchase price.  It sort of is what

5    it is.  It's a fixed amount.  There's a

6    formula in calculation.  We weren't

7    negotiating the par purchase price.

8        Q        I'm not suggesting you were

9    negotiating.

10                But was there at some point

11    a dispute as to what that amount should

12    be?

13        A        I believe there was a

14    disagreement as to the calculation at

15    some point.  But that's not what's going

16    on in this e-mail.

17        Q        What's going on in this

18    e-mail is a discussion of terms upon

19    which you would get an adjournment of the

20    mortgage foreclosure?

21        A        Correct.

22        Q        Now, just so it's clear,

23    under the intercreditor agreement, you

24    had a right to purchase the senior loan

25    at par at this point?

1                    MICHAEL REBIBO

2          A          Correct.  At all points up

3     until the day of a foreclosure, I have

4     the right to purchase it.

5          Q          And --

6          A          Once it's in default, that

7     is.

8          Q          And so the intercreditor

9     agreement contains provisions how you

10    would calculate that par purchase price;

11    correct?

12         A          Correct.

13                    MR. MARK:  Let's mark as

14         Exhibit 20, an e-mail, dated

15         December 20th, 2021, with an

16         attachment, also dated December 20th,

17         2021, with the Bates range being

18         KTB4200 through 4204.

19                    (The above-referred-to

20         document was marked as Defendant's

21         Exhibit 20 for identification, as of

22         this date.)

23         Q          Can you identify Exhibit 20?

24         A          Yes.

25         Q          What is it?

1              MICHAEL REBIBO

2      A      It's me in my capacity as

3  agent for the mezzanine lender,

4  exercising my rights under the

5  intercreditor to purchase the senior

6  mortgage.

7      Q      And that's what you did by

8  this letter, dated December 20th, 2021?

9      A      Yes.

10     Q      Why did you choose to

11  exercise that right?

12     A      Because the foreclosure was

13  scheduled for January 6th.  I had ten

14  business days, if I recall.  I had to

15  give ten business days notice to purchase

16  the senior loan.  I couldn't do it on a

17  day's notice.  And if I didn't exercise

18  it by that date, I would have missed the

19  deadline to commence the foreclosure

20  because it was Christmas and New Years.

21  So my counsel advised me not to wait.

22            MR. SCHARF:  I'd caution you

23      not to disclose communications with

24      counsel.

25            THE WITNESS:  Okay.

1              MICHAEL REBIBO

2              MR. SCARF:  I'll claw back

3         that answer.

4              MR. MARK:  Take that under

5         advisement.

6              I'm going to ask the

7         reporter to mark as Exhibit 21, an

8         e-mail, dated January 13th, 2022,

9         with an attachment, and the Bates

10        range is KTB3864, 3867.  And since

11        the attachment was produced in

12        native, it's not actually Bates

13        numbered.

14             (The above-referred-to

15        document was marked as Defendant's

16        Exhibit 21 for identification, as of

17        this date.)

18        Q      Before we discuss this

19   exhibit, just to have it in the record,

20   following your notice to exercise your

21   purchase option, you, in fact, did

22   exercise that option; correct?

23        A      Yes.

24        Q      And you exercised it.

25             Do you recall what date you

1                    MICHAEL REBIBO

2    exercised it?

3          A        That I exercised the

4    purchase option?

5          Q        Yes.

6          A        I believe it was

7    January 20th or on or around

8    January 20th, whatever the date was.  I'm

9    sorry.  December 20th.

10         Q        Sorry.

11                  But then you actually did

12   purchase the senior note?

13         A        Yes.  I purchased the senior

14   note on January 5th, 2021.

15         Q        So let's turn to this

16   exhibit.

17                  The e-mail at the top from

18   you to Yongsoo Park, you say, "We need to

19   start preparing the action plan for Kyobo

20   and investors."

21                  You see that?

22         A        Yes.

23         Q        Just so it's clear, who are

24   Kyobo and investors?

25         A        There are several investors

                    MICHAEL REBIBO

1

2    as I mentioned earlier in the investment

3    vehicle.  And we were preparing reporting

4    for them.

5         Q        I think in earlier

6    discussion, you had mentioned that the

7    investors were, in fact, passive

8    investors.  Do you recall that testimony?

9         A        Correct.

10        Q        Did that continue to be true

11   after you had made a capital call, and

12   they invested the additional funds?

13        A        That's correct.  But we

14   still report to them.

15        Q        But you didn't need their

16   approval for anything; is that correct?

17        A        No.  This is reporting.  We

18   have ongoing reporting to investors,

19   regardless of whether they have any

20   decision making power or not.

21        Q        What was the action plan

22   that's referred to here?

23        A        What we were going to do

24   once we close the loan.

25        Q        So what were the

1                MICHAEL REBIBO
2    alternatives that you were considering?
3         A        Obviously working with the
4    borrower.  We had canceled the
5    foreclosure that was scheduled for
6    January 6th.  I believe we had met with
7    the borrower on or around this week to
8    try and discuss a path towards a
9    resolution.  We were still marketing the
10   loan for sale.  We were exploring a
11   variety of options.  But certainly,
12   working with the borrower was one of
13   them.
14        Q        With whom from the borrower
15   did you have this meeting?
16        A        Meaning with the borrower in
17   January of 2021?
18        Q        2022.
19        A        Ben Ashkenazy, Michael
20   Alpert, Dan Levy.  Joe Press may have
21   been there.
22        Q        And what did you discuss?
23        A        We discussed restructuring
24   the loan, potentially, if there was a
25   possibility of resurrecting the deal with

```
1                  MICHAEL REBIBO
2      PIF.  I don't recall exactly, the detail.
3      But in general, potential solutions,
4      joint venture.  That was certainly
5      discussed.
6           Q       What would the joint venture
7      look like?
8           A       A joint venture typically
9      involves two parties having a common
10     equity interest.  We discussed a number
11     of scenarios but a joint venture, which
12     would involve us having a common equity
13     interest, in addition to our loan.
14          Q       So you were looking for an
15     equity contribution from Ashkenazy; is
16     that correct?
17          A       I don't think I was looking
18     for it.  I think I had the opportunity to
19     foreclose.  And I was trying to work in a
20     collaborative matter with the borrower
21     and find the compromise that worked best
22     for all parties.  I certainly wasn't
23     looking for anything else; trying to find
24     a solution.
25          Q       Did you make any specific
```

1                    MICHAEL REBIBO
2    proposals at this meeting?
3         A        Not in January.  They came
4    later on.
5         Q        When did you make specific
6    proposals?
7         A        I don't recall if it was
8    February or March or April.  No.  It was
9    not April.  I believe it was February and
10   March 2021.  We were exchanging proposals
11   between Ashkenazy and Rexmark.
12                 MR. SCHARF:  You mean
13        February of 2022?
14                 THE WITNESS:  2022.  I'm
15        sorry.  I keep saying 2021.  I'm
16        getting my years mixed up.
17        A        In 2022, in February and
18   March, we had exchanged proposals with
19   Ashkenazy.  I believe we submitted the
20   first proposal.  They countered and sent
21   us a markup.  And we countered back.
22   There was definitely an exchange of
23   proposals throughout that first quarter
24   of 2022.
25        Q        What was the nature of these

```
 1                    MICHAEL REBIBO
 2    proposals?
 3         A        A resolution that didn't
 4    involve a foreclosure.
 5         Q        Can you be more specific?
 6         A        No.  I don't think I can.  I
 7    mean it's a resolution that didn't
 8    involve a foreclosure.
 9         Q        Well, did it include
10    Ashkenazy putting up additional funds?
11         A        We may have requested that
12    at the time.  But I don't think that
13    was -- it may have been a request.  But I
14    don't recall what the proposals were,
15    other than we were taking an equity
16    interest.  He was retaining an equity
17    interest.  I believe our loans were still
18    staying in place.  But I don't recall if
19    he was putting up any money.  Certainly,
20    that would have been a wishful or a
21    hopeful expectation, given the preceding
22    two years.
23         Q        Below the e-mail we were
24    discussing is an e-mail from Chris
25    McGlone at Cushman & Wakefield.  Do you
```

```
 1                    MICHAEL REBIBO
 2    see that?
 3         A         Cushman & Wakefield, yes.  I
 4    see it.
 5         Q         Following your acquisition
 6    of the senior loan, did you expand the
 7    role of Cushman & Wakefield?
 8         A         I don't recall.
 9         Q         Did the role change after
10    you acquired this loan?
11         A         Yeah.  They were no
12    longer -- later on, we engaged them for
13    the UCC process, or we had engaged them
14    previously and then canceled them and
15    reengaged them later on for the UCC
16    process.
17                   But I don't believe their
18    role changed, no.  They were only engaged
19    to market the loan for sale and for any
20    activity regarding the foreclosure
21    process under the mezz loan.
22         Q         Did you engage them in
23    connection with -- strike that.
24                   If you look at the e-mail
25    from Mr. McGlone, he refers to a summary
```

```
 1                    MICHAEL REBIBO
 2      target investor list.  Do you see that?
 3           A       Yes.
 4           Q       Is that something you had
 5      requested from him?
 6           A       That's something they
 7      provide when they're marketing a loan.
 8      They provide an update on parties which
 9      had executed non-disclosures and parties
10      that they had calls with, people that
11      have expressed interest in purchasing a
12      loan.  So it's a reporting.
13           Q       So just to make sure I
14      understand, you're saying even after you
15      acquire the senior loan, you're still
16      trying to market the mezzanine loan?
17           A       After we had acquired the
18      senior loan, we had canceled the
19      foreclosure.  But we had not stopped
20      marketing the loan for sale.
21           Q       Were you still marketing the
22      mezzanine loan or also marketing the
23      senior loan at the time?
24           A       They were only engaged to
25      market the mezzanine loan.
```

1              MICHAEL REBIBO

2        Q        So the target investor

3    listed you -- they had sent you concern

4    marketing the mezzanine loan?

5        A        That's all they were

6    marketing.  They were not marketing the

7    senior loan.  Our role had changed as the

8    lender.  We had owned both loans at that

9    point in time.  But we did not sign a

10   separate agreement with them for the

11   senior loan or anything like that.

12       Q        If you look at the

13   spreadsheet attachment -- if you take a

14   look, the heading is "Union Station

15   Advisory Assignment."

16                Do you see that?

17       A        Yes.

18       Q        What was the scope of their

19   advisory assignment?

20       A        I don't know that it's an

21   advisory assignment.  If you look at the

22   agreement, they were exchanged to market

23   the loan for sale.

24       Q        At some point, was Cushman &

25   Wakefield's role with respect to Union

1                    MICHAEL REBIBO

2     Station expanded beyond marketing the

3     mezzanine loan?

4                    MR. SCHARF:  Objection to

5          form.  You can answer.

6          A        Post foreclosure, their role

7     had expanded later on in the year.  But

8     prior to the foreclosure, no.  I can't

9     think of how their role changed.

10         Q        At some point, did you ask

11    them to become involved in leasing

12    activities?

13         A        No.  They had pitched their

14    services to us.  But we had not

15    engaged -- we had not executed an

16    agreement with them for a leasing

17    activity of any kind.

18                    So there was no formal --

19    they had made a presentation to us.  But,

20    no, we had not executed or done any

21    agreement or formal arrangement for

22    leasing activity.

23         Q        Was there an informal

24    arrangement?

25         A        No.  They had previously

1                    MICHAEL REBIBO
2       been the leasing agent for the property
3       under Ashkenazy and were familiar with
4       the property and were giving us -- had
5       given us market information.  There was
6       an instance where they were communicating
7       with us about, you know, prospective
8       tenants in the market and just giving us
9       market information and had
10      communications.  But there was certainly
11      no formal exchange, normal arrangement
12      between Rexmark and Cushman & Wakefield
13      for leasing Union Station.
14           Q       Did they arrange meetings
15      between you and potential tenants?
16           A       Potential tenants, no.  I
17      think that's one of the statements in
18      Mr. Press's declaration.  But that's
19      false.
20                   MR. MARK:  I'm going to ask
21           the reporter to mark as Defendant's
22           Exhibit 22, an e-mail, dated
23           September 10th, 2021, with an
24           attachment, and the Bates range is
25           KTB4532, 4556.

1                  MICHAEL REBIBO
2                  (The above-referred-to
3          document was marked as Defendant's
4          Exhibit 22 for identification, as of
5          this date.)
6          Q        Mr. Rebibo, you mentioned a
7     couple of times, Cushman & Wakefield
8     pitching services.
9                  Is this pitch book that I
10    just gave you what you're referring to?
11                 MR. SCHARF:  Objection to
12         form.  You can answer after you
13         reviewed the document.
14         A        This is something that they
15    provided early on in May of 2021 when
16    they were pitching us to do a loan sale.
17    This team that's referenced, yeah, is the
18    portfolio advisory services group and
19    national loan.  It says "dedicated loan
20    sale team."  They also mention high
21    street retail and office leasing.
22    They're talking about their expanded
23    platform.  But it's concentrated on loan
24    sales as you could see here with various
25    assets concentrated in the regional

                    MICHAEL REBIBO

1   section.  So this is not a leasing --

2   90 percent of this book is about loan

3   sales.  It's a loan sale pitch book.

4        Q        It also mentions that

5   they're a leasing specialist too?

6        A        They are a leasing

7   specialist.  That's accurate.  But that's

8   not what they're pitching us on.  And

9   this is all about the mezz loan value

10  range, property values, valuation

11  methodology.  None of it revolves around

12  cash flows or -- there's no tenant-based

13  information or rent information here.

14  There's nothing.  They're just talking

15  about -- they're talking about their

16  various capacities to their company.  But

17  this is a loan sale presentation.

18  Representing it as anything else would be

19  false.

20              MR. MARK:  I'm going to ask

21         the reporter to mark as Exhibit 23,

22         an e-mail, dated January 14th, 2022,

23         with various attachments with the

24         Bates range KTB3822 through 3847.

1          MICHAEL REBIBO

2               (The above-referred-to

3          document was marked as Defendant's

4          Exhibit 23 for identification, as of

5          this date.)

6          Q       Mr. Rebibo, I'm showing you

7     Exhibit 23.  I could tell you I'm not

8     going to ask you about any of the

9     attachments.  I'm just going to focus on

10    the e-mail itself.

11              Do you recognize this

12    e-mail?

13         A       Yes.

14         Q       So this is an e-mail, dated

15    January 14th, 2022, from you to folks at

16    KTB and including Mr. Park.

17              And is the purpose of this

18    e-mail to ask KTB to approve various

19    agreements relating to Union Station?

20         A       That's part of it.  Part of

21    it is also to educate them on the

22    strategy going forward for the asset from

23    a leasing standpoint.

24         Q       And what was the strategy

25    you were trying to educate them on?

1          MICHAEL REBIBO

2               MR. SCHARF:  Objection to

3     form.  You can answer.

4     A          What the e-mail says.

5     Q          So let me just read the

6     first sentence of the e-mail.

7               It says, "The general plan

8     for the moment is to sign as many

9     agreements to bring retailers into the

10    station on short-term deals which can all

11    be terminated."

12               Was that the strategy?

13    A          That was the short-term

14    strategy at that point in time, yes.

15    Q          So the strategy was you

16    wanted to have as much of the space as

17    occupied as you could get occupied?

18    A          No.  You're saying the

19    strategy was I.  The strategy was the

20    asset needed to have as much space open

21    and operating as possible.  This e-mail

22    refers to getting consent for agreements

23    which were proposed by your client.

24    These were not being done independent of

25    your client.  They were being done in

```
 1                 MICHAEL REBIBO
 2    collaboration with your client.
 3         Q         I'm not --
 4         A         You said I, or you said you.
 5    So just clarifying what your statement
 6    was.
 7         Q         Fair point.
 8                   So the general plan that
 9    you're referring to is a joint plan
10    between Rexmark and the borrower?
11                   MR. SCHARF:  Objection to
12         form.
13         A         Yes.  The joint plan
14    between -- for the asset between
15    Ashkenazy and Rexmark was to ensure that
16    deals were made, so that the vacancies --
17    as few vacancies as possible remain and
18    tenants were open and operating.
19         Q         With whom at Ashkenazy did
20    you discuss this joint plan?
21         A         Joe Press.
22         Q         And you mentioned short-term
23    deals that can all be terminated.
24                   Was that part of the plan,
25    that all the deals be short-term deals?
```

MICHAEL REBIBO

1

2          A          Not all the deals, but the

3     majority of the deals, yes.  We felt like

4     the market was obviously not great at

5     that point in time.  And we weren't going

6     to commit long-term to -- we didn't think

7     it was in the best interest of the asset

8     to commit to low rents on a long-term

9     basis in hopes that COVID would be over

10    soon.

11         Q          And it's your understanding

12    that Ashkenazy agreed with the strategy

13    of just signing short-term deals?

14                    MR. SCHARF:  Objection to

15        form.  You can answer.

16         A          That's not my understanding.

17    That was -- your client made these

18    requests to us:  Lee's Flower Shop, ALWD,

19    Chop't.  These are not deals I'm

20    negotiating with tenants directly.  Your

21    client negotiated these deals and sought

22    my consent.

23         Q          I'm talking about the

24    general plan.  I just want to make sure

25    we're clear that the general plan you're

```
1                    MICHAEL REBIBO
2    describing here was a joint plan between
3    you and the borrower.
4                    MR. SCHARF:  Objection to
5         form.  You can answer.
6         A         Conceptually, that was a
7    plan that the borrower and I discussed
8    that we were in support of.  We didn't
9    always agree on everything on every
10   specific case.  But conceptually, that
11   was something we had discussed and had an
12   aligned interest on, making sure stores
13   were open.
14        Q         The e-mail we just talked
15   about at the very top of the e-mail, you
16   seem to be addressing someone named
17   Jihyung.
18                    Do you see that?
19        A         Jihyung.
20        Q         Who is Jihyung?
21        A         He was Seog's replacement.
22   He worked under Mr. Eum.  His last name
23   is Lim, L-I-M.
24                    MR. MARK:  Let's mark as
25        Exhibit 24, an e-mail, dated
```

1                    MICHAEL REBIBO
2          January 18th, 2022, which bears the
3          Bates numbers KTB1760 and 1761.
4                    (The above-referred-to
5          document was marked as Defendant's
6          Exhibit 24 for identification, as of
7          this date.)
8          Q        Can you identify Exhibit 24?
9          A        Yes.
10         Q        What is it?
11         A        It's an e-mail exchange
12    between myself and Cushman & Wakefield
13    about a trip that was taking place on
14    January 20th.
15         Q        And what was the purpose of
16    the trip?
17         A        To meet with prospective
18    joint venture partners or acquirers of
19    the mezzanine loan.
20         Q        So looking at the e-mail to
21    you from Sean Hayes, what is the second
22    e-mail, can you identify who Sean Hayes
23    was and what his role was?
24         A        He worked for -- he works --
25    I don't know if he's still there.  But he

MICHAEL REBIBO

1
2    worked for the loan sales team at Cushman
3    & Wakefield.
4        Q        And looking at the agenda
5    below that, it says, "Meet at Union
6    Station/initial property tour from 9 a.m.
7    to 11 a.m."
8                 What was the purpose of the
9    initial property tour?
10       A        Just to do a tour of the
11   property.  We toured the property every
12   time we were in town.
13       Q        Who was with you?  Did this
14   property tour actually take place?
15       A        Yes.  I believe so.
16       Q        Did all the meetings
17   described in the agenda take place as
18   scheduled?
19       A        I believe so, yeah.  I think
20   all these meetings took place.  I'd have
21   to double check.  But I believe all these
22   meetings took place, yes.
23       Q        Who participated in these --
24   in the property tour?
25       A        Myself, people from the

1              MICHAEL REBIBO
2    building, Ashkenazy, I believe, yeah;
3    Cushman & Wakefield, building employees,
4    Ashkenazy, I believe.  And I don't recall
5    if somebody from KTB was there.  But they
6    may or may not have been at this meeting.
7    I believe people from Korea were there
8    that day.  I believe there were people
9    from KTB present on that day.
10        Q         Just to clarify when you say
11   Ashkenazy, are you referring to Ashkenazy
12   individually?
13        A         No.  I don't know the last
14   time he's been to his own property.  No.
15   I was referring to Mr. Press.
16        Q         Now, the next item on the
17   agenda is C&W Leasing/Intro to C&W
18   Property Management.
19                  Can you expand on that item?
20        A         Sure.  They were pitching us
21   on their leasing and property management
22   services.
23        Q         The next item on the agenda
24   is Museum Tenant.
25        A         Yes.  I see that.

1                    MICHAEL REBIBO

2        Q        Who was that?

3        A        That was a non-for-profit

4    museum that was interested in acquiring a

5    portion of the mezzanine loan.  They were

6    interested in doing some sort of a

7    structured JV with us.

8        Q        Do you have any

9    understanding as to why a non-for-profit

10   museum would be interested in acquiring

11   an interest in a loan?

12       A        Yes.  Their interest was

13   that -- their interest was to eventually

14   take ownership, like some other

15   prospective buyers.  People had an

16   interest in acquiring the mezzanine loan

17   to foreclose and take ownership of the

18   leasehold.

19       Q        Just so I understand it, did

20   you have an understanding of what their

21   interest was because they wanted space at

22   Union Station?

23       A        They were interested in

24   owning and occupying a portion of the

25   station.

1          MICHAEL REBIBO

2          Q          In the meeting you had with

3    them, did you discuss the possibility of

4    them leasing spaces at Union Station?

5          A          No.  Their interest was

6    long-term, not like a five-year lease or

7    anything like that.

8          Q          And turning the page, it

9    talks about luncheon meetings at the

10   Monocle Restaurant.

11               Do you see that?

12         A          Yes.

13         Q          So you adjourned from the

14   station to the restaurant?

15         A          Yes.

16         Q          And then the three bullet

17   points indicates three different

18   meetings.  You see that?

19         A          Yes.

20         Q          So one of them is

21   Artemis/EDENS/Sage Hospitality.

22               You see that?

23         A          Yes.

24         Q          Who are they?

25         A          They're all reputable real

1                 MICHAEL REBIBO
2    estate companies, investors, owners,
3    operators, lenders in certain cases.
4         Q        So just to clarify, the
5    first bullet point now refers to three
6    different entities?
7         A        It's three different
8    companies.  They were looking at
9    acquiring the mezzanine loan in a joint
10   venture.
11        Q        And the next item is Acadia
12   Realty.
13        A        That's a public REIT that
14   lends and owns real estate throughout the
15   United States.
16        Q        And Argent, who is that?
17        A        Argent is a privately-owned
18   company based in New York that also
19   acquires debt, owns and operates real
20   estate.
21        Q        And all these three meetings
22   concern potential acquisition of the
23   loan?
24        A        Yes.
25        Q        And specifically, the

```
 1                    MICHAEL REBIBO
 2    mezzanine loan?
 3         A        Yes.
 4         Q        And then the final item is
 5    Madison Marquette.
 6                   Am I pronouncing that
 7    correctly?
 8         A        Yes.
 9         Q        Who are they?
10         A        They're a well-known real
11    estate company based in Washington, D.C.,
12    I believe.
13                   MR. MARK:  We've been going
14         about an hour.  We could take a short
15         break.
16                   THE VIDEOGRAPHER:  This will
17         end Media Unit 3, going off the
18         record at 2:33.
19                   (A short recess was taken.)
20                   THE VIDEOGRAPHER:  We're
21         back on the record at 2:48.  This
22         will begin Media Unit 4.
23         Q        Mr. Rebibo, going back to
24    Exhibit 24, which is the top of your
25    pile.
```

```
 1                    MICHAEL REBIBO
 2          A        That's a 4.  Okay.
 3          Q        The one we were just talking
 4     about before the break --
 5          A        Yes.
 6          Q        -- I had asked you who had
 7     participated in the property tour.
 8          A        Yes.
 9          Q        Turning to the next item on
10     the agenda, the C&W leasing meeting, who
11     participated in that meeting?
12          A        Members of Cushman &
13     Wakefield and Rexmark, and I can't recall
14     if KTB was present or not.  And that's
15     it, I believe.  Joe Press was not at that
16     meeting.  This took place in the
17     conference room in JLL's office at Union
18     Station.  He provided the conference
19     room.
20          Q        So you anticipated my next
21     question which is, where did the meeting
22     take place.
23                   So turning to the next one,
24     museum tenant meeting, who participated
25     in that meeting?
```

1           MICHAEL REBIBO
2        A        I believe it was the CEO or
3   one member of the museum.  I don't recall
4   if their broker or advisor was present.
5        Q        Was Cushman & Wakefield
6   there?
7        A        Yes.  I believe so, yes.
8        Q        I assume you were there?
9        A        Yes.
10        Q        And do you recall if anybody
11   from KTB was there?
12        A        Possibly, but I don't
13   recall.
14        Q        And where did that meeting
15   take place?
16        A        At the property as well.
17        Q        Let me ask you about the
18   leasing meeting.
19                 Did Cushman & Wakefield
20   bring a pitch book with them?
21        A        Yes.  I believe they did.
22        Q        Do you have a copy of that
23   pitch book?
24        A        Not on me.
25        Q        I didn't ask you if you have

1                    MICHAEL REBIBO

2    it in your pocket.

3                    But did you retain a copy of

4    that pitch book?

5         A        I don't recall if I retained

6    a copy of the pitch book.  But I believe

7    they did bring -- it was my first time

8    meeting them.  And I believe they brought

9    a copy of a pitch book.  I don't recall

10   if I retained it.

11        Q        Do you remember the name who

12   was described as the museum tenant here,

13   the name of the entity?

14        A        I don't.

15        Q        Again, turning to the

16   meetings that are described in the top of

17   page 2 of this document, in addition to

18   the entity that's mentioned in each --

19   for each of these bullet points, were the

20   participants yourself and Cushman &

21   Wakefield?

22        A        And KTB, I believe, yes.

23        Q        Did Joe Press attend any of

24   these meetings?

25        A        No.

1                    MICHAEL REBIBO
2                    MR. MARK:  I'm going to ask
3           the reporter to mark as Exhibit 25,
4           an e-mail chain in which the top
5           e-mail is dated January 24th, 2022.
6           And it has the Bates range
7           AMTRAKSDNY821 through 840.
8                    (The above-referred-to
9           document was marked as Defendant's
10          Exhibit 25 for identification, as of
11          this date.)
12          Q        Can you take a look at
13     Exhibit 25 and identify it, if you can?
14          A        Yes, I can.  It's an e-mail
15     exchange between myself and my counsel
16     with Amtrak and their counsel.
17          Q        Before looking at the
18     specific e-mails, do you have any
19     recollection of having communications
20     with Amtrak in January of 2022 after you
21     acquired the senior note?
22          A        Yes.
23          Q        What were the subject of
24     those communications?
25          A        They had expressed interest

1                     MICHAEL REBIBO
2      in acquiring both loans.  They requested
3      a meeting with us after we had acquired
4      the senior loan.  And that was the nature
5      of the discussions.
6           Q        Did the discussion include
7      discussions of a confidentiality
8      agreement?
9           A        Yes.
10          Q        What do you recall about
11     those discussions?
12          A        We never signed them.
13          Q        Do you recall any specific
14     reasons why you didn't sign them?
15          A        Yes.  We could not agree on
16     some of the language in the
17     confidentiality agreement regarding
18     disclosing confidential information.
19     They were reluctant to sign anything that
20     precluded them from using the information
21     against us or Ashkenazy or USI.
22          Q        Now, aside from e-mails, did
23     you have communications in person or by
24     telephone with Amtrak in January of 2022?
25          A        Yes.

1          MICHAEL REBIBO

2          Q          With whom did you have such

3     discussions?

4          A          Deborah Rochkind, the

5     associate general counsel.

6          Q          Were those discussions in

7     person or by telephone?

8          A          Both.

9          Q          Anybody else at Amtrak?

10         A          I can't recall.  But I don't

11    believe so.

12         Q          Do you recall having a call

13    with Dennis Newman?

14         A          I may have had a call with

15    him.  I don't recall.

16         Q          How many in-person meetings

17    did you have with Amtrak?

18         A          Only one.

19         Q          Where did that take place?

20         A          At their offices.

21         Q          Who attended that meeting?

22         A          Ms. Rochkind, Mr. MacGyver

23    and a third person.  I don't recall who

24    it was.

25         Q          Did anybody accompany you

```
1                    MICHAEL REBIBO
2      for that meeting?
3           A        I believe there was one
4      person from -- I believe someone from KTB
5      was attending.  Jaesang may have been
6      there, someone from Cushman & Wakefield.
7      I don't recall who else was at the
8      meeting.  I believe it was KTB and
9      Cushman & Wakefield.
10          Q        What was discussed at this
11     in-person meeting?
12          A        They had expressed interest
13     in buying the loans.  They had stated
14     that they had approval from their board
15     to show up at the foreclosure auction,
16     that they were prepared to show up at the
17     foreclosure auction.  And they had an
18     interest in acquiring the loans,
19     ultimately with the intention of
20     potentially owning the property or owning
21     the leasehold, I should say.
22          Q        Was there any discussion
23     about the cost, what they were prepared
24     to pay for that?
25          A        No.  They would not
```

```
 1                    MICHAEL REBIBO
 2    disclose -- they did not disclose what
 3    numbers they had authority for or
 4    anything like that.  We had asked for
 5    proof of approvals or proof of funds.
 6    They were not able to provide either.
 7         Q       How did you respond to them?
 8                 MR. SCHARF:  Objection to
 9         form.  You can answer.
10         A       In the meeting?
11         Q       Yes.
12         A       I advised them that we had
13    just received an appraisal, what the
14    property was valued at and that the
15    property was in contract previously at a
16    significant number for the valuation and
17    that we were open to discussing selling
18    the loan with them.
19         Q       Just to follow up on the
20    discussion of the confidentiality
21    agreement, what specifically did Amtrak
22    tell you were their concerns about your
23    proposed confidentiality agreement?
24         A       Well, it says it right here
25    in the e-mail.
```

1                    MICHAEL REBIBO

2           Q        Can you tell me where you're

3      referring to?

4           A        They were opposed to signing

5      a document which included any standard

6      language about the information being

7      provided was just for a specific purpose.

8      And we were selling them a loan,

9      potentially.  And we said that like in

10     any confidentiality agreement, that we're

11     disclosing information to you.  But it's

12     only for this specific purpose, that it

13     can't be used for an alternative purpose.

14     And the information can't be used against

15     us or USI.  So they were not comfortable

16     signing that.  You could see the reasons

17     here in this e-mail.

18          Q        And which e-mail are you

19     pointing to?

20          A        If you see my e-mail

21     response on January 24th, 2022 at

22     11:43 a.m., I said this isn't something

23     we are flexible on.  Every

24     confidentiality agreement Rexmark and

25     probably Amtrak I would guess has ever

```
1                    MICHAEL REBIBO
2    signed has language that information
3    cannot be adversely used against the
4    disclosing party.
5                 Given the situation here
6    where USI may be an adverse party to us
7    and have a claim against us for lender
8    liability issues, we aren't comfortable
9    with waiving a fundamental issue.
10   Whatever we discuss or disclose has to
11   stay confidential and not be shared or
12   used against USI in any way which could
13   directly or indirectly hurt the lenders.
14       Q       You wrote here against USI.
15               Did you mean Rexmark?
16       A       No.  At that point, I wasn't
17   USI.  At that point, Ashkenazy was USI.
18   This is in January of 2022.  Ashkenazy
19   was still --
20       Q       I get that.
21               Were you concerned if the
22   information was used against USI?
23       A       They were a tenant of the
24   property, sub-tenant.  I was interested
25   in selling them a loan, not giving them
```

1                    MICHAEL REBIBO
2    information that they could use to harm
3    my borrower or myself in any other way.
4    I was interested in protecting USI and
5    myself.
6         Q         Now, the concern, if you
7    turn to page 2 of this e-mail, I'm
8    looking at the e-mail from Deborah
9    Rochkind on Friday, January 21, 2022 at
10   4:37 p.m.
11                  She says, "We deal with USI
12   frequently.  And this is a risk for
13   Amtrak."
14                  Did you understand what her
15   concern was?
16        A         No.
17        Q         Well, I mean, she says, "We
18   have no intent of using the confidential
19   information or negotiations, but things
20   happen, and unintentionally, something
21   might be disclosed."
22                  You see that?
23        A         I see it, yes.
24        Q         So she is saying that since
25   we deal with USI frequently, it'll be

1                    MICHAEL REBIBO
2     very hard for them to split their brains
3     apart and not use information you give
4     them in their discussions with USI.  You
5     understand that?
6                    MR. SCHARF:  Objection to
7          form.  That's not what it says.
8                    MR. MARK:  The witness can
9          answer.
10         Q          You don't agree with my
11    interpretation of what you're saying?
12         A          I can't state definitively
13    what she's saying here.  Probably, the
14    only thing I could state definitively is
15    my impression at the time they were being
16    disingenuous.  And based on -- in
17    hindsight, all the information I have
18    today, she was clearly lying.
19         Q          What information are you
20    referring to that convinces you she was
21    lying?
22         A          Well, they were planning an
23    eminent domain action.  I had no
24    knowledge of it at the time.
25         Q          I take it prior to receiving

1                    MICHAEL REBIBO

2    the eminent domain papers, it didn't

3    occur to you that Amtrak might not do

4    that?

5         A        We had absolutely no

6    knowledge.  It was never discussed, not

7    in an e-mail or phone call; completely by

8    surprise.

9                    MR. MARK:  Let us mark as

10        Exhibit 26, an e-mail and attachment.

11        The first e-mail is dated January 31,

12        2022.  And the Bates range is KTB3609

13        through 3623.

14                    (The above-referred-to

15        document was marked as Defendant's

16        Exhibit 26 for identification, as of

17        this date.)

18        Q        Can you identify this

19    exhibit?

20        A        Give me a second.  Just

21    going through it.  There's a lot in here.

22    But it's an e-mail exchange from January

23    of 2022 between myself, Joe Press and Dan

24    Levy from Ashkenazy with various requests

25    for information as it related to

```
 1                    MICHAEL REBIBO
 2    operations, financials and leasing.
 3         Q        So let me ask you to take a
 4    look at your e-mail at the top of the
 5    second page of this document.  You see
 6    that?
 7         A        Second page?  Yes.
 8         Q        The e-mail says, "Thanks,
 9    Joe.  We really need the marketing
10    materials in rendering I spoke to you
11    about."
12                  You see that?
13         A        Yes.
14         Q        What was your need for
15    marketing materials?
16         A        I believe -- and I'm going
17    off of memory -- this was related to --
18    this is in late January after we had met
19    with Joe and Cushman & Wakefield.  This
20    may have been related to prospective
21    information that we were trying to put
22    out in the market.  I don't recall, to be
23    honest.  It may have been related for
24    leasing activity that Joe and I were
25    working on.  I don't know.  This chain
```

1                    MICHAEL REBIBO

2      talks about wiring instructions,

3      invoices, all kinds of things.

4                    At that time, we had just

5      transitioned into becoming the senior

6      lender.  We were taking a more -- we were

7      involved more in the financial

8      responsibilities for the asset because we

9      were in control of the lockbox.  And we

10     were getting information from the

11     borrower.  So lockbox information, real

12     estate taxes and insurance information,

13     ground rent, insurance taxes, CMRF

14     information is listed in this e-mail.

15     It's basically asking for all types of

16     information as it related to the property

17     and the marketing materials and

18     renderings.  I'm going off of memory.

19     But I think it was related to prospective

20     leasing information.

21          Q        And there in the top e-mail,

22     you say, "Thanks, Joe.  What about the

23     East Hall Lounge?"

24                    Do you know what that refers

25     to?

1                    MICHAEL REBIBO

2        A        The very top of which page?

3        Q        The first page, top of the

4     first page.

5        A        I believe this was referring

6     to a prospective tenant for the East Hall

7     Lounge.

8        Q        Did you have a particular

9     tenant in mind?

10                MR. SCHARF:  Objection to

11          form.

12       Q        Was there a prospective

13    tenant that you wish to send this

14    material to?

15                MR. SCHARF:  Objection to

16          form.

17       A        I believe there was a

18    prospective tenant that we had discussed

19    collectively with Ashkenazy that was

20    looking at taking a substantial space.

21    But we were not communicating directly

22    with that tenant.

23       Q        Who was communicating with

24    that tenant?

25       A        I can't recall the exact

```
 1                    MICHAEL REBIBO
 2      specifics.  But from my recollection,
 3      there was a tenant -- I believe it was a
 4      food hall that was out in the marketplace
 5      in DC.  That's the only thing that comes
 6      to mind because of the East Hall
 7      location.  The East Hall Lounge had been
 8      vacant for a number of years.  It was
 9      being used for event space infrequently.
10           Q        Was that a tenant that
11      Cushman & Wakefield brought to your
12      attention?
13           A        Possibly, yes.
14                    MR. MARK:  Let's mark as
15           Exhibit 27, an e-mail exchange, and
16           the top e-mail is dated
17           February 20th, 2022.  The Bates range
18           is KTB3370 to 3372.
19                    (The above-referred-to
20           document was marked as Defendant's
21           Exhibit 27 for identification, as of
22           this date.)
23           Q        Can you identify Exhibit 27?
24           A        It's an e-mail exchange
25      between myself and Joe Press regarding a
```

1                    MICHAEL REBIBO

2     prospective tenant at Union Station.

3          Q        Now, in the e-mail at the

4     very top, you say, "Joe, can you please

5     confirm what the prior rent was for each

6     space, information of the tenant?  Let's

7     discuss this week.  But I am not inclined

8     to agree to commit to a ten-year lease

9     right now given the situation with the

10    property."

11                   You see that?

12         A        Yes.

13         Q        Why were you not inclined to

14    agree to commit to a ten-year lease?

15         A        The rent for these two

16    prospective tenants combined was less

17    than the rent, if I recall, just for the

18    one tenant.  So if you see the e-mail

19    below, he's proposing two tenants for

20    200,000 and 200,000 each in Year 1.  So

21    $400,000 total to replace the Einstein

22    Bagel space and the America Space.  And I

23    believe the pre-existing -- the rent for

24    the Einstein Bagel space was over 700,000

25    or 600,000, some number.

1                    MICHAEL REBIBO

2                    So the rent was

3       significantly less than what even one of

4       the spaces had leased for.  Essentially,

5       it was for a fraction of whatever the

6       prior rents were.  And he wanted to

7       commit to it for a ten-year lease.  And I

8       didn't feel like it was a prudent

9       business decision at that point in time

10      because things were at the bottom.

11      Things were not good in terms of the

12      market at the time.

13           Q        So when you referred to

14      given the situation of the property, were

15      you referring to the fact that you

16      thought this was the bottom of the

17      market?

18           A        I felt that committing at a

19      low rent for a long-term period of

20      time -- and it wasn't just a low rent,

21      slightly lower, it was a fraction of what

22      they were collecting previously -- was

23      not in the best interest of my

24      investment.  I had sole discretion, not

25      reasonable discretion.  The loan was in

```
 1                    MICHAEL REBIBO
 2    default, and it was my decision.
 3                    MR. MARK:  Let's mark as
 4         Exhibit 28, an e-mail from Michael
 5         Rebibo, dated February 22nd, 2022,
 6         with the Bates numbers KTB3266 and
 7         3267.
 8                    (The above-referred-to
 9         document was marked as Defendant's
10         Exhibit 28 for identification, as of
11         this date.)
12         Q       Can you identify Exhibit 28?
13         A       Yes.  It's an e-mail
14    correspondence between myself and
15    Jaesang, giving him an update on the
16    various progress at Union Station since
17    acquiring the senior loan.
18         Q       The heading at the top of
19    the e-mail says "Agenda."
20                    Were the listings following
21    that a proposed agenda for a meeting or a
22    call?
23         A       It would appear so.
24         Q       Now, under the heading
25    "Progress Since Closing," the first item
```

```
 1                    MICHAEL REBIBO
 2      is "Resolution of SLG."
 3                    Can you explain what that
 4      refers to?
 5           A        We had a dispute with them
 6      after acquiring the senior loan, whereby
 7      they were not releasing reserves that
 8      were part of the acquisition of the
 9      senior loan.
10           Q        Was that dispute resolved?
11           A        It was resolved, yes.
12           Q        How was it resolved?
13           A        We settled with them.
14           Q        Item 6 on the list of
15      progress since closing is, "Review of all
16      operation to transition responsibility."
17                    What does that refer to?
18           A        That refers to what I spoke
19      about earlier in terms of transitioning
20      responsibility now that we went from
21      becoming the mezzanine lender to the
22      senior lender.  So our responsibilities
23      expanded as it related to administration
24      of the loan.
25                    So, for example, we were
```

1                    MICHAEL REBIBO
2      responsible for paying the ground rent on
3      the property, paying taxes, paying
4      various expenses that the senior lender
5      previously was responsible for.  But now
6      we were taking over that role.  So hence,
7      the e-mail exchange beforehand asking Joe
8      Press for information regarding real
9      estate taxes, CMRF, things like that.
10          Q         Under the heading
11     "Marketing," the first item is
12     "Meeting/Zoom with JV Partners."
13                    What does that refer to?
14          A         It's talking about marketing
15     of the mezzanine loan.
16          Q         Just to clarify, the
17     mezzanine loan, not the senior loan?
18          A         We had not engaged Cushman
19     formally to market the senior loan.
20     People were aware that we had bought the
21     senior loan and were interested in
22     acquiring both loans.  But we had only
23     engaged Cushman to market the mezzanine
24     loan.
25          Q         Was anybody interested in

1                    MICHAEL REBIBO

2      just buying the mezz loan from you and

3      not the senior loan at the same time?

4          A       Yes.  There were parties

5      because we didn't have the senior loan

6      until January of 2022.  And we were

7      marketing the mezzanine loan in 2021.

8          Q       I'm talking about after you

9      acquired the senior loan.

10                 Did you have discussion with

11     anybody where you would just sell them,

12     the junior loan, and keep the senior

13     loan?

14         A       Yes.

15         Q       Now, under the heading

16     "Debt," there's a reference to

17     "meetings/calls with lenders."

18                 What does that refer to?

19         A       That refers to leveraging

20     our position.

21         Q       Can you explain that?

22         A       We had acquired the senior

23     loan.  The senior loan was still

24     outstanding and is still outstanding.

25     And we acquired it all cash.  We had not

1              MICHAEL REBIBO

2    leveraged our position.  There was no

3    note-on-note financing.  So we were

4    exploring that option.

5         Q         Have you, in fact,

6    refinanced the debt?

7         A         No.

8         Q         And then under the heading

9    "Operation/Asset Management," Item No. 1

10   is "Meeting with Tenants/Negotiating

11   Amendments with Existing Tenants."

12             Do you see that?

13        A         Yes.

14        Q         Did you participate in

15   meetings with tenants?

16        A         At this point, other than

17   Amtrak, I can't think of a specific

18   tenant.  I may have participated with

19   Ashkenazy in some meetings.  I don't

20   know.  I can't recall a specific one.

21        Q         Did you participate in any

22   meetings with tenants without Ashkenazy

23   present?

24        A         Other than the one with

25   Amtrak, which in the capacity as a

```
 1                   MICHAEL REBIBO
 2      mezz loan buyer, no.
 3           Q        Under No. 4, there's a
 4      reference to leasing space.  Do you see
 5      that?
 6           A        Yes.
 7           Q        What does that refer to?
 8           A        It refers to leasing space.
 9           Q        What did you propose
10      discussing regarding leasing space?
11           A        It's just the discussion
12      point about leasing space.  We were
13      working along with the borrower very
14      closely at this point because we had a
15      significant investment in the asset.
16           Q        And then under the heading
17      "Workout with Ashkenazy/Foreclosure,"
18      there's an item, "Restructuring Term
19      Sheet."
20                    Does that refer to --
21           A        Correct.
22           Q        What does that refer to?
23           A        As I said, we had been
24      working with the borrower after acquiring
25      the mortgage loan in January.  We had
```

```
 1                    MICHAEL REBIBO
 2     been working in good faith with the
 3     borrower to try and find a resolution
 4     that didn't involve a foreclosure.  So we
 5     had been exchanging term sheets with the
 6     borrower.
 7          Q     And No. 2 underneath that is
 8     "CFIUS Filing."
 9                    What does that refer to?
10          A      CFIUS -- it's a committee
11     of -- it's for foreign investors to
12     invest in a property that's ultimately
13     owned by the government.  So there was a
14     question about whether we needed to file
15     or not which is one of the discussion
16     points.
17                    MR. MARK:  I'm marking as
18          Exhibit 29, an e-mail, dated April
19          14th, 2021, with the Bates numbers
20          BLKUSI233, 234.
21                    (The above-referred-to
22          document was marked as Defendant's
23          Exhibit 29 for identification, as of
24          this date.)
25          Q      Mr. Rebibo, can you identify
```

1                    MICHAEL REBIBO

2     Exhibit 29?

3          A          It's an e-mail between --

4     it's from 2021.  It's an e-mail between

5     myself and -- internally between myself

6     and Langston and then me forwarding the

7     e-mail to Michael Mesard from BlackRock.

8          Q          And the first e-mail

9     contains a preliminary list of potential

10    operators; correct?

11         A          Correct.

12         Q          Now, we had an earlier

13    discussion where you had, if I remember

14    correctly, mentioned to me that you

15    thought at one point, Ashkenazy was on a

16    list of potential operators?

17         A          Correct.

18         Q          And you believe you had

19    conveyed that list to BlackRock?

20         A          Yes.

21         Q          We reviewed our files.  It's

22    the only other list of potential

23    operators that we were able to find that

24    was conveyed to BlackRock.

25                    And you said Ashkenazy's not

```
 1                    MICHAEL REBIBO
 2     on this list; correct?
 3          A        I do see Ashkenazy's not on
 4     the list.
 5          Q        You mentioned you believe
 6     there is a list that contains Ashkenazy?
 7          A        Yes.
 8          Q        We don't have it.  So I'd
 9     ask you to produce it.
10          A        Okay.  I think you're trying
11     to establish that we weren't -- you're
12     trying to establish that we weren't
13     working with the borrower.  And I think
14     if you look at all these documents here,
15     you could see that we had worked in good
16     faith with the borrower and certainly
17     tried to support them for two and a half
18     years.  But we'll give you the list
19     anyways.
20          Q        You told me there is such a
21     list.  We can't find it.  So I'm asking
22     for it.
23          A        I will get it for you.  I'm
24     sorry if you don't have access to it.  So
25     I'll make sure we get that to you.
```

1           MICHAEL REBIBO
2      Q        Now, in April of 2022, as
3  we've already mentioned, Amtrak commenced
4  a condemnation proceeding; correct?
5      A        Yes.
6      Q        What impact did the
7  commencement of the condemnation
8  proceeding have on your Union Station
9  strategy?
10     A        Significant.
11     Q        Could you be a little bit
12  more specific?
13          MR. SCHARF:  Objection to
14      form.  You can answer.
15     A        Amtrak had filed a
16  condemnation and a quick take and had
17  taken title technically of the leasehold
18  by law.  And so all the efforts we were
19  previously working on.  But at that
20  point, at the time of the -- at the time
21  that the quick take was filed,
22  discussions with the borrower had been
23  broken down.  And we had notified them I
24  believe that we were commencing a
25  foreclosure action.

MICHAEL REBIBO

1

2      Q        Let me make sure I
3   understand correctly.
4               You're saying the
5   discussions of the borrower had broken
6   down prior to the commencement of the
7   condemnation action?
8      A        Yes.
9      Q        When you say broken down,
10  could you be more specific as to what
11  happened or did not happen that caused
12  you to believe the discussions had broken
13  down?
14     A        We had exchanged several
15  term sheets with the borrower.  After I
16  think the second or third term, Ben
17  Ashkenazy had asked for a meeting at his
18  office where he had essentially said that
19  after coming back from a month-long
20  vacation, he wasn't happy with the term
21  sheet.  He had reviewed it, or he hadn't
22  seen it before.  It was being exchanged
23  with Daniel Levy and that he wasn't
24  satisfied about the terms of the term
25  sheet.  And there was -- we had notified

```
1                    MICHAEL REBIBO
2    them that we were going to commence a
3    foreclosure action in April of 2022 prior
4    to the eminent domain being filed.
5         Q         Did Mr. Ashkenazy give you
6    any particular reason as to why he wasn't
7    satisfied with the terms?
8         A         I don't think he liked the
9    idea of giving up full control of the
10   asset.  And he owned 95 percent of the
11   asset personally since acquiring it.  I
12   don't think he was mentally prepared to
13   share control.  And someone in his
14   position has difficulty giving up
15   control.
16                  MR. MARK:  Let's take a
17        short break.  I just want to see if I
18        have anything else to ask.
19                  THE VIDEOGRAPHER:  This will
20        end Media Unit 4, going off the
21        record at 3:31.
22                  (A short recess was taken.)
23                  THE VIDEOGRAPHER:  We're
24        back on the record at 3:43.  This
25        will begin Media Unit 5.
```

1                    MICHAEL REBIBO

2                    MR. MARK:  I have no further

3        questions at this time.

4                    MR. SCHARF:  I have a few.

5     EXAMINATION BY

6     MR. SCHARF:

7        Q        Mr. Rebibo, if you could

8     take out what's been marked as

9     Defendant's Exhibit 24, please, it's the

10    January 18th, 2022 e-mail exchange that

11    you had with Sean Hayes.  I'd like to

12    focus on the 11 a.m. to 11:30 a.m.

13    meeting.  You see that on the agenda?

14       A        Yes.

15       Q        After that meeting

16    concluded, did the people from leasing

17    and property management of Cushman &

18    Wakefield continue with you in any way,

19    shape or form the rest of the day?

20       A        No.

21       Q        Now, focusing on the people

22    that you met afterwards -- Museum Tenant,

23    Artemis, EDENS, Sage Hospitality, Acadia

24    and Argent and Madison Marquette -- did

25    any of those prospective note purchasers

MICHAEL REBIBO

1
2    end up touring the property?

3         A        Yes.  They had all toured

4    prior to these meetings.  They had been

5    toured by Joe Press and other members of

6    Ashkenazy.

7         Q        So I guess you anticipated

8    my next question, which was, did anybody

9    from Ashkenazy play a role in those

10   property tours?

11   (Continued on the following page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2          A        Yes.  Joe Press and

3    Ashkenazy, Dan Levy were all aware of

4    these tours.  We coordinated through them

5    for the property tours from the

6    prospective note buyers.

7                    MR. SCHARF:  I have no

8        further questions.

9                    MR. MARK:  No more

10        questions.

11                    THE VIDEOGRAPHER:  This will

12        end Media Unit 5 and conclude the

13        deposition of Michael Rebibo.  We're

14        going off the record at 3:46,

15        9/21/23.

16                    (Time noted:  3:46 p.m.)

17

18            _____

                    MICHAEL REBIBO

19

20

21    Subscribed and sworn to

22    before me on this _____day

23    of _____, 2023.

24

            _____

25                  NOTARY PUBLIC

1
2                    I N D E X
3
4              E X A M I N A T I O N
5   EXAMINATION
6   Mr. Mark              6
    Mr. Scharf           172
7
8              E X H I B I T S
9
10  Defendant's              Description          Page
11  Defendant's Exhibit 1  Notice                10
12  Defendant's Exhibit 2  E-mail with           22
                             attachment
13
    Defendant's Exhibit 3  Letter                27
14
    Defendant's Exhibit 4  E-mail with           29
15                           attachments
16  Defendants' Exhibit 5  E-mail with           32
                             attachment
17
    Defendant's Exhibit 6  E-mail with           43
18                           attachment
19  Defendant's Exhibit 7  E-mail with           44
                             attachments
20
    Defendant's Exhibit 8  E-mails               47
21
    Defendant's Exhibit 9  E-mails               61
22
    Defendant's Exhibit 10 E-mail with           71
23                           attachment
24  Defendant's Exhibit 11 Letter                73
25

1

2                    INDEX (Cont.)

3

    Defendant's Exhibit 12 E-mails          79

4
    Defendant's Exhibit 13 E-mails with     82
5                       attachment
6   Defendant's Exhibit 14 E-mails          83
7   Defendant's Exhibit 15 E-mails          86
8   Defendant's Exhibit 16 E-mails          89
9   Defendant's Exhibit 17 E-mail and       95
                          attachment
10
    Defendant's Exhibit 18 E-mails          103
11
    Defendant's Exhibit 19 E-mails          110
12
    Defendant's Exhibit 20 E-mail with      113
13                      attachment
14  Defendant's Exhibit 21 E-mails with     115
                          attachments
15
    Defendant's Exhibit 22 Pitch book       127
16
    Defendant's Exhibit 23 E-mail with      129
17                      attachments
18  Defendant's Exhibit 24 E-mail           134
19  Defendant's Exhibit 25 E-mails          144
20  Defendant's Exhibit 26 E-mails          153
21  Defendant's Exhibit 27 E-mails          157
22  Defendant's Exhibit 28 E-mail           160
23  Defendant's Exhibit 29 E-mails          166

24

25

1

2                          INDEX (Cont.)

3

                          R E Q U E S T S

4

5

6        Page                              Line

7        168                               8

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                   C E R T I F I C A T I O N

3

4

5          I, ANTHONY GIARRO, a Shorthand

6     Reporter and a Notary Public, do hereby

7     certify that the foregoing witness, MICHAEL

8     REBIBO, was duly sworn on the date

9     indicated, and that the foregoing, to the

10    best of my ability, is a true and accurate

11    transcription of my stenographic notes.

12          I further certify that I am not

13    employed by nor related to any party to

14    this action.

15

16

17

18    ANTHONY GIARRO

19

20

21

22

23

24

25

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC
1-800-727-6396

330 Old Country Road      7 Times Square
Mineola, New York 11501  New York, New
York 10036

NAME OF CASE:  Daol Rexmark, et al. versus Union Station

DATE OF DEPOSITION: September 21, 2023

NAME OF DEPONENT:   Michael Rebibo

PAGE LINE (S)  CHANGE            REASON
____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

_____
MICHAEL REBIBO

SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20__.

_____  _____
(NOTARY PUBLIC)   MY COMMISSION EXPIRES:

**&**

**&** 1:18 27:20
93:7,11,18
94:7 106:12,16
106:21,24
121:25 122:3,7
124:24 126:12
127:7 134:12
135:3 136:3
141:12 142:5
142:19 143:20
147:6,9 154:19
157:11 172:17

**0**

**06649** 1:3 4:21

**1**

**1** 4:14 9:22
10:2,5 50:12
51:24 52:20
58:23 91:20
158:20 164:9
175:11
**1-800-727-6...**
179:3
**10** 51:14 70:22
71:4,7 175:11
175:22
**100** 19:17
28:13,18 30:10
**10017** 6:21
**10019** 1:19
2:11
**10022** 2:5

**10036** 179:5
**103** 176:10
**10:03** 1:13 4:4
**10th** 61:18 68:7
70:16 71:21
72:4 126:23
**11** 72:20,25
80:15 135:7
172:12 175:24
**110** 176:11
**113** 176:12
**115** 176:14
**11501** 179:4
**11:18** 58:24
**11:30** 172:12
**11:31** 59:3
**11:43** 149:22
**12** 7:20 79:16
79:22,24 80:15
176:3
**1200** 6:20
**127** 176:15
**129** 176:16
**12:30** 94:15,20
**12th** 21:19
22:23,24 23:5
23:6 29:14
32:9 42:9
**13** 82:3,9 176:4
**134** 176:18
**13th** 115:8
**14** 83:14,19
176:6
**144** 176:19

**10036** 179:5
**1467** 61:20
**14th** 128:23
129:15 166:19
**15** 37:6 58:17
86:8,14 100:6
176:7
**153** 176:20
**157** 176:21
**15th** 42:20 82:5
**16** 89:6,13
176:8
**160** 176:22
**1614** 83:16
**1633** 1:18 2:10
4:23
**166** 176:23
**168** 177:7
**16th** 82:13 83:2
**17** 95:2,8,11
176:9
**172** 175:6
**1761** 134:3
**18** 102:20
103:3,6 176:10
**18th** 134:2
172:10
**19** 109:18,25
110:3 176:11
**1:21** 94:23
**1:22** 1:3 4:21

**2**

**2** 21:18,25 22:4
24:3 26:2
48:24 50:13
59:4 60:17

74:4,19 91:21
94:19 97:20
103:10 107:20
143:17 151:7
166:7 175:12
**20** 8:8 113:14
113:21,23
176:12 179:24
**200,000** 158:20
158:20
**2006** 8:5
**2011** 8:6
**2016** 21:22
**2018** 14:25
17:14
**2020** 23:18
37:14 41:22
98:8,18
**2021** 21:16,20
22:23,25 23:3
23:5,6,17
26:25 27:24
28:4 29:14,15
30:5,9 31:14
32:9 33:10
36:13 37:17
41:23,24 42:10
42:20 44:9
47:19 49:2,8
56:11 57:19
59:11,13,24
61:13,18 69:10
70:16,23 72:17
74:16 76:12
77:15 79:18

82:5 83:15
85:2 86:10,24
89:8 93:17,22
95:4,17 97:14
98:8,20 102:23
103:11 106:23
107:14 109:21
113:15,17
114:8 116:14
118:17 120:10
120:15 126:23
127:15 163:7
166:19 167:4
**2022** 18:2,24
19:5 21:8
90:13,14,16
115:8 118:18
120:13,14,17
120:24 128:23
129:15 134:2
144:5,20
145:24 149:21
150:18 151:9
153:12,23
157:17 160:5
163:6 169:2
171:3 172:10
**2023** 1:13
174:23 179:7
**20th** 113:15,16
114:8 116:7,8
116:9 134:14
157:17
**21** 1:13 49:2,8
50:17 60:16

70:22 77:19
106:23 115:7
115:16 151:9
176:14 179:7
**21st** 44:9 76:12
77:15 100:8
103:11 107:6
**22** 126:22
127:4 175:12
176:15
**2202** 95:5
**222** 29:16
**22nd** 160:5
**23** 47:19
111:16 128:22
129:4,7 176:16
**2312** 102:24
**232** 32:11
**234** 166:20
**238** 42:21
**23rd** 49:16
**24** 133:25
134:6,8 140:24
172:9 176:18
**24th** 86:24
109:20 144:5
149:21
**25** 144:3,10,13
176:19
**2510** 72:22
**25th** 102:23
**26** 153:10,16
176:20
**26th** 71:13

**27** 157:15,21,23
175:13 176:21
**28** 160:4,10,12
176:22
**2874** 27:4
**28th** 86:10
**29** 166:18,23
167:2 175:14
176:23
**295** 6:19
**29th** 26:25
27:23 28:4
**2:33** 140:18
**2:48** 140:21
**2nd** 80:3 83:14

**3**

**3** 26:24 27:7,10
43:19 54:23
94:24 95:4,17
140:17 175:13
**31** 153:11
**32** 175:16
**3267** 160:7
**330** 179:4
**3372** 157:18
**3623** 153:13
**380** 109:10
**3847** 128:25
**3867** 115:10
**3:31** 171:21
**3:43** 171:24
**3:46** 174:14,16
**3rd** 79:17

**4**

**4** 29:13,19 39:6
140:22 141:2
165:3 171:20
175:14
**400,000** 158:21
**4162** 109:22
**4204** 113:18
**43** 175:17
**44** 175:19
**4556** 126:25
**4588** 89:10
**4614** 86:11
**47** 175:20
**4:37** 151:10

**5**

**5** 32:8,14,16
42:3 43:13
51:13 171:25
174:12 175:16
**50** 25:4 107:22
108:4,17 109:9
**5259** 178:17
**5th** 29:15
116:14

**6**

**6** 42:19,24 43:3
54:20,23
161:14 175:6
175:17
**600,000** 158:25
**61** 175:21
**666** 44:10

**688** 47:20
**6th** 114:13
118:6

**7**

**7** 44:8,13,19
175:19 179:4
**700,000** 158:24
**708** 70:25
**71** 175:22
**73** 175:24
**79** 176:3

**8**

**8** 1:5 14:19,21
18:5 47:15,23
47:25 48:3
60:18 175:20
177:7
**82** 82:6 176:4
**83** 176:6
**840** 144:7
**86** 176:7
**89** 176:8

**9**

**9** 61:16,23 62:2
71:22 135:6
175:21
**9/21/2023** 4:4
**9/21/23** 174:15
**90** 128:3
**909** 2:5
**95** 171:10
176:9
**9th** 89:8 93:17

**a**

**a.m.** 1:13 135:6
135:7 149:22
172:12,12
**ability** 178:10
**able** 7:10 10:19
103:5 106:8
148:6 167:23
**above** 9:24
21:23 27:5
29:17 32:12
42:22 44:11
45:18 47:21
49:6 61:21
71:2 72:23
79:20 82:7
83:17 86:12
89:11 95:6
102:25 109:23
113:19 115:14
127:2 129:2
134:4 144:8
153:14 157:19
160:8 166:21
**absolutely**
153:5
**acadia** 139:11
172:23
**accelerate**
36:17
**accelerated**
36:12 37:23
39:16 57:16
69:18

**acceptable**
51:17,19 88:9
**access** 168:24
**accommodati...**
57:5,6
**accompany**
146:25
**accurate** 48:11
67:7 93:2
98:10 101:6
128:8 178:10
**accurately** 75:5
77:3
**acquire** 25:11
123:15
**acquired** 21:7
90:14,18
122:10 123:17
144:21 145:3
163:9,22,25
**acquirers**
134:18
**acquires**
139:19
**acquiring**
90:12 137:4,10
137:16 139:9
145:2 147:18
160:17 161:6
162:22 165:24
171:11
**acquisition**
21:2 122:5
139:22 161:8

**act** 55:21
**acting** 70:11
110:11,13
**action** 5:7 61:6
61:10,12
116:19 117:21
152:23 169:25
170:7 171:3
178:14
**active** 16:3,5
96:17
**activities**
125:12
**activity** 122:20
125:17,22
154:24
**actual** 22:13
**actually** 15:7
23:25 115:12
116:11 135:14
**added** 48:21
**addition** 9:13
12:6 45:5
119:13 143:17
**additional**
117:12 121:10
**address** 6:14,16
6:17,19 33:15
45:6
**addressee** 50:4
**addressees**
49:13
**addressing**
133:16

**adjourned**
138:13
**adjournment**
111:18 112:19
**administer** 5:6
**administers**
15:14,15 18:16
**administration**
16:6 84:21,25
85:9 161:23
**administrator**
92:5
**adverse** 34:8
150:6
**adversely**
150:3
**advise** 56:13
**advised** 37:16
114:21 148:12
**advisement**
115:5
**advisor** 110:10
110:14,25
142:4
**advisory**
124:15,19,21
127:18
**affected** 52:24
**affiliate** 18:4
21:10
**affiliations**
5:14
**agenda** 104:19
104:22 135:4
135:17 136:17

136:23 141:10
160:19,21
172:13
**agent** 1:5,6
14:7 81:9,10
114:3 126:2
**agree** 4:13 52:8
67:10,20 68:2
102:15 133:9
145:15 152:10
158:8,14
**agreed** 3:4,9,13
34:10 106:5
132:12
**agreement** 52:3
53:15 55:8,11
98:8 105:18
111:23 112:3
112:23 113:9
124:10,22
125:16,21
145:8,17
148:21,23
149:10,24
**agreements**
35:23 37:15
108:6 129:19
130:9,22
**al** 4:17 179:6
**aligned** 133:12
**allocated** 25:21
**alpert** 29:9
30:19,20 31:2
118:20

**alternative**
76:16 78:4
149:13
**alternatives**
118:2
**alwd** 132:18
**amendments**
164:11
**america** 158:22
**amount** 24:19
37:5 38:24
41:2,6 51:11
52:8 69:20
108:13,19
111:24 112:3,5
112:11
**amounts** 24:13
79:10
**amtrak** 144:16
144:20 145:24
146:9,17
148:21 149:25
151:13 153:3
164:17,25
169:3,15
**amtraksdny821**
144:7
**andrew** 2:12
5:20
**answer** 7:8,9
36:19 40:2
46:6,14 52:2
67:25 68:24
84:19 90:10
115:3 125:5

127:12 130:3
132:15 133:5
148:9 152:9
169:14
**answered**
64:19 65:2
**answers** 18:23
**anthony** 1:20
5:4 178:5,18
**anticipate** 46:7
**anticipated**
141:20 173:7
**anticipating**
47:9 98:11
**anybody** 12:7
12:16 142:10
146:9,25
162:25 163:11
173:8
**anyways**
168:19
**apart** 51:20
92:23 152:3
**apartment**
13:13
**appear** 160:23
**appearance**
5:12
**appearances**
5:14
**appearing** 9:6
9:14,18
**appears** 33:16
**application**
30:11

**appraisal**
148:13
**approaches**
60:22 61:2
**appropriately**
70:11
**approval** 32:3
89:24 90:6
117:16 147:14
**approvals**
18:18 24:14
148:5
**approve** 129:18
**april** 21:19
22:23,24 23:3
23:5,6 26:25
27:23 28:4
29:13,15 30:4
30:9 31:14
32:9 39:7 42:9
42:20 44:9
47:19 49:2,8
49:16 50:17
56:11 57:19
60:16 68:14,14
71:12,13 76:12
77:15,19 100:8
120:8,9 166:18
169:2 171:3
**arabia** 41:16
**argent** 139:16
139:17 172:24
**arnold** 27:20
**arrange** 126:14

**arrangement**
76:17 78:4
125:21,24
126:11
**artemis** 138:21
172:23
**ashkenazy**
23:10,12 29:10
30:21 54:8
55:21 56:16
58:5,13 75:7
75:22 77:4
86:25 104:25
118:19 119:15
120:11,19
121:10 126:3
131:15,19
132:12 136:2,4
136:11,11
145:21 150:17
150:18 153:24
156:19 164:19
164:22 165:17
167:15 168:6
170:17 171:5
173:6,9 174:3
**ashkenazy's**
167:25 168:3
**asia** 91:5,18
**aside** 85:4
89:22 145:22
**asked** 98:2
106:15 141:6
148:4 170:17

**asking** 6:23
39:19 66:21
69:8,9 71:10
99:20 155:15
162:7 168:21
**asks** 51:2 91:22
**aspect** 63:8
**assemblage**
73:11
**asset** 8:7 13:12
15:13 17:2,14
33:4 45:14
56:24 62:23
63:7,8,12,12,15
63:20,20,22
64:15,16,22
65:3,4 66:8
69:14 76:7
129:22 130:20
131:14 132:7
155:8 164:9
165:15 171:10
171:11
**assets** 62:21
65:7 127:25
**assignment**
8:23 124:15,19
124:21
**assisted** 87:13
**associate** 146:5
**assume** 39:15
107:22 142:8
**assuming** 108:4
**attached** 26:25
29:14

**attachment**
21:19 28:3
32:8 34:13
36:5 42:19
44:8 70:23
82:4,16,19
86:19 87:4
95:3,16 109:19
113:16 115:9
115:11 124:13
126:24 153:10
175:12,16,18
175:23 176:5,9
176:13
**attachments**
29:22 72:21
128:24 129:9
175:15,19
176:14,17
**attempted**
76:16 78:3
**attend** 143:23
**attended** 86:21
146:21
**attending**
147:5
**attention** 99:4
157:12
**attorney** 5:16
**attorneys** 2:4
2:10 11:3 12:8
12:10,12,16
**auction** 147:15
147:17

**audio** 4:10,11
**author** 32:18
**authority** 148:3
**authorized** 5:5
**avenue** 2:5 6:20
**avoided** 88:4
**avoiding** 81:18
**aware** 23:8,15
23:19 24:4,6,8
24:12,17,18,20
24:24 25:2,7,8
25:9,12,13,17
28:8,10,18
30:8 63:18
71:16,20,24
97:23 162:20
174:3
**ax** 97:5

**b**

**b** 1:7 6:5,5
175:8
**back** 13:5
14:25 17:14
36:11 39:8
42:2 59:3
71:12 88:13,16
88:18 94:23
115:2 120:21
140:21,23
170:19 171:24
**background**
96:14
**bad** 76:21
78:22

**bagel** 158:22
158:24
**bank** 1:4 9:19
10:12 14:4,5
19:16
**banking** 17:2
**base** 91:17
**based** 8:3 38:15
47:2 53:12
98:4 128:13
139:18 140:11
152:16
**basically** 34:4
78:10 155:15
**basis** 68:19
69:4 90:20
132:9
**bates** 21:21
27:3 29:16
32:10 42:21
44:10 47:19
61:19 70:24
72:21 73:10,19
79:18 82:5
83:15 86:11
89:9 95:4
102:24 109:21
113:17 115:9
115:12 126:24
128:25 134:3
144:6 153:12
157:17 160:6
166:19
**bears** 29:15
83:15 86:10

89:9 102:23
134:2
**becoming**
155:5 161:21
**beginning** 5:15
84:2 103:24
**begins** 50:11
73:6 74:4,22
91:20 97:22
99:5 100:11
103:9
**behalf** 14:6,7,8
75:13 81:9
96:2 110:11
**belief** 96:21
**believe** 8:6
14:11,18 17:23
18:2,7 21:11
21:15 28:5
29:6,23 33:10
34:9 41:20
43:17 44:2
53:19 54:7,16
61:7 64:11,13
78:21 80:13
90:13 93:20,21
94:3 98:20
112:13 116:6
118:6 120:9,19
121:17 122:17
135:15,19,21
136:2,4,7,8
140:12 141:15
142:2,7,21
143:6,8,22

146:11 147:3,4
147:8 154:16
156:5,17 157:3
158:23 167:18
168:5 169:24
170:12
**ben** 29:10
30:21 118:19
170:16
**beneficial**
62:22
**benefit** 45:22
66:12 70:7
**benson** 1:18
2:9 4:23 5:18
5:21 74:5
**best** 11:13,17
11:20 65:13
66:2,16,22
67:11 68:3
96:8 98:14,25
99:14 100:4
103:20 119:21
132:7 159:23
178:10
**beyond** 9:2,3
45:15 125:2
**billionaire** 70:2
**bit** 22:21
169:11
**blackrock**
31:19,25 43:14
43:25 44:25
45:20 46:19,22
48:17,21 56:13

64:12 65:21
70:16 72:5
87:2 95:18
100:14,18
167:7,19,24
**blackrock's**
31:24 68:7
**blind** 15:25
**blkusi1463**
61:19
**blkusi1612**
83:16
**blkusi1617**
79:19
**blkusi210**
21:21
**blkusi219**
29:16
**blkusi229**
32:10
**blkusi233**
166:20
**blkusi235**
42:21
**blkusi663**
44:10
**blkusi683**
47:20
**board** 147:14
**bondholders**
62:19
**book** 127:9
128:3,4 142:20
142:23 143:4,6
143:9 176:15

**borrower**
23:21 28:21
38:4 39:23
40:4,6,18
53:10,24 56:23
57:4,8,8 60:7
61:4 65:16
66:5,11,15,18
67:2,6,17,23
68:4,14,16
69:2,6 70:7,10
70:13 71:12
76:3 78:15,16
79:9 81:19
86:4 88:4
98:16 102:10
118:4,7,12,14
118:16 119:20
131:10 133:3,7
151:3 155:11
165:13,24
166:3,6 168:13
168:16 169:22
170:5,15
**borrower's**
67:11 71:15
80:11 88:8
99:6
**bottom** 50:2,12
83:25 84:2
91:20 103:10
107:19 159:10
159:16
**bought** 162:20

**brains** 152:2
**brainstormed**
81:16
**breach** 97:9
**breached** 36:14
57:13 105:16
**break** 7:6,10
58:19 94:16
140:15 141:4
171:17
**breakdown**
25:20
**breaking** 52:6
**breland** 2:12
5:20,21
**briefly** 6:12 7:4
7:21
**briggs** 31:17
33:12
**bring** 25:15
34:24 42:6
55:13 108:22
130:9 142:20
143:7
**bringing** 36:11
36:20
**broadway** 1:19
2:10 4:24
**broken** 40:7
169:23 170:5,9
170:12
**broker** 142:4
**brought** 78:14
143:8 157:11

**brown** 95:17
95:22 96:6
98:5 103:12
**bucks** 51:20
**building** 136:2
136:3
**buildings** 13:13
13:13
**bullet** 138:16
139:5 143:19
**business** 6:17
6:19 13:7
110:18 111:3
114:14,15
159:9
**buy** 109:14
**buyer** 165:2
**buyers** 137:15
174:6
**buying** 147:13
163:2

| c |
| --- |

**c** 2:2 6:5 92:14
178:2,2
**c&w** 136:17,17
141:10
**calculate**
113:10
**calculation**
112:6,14
**call** 18:4 19:6
84:6 92:16,23
93:3 107:21
108:3,7 109:8
110:22 117:11

146:12,14
153:7 160:22
**called** 8:4 16:12
17:5
**calls** 111:9
123:10 163:17
**canceled** 118:4
122:14 123:18
**capacities**
128:17
**capacity** 1:4
114:2 164:25
**capital** 13:16
13:23 16:25
25:2,18 37:18
57:10 68:17
107:21 108:3,7
109:7 117:11
**carefully** 6:24
**carryover**
102:3
**case** 1:3 11:15
11:19 12:4,13
17:3,17 47:12
69:18 78:22
133:10 179:6
**cases** 13:19,20
139:3
**cash** 24:22 37:3
128:13 163:25
**caused** 102:12
170:11
**caution** 114:22
**cc** 90:25

**ccs** 33:14
**ceased** 59:14
**ceo** 142:2
**certain** 13:18
13:19 33:9
45:18 73:14
91:22 139:3
**certainly** 38:23
43:19 46:3
57:21 60:9
73:10 94:4,10
101:23 110:23
118:11 119:4
119:22 121:19
126:10 168:16
**certification**
3:7
**certified** 1:21
**certify** 178:7,12
**cfius** 24:15
30:11 166:8,10
**chain** 47:15
48:4,16,19
61:17 82:20
89:6,17 102:21
144:4 154:25
**change** 17:7
122:9 179:9
**changed** 48:19
90:16 122:18
124:7 125:9
**changes** 43:12
43:15,16
**charge** 14:14

**check** 135:21
**cho** 92:7,10
**choose** 114:10
**chop't** 132:19
**chris** 121:24
**christmas**
114:20
**circumstances**
11:7 34:7,11
40:16
**cities** 13:17
**claim** 150:7
**claims** 105:12
105:15,21
**clarify** 7:2 9:8
19:2,15 26:7
54:18 61:11
67:8 68:21
136:10 139:4
162:16
**clarifying**
131:5
**class** 32:2
**classes** 13:12
**claw** 115:2
**clear** 15:25
20:11 49:20
65:11 112:22
116:23 132:25
**clearly** 152:18
**client** 11:5 19:7
25:19 26:6,18
30:15 34:9
36:14 37:14,14
37:24,25 38:16

69:19,23,25
96:18 97:5
130:23,25
131:2 132:17
132:21
**client's** 11:21
74:23 75:9
**clients** 75:12
**close** 67:12
117:24
**closed** 39:11
**closely** 165:14
**closing** 160:25
161:15
**cmbs** 21:3
50:20 62:19
**cmrf** 155:13
162:9
**cohen** 2:4 12:11
**collaboration**
131:2
**collaborative**
119:20
**collateral** 19:11
34:22 36:7
97:6
**colleagues** 75:7
77:5
**collecting**
159:22
**collectively**
156:19
**combined**
158:16

**come** 23:7
33:21 37:8
38:9 47:4 70:4
79:9 88:13,16
97:13 105:19
**comes** 157:5
**comfortable**
105:14,20,23
149:15 150:8
**coming** 170:19
**commence**
106:2 114:19
171:2
**commenced**
61:3,6,12
169:3
**commencem...**
169:7 170:6
**commencing**
61:5,10 169:24
**comment** 60:10
**commenting**
98:22
**commercial**
13:10
**commission**
179:25
**commit** 40:22
53:11 57:9
70:9 132:6,8
158:8,14 159:7
**committee**
166:10
**committees**
52:4

**committing**
159:18
**common** 90:11
90:13 119:9,12
**communicates**
18:20
**communicating**
72:15 104:12
104:16,18,21
126:6 156:21
156:23
**communication**
36:4
**communicati...**
35:19 54:14
114:23 126:10
144:19,24
145:23
**companies**
139:2,8
**company** 8:3,7
96:23 97:2
128:17 139:18
140:11
**complete** 8:22
88:12 103:22
**completed** 8:14
**completely**
16:2 77:20,24
153:7
**compliance**
15:11 18:17
**complicated**
65:4

**comply** 35:9,13
**complying**
38:14
**comprehensive**
87:17
**compromise**
119:21
**concentrated**
127:23,25
**concept** 42:5
43:20 45:7,12
45:18 51:6,9
54:3 59:16
**conceptually**
45:13 133:6,10
**concern** 58:11
124:3 139:22
151:6,15
**concerned**
56:22 150:21
**concerning**
72:6
**concerns** 58:14
89:23 148:22
**conclude**
174:12
**concluded**
172:16
**condemnation**
169:4,7,16
170:7
**conduct** 76:10
77:13
**conference**
141:17,18

**confidence**
70:6
**confidential**
145:18 150:11
151:18
**confidentiality**
145:7,17
148:20,23
149:10,24
**confining** 99:17
**confirm** 97:16
158:5
**confirmed**
76:11 77:13
**conflict** 33:24
**conglomerate**
16:24
**connection**
30:12 33:23
39:24 122:23
**consent** 35:4,6
35:12,14 36:6
68:15 71:15,18
76:5,24 79:2
99:6 130:22
132:22
**consenting**
75:17
**consents** 35:10
35:24 102:12
**conservatively**
108:24
**consider** 75:17
**considering**
38:23 55:21

93:24 94:14
118:2
**consultant**
110:10
**consummated**
41:24
**cont** 176:2
177:2
**contact** 30:24
30:25 31:9,16
**contacts** 31:13
**contain** 34:20
44:19
**contained** 42:3
96:5,9 98:13
99:21 100:2
**contains** 54:11
54:20 82:13
86:20 113:9
167:9 168:6
**contents** 98:9
**contingent**
53:17
**continue** 4:12
76:9 117:10
172:18
**continued**
173:11
**continues**
50:12 91:21
**continuing**
57:2,14
**contract** 28:23
98:17,19
148:15

**contribution**
25:3 119:15
**control** 155:9
171:9,13,15
**controlling**
32:2
**controversial**
50:24
**convenient**
58:18
**conveniently**
53:25
**conversation**
58:8 62:8 85:5
85:13,15 104:2
**conversations**
4:7 43:13
44:24
**convey** 62:18
63:14
**conveyed**
167:19,24
**convinced**
106:6
**convinces**
152:20
**coordinated**
174:4
**copy** 22:12,16
24:2 25:25
26:4,5,9 28:23
71:10 74:15
98:19 142:22
143:3,6,9

**corporate** 9:14
9:18
**correct** 17:6
19:18,19 20:13
20:14,20,23,24
21:3,4 26:2
28:9 31:23
34:14 38:4
39:20,21 49:4
49:13,14,22,23
50:25 51:8,11
70:18,19 77:8
80:21,22 84:15
86:21 87:2,14
87:15 93:19
95:19,20,23,24
96:2,3,10
97:19 98:14,24
99:13 100:3,23
100:25 101:8
101:11,13,21
103:22 104:6
104:16 106:10
106:18 107:3,4
109:16 112:21
113:2,11,12
115:22 117:9
117:13,16
119:16 165:21
167:10,11,17
168:2 169:4
**correctly** 75:21
109:13 110:8
140:7 167:14
170:3

**correlation**
38:6
**corresponden...**
56:7,11 83:22
160:14
**corresponden...**
53:22 54:7
56:5
**cost** 147:23
**counsel** 3:5
5:13 95:22
114:21,24
144:15,16
146:5
**countered**
120:20,21
**counterpart**
16:11 18:15
**counterpropo...**
88:14,16,18
**country** 179:4
**couple** 17:10
127:7
**court** 1:2 3:17
4:19 5:3 6:3
**covenants**
105:17
**cover** 22:13
27:19 45:3
**covid** 132:9
**cre** 1:5 14:18
14:20 17:21
18:5
**create** 76:16
78:4

**created** 11:24
**credibility**
37:25 56:25
57:21
**credit** 40:8,12
**cure** 38:11
39:12 40:18
**current** 25:16
34:25 36:21
37:4 42:6
50:20 78:14
79:10 108:23
**currently** 7:12
**cushion** 51:3
**cushman** 93:7
93:11,18 94:7
106:12,16,21
106:24 121:25
122:3,7 124:24
126:12 127:7
134:12 135:2
136:3 141:12
142:5,19
143:20 147:6,9
154:19 157:11
162:18,23
172:17
**cv** 1:3 4:21

**d**

**d** 1:7 175:2
**d.c.** 20:19 63:11
140:11
**damage** 97:7
**dan** 29:9 30:20
71:8 118:20

153:23 174:3
**daniel** 170:23
**daol** 1:4,6 4:16
14:12 15:13
16:13,14,16,18
16:22,23 17:4
17:12,17 18:8
179:6
**date** 10:3 22:2
27:2,8 29:20
32:15 42:25
44:14 47:24
61:24 71:5
73:2 79:23
82:10 83:20
85:5 86:15
89:14 95:9
98:22 103:4,22
110:2 113:22
114:18 115:17
115:25 116:8
127:5 129:5
134:7 144:11
153:17 157:22
160:11 166:24
178:8 179:7
**dated** 21:19
26:24 27:23
29:13,15 32:9
42:20 44:9
47:16,18 49:7
49:16 61:18
70:22 71:13
76:12 77:15
79:17 82:4

83:14 86:9
89:8 95:3,17
102:22 103:10
109:20 113:14
113:16 114:8
115:8 126:22
128:23 129:14
133:25 144:5
153:11 157:16
160:5 166:18
**dates** 42:8,13
59:11 79:5
98:6
**david** 2:6,12
5:17,23 58:16
73:8 99:15
**day** 23:5 80:15
80:15 90:20,20
113:3 136:8,9
172:19 174:22
179:24
**day's** 114:17
**days** 114:14,15
**dc** 157:5
**de** 36:17 109:5
**deadline**
114:19
**deal** 52:24 53:8
60:8 66:14
96:18 108:12
118:25 151:11
151:25
**dealing** 63:21
64:5

**deals** 130:10
131:16,23,25
131:25 132:2,3
132:13,19,21
**deborah** 146:4
151:8
**debt** 1:5 14:18
14:20 17:21
18:5 25:15
32:2 33:5 37:4
139:19 163:16
164:6
**december**
98:17 109:20
111:16 113:15
113:16 114:8
116:9
**decision** 16:6,9
65:6 117:20
159:9 160:2
**decisions** 32:4
**declaration**
126:18
**declarations**
11:4
**declined** 81:4
**dedicated**
127:19
**default** 35:22
37:10 38:7,12
39:13 69:17
83:5 94:10
113:6 160:2
**defaulted** 37:15
56:23

**defaults** 36:13
40:19
**defendant** 1:11
2:10 5:19,22
**defendant's**
9:25 10:4
21:24 22:4
27:6,10 29:12
29:18 32:7,13
42:18,23 43:3
44:7,12 47:22
61:22 70:21
71:3 72:24
79:16,21 82:8
83:13,18 86:13
89:12 95:7
103:2 109:24
113:20 115:15
126:21 127:3
129:3 134:5
144:9 153:15
157:20 160:9
166:22 172:9
175:10,11,12
175:13,14,17
175:19,20,21
175:22,24
176:3,4,6,7,8,9
176:10,11,12
176:14,15,16
176:18,19,20
176:21,22,23
**defendants**
12:4 175:16

**definitely** 30:20
73:20 120:22
**definitive** 98:17
**definitively**
152:12,14
**degree** 8:12,15
8:20
**demand** 76:14
77:17
**denial** 63:22
**dennis** 146:13
**department**
40:8,12,12
93:15
**deponent** 179:7
**deposed** 12:20
12:21
**deposit** 69:16
98:21
**deposited**
28:13 30:10
**deposition** 1:16
3:7,14 4:15,22
9:13,23 10:11
10:13,17,20,23
10:24 12:17,22
174:13 179:7
**describe** 7:21
18:12 105:23
**described**
135:17 143:12
143:16
**describes** 75:5
75:21

**describing**
133:2
**description**
175:10
**designated**
81:9
**designees** 15:6
**despite** 62:9
**detail** 119:2
**details** 24:6,8
56:7
**dialogue** 71:25
80:13,14
**died** 59:12 60:3
**different** 16:25
96:18,19
108:25 138:17
139:6,7
**difficult** 57:12
62:12 64:9
**difficulty**
171:14
**direct** 99:3
**directed** 10:11
82:16
**directly** 81:5
110:16 132:20
150:13 156:21
**disagreement**
112:14
**disappointed**
84:9,24 85:7
**disclose** 114:23
148:2,2 150:10

**disclosed**
151:21
**disclosing**
145:18 149:11
150:4
**disclosures**
123:9
**discovery** 11:2
26:15
**discretion**
90:19 159:24
159:25
**discuss** 42:4,11
45:6 80:21
81:12,20 88:3
115:18 118:8
118:22 131:20
138:3 150:10
158:7
**discussed** 38:2
38:5 43:10,20
44:21 52:18
60:17 81:23
118:23 119:5
119:10 133:7
133:11 147:10
153:6 156:18
**discussing**
52:12 53:17
59:6 63:4
77:22 81:15
121:24 148:17
165:10
**discussion** 13:3
66:13 71:25

72:18 80:25
106:12 112:18
117:6 145:6
147:22 148:20
163:10 165:11
166:15 167:13
**discussions**
43:21,24 44:3
59:13 60:2
72:5,9,10,13
76:23 78:25
80:17 88:20,23
88:24 94:2,4
106:2,9 145:5
145:7,11 146:3
146:6 152:4
169:22 170:5
170:12
**disingenuous**
152:16
**dispute** 112:11
161:5,10
**disputes** 104:25
**dissecting**
101:12
**distress** 63:13
65:3
**distressed** 64:6
**district** 1:2,2
4:19,20
**divided** 46:8
**document** 9:25
10:7,9 21:24
22:7,9,11 27:6
27:12,15,18

29:18 32:13
42:23 43:5,7
44:12,16,18
47:22 48:25
54:10,13 61:22
71:3 72:24
73:4,7,24 74:2
79:21 82:8,13
82:17 83:18
86:13,17 89:12
89:21 90:23
95:7,14 103:2
109:24 113:20
115:15 127:3
127:13 129:3
134:5 143:17
144:9 149:5
153:15 154:5
157:20 160:9
166:22
**documentation**
28:25 29:3
**documents**
11:14,18,23,24
12:7 38:14,15
38:22 73:9,12
168:14
**doing** 58:12
59:16,19 66:14
77:11 137:6
**dollars** 69:13
69:21 70:9
**domain** 152:23
153:2 171:4

**double** 135:21
**dual** 60:21
**due** 36:13,22
79:10
**duly** 6:6 178:8

**e**

**e** 2:2,2 6:5,5
11:12 21:18
22:13 26:24
27:19 28:2
29:13,22 32:8
32:19 33:11,15
36:4 42:19
44:8 45:3
47:15,16,17
48:4,6,16,19,25
49:3,3,7,12,16
49:18,21,22,25
50:8,11,15,17
51:23,24 52:20
53:21 54:6,13
59:8 60:15,19
61:17,17 62:4
62:6 66:14
68:7 70:22
71:8,22,24
72:4 76:11
77:14,20 79:16
79:25 80:3,5,5
80:8 82:3,4,20
83:14 84:4
86:9,19 87:5
89:6,7,17,19,23
90:5,21 91:19
92:15,24 93:2

93:6,6,11,17
95:3 100:7
102:21,22
103:9,16,19,21
103:25 105:3
106:19 109:19
109:20 110:6
111:17 112:16
112:18 113:14
115:8 116:17
121:23,24
122:24 126:22
128:23 129:10
129:12,14,18
130:4,6,21
133:14,15,25
134:11,20,22
144:4,5,14,18
145:22 148:25
149:17,18,20
151:7,8 153:7
153:10,11,22
154:4,8 155:14
155:21 157:15
157:16,24
158:3,18 160:4
160:13,19
162:7 166:18
167:3,4,7,8
172:10 175:2,4
175:8,12,14,16
175:17,19,20
175:21,22
176:3,4,6,7,8,9
176:10,11,12

176:14,16,18
176:19,20,21
176:22,23
177:3,3 178:2
**earlier** 56:24
97:16 110:17
117:2,5 161:19
167:12
**early** 23:17
41:23 97:14
98:8,20 127:15
**east** 155:23
156:6 157:6,7
**edens** 138:21
172:23
**educate** 129:21
129:25
**education** 7:22
8:21,24 13:15
**educational**
62:25
**effect** 3:16
36:17 39:19
**effective** 98:20
**effectively**
80:11
**efforts** 103:25
169:18
**eight** 83:11
**einstein** 158:21
158:24
**either** 30:18,19
30:20 111:21
148:6

**elaborate** 54:2
**elected** 40:20
105:25
**eligible** 53:24
**eminent** 152:23
153:2 171:4
**employed** 7:12
8:2 178:13
**employee** 32:22
92:2
**employees**
136:3
**employments**
7:23
**engage** 76:23
78:25 102:10
122:22
**engaged** 93:21
94:4 107:15
111:6,6,10
122:12,13,18
123:24 125:15
162:18,23
**ensure** 65:15
66:17 67:15
131:15
**enter** 53:15
**entered** 98:7,16
**entertain** 79:8
**entire** 81:9
**entirely** 68:10
79:4
**entities** 14:2
139:6

**entity** 14:21
17:19,20,20,21
17:22,24,24
143:13,18
**equally** 46:8
**equity** 23:9,13
23:16 28:8
30:12 38:3,8
39:10,24 65:22
68:9 70:17
72:7 75:16
76:6,19 78:6
119:10,12,15
121:15,16
**errata** 179:2
**escrow** 28:13
28:19 30:10
69:16
**esq** 2:6,7,12,12
**essentially**
14:14 57:2
159:4 170:18
**establish**
168:11,12
**estate** 8:3,9
13:11,21 96:25
139:2,14,20
140:11 155:12
162:9
**estimated**
108:24 109:3
**et** 4:17 179:6
**eum** 18:11
90:24 133:22

**eum's** 18:13
**europe** 13:12
13:18
**evaluating**
108:18
**event** 157:9
**eventually**
25:24 137:13
**everybody** 64:4
**everyone's**
65:13 66:16,22
**evidence** 76:22
77:14
**evidenced**
76:11 78:24
**exact** 25:7,8
30:6 41:19
42:7,13 59:10
72:2 156:25
**exactly** 33:9
34:12 49:12
107:2 119:2
**examination**
6:9 172:5
175:5
**examined** 6:7
**example**
161:25
**except** 3:10
**exchange** 59:9
120:22 126:11
134:11 144:15
153:22 157:15
157:24 162:7
172:10

**exchanged**
71:11 120:18
124:22 170:14
170:22
**exchanging**
120:10 166:5
**excluding**
66:10 67:2
**execute** 105:5
**executed** 37:12
37:13 123:9
125:15,20
**executive** 31:4
**exercise** 114:11
114:17 115:20
115:22
**exercised**
115:24 116:2,3
**exercising**
114:4
**exhibit** 9:22
10:2,5 21:18
21:25 22:4
24:3 26:2,24
27:7,10 29:13
29:19 32:8,14
32:16 42:3,10
42:19,24 43:3
43:13 44:8,13
44:19 45:4
47:6,10,15,23
47:25 48:3
49:4 54:20,23
56:3 60:18
61:16,23 62:2

70:22 71:4,7
71:22 72:20,25
79:16,22,24
82:3,9 83:14
83:19 86:8,14
89:6,13 95:2,8
95:11 102:20
103:3,6 109:18
109:25 110:3
113:14,21,23
115:7,16,19
116:16 126:22
127:4 128:22
129:4,7 133:25
134:6,8 140:24
144:3,10,13
153:10,16,19
157:15,21,23
160:4,10,12
166:18,23
167:2 172:9
175:11,12,13
175:14,16,17
175:19,20,21
175:22,24
176:3,4,6,7,8,9
176:10,11,12
176:14,15,16
176:18,19,20
176:21,22,23
**existing** 38:11
39:12 108:20
108:21 158:23
164:11

**expand** 122:6
136:19
**expanded**
125:2,7 127:22
161:23
**expect** 39:22
40:3,4
**expectation**
121:21
**expenses** 162:4
**experiencing**
63:13
**expires** 179:25
**explain** 108:16
161:3 163:21
**explicit** 83:9
**exploring** 63:6
118:10 164:4
**express** 84:22
104:20
**expressed**
58:10 85:16
123:11 144:25
147:12
**expressing**
58:13
**extension**
111:20
**extent** 63:19
**eye** 64:10,10

**f**

**f** 178:2
**face** 40:15
**facilitates**
18:18

**fact** 22:15,19
22:22 23:8
38:20 39:15
53:20 100:8
109:8 115:21
117:7 159:15
164:5
**facts** 99:16,18
99:21 100:2,6
**factual** 101:18
**factually** 101:8
101:8,11
**failure** 102:9
**fair** 50:23
131:7
**faith** 69:22
70:13 76:21
78:22 102:10
166:2 168:16
**false** 76:8 77:20
77:24 79:13,14
126:19 128:20
**familiar** 10:6,8
22:8 43:6 62:3
62:20 64:14
73:25 89:20
95:13 126:3
**far** 51:20 75:20
**fargo** 21:5,12
21:13 31:18,21
34:2 43:23
44:2,4 45:2
47:5,7 48:20
49:21 50:3,8
71:17 72:6

80:24 81:13
84:5,24 85:7
87:2 92:17
95:18 97:17
**february** 120:8
120:9,13,17
157:17 160:5
**fed** 57:23
**fee** 36:23,23
**feel** 159:8
**fees** 83:9
**feet** 8:8
**felt** 97:9 105:15
132:3 159:18
**file** 166:14
**filed** 4:18
169:15,21
171:4
**files** 167:21
**filing** 3:6 166:8
**final** 140:4
**finalized** 51:25
52:3
**financial** 15:8
16:19,23,23
17:4,5,12
155:7
**financially** 5:8
**financials**
154:2
**financing** 164:3
**find** 80:17
106:3 119:21
119:23 166:3
167:23 168:21

**finding** 53:18
59:20
**fine** 6:18 58:21
**finish** 7:8
**finishing** 8:21
**firm's** 20:25
**first** 6:6 12:24
24:9 29:25
42:4,11 43:21
45:4 47:16,17
48:25 50:2,19
51:24 62:5
73:18 77:12
80:4 84:2
89:22 90:21,22
92:16,18
102:21 110:6
120:20,23
130:6 139:5
143:7 153:11
156:3,4 160:25
162:11 167:8
**five** 58:19
100:12 138:6
**fixed** 112:5
**flexible** 149:23
**flow** 37:4
**flower** 132:18
**flows** 128:13
**focus** 129:9
172:12
**focusing**
172:21
**folks** 103:12
129:15

**follow** 62:8
88:19 148:19
**following** 80:9
100:11 115:20
122:5 160:20
173:11
**follows** 6:8
**food** 157:4
**forbearance**
37:12,13
**forbes** 70:3
**force** 3:16
**foreclose** 35:3,7
35:12 36:6
78:12 119:19
137:17
**foreclosed**
35:18 59:8
**forecloses**
65:17 66:19
67:18
**foreclosing**
67:22
**foreclosure**
17:25 18:2,23
19:2,4,8,15,20
19:22 34:17,22
42:6 43:9
59:16,19,23
60:11,12 61:5
61:7,12 76:20
78:7 100:16,19
107:17 111:18
111:20 112:20
113:3 114:12

114:19 118:5
121:4,8 122:20
123:19 125:6,8
147:15,17
165:17 166:4
169:25 171:3
**foregoing**
178:7,9
**foreign** 25:3
166:11
**forget** 111:10
**form** 3:10
36:18 40:2
46:14 67:25
84:18 90:10
105:5 125:5
127:12 130:3
131:12 132:15
133:5 148:9
152:7 156:11
156:16 169:14
172:19
**formal** 52:22
88:18 125:18
125:21 126:11
**formally** 94:3
162:19
**formed** 14:24
16:4 17:22,24
**formula** 112:6
**forward** 80:18
81:17 129:22
**forwarding**
167:6

**found** 41:20
**founding** 7:25
**four** 8:18 82:21
  82:22
**fraction** 159:5
  159:21
**frank** 104:3,5,9
**frankly** 73:22
**frequently**
  151:12,25
**friday** 151:9
**fried** 104:2,5,9
**friendlily**
  110:23
**friendly** 110:20
  110:24
**front** 82:25
**fruition** 38:9
**frustrated**
  68:15,25 69:5
  70:12
**fulfilled** 40:6
**full** 8:21 48:25
  63:19 74:19
  92:6 99:4
  171:9
**fully** 63:7,9,10
  64:2
**fund** 1:5,6
  14:19,20 16:15
  16:16 17:21
  18:5 37:17
  38:21 39:6
  41:15

**fundamental**
  150:9
**funded** 15:5
  41:22 98:21
**funding** 36:25
**funds** 25:15
  28:22 38:11
  39:12 40:22
  108:11 109:4
  117:12 121:10
  148:5
**further** 3:9,13
  19:14 48:15
  63:15 76:10,22
  77:13 78:23
  102:3 172:2
  174:8 178:12
**future** 51:3
  52:9 58:15
  105:13

**g**

**gates** 33:16,19
**gateway** 13:17
**general** 24:18
  85:23 87:19
  90:4 98:2
  119:3 130:7
  131:8 132:24
  132:25 146:5
**generally** 31:14
  57:23 89:18
  93:4 98:6,9
**getting** 46:17
  59:22 104:9
  120:16 130:22

  155:10
**ghw** 1:3 4:21
**giarro** 1:20 5:4
  178:5,18
**give** 114:15
  152:3 153:20
  168:18 171:5
**given** 78:15
  79:12 96:22
  108:19 121:21
  126:5 150:5
  158:9 159:14
**giving** 126:4,8
  150:25 160:15
  171:9,14
**glauberson**
  2:19 4:25
**globally** 8:9
**go** 4:13 11:9
  13:5,25 39:8
  47:12 65:7,10
  108:10
**goes** 84:8
**going** 4:3 25:11
  29:11 32:6
  37:17 40:21
  41:2,5 42:17
  44:6 47:12
  53:9 58:17,23
  61:15 69:15
  70:20 71:25
  73:5 74:18
  75:3 82:16
  83:12 84:17
  86:7 89:15

  94:19,25 99:3
  102:19 107:19
  109:17 112:15
  112:17 115:6
  117:23 126:20
  128:21 129:8,9
  129:22 132:5
  140:13,17,23
  144:2 153:21
  154:16 155:18
  171:2,20
  174:14
**good** 4:2 6:11
  12:25 36:11
  57:6 69:22
  94:16 102:10
  159:11 166:2
  168:15
**gotten** 97:3
**government**
  166:13
**graduate** 8:25
**grasp** 62:12
**great** 132:4
**green** 21:9,10
  95:18 96:15
  97:16 104:6,10
  104:15,17
  110:11,24
  111:5
**grind** 97:5
**ground** 155:13
  162:2
**group** 8:4
  16:19,23,23

17:4,5,12
127:18
**guess** 18:4 19:6
37:20 46:3
60:4 66:20
69:3 110:14
149:25 173:7

**h**

**h** 6:5 92:14
175:8
**half** 8:18 94:11
94:12 168:17
**hall** 155:23
156:6 157:4,6
157:7
**hana** 15:24
**handing** 10:4
**handled** 84:10
84:25 85:8
**handling** 85:8
**hanhwa** 15:23
**happen** 151:20
170:11
**happened** 59:7
170:11
**happy** 7:3
170:20
**hard** 152:2
**harm** 102:13
151:2
**hayes** 134:21
134:22 172:11
**head** 91:5
**heading** 124:14
160:18,24

162:10 163:15
164:8 165:16
**heavily** 19:12
**held** 1:17 13:3
19:20 20:11,17
21:2 86:23
**help** 12:17 45:7
**helpful** 64:17
64:18,23,25
65:5
**hereto** 3:6
**hi** 84:6
**hiatus** 60:5
**high** 7:22 9:2,3
24:16 31:4
96:18,19
127:20
**highly** 62:10
**hindsight** 69:7
69:9 152:17
**history** 110:18
**holdings** 1:6
7:15 23:10,12
75:10
**home** 6:15
**honest** 40:5
154:23
**honestly** 17:9
42:16
**hopeful** 121:21
**hopes** 132:9
**horizon** 94:13
**hospitality**
13:14 138:21
172:23

**hour** 58:17
140:14
**hundred** 69:16
**hundreds**
69:13
**hurt** 150:13

**i**

**idea** 42:14,15
42:15 57:12
171:9
**ideas** 81:17
**identification**
10:2 21:20,25
27:7 29:19
32:14 42:24
44:13 47:23
61:23 71:4
72:25 79:22
82:9 83:19
86:14 89:13
95:8 103:3
109:25 113:21
115:16 127:4
129:4 134:6
144:10 153:16
157:21 160:10
166:23
**identified**
31:21 33:13
90:24
**identify** 32:20
47:25 61:25
71:6 79:24
86:16 95:12
103:5 110:3

113:23 134:8
134:22 144:13
153:18 157:23
160:12 166:25
**ignoring** 99:6
**imagine** 72:9
72:13 79:13
81:7 86:5
**impact** 169:6
**important** 64:3
**importantly**
60:19
**impression**
46:10,12
152:15
**inclined** 158:7
158:13
**include** 50:3,7
121:9 145:6
**included** 53:23
54:8 58:5
149:5
**including** 24:15
33:14 35:14
66:5 68:3
129:16
**incorrect** 75:25
**increase** 51:11
51:16
**increasingly**
65:11
**independent**
130:24
**index** 176:2
177:2

indicated 76:3
79:7 178:9
indicates 78:20
138:17
indirectly
150:13
individually
9:12 136:12
individuals
30:23
industrial
13:14
inferring 67:7
informal
125:23
information
30:17 56:10
64:5,8,12
74:23 75:6,9
75:21 77:3
91:22 96:5,9
98:5,12,23
126:5,9 128:14
128:14 145:18
145:20 149:6
149:11,14
150:2,22 151:2
151:19 152:3
152:17,19
153:25 154:21
155:10,11,12
155:14,16,20
158:6 162:8
informative
63:2

informed 23:21
30:13,14 75:11
76:4
infrastructure
13:14
infrequently
157:9
infusion 24:22
initial 135:6,9
initially 47:4
initiate 76:20
78:7 100:16
inject 37:6,18
68:17 69:13
injection 25:18
insignificant
69:20
instance 126:6
instill 70:5
institution 17:3
institutional
13:16
institutions
15:5,18,22
91:16
instructions
155:2
insurance
15:23,24
155:12,13
intended 87:16
intent 151:18
intention
147:19

intentionally
66:25
intercreditor
35:9,23 36:2
55:7,11,17
97:10 105:17
112:23 113:8
114:5
interest 20:12
20:18,21 24:21
25:4 33:25
36:22 45:16
59:15,19 60:10
60:12 65:13
66:2,17,22
67:3,11,22
68:3 76:7 94:7
104:20 119:10
119:13 121:16
121:17 123:11
132:7 133:12
137:11,12,13
137:16,21
138:5 144:25
147:12,18
159:23
interested 5:8
59:20 73:22
104:12,15,18
137:4,6,10,23
150:24 151:4
162:21,25
interfere 4:10
internal 45:24
88:10

internally
167:5
interpretation
152:11
intro 136:17
introduced
6:12
invest 13:15,22
166:12
investco 20:12
invested 15:19
117:12
investment 1:5
13:9 14:6,9,15
14:17,25 15:6
15:8,14,15
16:7 17:2
18:16 23:9,13
23:16 24:10,19
25:14,21,23
28:8 30:12
31:5 38:3,9
39:2,10,24
41:15 63:16,23
65:22 70:17
72:7 75:18
76:24 79:2
117:2 159:24
165:15
investor 123:2
124:2
investors 16:3
16:5 107:22
108:4,6 109:13
116:20,24,25

117:7,8,18
139:2 166:11
**invests** 13:10
96:24
**invoices** 155:3
**involve** 59:22
119:12 121:4,8
166:4
**involved** 14:2
24:12 65:6
81:8 83:22
86:24 97:3
125:11 155:7
**involves** 119:9
**involving** 81:18
**irreparable**
102:13
**issue** 105:8
150:9
**issues** 150:8
**it'll** 151:25
**item** 54:23
136:16,19,23
139:11 140:4
141:9 160:25
161:14 162:11
164:9 165:18

**j**

**j** 2:12
**jaesang** 18:11
90:24 92:4
147:5 160:15
**james** 12:12
**jantz** 27:20

**january** 21:8
90:12,14,16
114:13 115:8
116:7,8,14
118:6,17 120:3
128:23 129:15
134:2,14 144:5
144:20 145:24
149:21 150:18
151:9 153:11
153:22 154:18
163:6 165:25
172:10
**jay** 27:19
**jihyung** 133:17
133:19,20
**jll's** 141:17
**joe** 118:20
131:21 141:15
143:23 153:23
154:9,19,24
155:22 157:25
158:4 162:7
173:5 174:2
**joined** 7:23
**joint** 23:23
41:10 56:14
119:4,6,8,11
131:9,13,20
133:2 134:18
139:9
**june** 19:5 79:17
80:3 82:5,13
83:2,14 85:2
86:10,24

**junior** 163:12
**jv** 52:25 53:6
53:18 54:5
99:6 102:12
137:7 162:12

**k**

**kasowitz** 1:17
2:9 4:23 5:18
5:21 74:4,12
**keen** 57:11
**keep** 57:12
78:17 120:15
163:12
**keeping** 56:25
**kind** 125:17
**kinds** 155:3
**kl** 33:16,18
**know** 6:22 7:6
11:22 17:9
25:6 26:17
39:4,14,15,17
40:4,25 41:17
41:19 43:4
45:23 46:3,11
53:8,13 54:10
54:12 60:20
79:3,11 80:14
85:16,17 98:18
105:22 107:5
124:20 126:7
134:25 136:13
154:25 155:24
164:20
**knowledge**
11:14,18 64:14

96:9 98:15,25
99:14 100:4
103:21 152:24
153:6
**known** 55:18
111:2,14
140:10
**kookmin** 1:4
9:19 10:11
14:4,5 15:7,7
19:16
**korea** 1:6 14:7
14:22,24 15:16
16:11,17 18:15
18:21 89:25
91:7,10,13
136:7
**korean** 1:5
15:12 18:17,19
**ktb** 1:5 14:18
14:20 15:13
16:12 17:5,14
17:21 18:5
90:7 92:2
103:12 129:16
129:18 136:5,9
141:14 142:11
143:22 147:4,8
**ktb0002424**
72:22
**ktb1760** 134:3
**ktb19048** 82:6
**ktb2196** 95:5
**ktb2298** 102:24

**ktb3266** 160:6
**ktb3370** 157:18
**ktb3609** 153:12
**ktb3822** 128:25
**ktb3864** 115:10
**ktb4152** 109:21
**ktb4200** 113:18
**ktb4532** 126:25
**ktb4557** 89:9
**ktb4609** 86:11
**kyobo** 15:23
116:19,24

**l**

**l** 3:2 6:5 133:23
**lacking** 40:9
**landlord** 96:24
**langston** 32:19
32:20 49:2
87:13 167:6
**language** 18:21
145:16 149:6
150:2
**large** 8:2 17:3
91:16
**largely** 52:23
**larger** 109:11
**late** 23:18
37:14,24 41:22
59:12 68:14
97:14 98:8
154:18
**latest** 47:18
**law** 169:18
**laws** 14:21

**leaned** 19:12
**lease** 138:6
158:8,14 159:7
**leased** 159:4
**leasehold** 20:17
20:21 137:18
147:21 169:17
**leasing** 125:11
125:16,22
126:2,13
127:21 128:2,6
128:7 129:23
136:17,21
138:4 141:10
142:18 154:2
154:24 155:20
165:4,8,10,12
172:16
**leave** 33:8
**leaving** 85:4
89:22
**lee's** 132:18
**left** 87:21
**legal** 14:21
83:9
**lender** 13:19
19:9,16 31:10
31:16 34:21
35:3,5,7,11,20
36:10,16,21
37:23 39:19
42:4 46:2
48:17 53:16
59:14 60:8
61:9 64:5

65:13,14 66:8
66:23,24 67:14
67:15 70:6
71:11,14 76:19
78:7,11,14,20
79:7 81:10
88:11,15 97:11
97:11 99:5
100:15,17
105:13,16
108:13,22
109:3 110:15
111:5,24 114:3
124:8 150:7
155:6 161:21
161:22 162:4
**lender's** 36:6
37:19 40:23
45:16 76:22
78:24 97:23
102:9
**lenders** 37:12
37:16 40:24
46:9 57:7 58:9
62:19 75:14,15
76:18 78:5
139:3 150:13
163:17
**lends** 139:14
**letter** 22:14,16
24:2 25:25
26:5,9,10,12,16
26:20,22 27:2
28:7,12,17
29:14 30:7

35:16 36:9
72:20 73:5,23
74:4,16,20
79:6 80:11
82:14 83:2
86:5 95:15,16
95:22,25 96:6
96:10,13,14
97:9,21 100:6
105:6,10,25
106:8 114:8
175:13,24
**letterhead** 74:5
**letters** 79:5
**level** 24:16 31:4
31:7 64:8
**leverage** 109:5
**leveraged**
164:2
**leveraging**
163:19
**levy** 29:9 30:21
31:2 71:8
118:20 153:24
170:23 174:3
**liability** 150:8
**life** 15:23,24
**liked** 171:8
**lim** 133:23
**line** 34:16
90:25 177:6
179:9
**lines** 100:12
**lisa** 84:6

**list** 10:13 43:19
  54:4,7,20
  55:18,25 56:2
  58:4,6 123:2
  161:14 167:9
  167:16,19,22
  168:2,4,6,18,21
**listed** 22:10
  55:6 124:3
  155:14
**listen** 6:24
**listings** 160:20
**lists** 33:13
  53:22 55:2
**litigation** 80:12
  81:8,19 86:3
  88:5 96:17
**little** 22:21
  80:13 169:11
**llc** 1:4,7,10 4:17
  4:18 7:15
  14:13 17:18
  20:12 75:10
  179:2
**llp** 1:18 2:4,9
  4:23
**loan** 14:10
  15:14 17:14
  19:5,17,21,23
  20:7,8 21:9,12
  32:5 34:25
  36:11,12,17
  37:10,23 38:7
  38:13,14,22
  39:16,20 42:6

46:16 55:12
  57:15,15 58:11
  59:21 60:14
  63:5 69:17
  75:11 81:16
  84:21,25 85:9
  90:12,15,18
  92:5 93:15
  94:10 95:18
  96:16 100:17
  106:13 107:13
  108:20,22
  109:6,15
  112:24 114:16
  117:24 118:10
  118:24 119:13
  122:6,10,19,21
  123:7,12,15,16
  123:18,20,22
  123:23,25
  124:4,7,11,23
  125:3 127:16
  127:19,19,23
  128:3,4,10,18
  134:19 135:2
  137:5,11,16
  139:9,23 140:2
  145:4 148:18
  149:8 150:25
  159:25 160:17
  161:6,9,24
  162:15,17,17
  162:19,21,24
  163:2,3,5,7,9
  163:12,13,23

163:23 165:2
  165:25
**loan's** 69:17
**loans** 102:14
  121:17 124:8
  145:2 147:13
  147:18 162:22
**lobby** 93:14
**located** 1:18
**location** 4:22
  157:7
**lockbox** 155:9
  155:11
**long** 7:18 41:17
  42:9,12 107:5
  132:6,8 138:6
  159:19 170:19
**longer** 122:12
**look** 22:5 43:2
  49:15 50:10
  51:23 54:19
  73:4 74:3,18
  82:12,14 95:11
  102:2 103:8,19
  119:7 122:24
  124:12,14,21
  144:12 154:4
  168:14
**looked** 50:16
**looking** 49:12
  53:20 54:22
  62:23 65:8
  73:19 82:18
  90:21 106:19
  119:14,17,23

134:20 135:4
  139:8 144:17
  151:8 156:20
**looks** 98:24
**lose** 59:15
  60:10
**lot** 12:12 70:5
  70:12 100:5
  153:21
**loud** 99:11
**lounge** 155:23
  156:7 157:7
**low** 132:8
  159:19,20
**lower** 108:13
  159:21
**lunch** 94:17,21
**luncheon** 138:9
**lying** 152:18,21

**m**

**m** 6:5 133:23
  175:4
**macgyver**
  146:22
**made** 15:4
  16:24 23:10
  24:22 30:11
  37:9 40:7
  43:12 45:19
  47:3 50:20
  56:14 57:4
  71:9 117:11
  125:19 131:16
  132:17

**madison** 6:20 140:5 172:24

**mahnoor** 2:7 5:24

**mail** 21:18 22:13 26:24 27:19 28:2 29:13,22 32:8 32:19 33:11,15 36:4 42:19 44:8 45:3 47:15,16,17 48:4,6,16,19,25 49:3,3,7,12,16 49:18,21,22,25 50:8,11,15,17 51:23,24 52:20 53:21 54:6,13 59:8 60:15,19 61:17,17 62:4 62:6 66:14 68:7 70:22 71:8,22,24 72:4 76:11 77:14,20 79:16 79:25 80:3,5,5 80:8 82:3,4,20 83:14 84:4 86:9,19 87:5 89:6,7,19 90:21 91:19 92:15,24 93:2 93:6,6,11,17 95:3 100:7 102:21,22

103:9,16,19,21 103:25 105:3 106:19 109:19 109:20 110:6 111:17 112:16 112:18 113:14 115:8 116:17 121:23,24 122:24 126:22 128:23 129:10 129:12,14,18 130:4,6,21 133:14,15,25 134:11,20,22 144:4,5,14 148:25 149:17 149:18,20 151:7,8 153:7 153:10,11,22 154:4,8 155:14 155:21 157:15 157:16,24 158:3,18 160:4 160:13,19 162:7 166:18 167:3,4,7,8 172:10 175:12 175:14,16,17 175:19,22 176:9,12,16,18 176:22

**mails** 11:12 89:17,23 90:5 144:18 145:22 175:20,21

176:3,4,6,7,8 176:10,11,14 176:19,20,21 176:23

**maintaining** 56:23

**major** 13:17 32:4

**majority** 25:11 101:7 132:3

**make** 29:7 39:23 46:5 53:9 108:11 119:25 120:5 123:13 132:24 168:25 170:2

**makes** 64:9

**making** 16:7,9 65:6 117:20 133:12

**management** 1:6 8:7 16:6,8 16:15 17:2,15 33:4 136:18,21 164:9 172:17

**manager** 13:10 15:13 16:17

**managing** 7:17

**march** 36:13 37:24 39:7 120:8,10,18

**mark** 2:12 5:17 5:17 6:10 9:22 13:2,5 21:17 21:17 26:23,23

29:11,12 32:6 32:7 42:17,18 44:6,7 47:14 47:14 58:20 61:15,16 70:20 70:21 72:19,19 73:16,21 74:10 74:10,12 79:15 79:15 82:2,2 83:12,13 86:7 86:8 89:5,5 94:15,25 95:2 99:20 102:19 102:20 109:17 109:18 113:13 113:13 115:4,7 126:20,21 128:21,22 133:24,24 140:13 144:2,3 152:8 153:9,9 157:14,14 160:3,3 166:17 171:16 172:2 174:9 175:6

**marked** 9:25 21:24 22:4 24:3 26:2 27:6 27:10 29:18 32:13 42:23 43:3 44:12 47:22 61:22 71:3 72:24 79:21 82:8 83:18 86:13

89:12 95:7,11
103:2 109:24
113:20 115:15
127:3 129:3
134:5 144:9
153:15 157:20
160:9 166:22
172:8
**market** 63:11
91:17 107:13
122:19 123:16
123:25 124:22
126:5,8,9
132:4 154:22
159:12,17
162:19,23
**marketing** 94:8
118:9 123:7,20
123:21,22
124:4,6,6
125:2 154:9,15
155:17 162:11
162:14 163:7
**marketplace**
157:4
**marking** 73:13
166:17
**markup** 120:21
**marquette**
140:5 172:24
**master** 21:10
21:12
**material** 25:12
156:14

**materially** 23:6
**materials** 11:2
154:10,15
155:17
**matter** 4:16
18:13 33:23
119:20
**matters** 31:3,4
31:6 90:7
**mayer** 95:17,22
96:6 98:5
103:12
**mcglone**
121:25 122:25
**mean** 22:23
40:14 47:17
98:7 120:12
121:7 150:15
151:17
**meaning**
118:16
**meaningfully**
102:9
**means** 40:18
69:25 70:4
**meant** 107:17
**media** 4:14
58:23 59:4
94:19,24
140:17,22
171:20,25
174:12
**mediator**
110:21

**medical** 13:15
**meet** 35:25
55:14,16 105:5
134:17 135:5
**meeting** 86:20
86:23 87:5,8
87:18,25 88:2
88:7,20 104:2
118:15 120:2
136:6 138:2
141:10,11,16
141:21,24,25
142:14,18
143:8 145:3
146:21 147:2,8
147:11 148:10
160:21 162:12
164:10 170:17
172:13,15
**meetings**
126:14 135:16
135:20,22
138:9,18
139:21 143:16
143:24 146:16
163:17 164:15
164:19,22
173:4
**member** 1:10
4:18 14:11
18:8,10 19:18
20:2 142:3
**members** 14:12
15:3 17:23
18:6 141:12

173:5
**membership**
20:11
**memorandum**
34:14,20
**memory** 11:6
11:10 154:17
155:18
**mentally**
171:12
**mention** 127:20
**mentioned** 7:5
18:23 34:24
53:5 90:25
93:6 117:2,6
127:6 131:22
143:18 167:14
168:5 169:3
**mentions** 74:25
128:5
**mesard** 31:18
33:12 49:7,25
50:7 51:2
57:18 58:2
60:18,25 62:7
62:18 72:4
75:13 76:3,12
76:13,15 77:15
77:16,22 78:3
79:17 80:2,16
80:19 81:4
84:4,22 85:6
85:20 100:15
167:7

| | | | |
|---|---|---|---|
| **mesard's** 50:11 | 23:1 24:1 25:1 | 111:1 112:1 | **microphones** |
| 50:15 52:20 | 26:1 27:1 28:1 | 113:1 114:1 | 4:5,9 |
| 60:15 | 29:1,9 30:1,19 | 115:1 116:1 | **mid** 68:14 |
| **messages** 11:12 | 30:20 31:1,18 | 117:1 118:1,19 | **middle** 7:7 |
| **met** 118:6 | 32:1 33:1,12 | 119:1 120:1 | **middleman** |
| 154:18 172:22 | 34:1 35:1 36:1 | 121:1 122:1 | 110:14 |
| **methodology** | 37:1 38:1 39:1 | 123:1 124:1 | **million** 8:8 |
| 128:12 | 40:1 41:1 42:1 | 125:1 126:1 | 19:17 28:13,18 |
| **mezz** 111:5 | 43:1 44:1 45:1 | 127:1 128:1 | 30:10 37:6 |
| 122:21 128:10 | 46:1 47:1 48:1 | 129:1 130:1 | 39:6 51:13,14 |
| 163:2 165:2 | 49:1,7,25 50:1 | 131:1 132:1 | 51:20 69:16,21 |
| **mezzanine** 19:5 | 51:1 52:1 53:1 | 133:1 134:1 | 100:6 107:22 |
| 19:9 20:8 | 54:1 55:1 56:1 | 135:1 136:1 | 108:4,17 109:9 |
| 34:17,21 35:3 | 57:1 58:1 59:1 | 137:1 138:1 | 109:10 |
| 43:9 65:14 | 60:1 61:1 62:1 | 139:1 140:1 | **millions** 69:13 |
| 66:24 67:14 | 62:6 63:1 64:1 | 141:1 142:1 | **mind** 57:25 |
| 75:11 76:19 | 65:1 66:1 67:1 | 143:1 144:1 | 67:9 156:9 |
| 78:7 97:11 | 68:1 69:1 70:1 | 145:1 146:1 | 157:6 |
| 100:15,16,17 | 71:1 72:1 73:1 | 147:1 148:1 | **mineola** 179:4 |
| 102:14 107:13 | 74:1 75:1,9 | 149:1 150:1 | **minimal** 38:24 |
| 110:15 114:3 | 76:1 77:1 78:1 | 151:1 152:1 | **minority** 25:10 |
| 123:16,22,25 | 79:1,17 80:1,2 | 153:1 154:1 | **minute** 58:19 |
| 124:4 125:3 | 81:1 82:1 83:1 | 155:1 156:1 | **misbah** 2:7 |
| 134:19 137:5 | 84:1,4 85:1 | 157:1 158:1 | 5:24 12:11 |
| 137:16 139:9 | 86:1,9 87:1 | 159:1 160:1,4 | **misleading** |
| 140:2 161:21 | 88:1 89:1,7 | 161:1 162:1 | 78:10,13,19 |
| 162:15,17,23 | 90:1 91:1 92:1 | 163:1 164:1 | **missed** 48:3 |
| 163:7 | 93:1 94:1 95:1 | 165:1 166:1 | 114:18 |
| **michael** 1:16 | 96:1 97:1 98:1 | 167:1,7 168:1 | **missing** 48:2,5 |
| 4:15 6:1,15 7:1 | 99:1 100:1 | 169:1 170:1 | **mixed** 120:16 |
| 8:1 9:1 10:1 | 101:1 102:1 | 171:1 172:1 | **modification** |
| 11:1 12:1 13:1 | 103:1 104:1 | 173:1 174:13 | 36:22 63:5 |
| 14:1 15:1 16:1 | 105:1 106:1 | 174:18 178:7 | **moinian** 8:4 |
| 17:1 18:1 19:1 | 107:1 108:1 | 179:7,22 | **moment** 22:5 |
| 20:1 21:1 22:1 | 109:1 110:1 | | 107:23 130:8 |

**money** 38:24
69:20 70:4,9
91:15 109:14
121:19
**monocle**
138:10
**month** 39:6
170:19
**months** 41:25
83:10,10,11
**morning** 4:3
6:11
**morrison** 2:4
12:10
**mortgage**
20:22 21:2,6,8
75:13,14 76:18
76:22 78:5,11
78:13,20,24
111:18,20,23
112:20 114:6
165:25
**move** 80:18
81:17
**multi** 70:2
**multiple** 60:22
73:11
**museum**
136:24 137:4
137:10 141:24
142:3 143:12
172:22
**mute** 4:7

**n**

**n** 2:2 3:2 175:2
175:4,4 178:2
**name** 4:25 6:14
14:16 17:7
18:9 58:14
74:25 92:6,9
92:13 133:22
143:11,13
179:6,7
**named** 86:5
91:22 110:7
133:16
**names** 12:14
15:21 58:5
**national** 97:2
127:19
**native** 18:21
115:12
**naturally** 35:25
**nature** 63:19
96:22 97:8
109:6 120:25
145:4
**necessarily**
35:12
**necessary**
18:18 102:11
109:14
**need** 8:20 35:4
35:6,9,10,11,13
52:14 55:13
73:14 108:11
109:3,4 116:18
117:15 154:9

154:14
**needed** 24:15
88:11,12
130:20 166:14
**needs** 50:20
**negate** 38:20
**negotiate** 36:9
**negotiated**
132:21
**negotiating**
23:23 112:7,9
132:20 164:10
**negotiations**
88:25 151:19
**never** 51:25
52:4 57:7
59:23 81:6
101:23 145:12
153:6
**nevertheless**
70:15
**new** 1:2,19,19
1:22 2:5,5,11
2:11 4:20,24
4:24 6:7,20,20
8:3 91:9 96:19
96:20,23,25
114:20 139:18
179:2,4,4,4
**newman**
146:13
**non** 101:17
123:9 137:3,9
**normal** 126:11

**notary** 1:22
3:15 6:6
174:25 178:6
179:25
**note** 4:4 116:12
116:14 144:21
164:3,3 172:25
174:6
**noted** 174:16
**notes** 178:11
**notice** 10:10
61:8 65:16
66:19 67:6,17
68:13 71:13
72:7 83:5,9
97:12 114:15
114:17 115:20
175:11
**noticed** 9:12
73:9
**notices** 9:7
11:11 61:4
71:10
**noticing** 5:15
**notified** 169:23
170:25
**november**
21:15 59:24
93:22 95:4,17
97:14 102:23
103:11 106:23
107:6,9,14
**number** 8:5
21:21 27:3
33:14,15 37:11

79:18 91:16
108:17,24
119:10 148:16
157:8 158:25
**numbered**
115:13
**numbers** 29:16
32:10 42:21
43:17 44:10
47:20 61:19
65:8 70:24
72:21 82:6
83:15 86:11
95:5 102:24
134:3 148:3
160:6 166:19
**numerous** 40:7
57:4,13 75:12
78:15 111:13

**o**

**o** 3:2 6:5 92:14
175:4 178:2
**oath** 5:6
**object** 36:18
**objection** 39:25
46:13 67:24
84:18 90:9
125:4 127:11
130:2 131:11
132:14 133:4
148:8 152:6
156:10,15
169:13
**objections** 3:10
5:10

**obligated** 38:16
38:21
**obligations**
37:17 40:7
57:13
**obliging** 38:13
**obtain** 22:16
35:24 36:5
76:18 78:6
81:3
**obtained** 24:15
26:20,22
**obviously**
71:24 78:17
118:3 132:4
**occasion** 50:6
**occasions** 75:12
**occupied**
130:17,17
**occupying**
137:24
**occur** 153:3
**october** 21:15
93:21 97:14
107:9
**office** 13:13
87:11 91:7,13
127:21 141:17
170:18
**offices** 1:17
91:8 146:20
**official** 81:6
93:13
**officially** 61:6
107:7,8

**okay** 19:25
20:6 26:15
27:13 99:23
114:25 141:2
168:10
**old** 179:4
**once** 16:4 34:6
34:7 113:6
117:24
**ongoing** 117:18
**online** 62:24
**open** 130:20
131:18 133:13
148:17
**operate** 13:21
**operates** 96:25
139:19
**operating** 64:4
64:7 130:21
131:18
**operation**
55:10 161:16
164:9
**operations**
154:2
**operator** 53:6
**operators**
52:25 54:5,21
139:3 167:10
167:16,23
**opinion** 55:19
100:5,24 101:2
101:4,13,14,16
102:17,18

**opinions** 99:17
99:19
**opportunities**
78:16
**opportunity**
119:18
**opposed** 99:18
149:4
**option** 115:21
115:22 116:4
164:4
**options** 63:6
111:21 118:11
**order** 8:19 35:2
36:16 73:10
75:17 88:13
**organized** 15:3
**originated**
14:10,25 17:13
**outcome** 5:9
36:9
**outstanding**
163:24,24
**overdo** 83:10
83:11,11
**oversaw** 33:4
**oversees** 18:17
**owed** 108:20
**own** 13:20,23
70:9 136:14
**owned** 8:2
31:25 124:8
139:17 166:13
171:10

**owner** 13:20
**owners** 139:2
**ownership**
  137:14,17
**owning** 137:24
  147:20,20
**owns** 17:19
  139:14,19

**p**

**p** 2:2,2 3:2
**p.m.** 151:10
  174:16
**pacific** 91:6
**page** 45:4
  48:24 50:3,12
  50:13 51:24
  52:20 54:23
  60:17 73:6
  74:4,19 80:6
  84:2,3 90:22
  91:20,21 92:16
  92:19 97:20
  99:2 102:3,4
  102:22 103:10
  107:20 110:6
  138:8 143:17
  151:7 154:5,7
  156:2,3,4
  173:11 175:10
  177:6 179:9
**pages** 73:15
  82:21,23 89:23
**pandemic**
  38:18

**papers** 153:2
**par** 111:24
  112:4,7,25
  113:10
**paragraph**
  74:19 75:4,5
  93:5 97:22
  98:4,4,10,13,24
  99:4,10,13,22
  99:24 100:3
  102:4 106:11
**parentheses**
  66:23
**park** 91:2,4
  116:18 129:16
**part** 34:10
  39:18 61:8,10
  73:23 101:3,10
  101:16,18
  129:20,20
  131:24 161:8
**partial** 24:21
**participants**
  143:20
**participate**
  43:23 164:14
  164:21
**participated**
  44:3 135:23
  141:7,11,24
  164:18
**participation**
  45:7,12 52:15
  52:22 75:15
  76:6

**particular**
  31:12 60:3,12
  156:8 171:6
**parties** 3:6 4:13
  18:20 46:2
  48:2,5,18
  54:14 55:3,6
  55:18 56:14
  62:22 65:6
  66:3,4,6,11
  67:2,21 68:3
  88:3,10 110:19
  111:8 119:9,22
  123:8,9 163:4
**partner** 52:25
  53:6,18
**partners** 54:5
  134:18 162:12
**party** 5:7 14:14
  19:6 23:24
  37:25 40:14
  48:17 53:9,11
  53:24 54:21
  55:9,14,22,24
  57:12 64:7,8
  66:15 69:12
  70:6 81:11
  150:4,6 178:13
**passive** 16:2
  117:7
**past** 36:21
  79:10 105:13
**path** 37:21
  118:8

**patience** 37:20
  60:20
**pay** 37:4
  147:24
**paying** 36:22
  162:2,3,3
**pending** 24:5,7
  28:11 38:19
  39:4 40:17,20
  41:8,9,18
  65:15 66:17
  67:5,16 80:10
**people** 22:11
  33:15 57:22
  64:9 123:10
  135:25 136:7,8
  137:15 162:20
  172:16,21
**percent** 25:4
  128:3 171:10
**percentage**
  25:7,9,10
**perception**
  101:19,23
**perform** 78:17
**period** 31:9
  37:2 101:25
  159:19
**person** 87:12
  90:25 145:23
  146:7,16,23
  147:4,11
**personally**
  14:12 62:23
  64:16,21

171:11
**persons** 89:25
**persuade** 36:16
65:20
**phil** 2:19 4:25
**phone** 44:5
111:8 153:7
**phones** 4:8
**photos** 62:9
**physically**
62:13
**pick** 4:6 48:8
**pictures** 62:24
65:8
**pif** 41:11,13
119:2
**pile** 140:25
**pin** 22:20
**pitch** 127:9
128:4 142:20
142:23 143:4,6
143:9 176:15
**pitched** 125:13
**pitching** 127:8
127:16 128:9
136:20
**place** 4:8,12
11:8 17:8
18:24 60:6
90:20 107:6
109:8,10
121:18 134:13
135:14,17,20
135:22 141:16
141:22 142:15

146:19
**plaintiff** 10:11
17:16
**plaintiffs** 1:8
2:4 5:25
**plan** 116:19
117:21 130:7
131:8,9,13,20
131:24 132:24
132:25 133:2,7
**planning**
152:22
**platform** 91:15
127:23
**play** 173:9
**please** 4:4,7
5:11 6:3,13,24
7:2 22:4 80:20
84:6 158:4
172:9
**pleased** 86:6
**pocket** 143:2
**point** 7:5 22:16
24:25 26:9
31:15 33:21
37:11,22 50:19
50:24 52:7,7
52:11,13 57:16
62:9 70:14
81:24,25 83:6
83:8 85:22
86:2 93:23
96:13 106:17
112:10,15,25
124:9,24

125:10 130:14
131:7 132:5
139:5 150:16
150:17 159:9
164:16 165:12
165:14 167:15
169:20
**pointing** 49:11
149:19
**points** 113:2
138:17 143:19
166:16
**porter** 27:20
**portfolio** 33:5
127:18
**portion** 100:25
137:5,24
**position** 7:16
32:24 68:8
163:20 164:2
171:14
**possibility**
118:25 138:3
**possible** 130:21
131:17
**possibly** 94:8
142:12 157:13
**post** 7:22 8:20
8:22,24 17:24
90:14 125:6
**potential** 23:9
23:11,12,16,23
24:5,7,10 28:8
34:8 38:3,15
52:25 53:5,10

55:23,24 69:12
69:14 81:7,21
88:24 119:3
126:15,16
139:22 167:9
167:16,22
**potentially**
45:8 46:24
66:9 97:4,6
109:4 118:24
147:20 149:9
**power** 117:20
**practice** 90:11
90:13,17
**pre** 158:23
**preapproved**
54:5,21 58:4
**preceding**
121:21
**precluded**
145:20
**predatory**
78:21
**preliminary**
61:9 167:9
**premise** 77:17
77:23
**premium** 45:17
45:22 46:8,15
46:22
**prenegotiation**
105:6,10,25
106:7
**prepare** 10:23
12:17 87:8

prepared 34:14
147:16,23
171:12
preparing
107:21 116:19
117:3
present 2:18
136:9 141:14
142:4 164:23
presentation
125:19 128:18
president 8:6
33:2
press 31:6
118:20 131:21
136:15 141:15
143:23 153:23
157:25 162:8
173:5 174:2
press's 126:18
pressure
100:14
pressured
101:20
pressuring
78:12 101:14
101:15
previous 49:4
49:18 68:24
79:12
previously
12:20 17:5
21:14 26:8
36:24 43:10
104:24 106:15

122:14 125:25
148:15 159:22
162:5 169:19
price 111:25
112:4,7 113:10
primarily
13:16 96:24
principal 7:17
45:16
prior 7:23,25
8:10 11:7
12:20 18:22
19:15 20:25
21:14 42:9
53:21 54:6
60:9 90:11
107:10 125:8
152:25 158:5
159:6 170:6
171:3 173:4
private 4:7
privately 8:2
139:17
probably
149:25 152:13
problem 47:11
104:8
proceeding
5:11 169:4,8
proceedings
76:20 78:8
process 23:22
61:5 90:6
107:15,16,17
122:13,16,21

processes 88:11
produce 168:9
produced
11:15,19,25
12:3 48:8
73:17 115:11
producing 37:3
production
53:25 54:9
professional
1:20
profile 96:18
96:19
profit 45:7,11
52:14,21 137:3
137:9
progress
160:16,25
161:15
project 57:10
projected
36:25
promises 36:14
40:8
prompted 80:7
pronounce
92:8
pronouncing
110:8 140:6
proof 28:22
148:5,5
properly 56:24
properties 8:9
property 31:7
37:3 40:22

62:12 65:12
96:20 126:2,4
128:11 135:6,9
135:11,11,14
135:24 136:14
136:18,21
141:7 142:16
147:20 148:14
148:15 150:24
155:16 158:10
159:14 162:3
166:12 172:17
173:2,10 174:5
proposal 34:17
34:21,24 37:9
39:18 42:3
43:9,22,22
44:20 45:6,19
50:16 59:8
88:3,8 101:15
120:20
proposals
53:23 58:15
81:23,25
100:19 101:6
101:17,24
120:2,6,10,18
120:23 121:2
121:14
propose 36:15
165:9
proposed 25:2
31:5 36:20
39:2 40:25
41:4,10 51:21

51:22 65:21
68:8 76:5
77:19,23
130:23 148:23
160:21
**proposing** 37:6
45:14 51:8,10
158:19
**prospective**
55:5 60:8
126:7 134:17
137:15 154:20
155:19 156:6
156:12,18
158:2,16
172:25 174:6
**protecting**
151:4
**provide** 56:6
96:4 103:16
123:7,8 148:6
**provided** 11:3
11:5 28:21
30:17 39:11
65:16 66:19
67:6,17 75:6
75:22 77:4
98:5 127:15
141:18 149:7
**providing**
38:10 102:11
**provision**
105:11
**provisions**
113:9

**prudent** 159:8
**public** 1:22
3:15 6:6 41:15
139:13 174:25
178:6 179:25
**pull** 47:5
**purchase**
111:24 112:4,7
112:24 113:4
113:10 114:5
114:15 115:21
116:4,12
**purchased**
116:13
**purchasers**
172:25
**purchasing**
123:11
**purpose** 14:23
36:3,8 87:24
96:12 103:15
129:17 134:15
135:8 149:7,12
149:13
**purposes** 21:20
**pursuant** 9:6
**pursue** 111:21
**put** 28:18 52:9
108:23 109:14
154:21
**putting** 97:12
121:10,19

**q**

**qualifications**
35:25
**qualified** 35:16
55:15
**qualify** 55:8,14
55:19
**quarter** 120:23
**question** 3:11
7:7,8 9:9 10:5
22:6 39:9 52:2
64:20 65:3
66:21 68:22
69:3 83:3,23
90:4 98:12
99:18,25
141:21 166:14
173:8
**questions** 6:23
6:25 82:15
172:3 174:8,10
**quick** 169:16
169:21
**quote** 75:16,16

**r**

**r** 2:2 6:5 177:3
178:2
**raised** 91:15
**range** 73:19
89:9 109:21
113:17 115:10
126:24 128:11
128:25 144:6
153:12 157:17

**reach** 80:20,23
81:13
**reached** 93:14
111:23
**reaching** 80:16
**reaction** 56:18
56:21
**read** 75:3,20
77:2 99:10,11
99:12,24
100:10 102:8
130:5
**reading** 76:9
**real** 8:3,9 13:10
13:21 96:25
138:25 139:14
139:19 140:10
155:11 162:8
**really** 82:15
97:2 104:11
154:9
**realtime** 1:21
**realty** 139:12
**reason** 58:7
60:3 66:20
73:13 83:4,7
91:12 106:5
171:6 179:9
**reasonable**
52:14 68:18
159:25
**reasons** 145:14
149:16
**rebibo** 1:17
4:16 6:1,15 7:1

| | | | |
|---|---|---|---|
| 8:1 9:1 10:1 | 96:1 97:1 98:1 | 167:1 168:1 | **receive** 25:20 |
| 11:1 12:1 13:1 | 99:1 100:1 | 169:1 170:1 | 25:25 26:9,13 |
| 14:1 15:1 16:1 | 101:1 102:1 | 171:1 172:1,7 | 28:2 29:5 |
| 17:1 18:1 19:1 | 103:1 104:1 | 173:1 174:13 | **received** 22:12 |
| 20:1 21:1 22:1 | 105:1 106:1 | 174:18 178:8 | 24:2 26:4,4,17 |
| 23:1 24:1 25:1 | 107:1 108:1 | 179:7,22 | 26:18 28:7,17 |
| 26:1 27:1 28:1 | 109:1 110:1 | **recall** 12:13 | 68:13 148:13 |
| 29:1,21 30:1 | 111:1 112:1 | 22:18 23:4,18 | **receiving** |
| 31:1 32:1 33:1 | 113:1 114:1 | 26:3,6,12,14,16 | 152:25 |
| 34:1 35:1 36:1 | 115:1 116:1 | 26:19,21 29:25 | **recess** 58:25 |
| 37:1 38:1 39:1 | 117:1 118:1 | 30:6 34:7,11 | 94:21 140:19 |
| 40:1 41:1 42:1 | 119:1 120:1 | 42:7,13,16 | 171:22 |
| 43:1 44:1 45:1 | 121:1 122:1 | 44:4 51:18 | **reciprocated** |
| 46:1 47:1 48:1 | 123:1 124:1 | 59:10 71:19,23 | 57:7 |
| 49:1 50:1 51:1 | 125:1 126:1 | 72:2,8,10,17 | **recognize** 22:7 |
| 52:1 53:1 54:1 | 127:1,6 128:1 | 81:22,23 83:7 | 27:11,14,17 |
| 55:1 56:1 57:1 | 129:1,6 130:1 | 85:10,11,12,14 | 32:16,17 43:4 |
| 58:1 59:1 60:1 | 131:1 132:1 | 85:15,18 87:21 | 44:15,17 89:19 |
| 61:1,25 62:1 | 133:1 134:1 | 88:17 89:3 | 129:11 |
| 63:1 64:1 65:1 | 135:1 136:1 | 107:2,8,10 | **recollection** |
| 66:1 67:1 68:1 | 137:1 138:1 | 111:4,5 114:14 | 92:22 106:20 |
| 69:1 70:1 71:1 | 139:1 140:1,23 | 115:25 117:8 | 144:19 157:2 |
| 71:6 72:1 73:1 | 141:1 142:1 | 119:2 120:7 | **recommend** |
| 73:3 74:1 75:1 | 143:1 144:1 | 121:14,18 | 62:11 |
| 75:9,14 76:1 | 145:1 146:1 | 122:8 136:4 | **record** 4:3,13 |
| 76:13,15,17 | 147:1 148:1 | 141:13 142:3 | 5:15 6:14 13:2 |
| 77:1,16 78:1,2 | 149:1 150:1 | 142:10,13 | 13:4,6 18:25 |
| 78:5 79:1 80:1 | 151:1 152:1 | 143:5,9 145:10 | 20:11 48:12 |
| 81:1 82:1,11 | 153:1 154:1 | 145:13 146:10 | 58:24 59:3 |
| 83:1,21 84:1 | 155:1 156:1 | 146:12,15,23 | 94:20,23 |
| 85:1 86:1,9 | 157:1 158:1 | 147:7 154:22 | 115:19 140:18 |
| 87:1 88:1 89:1 | 159:1 160:1,5 | 156:25 158:17 | 140:21 171:21 |
| 89:8,15 90:1 | 161:1 162:1 | 164:20 | 171:24 174:14 |
| 91:1 92:1 93:1 | 163:1 164:1 | **recalled** 92:3 | **recorded** 4:15 |
| 94:1 95:1,10 | 165:1 166:1,25 | | |

recording 4:11
recovered
  45:15
redacted 30:7
reengage 80:17
reengaged
  122:15
refer 19:25
  20:6 41:13
  108:2 161:17
  162:13 163:18
  165:7,20,22
  166:9
reference 34:16
  77:21 104:23
  163:16 165:4
referenced
  35:15 100:7,7
  127:17
referred 9:24
  14:17 21:23
  27:5 29:17
  32:12 40:11
  42:22 44:11
  47:21 61:21
  67:4 71:2
  72:23 79:20
  82:7 83:17
  86:12 89:11
  95:6 102:25
  109:23 113:19
  115:14 117:22
  127:2 129:2
  134:4 144:8
  153:14 157:19

159:13 160:8
  166:21
referring 19:3
  22:12 40:13
  41:7 46:19
  48:13,23 53:4
  53:7 54:19,24
  66:7 72:14
  74:7 83:2
  84:13,20 85:20
  85:24 127:10
  131:9 136:11
  136:15 149:3
  152:20 156:5
  159:15
refers 122:25
  130:22 139:5
  155:24 161:4
  161:18 163:19
  165:8
refinance
  108:12 109:2
refinanced
  164:6
refresh 106:20
refreshed 11:6
refreshing
  11:10
refusal 76:23
  78:25
regard 105:9
regarding 32:5
  52:21 76:24
  79:2 90:17
  103:16 122:20

145:17 157:25
  162:8 165:10
regardless
  38:17,18 40:19
  117:19
regional 127:25
registered 1:20
regular 30:24
  30:25
regulations
  15:11
reinstate 39:20
  46:16 59:21
  60:13 108:22
reinstated
  58:12
reinstating
  81:16
reit 139:13
reiterated
  76:13 77:16
related 5:6
  16:18 31:3,3,7
  101:2,4 153:25
  154:17,20,23
  155:16,19
  161:23 178:13
relating 90:7
  129:19
relationship
  14:3 16:21
  17:12 111:7
relative 38:25
relatively 69:20

releasing 161:7
relevant 108:5
reluctant
  145:19
rely 40:24
remain 131:17
remember
  143:11 167:13
removed 47:7
  48:20 58:14
rendering
  154:10
renderings
  155:18
rent 128:14
  155:13 158:5
  158:15,17,23
  159:2,19,20
  162:2
rents 132:8
  159:6
repeat 20:4
  99:25
replace 158:21
replaced 97:17
replacement
  133:21
reply 47:8
report 77:3
  103:25 117:14
reporter 1:21
  1:21 5:3 6:3
  29:12 32:7
  42:18 44:7
  61:16 70:21

83:13 86:8
95:2 102:20
109:18 115:7
126:21 128:22
144:3 178:6
**reporting**
117:3,17,18
123:12 179:2
**representative**
9:15,18 111:4
**representatives**
31:10 86:25
**represented**
33:20,25 36:4
**representing**
5:2 33:22 34:4
104:6 128:19
**reputable**
138:25
**request** 29:8
39:23 47:4
71:9,15,18
99:7 121:13
**requested**
36:24 100:13
121:11 123:5
145:2
**requesting**
101:6
**requests** 89:24
132:18 153:24
**required** 63:15
63:22 108:6
**requires** 35:14

**requiring**
75:15
**reserved** 3:11
**reserves** 108:23
109:5 161:7
**resolution**
37:22 59:21
81:15 88:4
94:13 106:4
118:9 121:3,7
161:2 166:3
**resolve** 60:13
**resolved**
161:10,11,12
**respect** 31:4
64:18,25 68:8
75:24 77:7
93:12 124:25
**respective** 3:5
**respond** 49:17
108:7 148:7
**responded**
71:17
**responds** 71:14
80:19
**response** 47:8
48:5 50:15
52:19,23 71:9
71:21 72:6
79:6 80:2 81:7
100:14 149:21
**responsibilities**
38:21 155:8
161:22

**responsibility**
161:16,20
**responsible**
162:2,5
**rest** 98:22,23
172:19
**restaurant**
138:10,14
**restructure**
57:15
**restructured**
58:12
**restructuring**
88:25 118:23
165:18
**result** 25:3
36:10 43:13
44:24 60:6
88:6
**resulted** 38:10
**resurrecting**
118:25
**retail** 13:15
127:21
**retailers** 130:9
**retain** 107:12
143:3
**retained** 93:18
106:17,21,24
107:7,9,11
143:5,10
**retaining**
121:16
**review** 161:15

**reviewed** 10:16
10:24,25 11:3
11:11,15,19,23
127:13 167:21
170:21
**reviewing** 12:6
**revolves** 128:12
**rexmark** 1:4,6
1:7 4:16 7:15
7:19,24,25
11:24 12:2
13:8,9,22 14:4
14:7,10,11,13
17:13,17 32:23
32:25 33:6
34:14 53:17
55:8 75:10
89:25 90:6
91:6,8 93:17
106:21 120:11
126:12 131:10
131:15 141:13
149:24 150:15
179:6
**rexmark's**
17:11 50:17
53:14
**right** 17:25
90:2 105:23
112:24 113:4
114:11 148:24
158:9
**rights** 32:3,4
114:4

**risk** 151:12
**road** 179:4
**robert** 110:7,9
**rochkind** 146:4
 146:22 151:9
**roger** 31:17
 33:12
**role** 16:4,5,9
 18:13,14 31:24
 33:18 55:6,22
 57:2,14 93:10
 93:13 110:12
 122:7,9,18
 124:7,25 125:6
 125:9 134:23
 162:6 173:9
**room** 141:17,19
**rounded** 43:18
**routinely** 72:16
**rules** 15:10
**run** 37:20
 107:15
**running** 60:20

**s**

**s** 2:2 3:2,2
 175:8 177:3,3
 179:9
**sage** 138:21
 172:23
**sake** 18:25
**sale** 93:15
 106:13 118:10
 122:19 123:20
 124:23 127:16
 127:20 128:4

 128:18
**sales** 127:24
 128:4 135:2
**satisfied** 170:24
 171:7
**saudi** 41:16
**saw** 30:2
**saying** 26:13
 57:20,22 58:3
 78:11 80:20
 104:14 109:13
 120:15 123:14
 130:18 151:24
 152:11,13
 170:4
**says** 34:16 45:4
 60:18 66:16
 70:3 77:13
 84:6 100:13
 107:21 127:19
 130:4,7 135:5
 148:24 151:11
 151:17 152:7
 154:8 160:19
**scenario**
 108:21,25
**scenarios**
 108:19 119:11
**scharf** 2:6 5:23
 5:23 12:11
 36:18 39:25
 46:13 58:16
 67:24 73:8,18
 77:9 82:19,24
 84:17 90:9

 99:15,23
 114:22 115:2
 120:12 125:4
 127:11 130:2
 131:11 132:14
 133:4 148:8
 152:6 156:10
 156:15 169:13
 172:4,6 174:7
 175:6
**scheduled**
 114:13 118:5
 135:18
**scheme** 76:21
 78:23
**school** 7:22
 8:11,22 9:2,3
**scope** 124:18
**se** 59:19
**sealing** 3:6
**sean** 134:21,22
 172:11
**second** 73:6
 80:5 84:3 99:4
 110:6 134:21
 153:20 154:5,7
 170:16
**section** 128:2
**sectors** 16:25
**see** 10:13 27:21
 28:14 33:16
 34:18 45:9
 47:7 48:3,18
 50:21 51:4
 53:2 54:22

 60:23 62:15,22
 64:9 65:7,18
 74:5,7,13,20
 79:4,6 83:25
 84:11 87:6
 91:2,23 92:17
 93:8 97:24
 99:8 100:20
 102:5 103:12
 104:3 105:6
 106:13 107:20
 107:24 108:14
 116:21 122:2,4
 123:2 124:16
 127:24 133:18
 136:25 138:11
 138:18,22
 149:16,20
 151:22,23
 154:5,12
 158:11,18
 164:12 165:4
 168:3,15
 171:17 172:13
**seeking** 46:15
 46:22 111:17
**seem** 133:16
**seems** 73:10
**seen** 26:10,11
 26:15 27:16
 29:21,23 30:7
 64:16,22 98:19
 170:22
**selectively** 58:7

**self** 76:21 78:23
**sell** 163:11
**selling** 148:17
  149:8 150:25
**send** 80:7 83:8
  156:13
**sending** 83:5
  96:13
**senior** 19:21,23
  31:10,16 32:2
  35:5,7,11,20
  36:5,10,16,21
  37:2,4,19,23
  40:23 42:4
  45:15 46:2,9
  48:17,21 53:15
  55:11 58:9
  59:13 60:7
  65:13 66:8,23
  67:14 71:11,14
  79:7 81:10
  85:9 88:11,12
  88:15 90:12,15
  90:18 97:10,22
  99:5 102:8,13
  105:13,16
  108:12 109:6
  109:15 112:24
  114:5,16
  116:12,13
  122:6 123:15
  123:18,23
  124:7,11
  144:21 145:4
  155:5 160:17

161:6,9,22
  162:4,17,19,21
  163:3,5,9,12,22
  163:23
**sense** 60:2
**sensitive** 4:5
**sent** 33:11
  49:18 61:3,8
  62:10 71:21
  80:3 89:25
  93:7 120:20
  124:3
**sentence** 62:5
  62:18 77:10,10
  77:12,18,24
  100:11,22
  102:7 130:6
**seog** 91:22,25
  92:2,7
**seog's** 133:21
**separate** 15:5
  20:22 57:24
  67:18 73:12
  92:23 124:10
**september** 1:13
  89:8 93:17
  126:23 179:7
**sequence** 73:20
**service** 16:16
**servicer** 15:12
  16:11 21:5,9
  21:11,14 31:17
  31:22 75:10
  96:16 97:18
  100:18

**services** 21:9
  95:19 125:14
  127:8,18
  136:22
**servicing** 21:13
  36:23
**serving** 76:21
  78:23
**settled** 161:13
**seven** 83:10
**several** 24:14
  116:25 170:14
**shape** 172:19
**share** 25:11
  171:13
**shared** 150:11
**shareholders**
  15:2
**sheet** 52:2
  165:19 170:21
  170:25 179:2
**sheets** 166:5
  170:15
**shop** 132:18
**short** 20:15
  58:18,25
  130:10,13
  131:22,25
  132:13 140:14
  140:19 171:17
  171:22
**shortfalls** 36:25
  51:3 52:10
**shorthand**
  178:5

**show** 9:21 22:3
  27:9 47:6
  69:22 147:15
  147:16
**showing** 58:6
  129:6
**side** 11:21,21
  18:17
**sign** 105:25
  106:7 124:9
  130:8 145:14
  145:19
**signature**
  178:17
**signed** 3:14,16
  74:9,10,12
  145:12 150:2
**significant**
  25:18 41:2,6
  148:16 165:15
  169:10
**significantly**
  40:9 159:3
**signing** 132:13
  149:4,16
**similar** 20:3
  39:23 84:23
**simple** 83:3
**simply** 10:5
  22:6
**sincerely** 39:4
**single** 14:23
**situation** 62:13
  64:6 86:6
  150:5 158:9

159:14
**six** 41:25 83:10
**size** 24:18
38:25
**skipped** 53:25
**sl** 21:10 96:15
97:16 104:6,9
104:15,17
110:11,24
111:5
**slg** 161:2
**slightly** 98:7
159:21
**sole** 1:10 4:18
19:18 20:2
159:24
**solely** 43:24
**solution** 80:18
119:24
**solutions** 81:18
81:21 119:3
**solve** 69:19
**somebody**
48:20 136:5
**soon** 132:10
**sorry** 11:16
40:10 41:12
92:11 94:2
101:9 116:9,10
120:15 168:24
**sort** 45:17
112:4 137:6
**sought** 76:18
78:6,14 90:6
97:3 132:21

**sources** 74:23
75:8
**south** 14:6,22
14:24 15:15
16:11,17 18:15
18:16,19,20
89:25 91:7,10
91:13
**southern** 1:2
4:20
**sovereign**
24:11 25:4
**space** 130:16
130:20 137:21
156:20 157:9
158:6,22,22,24
165:4,8,10,12
**spaces** 138:4
159:4
**span** 80:15,15
**speak** 12:7,16
18:19 81:5,11
**speaking** 12:15
**special** 21:9,14
31:17,21 36:23
96:16 97:17
100:18 110:15
**specialist** 128:6
128:8
**specific** 24:12
30:16 48:13,22
72:8,11,17
81:20 83:6,23
85:4,15 87:20
89:2 91:12

98:3 100:9
119:25 120:5
121:5 133:10
144:18 145:13
149:7,12
164:17,20
169:12 170:10
**specifically**
9:17 24:23
25:22 66:16
67:4 71:13
85:21 87:23
97:21 139:25
148:21
**specifics** 43:19
157:2
**specified** 67:14
**spell** 92:12
**spend** 8:16
**spent** 8:18
**split** 45:24,25
46:17 152:2
**spoke** 12:8
154:10 161:18
**spotlight** 86:4
**spreadsheet**
65:9 124:13
**square** 8:8
179:4
**standard** 149:5
**standing** 36:12
**standpoint**
129:23
**stands** 70:7

**start** 116:19
**started** 59:5,23
**state** 1:22 5:11
5:13 6:7,13
63:12 152:12
152:14
**stated** 76:15
78:2 147:13
**statement** 76:2
76:7 78:9,10
78:13,19,19
79:4 102:16
131:5
**statement's**
79:11,14
**statements**
79:12 126:17
**states** 1:2,6
4:19 13:11,18
14:10,15 17:22
139:15
**station** 1:4,10
4:17,18 14:13
17:17 19:18
20:2,12,18
23:13 55:10
65:5 84:14
90:8 93:12
103:17 124:14
125:2 126:13
129:19 130:10
135:6 137:22
137:25 138:4
138:14 141:18
158:2 160:16

169:8 179:6
**status** 103:17
**stay** 150:11
**staying** 121:18
**stenographic** 178:11
**steps** 61:9
**stipulated** 3:4,9 3:13
**stop** 34:4 75:19
**stopped** 33:22 60:4 123:19
**stores** 133:12
**strategy** 129:22 129:24 130:12 130:14,15,19 130:19 132:12 169:9
**street** 127:21
**strike** 52:24 122:23
**structure** 45:8
**structured** 137:7
**su** 32:19,21 49:2 87:13 107:14
**sub** 17:20 150:24
**subject** 20:22 144:23
**submit** 101:15
**submitted** 100:17 101:17 101:24 120:19

**subscribed** 174:21 179:23
**subsequently** 80:23
**subsidiary** 16:22 18:3
**substance** 88:22
**substantial** 24:22 91:14 156:20
**sufficient** 25:15 38:11 39:12
**suggesting** 112:8
**suite** 6:20
**summaries** 86:20
**summarize** 92:16
**summary** 87:5 87:9,16,17,22 93:3 122:25
**sunday** 103:11
**superior** 64:15
**support** 65:21 70:17 133:8 168:17
**sure** 6:22 9:10 30:18 38:6 40:16 46:5 47:13 68:23 100:10 106:17 123:13 132:24 133:12 136:20

168:25 170:2
**surprise** 153:8
**swear** 6:3
**sworn** 3:16 6:6 174:21 178:8 179:23

## t

**t** 3:2,2 175:4,8 177:3 178:2,2
**take** 4:12 7:6 7:10 17:8 22:5 40:15 43:2 55:9 61:10 62:11 74:3 77:10 82:12 95:10 103:19 109:8 115:4 124:13 135:14 135:17 137:14 137:17 140:14 141:22 142:15 144:12 146:19 152:25 154:3 169:16,21 171:16 172:8
**taken** 12:23 58:25 94:21 96:15 140:19 169:17 171:22
**talked** 38:25 81:17 133:14
**talking** 20:7 24:9 31:13 59:9 77:18 81:11 85:3

110:16 111:16
127:22 128:15
128:16 132:23
141:3 162:14
163:8
**talks** 138:9 155:2
**target** 123:2 124:2
**taxes** 155:12,13 162:3,9
**team** 127:17,20 135:2
**technically** 110:25 169:17
**telephone** 145:24 146:7
**tell** 28:6 47:12 49:11 60:25 75:4 95:12 99:12 103:20 129:7 148:22 149:2
**telling** 57:17
**ten** 80:15 114:13,15 158:8,14 159:7
**tenant** 128:13 136:24 141:24 143:12 150:23 150:24 156:6,9 156:13,18,22 156:24 157:3 157:10 158:2,6 158:18 164:18

172:22
**tenants** 126:8
126:15,16
131:18 132:20
158:16,19
164:10,11,15
164:22
**term** 52:2
130:10,13
131:22,25
132:6,8,13
138:6 159:19
165:18 166:5
170:15,16,20
170:24
**terminated**
130:11 131:23
**termination**
80:9
**terms** 35:8
55:15,16 101:5
112:18 159:11
161:19 170:24
171:7
**testified** 6:8
26:8 97:15
104:24
**testify** 10:19
**testimony**
49:24 50:5
55:20 117:8
**text** 11:12
**thank** 47:9
**thanks** 154:8
155:22

**theirs** 34:9
64:15
**theoretically**
35:21
**thing** 53:20
57:22 82:14
152:14 157:5
**things** 24:13
25:19 34:23
35:14,17 45:5
57:18,21 60:6
94:14 109:6
151:19 155:3
159:10,11
162:9
**think** 7:4 25:8
26:7 31:20
48:10 49:10
51:20 53:23
59:5,18,20
60:5,11 62:24
63:7,9,10,17,18
63:21,25 64:3
64:19 65:2
90:23 97:15
109:9 117:5
119:17,18
121:6,12 125:9
126:17 132:6
135:19 155:19
164:17 168:10
168:13 170:16
171:8,12
**third** 2:5 23:24
52:13 53:9,11

54:21 55:3,6
55:14 69:12
74:19 146:23
170:16
**thorough** 62:10
**thought** 62:21
62:25 64:17,22
65:25 159:16
167:15
**threat** 86:3
**threatening**
80:12
**three** 15:4,17
30:22 138:16
138:17 139:5,7
139:21
**threshold**
45:18
**thursday** 62:8
**time** 3:11 4:8
5:12 8:16
17:25 19:19
20:4 21:7,13
23:7 28:16
30:7 31:9,15
31:22 32:25
33:19 35:4
37:2,22 41:3,6
44:5 47:18
58:18 59:17
60:14,21 65:25
68:6 69:22
72:16 78:22
83:6,8 85:22
86:2 92:3

93:10,16,23
94:6,12,16
95:21 101:25
104:13,19
105:14,19,24
111:15,22
121:12 123:23
124:9 130:14
132:5 135:12
136:14 143:7
152:15,24
155:4 159:9,12
159:20 163:3
169:20,20
172:3 174:16
**timelines** 41:20
**times** 127:7
179:4
**title** 169:17
**titled** 87:5
**today** 6:23
10:23 12:20
152:18
**told** 25:19
28:20 38:4
40:21 58:2
75:14 85:6
94:6 168:20
**tomorrow** 84:7
**took** 11:8 18:24
60:5,6 90:20
107:6 109:10
135:20,22
141:16

| | | | u |
|---|---|---|---|

**top** 47:17 49:3
  50:13 61:17
  62:6 82:4 84:3
  89:7 90:22
  91:21 92:15,18
  102:4,22
  109:20 116:17
  133:15 140:24
  143:16 144:4
  154:4 155:21
  156:2,3 157:16
  158:4 160:18
**topics** 10:13,17
  10:20,25
**torres** 1:18 2:9
  4:23 5:18,21
  74:5
**total** 25:14 37:5
  158:21
**touch** 31:6
  104:9
**tour** 135:6,9,10
  135:14,24
  141:7
**toured** 135:11
  173:3,5
**touring** 62:13
  65:12 173:2
**tours** 173:10
  174:4,5
**towards** 37:21
  102:11 118:8
**town** 135:12
**tracking** 60:21
  61:2

**transaction**
  15:9 24:5,7
  28:11 38:19
  39:5 40:17,20
  40:25 41:5,8,9
  41:21 56:15
  59:12 65:15
  66:18 67:5,12
  67:16,19,22
  68:9,18 69:12
  69:15 70:8,18
  75:18 76:5,25
  77:19,23 79:3
  79:8 80:10
  84:10,14 97:4
  97:13 102:12
**transactions**
  38:16 111:13
**transcription**
  178:11
**transfer** 35:16
**transition**
  161:16
**transitioned**
  155:5
**transitioning**
  161:19
**trial** 3:12
**tried** 168:17
**trip** 62:11
  134:13,16
**true** 79:4,11
  96:10 98:13,24
  99:13 100:3,22
  100:25 103:21

117:10 178:10
**trust** 1:5 16:2
  21:3 50:20
**trustee** 1:5 14:5
  14:8 15:12
  19:16
**try** 22:20 48:22
  106:3 118:8
  166:3
**trying** 57:3,24
  59:25 60:13
  62:17 63:14,24
  64:24 65:20
  67:8 111:19
  119:19,23
  123:16 129:25
  154:21 168:10
  168:12
**turn** 48:24 80:4
  97:20 99:2
  116:15 151:7
**turning** 42:2
  138:8 141:9,23
  143:15
**two** 9:6 23:5
  57:3 89:22
  119:9 121:22
  158:15,19
  168:17
**type** 53:8,16
**types** 155:15
**typical** 90:5
**typically** 62:20
  119:8

**u** 3:2 177:3
**ucc** 107:15,16
  122:13,15
**ultimately**
  147:19 166:12
**under** 14:21
  19:4,17 35:8
  35:22,25 38:22
  54:23 55:7,10
  97:10 108:5
  112:23 114:4
  115:4 122:21
  126:3 133:22
  160:24 162:10
  163:15 164:8
  165:3,16
**undergraduate**
  8:11
**underneath**
  92:4 166:7
**understand**
  6:25 9:5,11,19
  46:6 50:14
  56:12 63:9,25
  64:2,24 109:12
  123:14 137:19
  151:14 152:5
  170:3
**understanding**
  46:21,25 68:6
  68:11,12,20
  69:4,9 81:4
  85:19,24
  132:11,16

137:9,20
**understood**
63:7,11,19
105:9
**unintentionally**
151:20
**union** 1:4,10
4:17,18 14:13
17:17 19:17
20:2,12,18
23:13 55:10
65:5 84:14
90:7 93:12
103:17 124:14
124:25 126:13
129:19 135:5
137:22 138:4
141:17 158:2
160:16 169:8
179:6
**unit** 4:14 58:23
59:4 94:19,24
140:17,22
171:20,25
174:12
**united** 1:2,6
4:19 13:11,18
14:9,15 17:22
139:15
**university** 8:11
8:13,15
**unlawful** 76:14
77:17
**unwilling** 68:17

**unwillingness**
57:9
**update** 103:16
123:8 160:15
**updated** 43:8
43:22 44:20
48:15 100:18
**updates** 44:23
**upside** 75:16
76:6
**urging** 70:16
**usdcussm2872**
27:3
**usdcussm703**
70:24
**use** 151:2 152:3
**used** 149:13,14
150:3,12,22
157:9
**usi** 20:15,17
23:14 25:5
30:23 145:21
149:15 150:6
150:12,14,17
150:17,22
151:4,11,25
152:4
**using** 145:20
151:18
**ussm** 20:2,11
23:14

**v**

**vacancies**
131:16,17

**vacant** 157:8
**vacation**
170:20
**vaguely** 92:25
**valuation**
128:11 148:16
**valuations**
24:13
**value** 40:15
45:14 128:10
**valued** 148:14
**values** 128:11
**variety** 118:11
**various** 8:9
11:11 13:21
18:20 25:19
35:10 36:13
40:18 55:2
63:6 72:20
79:5 89:24
108:18 111:21
127:24 128:17
128:24 129:18
153:24 160:16
162:4
**vehicle** 14:6,9
14:17,24 15:20
16:4 117:3
**venture** 16:25
23:23 41:10
56:14 119:4,6
119:8,11
134:18 139:10
**veritext** 5:2,4
179:2

**verrone** 110:7
110:9
**version** 43:8
44:20
**versus** 4:17
19:6 57:25
62:23 65:8
179:6
**veto** 32:4
**vice** 8:6 33:2
**video** 4:11,15
**videographer**
2:19 4:2 5:3
6:2 58:22 59:2
94:18,22
140:16,20
171:19,23
174:11
**videotaped**
1:16
**view** 84:23
104:14,17
**vocal** 57:9
**voluntary**
108:8,9

**w**

**w** 2:12
**wait** 114:21
**waived** 3:8
**waiving** 105:12
105:15,20
150:9
**wakefield** 93:7
93:11,18 94:7
106:12,16,21

106:24 121:25
122:3,7 126:12
127:7 134:12
135:3 136:3
141:13 142:5
142:19 143:21
147:6,9 154:19
157:11 172:18
**wakefield's**
124:25
**want** 47:11
62:9 82:15
83:23 132:24
171:17
**wanted** 81:10
106:2 130:16
137:21 159:6
**washington**
20:18 63:11
140:11
**way** 48:7 73:16
84:9,24 85:7
85:11 105:23
112:2 150:12
151:3 172:18
**ways** 34:11
**we've** 6:11 24:2
25:25 31:20
33:12 38:2,5
43:3,10 50:16
52:17 58:16
59:9 60:16
90:23 91:15
95:11 140:13
169:3

**week** 118:7
158:7
**welcome** 73:3
**wells** 21:5,11
21:13 31:18,21
34:2 43:23
44:2,4 45:2
47:5,7 48:20
49:21 50:3,8
71:17 72:6
80:20,24 81:13
84:5,24 85:7
86:25 92:17
95:18 97:17
**went** 52:4
161:20
**whispering** 4:6
**willing** 39:3,6
52:9 69:24
70:8 79:8
105:4
**willingness**
53:14
**wiped** 59:22
**wiring** 155:2
**wish** 156:13
**wishful** 121:20
**withdraw** 34:3
**withdrew**
34:10
**witness** 6:4
82:22 114:25
120:14 152:8
178:7

**word** 56:25
78:18
**work** 57:4
102:11 119:19
**worked** 92:3
119:21 133:22
134:24 135:2
168:15
**working**
108:21 118:3
118:12 154:25
165:13,24
166:2 168:13
169:19
**workout**
165:17
**works** 91:6
112:2 134:24
**write** 52:21
**written** 42:10
95:25 111:17
**wrong** 93:25
**wrote** 68:6
150:14

**x**

**x** 1:3,12 175:2
175:4,8

**y**

**y** 2:6
**yeah** 38:5
84:12 122:11
127:17 135:19
136:2

**year** 94:11,11
125:7 138:6
158:8,14,20
159:7
**years** 7:20 8:5
8:19 11:8
17:10 37:11
57:3 111:2
114:20 120:16
121:22 157:8
168:18
**yeshiva** 8:10,13
8:15
**yongsoo** 91:2,4
116:18
**york** 1:2,19,19
1:22 2:5,5,11
2:11 4:21,24
4:24 6:7,20,21
8:4 91:9 96:19
96:20,23,25
139:18 179:2,4
179:4,5

**z**

**zoom** 162:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.