USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/3/2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- X
                                                 :

DAOL REXMARK UNION STATION LLC; *and*  :
KOOKMIN BANK CO., LTD., *in its capacity as trustee of* :
KTB CRE DEBT FUND NO. 8, *a Korean Investment*  :
*Trust, by its agent in* Korea DAOL FUND  :        1:22-cv-6649-GHW
MANAGEMENT CO. *and by its agent in United States* :
REXMARK HOLDINGS LLC *d/b/a* REXMARK, :      MEMORANDUM
                                                 :     OPINION & ORDER
                                                 :
                          Plaintiffs,     :
                                                   :
                  -against-         :
                                                   :
UNION STATION SOLE MEMBER, LLC,     :
                                                 :
                         Defendant.     :
                                                   :
---------------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

    Kookmin Bank Co., Ltd., as trustee of KTB CRE Debt Fund No. 8 (the "Mezz Lender")

loaned Union Station Sole Member, LLC ("USSM") $100,000,000. The loan was a so-called

"mezzanine loan," secured by the stock of USSM's subsidiary, Union Station Investco LLC ("USI").

USI held a long-term ground lease over Union Station in Washington, D.C.

    The COVID-19 pandemic devastated USI's business leasing commercial space in the station.

USSM stopped making payments on its loan in May 2020. The Mezz Lender did not immediately

foreclose on its collateral. Instead, the owners of USI and USSM—led by their principal owner, Ben

Ashkenazy—continued to operate the business. In May 2022, however, the Mezz Lender's patience

was exhausted, and it noticed a non-judicial foreclosure sale of the stock of USI that had been

pledged to secure its loan. USSM did not sue to enjoin the sale; it did not declare bankruptcy.

Ultimately, the Mezz Lender purchased the stock at auction. The Mezz Lender notified Mr.

Ashkenazy and the managers of USI and USSM that it now owned the shares of USI, and that, as

equity owner, it now owned and controlled the company. They ignored the notice and continued to

operate the business as if the foreclosure sale had not been completed.

In order to force Defendant to recognize the effect of the non-judicial foreclosure sale, Plaintiffs filed this action seeking declaratory judgment to force the debtor to recognize the effectiveness of the non-judicial foreclosure action.  In response, USSM has raised a number of arguments.  It claims that the loan documents limit the Mezz Lender's recovery from the collateral it acquired in the foreclosure proceeding to the amount of the debt owed to it.  And Defendant asserts that principles of equity should prevent the Mezz Lender from realizing on its security interest as a result of alleged interference with the operations of the business by the Mezz Lender and others.  These arguments are not supported by the text of the agreements.  Because Defendant failed to seek an injunction prior to the consummation of the non-judicial foreclosure sale, its equitable defenses have not been asserted timely.  And in any event, those defenses have no merit—none of the conduct identified by Defendants as "inequitable" justify precluding Plaintiff from exercising its remedies as a secured party.  Therefore, Plaintiff's motion for declaratory judgment is GRANTED.

## I.    BACKGROUND[1]

### A.  Washington's Union Station and the Borrowers' Interest In It

Union Station in Washington, D.C. is a gateway to the nation's capital.  It is a critical transportation hub—the National Railroad Passenger Corporation, commonly known as "Amtrak," is a tenant.  56.1 Statement and Response, Dkt. No. 167 ("SUMF"), ¶ 131.  The station also offers over 100,000 square feet of retail space.  *Id.* ¶ 332.

Union Station is owned by the United States through the Department of Transportation.  *See* 40 U.S.C. § 6902.  The Union Station Redevelopment Corporation ("USRC"), established under the aegis of the Union Station Redevelopment Act, P.L. 97-125 (December 29, 1981), is ultimately

---

[1] The facts are drawn from the parties' Local Rule 56.1 statements and other documents submitted in connection with the parties' cross-motions for summary judgment.  They are undisputed in relevant part unless otherwise noted.

responsible for administering the station.  USRC does so in part by leasing space in the station to tenants.[2]  SUMF ¶ 191.  One such lease is at the heart of this dispute.

In 2018, when the loan transactions that gave rise to this case closed, Union Station Investco LLC ("USI") held a long term ground lease over Union Station.  SUMF ¶ 191; Dkt. No. 147-5, Ex. B.  The ground lease has not been provided to the Court, however, the Court understands that the ground lease allowed USI to sublease commercial space in the station, as well as to lease space in the station to Amtrak.  SUMF ¶¶ 136-137.  The lease between USI and USRC required USI to make periodic ground lease payments to USRC.  *See* Dkt. No. 147-1, 147-3, § 6.8.1.

All of USI's equity was owned by its parent company, Union Station Sole Member, LLC ("USSM").  *Id.* ¶ 13.  The Court understands that USSM was purely a holding company, with no material assets other than its equity interest in USI.

Ultimately, the individual behind both USSM and USI was Ben Ashkenazy.  *Id.* ¶ 19.  In 2018, Mr. Ashkenazy held 95% of the ownership interest in USSM.  *Id.*

**B.  The Loan Transactions**

In 2018, USI and USSM entered into a pair of loan transactions.  USI borrowed approximately $330,000,000 from Citi Real Estate Funding Inc. ("Citi") and Natixis Real Estate Capital LLC ("Natixis").  Dkt. Nos. 147-1–147-3 (the "Mortgage Loan Agreement").  That loan was secured by a pledge of substantially all of USI's assets—but, most importantly, by a mortgage of USI's leasehold interest in Union Station.  For that reason, the Court will refer to the loan to USI as the "Mortgage Loan."

At the same time, USSM borrowed $100,000,000 from Kookmin Bank Co., Ltd. ("Kookmin"), as trustee of KTB CRE Debt Fund No. 8 (the "Mezz Lender").  Dkt. Nos. 147-6-

---

[2] The United States leases the station to USRC.  Dkt. No. 147-5, Ex. B.  As a result, the ground lease between USRC and USI is technically a sub-lease.

147-7 (the "Mezz Loan Agreement"). That loan was secured by a pledge of USSM's only real asset—the equity interests in USI. The Court will refer to the loan to USSM as the "Mezzanine Loan."[3] The record does not say how all of the proceeds of the two financings were used, but as a result of the financing, approximately $100,000,000—the amount of the Mezzanine Loan to USSM—was paid out to the equity holders of USSM. SUMF ¶ 18.

### 1.    The Mortgage Loan Agreement

USI, Citi and Natixis entered into the Mortgage Loan Agreement on May 8, 2018. The Mortgage Loan Agreement was governed by New York law. Mortgage Loan Agreement § 11.3. The Mortgage Loan Agreement provided for periodic payments on the loan through the stated maturity date of May 9, 2028. *Id.* § 2.3. The loan accrued interest at a relatively modest rate, which increased to the greater of 1% over the prime rate or 5% over the stated interest rate in the event of a default. *Id.* § 2.2. The Mortgage Loan Agreement defined a series of "Events of Default," which would permit the lenders to accelerate the loan and exercise remedies against the borrower. *Id.* § 10.1. First among those events of default was a failure by the borrower to make payment of the debt when due. *Id.*

The Mortgage Loan was secured by a security interest in USI's ground lease with USRC, as well as substantially all of USI's other property. *Id.* § 4.2.1. In addition, the Mortgage Loan

---

[3] "In the real estate industry a mezzanine financing refers to a loan secured principally by the borrower's equity in other entities. Unlike conventional mortgage financing where the borrower owns real estate, a mezzanine borrower doesn't directly own any real property nor does it operate any business—it acts merely as a sort of holding company. A mezzanine borrower typically only owns equity in a family of other subsidiaries, and these other subsidiaries actually own the underlying real property. Therefore, the value of the mezzanine borrower's collateral is derived solely from its indirect ownership of the underlying real property. The complicating factor, however, is that this same underlying parcel of land also typically serves as collateral for a mortgage loan between a conventional mortgage lender and the mortgage borrower—the direct owner of the property. Because of the unique structure of mezzanine financing, therefore, the mezzanine loan is always subordinate to the senior mortgage lender's collateral. At the same time, however, the mezzanine loan remains senior to the borrower's equity investment in the underlying real property." Andrew R. Berman, *"Once a Mortgage, Always a Mortgage"—The Use (and Misuse of) Mezzanine Loans and Preferred Equity Investments*, 11 Stan. J.L. Bus. & Fin. 76, 79 (2005). "Both economically and legally, the value of the mezzanine borrower's collateral derives solely from its indirect ownership of the underlying mortgaged property." Andrew R. Berman, *Risks and Realities of Mezzanine Loans*, 72 Mo. L. Rev. 993, 995 (2007).

Agreement required the creation of a series of cash management accounts, into which revenues from station tenants were to be deposited. *Id.* § 2.7. The funds in those accounts were required to be distributed pursuant to a waterfall detailed in the Mortgage Loan Agreement. *Id.* Only after operating expenses and debt service on the Mortgage Loan and the Mezzanine Loan were satisfied could funds be distributed to the equity holders of the company. *Id.* And during the occurrence of an Event of Default, the Mortgage Loan Agreement permitted the lender to apply funds in the cash management accounts to repay amounts outstanding under the Mortgage Loan Agreement. *Id.* § 2.7.2(d).

The Mortgage Loan Agreement contemplated the possibility that USI's leasehold interest in Union Station could be condemned. Section 5.2.2, entitled "Condemnation," granted the lenders the right to act as USI's attorney in fact with respect to any condemnation proceeding during the continuance of an Event of Default.[4]

While Citi and Natixis were the initial lenders under the Mortgage Loan Agreement, the agreement contemplated that the loan would be securitized to permit other financial entities to

---

[4] Mortgage Loan Agreement § 5.2.2 ("Borrower shall provide Lender with copies of any written notice received by Borrower of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all notices or papers served in connection with such Condemnation or related proceedings promptly upon obtaining knowledge thereof (Lender acknowledging that Borrower shall have complied with this covenant with respect to any Condemnation that is not a Material Condemnation if Borrower delivers such written notice to Lender by no later than the end of the calendar quarter in which Borrower first obtained such knowledge). Borrower may settle and compromise any Material Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall from time to time deliver to Lender all instruments reasonably requested by Lender to permit such participation. Borrower shall, at its cost and expense, diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings. Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents. If any portion of the Property is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of *Section 5.3* hereof. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.").

acquire an economic interest in it. The Mortgage Loan Agreement also provided for the appointment of a "servicer." Mortgage Loan Agreement § 11.24. Wells Fargo Bank, N.A. ("Wells Fargo") was engaged as the servicer for the Mortgage Loan Agreement. SUMF ¶¶ 28, 70.

And, indeed, shortly after the Mortgage Loan closed, the loan was contributed to a trust pursuant to a Trust and Servicing Agreement, dated as of June 9, 2018, among Citi, Wells Fargo, as servicer and special servicer, Wilmington Trust, N.A., as trustee, and Citi, as certificate administrator. Dkt. Nos. 147-23-25 (the "Trust Agreement"). In turn, the trust issued several series of certificates representing interests in the trust. *See* Trust Agreement at 1-4. BlackRock, Inc. ("BlackRock") was the controlling class representative of the holders of certificates issued in the securitization. SUMF ¶ 28. As a general matter, decisions with respect to the administration of the trust were left to the servicer and special servicer. Trust Agreement § 3. However, as controlling class representative, BlackRock had the authority to consent to any "Major Decision."[5] SUMF ¶ 28; Trust Agreement § 9.3.

### 2. The Mezz Loan Agreement

USSM and Kookmin entered into the Mezz Loan Agreement on May 8, 2018. Like the Mortgage Loan Agreement, after which it was likely patterned, the Mezz Loan Agreement was governed by New York law. Mezz Loan Agreement § 11.3. The Mezz Loan Agreement provided for periodic payments on the loan through the stated maturity date of May 9, 2028. *Id.* § 2.3. The

---

[5] "Major Decision" was defined in the Trust Agreement to include, among other things: "(iii) any transfer of the Property or any portion of the Property, or any transfer of any direct or indirect ownership interest in the Borrower to the extent the lender's consent under the Mortgage Loan Documents is required, except in each case as expressly permitted by the Mortgage Loan Documents, or in connection with a pending or threatened condemnation;" "(vi) any proposed or actual foreclosure upon or comparable conversion (which shall include acquisitions of any Foreclosed Property) of the ownership of the Property;" "(vii) any amendment, modification or waiver, or any consent to an amendment, modification or waiver, of any monetary term (other than late fees and Default Interest but including, without limitation, the timing of payments and the acceptance of discounted pay-offs) or material non-monetary term of the Mortgage Loan or any extension of the Maturity Date of the Mortgage Loan;" and "(viii) following a default with respect to the Mortgage Loan or a Mortgage Loan Event of Default, any exercise of remedies, including the acceleration of the Mortgage Loan or initiation of judicial, bankruptcy or similar proceedings under the Mortgage Loan Documents or with respect to the Borrower or the Property . . . ." Trust Agreement at 33-34.

loan accrued interest at a fixed interest rate of 5.8%, which increased to the greater of the "Maximum Legal Rate"—the maximum non-usurious rate that could be charged—or 1% over the prime rate or 5% over the stated interest rate in the event of a default. *Id.* § 2.2. In addition, the Mezz Loan Agreement required the payment of a late payment charge in the event that any amount due remained outstanding after any cure period. *Id.* § 2.3.4. The Mezz Loan Agreement defined a series of "Events of Default," which would permit the lender to accelerate the loan and exercise remedies against the borrower. *Id.* § 10.1. First among those events of default was a failure by the borrower to make payment of the debt when due. *Id.*

Like the Mortgage Loan Agreement, the Mezz Loan Agreement contained a provision that contemplated the possibility that USI's leasehold interest in Union Station could be condemned. Section 5.2.2, entitled "Condemnation," granted the Mezz Lender a series of rights in the event of any condemnation proceeding. The language of Section 5.2.2 tracks in part the equivalent provision of the Mortgage Loan, but makes it clear that the rights of the Mezz Lender are subject to the rights of the lenders under the Mortgage Loan Agreement—whether to act as attorney for USSM, or to receive the proceeds of condemnation.[6]

---

[6] Mezz Loan Agreement § 5.2.2 ("Borrower shall provide Lender with copies of any written notice received by Borrower or Mortgage Borrower of any actual or threatened Condemnation by any Governmental Authority of all or any part of the Property and shall deliver to Lender a copy of any and all notices or papers served in connection with such Condemnation or related proceedings promptly upon obtaining knowledge thereof (Lender acknowledging that Borrower shall have complied with this covenant with respect to any Condemnation that is not a Material Condemnation if Borrower delivers or causes Mortgage Borrower to deliver such written notice to Lender by no later than the end of the calendar quarter in which Borrower or Mortgage Borrower first obtained such knowledge). Borrower may settle and compromise or may permit Mortgage Borrower to settle and compromise any Material Condemnation only with the prior consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost and expense, in any applicable litigation or proceeding and settlement discussions in respect thereof and Borrower shall from time to time deliver or shall cause Mortgage Borrower from time to time to deliver to Lender all instruments reasonably requested by Lender to permit such participation. Borrower shall, at its cost and expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation. Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement, the Note and the other Loan Documents and the Debt shall not be reduced

Section 10.2 of the *Mezz Loan Agreement* outlined the broad scope of the remedies that were available to the lender during the continuance of an event of default. As will be relevant to the Court's analysis below, the provisions make it clear that the lender's rights to exercise its remedies are cumulative, not exclusive.

> (a) Upon the occurrence of an Event of Default . . . and at any time thereafter while any such Event of Default is continuing, Lender may, *in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents* or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral[7], including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents and may exercise the rights and remedies of a secured party under the UCC against Borrower and the Collateral, including, without limitation, all rights or remedies available at law or in equity . . . .

> (b) Upon the occurrence of any Event of Default and at any time thereafter while any Event of Default is continuing, all or any one or more of the rights, powers, privileges *and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time* and from time to time, whether or not all or any portion of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or initiated or taken other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Collateral. *Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.* Without limiting the generality of the foregoing, Borrower agrees that, if an Event of Default has occurred and remains outstanding, (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its rights and

---

until any Net Liquidation Proceeds After Debt Service shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lender shall not be limited to the interest paid on the Award by any Governmental Authority, but shall be entitled to receive out of the Net Liquidation Proceeds After Debt Service interest at the rate or rates provided herein or in the Note. If any portion of the Property is taken by any Governmental Authority, Borrower shall cause Mortgage Borrower to promptly commence and diligently prosecute to completion the Restoration of the Property and otherwise comply with the provisions of Section 5.3 of the Mortgage Loan Agreement. Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full.").

[7] "Collateral" is defined in the Mezz Loan Agreement as the "Collateral" defined in (and pledged pursuant to) the pledge agreement discussed below. Mezz Loan Agreement at 5.

remedies against the Collateral and the Pledge Agreement has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Obligations or the Debt has been paid in full.

(c) With respect to Borrower and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Collateral for the satisfaction of any of the Debt in any order, proportion or priority, and Lender may seek satisfaction out of the Collateral, or any part thereof, in its sole and absolute discretion in respect of the Debt.

Mezz Loan Agreement § 10.2 (emphasis added).

The Mezzanine Loan was secured by a security interest in the equity of USI. That security interest was documented pursuant to a Pledge and Security Agreement, entered into between USSM and Kookmin on May 8, 2018. Dkt. No. 147-8 (the "Pledge Agreement"). The Pledge Agreement too was governed by New York law. *Id.* § 18(f). In the Pledge Agreement, USSM pledged all of its interest in the equity of USI as collateral to secure the Mezz Loan. Pledge Agreement § 2(i) (pledging all of USSM's right, title and interest in "all Pledged Company Interests, including, without limitation the status as a member of Mortgage Borrower and all economic, voting and managerial rights and powers of Pledgor in Mortgage Borrower").

Several provisions in the Pledge Agreement set forth the rights of the lender to enforce its interests in the collateral following the occurrence of an event of default. For example, Section 8 of the Pledge Agreement, entitled "Rights of Lender," provided the following:

(a) . . . . If an Event of Default shall occur and be continuing, then all such Pledged Company Interests at Lender's option and in accordance with an exercise of remedies pursuant to the terms of this Agreement, shall be registered in the name of Lender or its nominee (if not already so registered), and Lender or its nominee may thereafter exercise (i) all voting, managerial, limited liability company and other rights pertaining to the Pledged Company Interests and the business and affairs of Mortgage Borrower and (ii) any and all rights of conversion, exchange, and subscription and any other rights, privileges or options pertaining to such Pledged Company Interests as if it were the absolute owner thereof . . . , all without liability except to account for property actually received by it, but Lender shall have no duty to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

And Section 9 of the Pledge Agreement—"Remedies"—laid out in detail the rights of the

9

lender to foreclose on the collateral. Those rights expressly permitted the lender to conduct a non-judicial foreclosure sale of the collateral. As with the Mezz Loan Agreement's remedies provision, the remedies provision in the Pledge Agreement stated that the rights of the lender were cumulative and non-exclusive.

>    (a)   If an Event of Default shall occur and be continuing, Lender may, *in addition to all other rights and remedies* granted in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Debt:

>        (i)   exercise all rights and remedies of a secured party under the Code[8] (whether or not said Code is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, managerial, consensual and other powers of ownership pertaining to the Collateral under Mortgage Borrower's Operating Agreement as if Lender were the sole and absolute owner thereof (and Borrower agrees to take all such action as may be appropriate to give effect to such right);

>    (b)   Without limiting the generality of the foregoing, if an Event of Default shall occur and be continuing, Lender . . . may in such circumstances forthwith and in accordance with an exercise of remedies pursuant to the terms of this Agreement collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, assign, give option or options to purchase or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, in the over-the-counter market, at any exchange, broker's board or office of Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best in its sole discretion, for cash or on credit or for future delivery without assumption of any credit risk. . . . Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of Pledgor, which right or equity of redemption is hereby waived or released. Lender shall apply any Proceeds from time to time held by it and the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale, after deducting all reasonable costs and expenses of every kind incurred therein or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of Lender hereunder, including, without limitation, reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Debt, in such order as Lender may elect, and only after such application and after the payment by Lender of any other amount required by any

---

[8] "Code" is defined in the Pledge Agreement as "the Uniform Commercial Code from time to time in effect in the State of New York." Pledge Agreement at 2.

provision of law, including, without limitation, Sections 9-610 and 9-615 of the Code, need Lender account for the surplus, if any, to Pledgor.  To the extent permitted by applicable law, Pledgor waives all claims, damages and demands it may acquire against Lender arising out of the exercise by Lender of any of its rights hereunder, except for any claims, damages and demands it may have against Lender arising from the willful misconduct or gross negligence of Lender or any of its affiliates, agents and/or employees. . . .

(c)  The rights, powers, privileges and remedies of Lender under this Agreement *are cumulative and shall be in addition to* all rights, powers, privileges and remedies available to Lender at law or in equity.  *All such rights, powers and remedies shall be cumulative and may be exercised successively or concurrently* without impairing the rights of Lender hereunder.

Pledge Agreement § 9 (emphasis added).

The Pledge Agreement also contemplated the prospect that the pledged equity interests in USI would need to be sold in a private sale.  Pledge Agreement § 10.  USSM acknowledged that private sales could "result in prices and other terms less favorable to Lender than if such sale were a public sale . . ." but that such a sale would still be commercially reasonable.  *Id.*  USSM specifically exculpated lender from any liability "as a result of a sale of any Collateral . . . at any private sale conducted in a commercially reasonable manner . . . ."  *Id.* §§ 10(b) and (e).  Moreover, while the Pledge Agreement permitted the lender to conduct a foreclosure sale in any commercially reasonable manner, the agreement also outlined a series of safe harbor conditions:[9]  any sale conducted in

---

[9] Pledge Agreement § 10(d) ("Without in any way limiting Lender's right to conduct a foreclosure sale in any manner which is considered commercially reasonable, Pledgor hereby agrees that any foreclosure sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:  (i) Lender conducts the foreclosure sale in the State of New York, (ii) The foreclosure sale is conducted in accordance with the laws of the State of New York, (iii) Not more than fifteen (15) Business Days before, and not less than five (5) Business Days in advance of the foreclosure sale, Lender notifies Pledgor at the address set forth herein of the time and place of such foreclosure sale, (iv) The foreclosure sale is conducted by an auctioneer licensed in the State of New York and is conducted in front of the New York Supreme Court located in New York City or such other New York State Court having jurisdiction over the Collateral on any Business Day between the hours of 9 a.m. and 5 p.m., (v) The notice of the date, time and location of the foreclosure sale is published in the New York Times or The Wall Street Journal (or, if the New York Times and The Wall Street Journal are no longer widely circulated in print format, such other newspaper widely circulated in print format in New York, New York) for seven (7) consecutive days prior to the date of the foreclosure sale, and (vi) Lender sends notification of the foreclosure sale to all Persons from which Lender has received written notice of a claim or interest in any Collateral and all secured parties identified as a result of a search of the UCC financing statements in the filing offices located in the State of Delaware conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date[.]").

accordance with them "shall be considered a commercially reasonable sale . . . ." *Id.* § 10(d). USSM irrevocably waived "any right to contest any such sale." *Id.*

Mr. Ashkenazy also personally guaranteed the Mezz Loan pursuant to a Guarantee of Recourse Obligations between Mr. Ashkenazy and Kookmin. Dkt. No. 147-9 (the "Guaranty"). As suggested by its title, Mr. Ashkenazy's guaranty did not apply in all circumstances. Instead, he guaranteed only a defined category of "Recourse Liabilities." *Id.* § 1.1(a). Only in limited circumstances did his guaranty extend to cover the entire amount owing under the Mezz Loan. *Id.* Those specific circumstances were defined in the Mezz Loan Agreement as "Springing Recourse Events." This provision is important for the reader to understand why the borrowers likely did not file a Chapter 11 proceeding, which is often the preferred choice of a debtor seeking to remain in control of his company and retain any residual equity value while working toward an accommodation with his creditors. For the first "Springing Recourse Event" that would have made Mr. Ashkenazy personally and unconditionally liable for the full amount of the Mezz Loan was when "Borrower or Mortgage Borrower files a voluntary petition under the Bankruptcy Law . . . ." Mezz Loan Agreement § 11.22.

In the Guaranty, Mr. Ashkenazy covenanted that "[a]t all times while the Debt remains unsatisfied, Guarantor shall maintain Unencumbered Liquid Assets . . . of not less than $20,000,000 [and] a Net Worth . . . of not less than $500,000,000." Guaranty § 5.1(d). And according to Mr. Ashkenazy, he has met that requirement at all times relevant to this case: he describes himself as a "significantly wealthy man," who since entering the Mezz Loan Agreement in 2018 has maintained at least $20,000,000 across his bank accounts, and whose net worth has "always been very significant in excess of half a billion dollars." SUMF ¶¶ 16, 17.

The lenders under the Mortgage Loan Agreement and the Mezz Loan Agreement entered into an intercreditor agreement. The intercreditor agreement has not been presented to the Court; it

12

has limited significance to this dispute.  However, Plaintiff asserts that the intercreditor agreement

contained a provision that allowed the lender under the Mezz Loan Agreement to acquire the

Mortgage Loan at par value.  SUMF ¶ 103.

### C.  The COVID-19 Pandemic Causes Financial Challenges

Before the COVID-19 pandemic struck, USI and USSM were able to remain current on all

of their obligations under the Mortgage and Mezz Loan Agreements.  Dkt. No. 180 ("SUMF

Reply") ¶ 346.  Union Station was managed by Yossi Preiserowicz, the Chief Operating Officer of

Ashkenazy Acquisition Corporation ("AAC"), an affiliate of USSM.  Dkt. No. 169 (declaration of

Yossi Preiserowicz, or "Press Decl.") ¶¶  1, 2; SUMF ¶ 20.[10]  Mr. Press reported to Mr. Ashkenazy.

Jones Lang Lasalle Americas Inc. "was responsible for the property management services for Union

Station pursuant to a master management agreement" with AAC.  SUMF ¶ 22.

Understandably, the pandemic devastated Union Station's business model:  "lockdowns and

travel restrictions led to an enormous reduction in the number of travelers, shoppers, and other

visitors to Union Station."  *Id.* ¶ 347.  As a result, many of the station's tenants went out of business

or were unable to pay their rent.  *Id.*  This resulted in a substantial reduction in the revenues of

USI—and, in turn, USSM—leading them to fall behind in their payment obligations.  *Id.*  Starting

with the payment due on May 9, 2020, USI and USSM did not make the full payment due under the

loans.  *Id.* ¶ 348.  From that point on, USI and USSM were in payment default under both loan

agreements.  SUMF ¶¶ 23-25.  Because they had failed to make a payment when due, the borrowers'

default gave rise to an "Event of Default" under both the Mortgage Loan Agreement and the Mezz

Loan Agreement, entitling the lenders to exercise the remedies described in those agreements—

including foreclosure on the collateral pledged in support of each loan.  *Id.* ¶ 25; Mezz Loan

---

[10] Mr. Preiserowicz uses the name "Joe Press" professionally.  Press Decl. ¶ 1.  Following the convention adopted by the parties in their briefing, the Court will refer to Mr. Preiserowicz using that name in this opinion..

Agreement § 10.2.

### D. The Lenders Agree to Forbear

Rather than exercising their remedies immediately after the default, the lenders entered into forbearance agreements with the borrowers. In July 2020, USI entered into a forbearance agreement for the Mortgage Loan. SUMF ¶ 26. Under that agreement, USI promised to begin making payments to the lenders under the Mortgage Loan Agreement after a deferral period. *Id.* ¶ 29. USSM and the Mezz Lender entered into a forbearance agreement with respect to the Mezzanine Loan as well. *Id.* ¶ 30. The forbearance period extended from May 9, 2020 through March 8, 2021. *Id.* ¶ 32. The Mezz Lender agreed that it would not exercise its remedies against the collateral during the forbearance period. *Id.* ¶ 30. The forbearance agreement provided that payments that would otherwise have been due during forbearance period would instead be deferred and paid out in a series of catch-up payments. *Id.* ¶ 34; Dkt. No. 147-10 ("Mezz Loan Forbearance") § 3.

USSM agreed to compensate the lender for its agreement to forbear. USSM agreed to pay a modification fee of $600,000, payable in six monthly installments, as well as "Special Servicing Fees." SUMF ¶¶ 35–36. None of those payments were due until after the expiration of the deferral period. *Id.* The Mezz Loan Forbearance also required that USSM reimburse the out-of-pocket expenses incurred by Kookmin in connection with the forbearance agreement. *Id.* ¶ 37. Half of that amount—$55,000—was due in November, 2020, one month after the Mezz Loan Forbearance was executed. The second half was due the following month. *Id.* ¶ 38. USSM did not make either payment, "putting USSM in default of the Mezz Loan Forbearance almost immediately." *Id.* ¶ 39. USSM never made any of the other payments due under the Mezz Loan Forbearance. *Id.* ¶ 40. Nor did USI meet its payment obligations under the forbearance agreement it had entered into with respect to the Mortgage Loan. *Id.* ¶ 41.

### E. The Mortgage Loan Lender Does Not Consent to Infusion of Capital by the Saudi Arabian Public Investment Fund

During the forbearance period, Mr. Ashkenazy worked to secure a source of outside financing that would remedy his companies' financial distress. In December, 2020, an affiliate of USSM entered into an agreement with the Public Investment Fund of the Kingdom of Saudi Arabia ("PIF"). SUMF ¶ 42; SUMF Reply ¶ 350. Pursuant to that agreement, PIF was to acquire an ownership interest in Ashkenazy Union Station Holdings LLC ("Ashkenazy Holdings"), the parent company of USSM. SUMF ¶ 42; SUMF Reply ¶ 350. The deal valued the leasehold interest in Union Station at approximately $700 million. *Id.* Mr. Press testified that the deal with PIF was designed to pay off the Mezzanine Loan in full and to leave enough equity to cover any shortfalls and to fund the obligations of Union Station going forward. SUMF Reply ¶ 350. The parties do not dispute whether the PIF deal would have provided sufficient capital to repay the Mezzanine Loan in full; but Plaintiff contends that the proceeds of the PIF deal would not have been sufficient to repay the Mortgage Loan in full.

To document the deal with PIF, Ashkenazy Holdings and PIF entered into a contribution agreement, that outlined the terms of the transaction. SUMF ¶ 43; Dkt. Nos. 147-11-17 (the "Contribution Agreement"). On February 3, 2021, PIF made a $100 million deposit into an escrow account in connection with its deal with Ashkenazy Holdings. SUMF ¶ 49.

Because the deal with PIF would result in a change in the ownership structure of USSM and USI, the deal required consent of the lenders under the Mortgage Loan Agreement and the Mezz Loan Agreement. SUMF Reply ¶ 352. However, because the deal was anticipated to refinance the Mezzanine Loan in full, Plaintiffs take the position that consent from the Mezz Lender was not needed. *Id.* Consistent with that position, the Contribution Agreement required that Ashkenazy Holdings needed to obtain written consent from the lender under the Mortgage Loan Agreement before the scheduled closing date, but that consent from the Mezz Lender was required only if the

Mezzanine Loan was to remain outstanding after the closing of the deal.  SUMF ¶ 45; Contribution Agreement § 3.1(e).[11]

The PIF deal was subject to review by the Committee on Foreign Investment in the United States ("CIFIUS").  Under the terms of the Contribution Agreement, the "Closing Date" for the PIF deal was to be determined based on when CIFIUS began its review.  SUMF ¶ 47.  At the time that it entered into the Contribution Agreement, Ashkenazy Holdings filed a notice with CIFIUS to initiate the review process.  SUMF ¶ 44.  At some point, Ashkenazy Holding refiled the notice; on April 6, 2021, CIFIUS review of the deal was re-initiated by the U.S. Department of the Treasury based on that refiled notice.  *Id.* ¶ 60.

Meanwhile, both USSM and USI had violated the terms of their respective forbearance agreements.  On March 9, 2021 USSM defaulted on the Mezz Loan Forbearance because it had failed to make any of the payments due after the deferral period.  *Id.* ¶ 50.  And USI defaulted on its forbearance agreement with respect to the Mortgage Loan by failing to make the payments due on the agreed schedule.  *Id.* ¶ 51.  On March 10, 2021, a notice of default was issued with respect to the Mortgage Loan.  *Id.* ¶ 55.  The Mezz Lender followed suit on March 22, 2021.  *Id.* ¶ 56.  On March 26, 2021, Wells Fargo sent a notice of default and acceleration of the Mortgage Loan and demanded full repayment of the outstanding debt.  *Id.* ¶ 57.  On April 12, 2021, an additional notice of default was issued under the Mortgage Loan as a result of USI's failure to make catch-up payments that had been due on April 9, 2021.  *Id.* ¶ 61.

It was on April 12, 2021—in the immediate wake of that series of default notices—that USI made its first formal written request to the lenders under the Mortgage Loan to consent to the PIF

_____

[11] Contribution Agreement § 3.1(e) ("The Company [Ashkenazy Holdings] shall have delivered to PIF Existing Senior Lender's written consent to the Contemplated Transactions with respect to the admission of PIF as a member of the Company (which may be contained in the Existing Senior Lender Estoppel Certificate) and in the event the Existing Mezzanine Loan shall remain outstanding after the Closing, the Existing Mezzanine Lender's written consent to the Contemplated Transactions with respect to the admission of PIF as a member of the Company (which may be contained in the Existing Mezzanine Lender Estoppel Certificate).")

transaction. *Id.* ¶ 62. The request was made to Wells Fargo as special servicer for the Mortgage

Loan. *Id.* Consent was not assured. The Mortgage Loan Agreement provided that the lenders'

consent to a transfer "shall not be unreasonably withheld . . . provided that the following conditions

are satisfied: . . . (ii) no Default or Event of Default shall have occurred and remain outstanding."

Mortgage Loan Agreement § 8.2. Of course, at the time that USI made the request, an Event of

Default had occurred and was outstanding. No formal request for consent was made to the Mezz

Lender, and it is undisputed that Wells Fargo and the lender under the Mortgage Loan did not have

the authority to speak on behalf of the Mezz Lender or to waive the Mezz Lender's rights under the

Mezz Loan Agreement. *Id.* ¶¶ 68, 69.

      Wells Fargo responded to the request for consent to the PIF deal on April 26, 2021 (the

"April 26 Response"). *Id.* ¶ 72. In its response, Wells Fargo wrote that

> Lender remains willing to consider the Proposed Transaction. However,
> until payment of the Missed Deferral Catch-Up Payment is made to Lender, Special
> Servicer is not in a position to consider the Proposed Transaction further. Lender
> has afforded Borrower a number of accommodations over the past year and Lender
> needs Borrower to remedy its serious payment failures in order to move forward.

SUMF ¶ 73. The Mezz Lender did not withhold consent to the PIF deal. *Id.* ¶ 87. To the contrary,

once it learned about the general parameters of the discussion regarding the PIF deal, the Mezz

Lender encouraged the lender under the Mortgage Loan to consent to the deal. *Id.* ¶ 88.

      USI did not make the payments requested in the April 26 Response. *Id.* ¶ 82. At the time,

Mr. Ashkenazy had the financial liquidity to make the requested payments, but he did not do so.

*Id.* ¶¶ 83–84. Similarly, USSM could have issued capital calls to raise money, but it did not do so. *Id.*

¶¶ 85–86. USI never obtained the Mortgage Loan lender's consent to the PIF deal. And on May

10, 2021, PIF sent a letter to USI, informing USI that "PIF is exercising its right to terminate the

Contribution Agreement pursuant to Section 8.1(a) thereof for failure by the Company to satisfy its

closing conditions by the Scheduled Closing Date, including, without limitation, delivering Senior

Lender's written consent to the Contemplated Transactions." *Id.* ¶ 90.

### F.  The Mezz Lender Acquires the Mortgage Loan

Neither USI nor USSM made any payments with respect to the loans throughout the course

of the remainder of 2021.  *Id.* ¶ 95.  On June 16, 2021, the Mezz Lender provided a notice of default

to USSM for nonpayment of the Mezzanine Loan.  *Id.* ¶ 96.  And on November 12, 2021, the Mezz

Lender provided USSM another notice of default as a result of USSM's failure to pay the amounts

owing under the Mezz Loan Forbearance and the Mezz Lender accelerated the Mezzanine Loan,

making the entire amount of the loan due and payable immediately.  *Id.* ¶ 97.

On November 19, 2021, the lender under the Mortgage Loan notified the Mezz Lender that

it intended to conduct a foreclosure sale on the Mortgage Loan on January 6, 2022.  *Id.* ¶ 98.  If the

lender foreclosed on the collateral under the Mortgage Loan, the sole source of payment for the

Mezzanine Loan would be extinguished, severely diminishing its value.  *Id.* ¶ 99.  Confronted with

that threat, the Mezz Lender acted.  It decided to purchase the Mortgage Loan.  On January 5, 2022,

Kookmin, as trustee of KTB CRE Debt Fund No. 8, purchased the Mortgage Loan for

approximately $358 million.  *Id.* ¶ 104.  From that point on, the Mezzanine Loan and the Mortgage

Loan were both owned by the same entity.

The transfer of the Mortgage Loan was documented pursuant to an assignment and

assumption agreement (the "Assignment Agreement").  *Id.* ¶ 105.  Section 3 of the Assignment

Agreement provided that Kookmin, in its capacity as trustee of KTB CRE Debt Fund No. 8:

> hereby accepts the foregoing assignment of all of Assignor's right, title, and interest
> in and to the Purchased Loan Interest and hereby assumes and agrees to fulfill,
> perform and discharge, from and after the date hereof, all of the various
> commitments, obligations and liabilities of Assignor under the Purchased Loan
> Interest accruing from and after the date hereof and hereby agrees to be bound by
> the terms and provisions thereof, to the same effect as if Assignee had been the
> "Lender" under the Mortgage Loan Documents.

Assignment Agreement § 3.  Under the terms of the Mortgage Loan Agreement, Kookmin thus

became a "Co-Lender."  SUMF ¶ 108.  Section 11.36 of the Mortgage Loan Agreement provides

that Co-Lenders' obligations are several and not joint.  Mortgage Loan Agreement § 11.36(a)(ii)

("The liabilities of Lender and each of the Co-Lenders shall be several and not joint. . . .  Neither

Lender nor any Co-Lender shall be responsible for the obligations of any other Co-Lender.").

### G. Kookmin Works to Find Investors in the Loans

Over the course of the following year, Kookmin worked to find ways to reduce its exposure.

Michael Rebibo, the managing principal of Rexmark Holdings LLC, worked as the agent for the

Mezz Lender in the United States.  Dkt. No. 147 ("Rebibo Decl.").  Mr. Rebibo pursued several

options.  He negotiated with representatives of the borrowers and Mr. Ashkenazy.  SUMF ¶ 112.

He also worked to market the Mezzanine Loan for sale to a third party.  Id. ¶ 113.  And the Mezz

Lender considered finding a third party who could enter into a joint venture if the Mezz Lender

foreclosed on the pledged equity interests in USI.  Id. ¶ 114.

The Mezz Lender retained Cushman & Wakefield to market the Mezzanine Loan for sale

and to prepare for the possible foreclosure on the equity interests in USI.  SUMF ¶ 125.  Cushman

& Wakefield sought out joint venture partners who could invest $50-100 million in Union Station,

and who could also help to manage the property with the Mezz Lender.  Id. ¶ 128.

Amtrak—one of the sub-tenants at Union Station—approached the Mezz Lender about

possible opportunities for Amtrak.  Id. ¶ 131.  Amtrak asked to review documents so that Amtrak

could evaluate and negotiate a potential transaction.  Id. ¶ 133.  The discussions with Amtrak

foundered when the Mezz Lender proposed a non-disclosure agreement that contained a provision

to which Amtrak would not agree.  Id. ¶¶ 134-141.  The proposed non-disclosure agreement limited

the use of confidential information "for assessing the property and the potential acquisition of the

loans." Id. ¶ 135.  Amtrak was not willing to accept those restrictions—and responded that "Amtrak

is not willing to give up its right, as a tenant of USI, to negotiate any transaction we want to with

USI." *Id.* ¶ 136.  The Mezz Lender attempted to reassure Amtrak that its proposal did not prevent

Amtrak from having discussions with its landlord, but Amtrak did not change its position.  *Id.*

¶¶ 137-138.

### H.  USI Requests the Mortgage Loan Lender's Approval of Leases

Meanwhile, USI continued to operate Union Station.  Because the Mortgage Loan was in

default, however, the Mortgage Loan Agreement required that USI seek lender approval for a

number of aspects of the station's operations.  The Mortgage Loan lender's consent was required

"before USI could make payments to vendors and third parties for the operation of Union Station."

*Id.* ¶ 116.  USI provided the required information and the Mortgage Loan lender would approve

expenses to be released from the lockbox accounts that had been established to secure the Mortgage

Loan.  *Id.*

During the continuance of an Event of Default, USI and USSM were required to obtain

their lenders' consent before USI could enter into any new lease.  Both the Mortgage Loan

Agreement and the Mezz Loan Agreement required the prior written approval of any "Major

Lease," which was defined to include any lease entered into during the continuance of an Event of

Default.  Mortgage Loan Agreement §§ 1.1, 4.1.9(c); Mezz Loan Agreement § 1.1, 4.1.9(c).

However, the discretion of the lenders was subject to a caveat, namely that their consent "shall not

be unreasonably withheld, conditioned or delayed . . . ."  Mortgage Loan Agreement § 4.1.9(c); Mezz

Loan Agreement § 4.1.9(c).

USI, usually through Mr. Press, would bring new proposed leases or extensions to the

lenders for review and approval.  SUMF ¶ 124.  The lenders approved all of the proposed leases

with the exception of two.  Rebibo Decl. ¶ 127.  Those two were for relatively small spaces in the

station, which collectively would have occupied just over 2,000 square feet of retail space—about

2% of Union Station's retail space.  *Id.* ¶ 123.  The leases presented to Mr. Rebibo for approval had

ten year terms, and provided for aggregate lease payments for both locations that was "significantly less than what even one of the spaces had previously leased for." *Id.* ¶ 125. Mr. Rebibo informed Mr. Press that the lenders were "not inclined to agree to commit to a ten year lease right now given the situation with the property." *Id.* ¶ 124.

### I.   Amtrak Commences Condemnation Proceeding

Just days after the discussions with Amtrak regarding a proposed non-disclosure agreement folded, Amtrak notified USI that it was going to conduct an appraisal of the Union Station leasehold. SUMF ¶ 142. Amtrak conducted that appraisal based on the information available to it at the time. *Id.* ¶ 144.

On April 14, 2022, Amtrak filed an eminent domain proceeding to take USI's leasehold interest in Union Station. *Id.* ¶ 145. That case was filed in District Court in the District of Columbia under the caption *Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Interest Pertaining to Described Leasehold Interests at Washington Union Station, et al.*, 1:22-cv-01043-APM (D.D.C.) (the "Condemnation Action"). *Id.* The Condemnation Action was based on the January 2022 appraisal conducted by Amtrak. Relying on that appraisal, Amtrak deposited $250 million with the district court during the pendency of the Condemnation Action. Rebibo Decl. ¶ 177. That amount is substantially less than the amount owned on the Mortgage Loan and the Mezzanine Loan.

USI, USSM, as well as the lenders under the Mortgage Loan Agreement and the Mezz Loan Agreement were named as defendants in the Condemnation Action. SUMF ¶ 146. Understandably, given that Amtrak's valuation of the leasehold leaves the loans under water—and is substantially less than the $700 million valuation for the leasehold interest that served as the underpinning for the failed PIF deal—USI, USSM are challenging Amtrak's authority to take the leasehold interest by eminent domain and the amount of compensation deposited with the district court. *Id.* ¶ 146.

Pursuant to Section 5.2.2 of the Mezz Loan Agreement, the Mezz Lender "sent notice to all

relevant parties that it had the exclusive power to make any compromise or settlement in connection with the Condemnation Action." *Id.* ¶ 154. Remember that the language of the Mezz Loan Agreement provided that "Lender is hereby irrevocably appointed to act after the occurrence and during the continuance of an Event of Default as Borrower's attorney-in-fact, coupled with an interest, with exclusive power to collect, receive and retain any Award and to make any compromise or settlement in connection with any Material Condemnation." Mezz Loan Agreement § 5.2.2. Plaintiffs take the position that Mr. Ashkenazy and USSM ignored that notice and continued to act as though they had the right to settle the Condemnation Action. Defendant disputes that assertion. *Id.* ¶ 155.

### J.  The Mezz Lender Exercises Its Remedies

On May 13, 2022—just over two years after USI and USSM's first payment default—the Mezz Lender exercised the remedies available to it under the Mezz Loan Agreement and the Pledge Agreement. *Id.* ¶ 156. To that end, the Mezz Lender issued three notices that day. The first notice (the "Section 8(a) Notice") "notified USSM that Mezz Lender was exercising its rights pursuant to Section 8(a) of the Pledge Agreement . . . ." *Id.* ¶ 157. That section of the Pledge Agreement provided that at the Mezz Lender's option following the occurrence of an Event of Default, "all Pledged Company Interests . . . shall be registered in the name of Lender, . . . and Lender or its nominee may thereafter exercise (i) all voting, managerial, limited liability company and other rights pertaining to the Pledged Company Interests and the business and affairs of Mortgage Borrower . . . ." Pledge Agreement § 8(a). In response, USSM refused to register the equity interests in USI in the Mezz Lender's name. SUMF ¶ 159. And after receiving the notice, USSM "did not change anything with respect to the management and operation of USI." *Id.* ¶ 158.

The second notice sent by the Mezz Lender notified USSM that it was exercising certain of its rights under Section 9(a) of the Pledge Agreement—in particular, the right "to exercise all voting,

managerial, consensual and other powers of ownership pertaining to the Collateral under Mortgage Borrower's Operating Agreement as if Lender were the sole and absolute owner thereof." Pledge Agreement § 9(a); SUMF ¶ 160. Acting in accordance with that provision, the Mezz Lender amended USI's operating agreement and appointed William H. Henrich to act as the new manager for USI. *Id.* ¶ 161. The Mezz Lender notified Mr. Ashkenazy that he was no longer the manager of USI. *Id.* ¶ 162. USSM did not cede the ability to exercise managerial control over USI. *Id.* ¶ 163. And Mr. Press, the "day-to-day operations person for USSSM," simply refused to recognize that Mr. Henrich had any management responsibilities, notwithstanding the Mezz Lender's exercise of its remedies. *Id.* ¶¶ 164, 188.

The third notice informed USI that the Mezz Lender was exercising its rights as attorney-in-fact pursuant to Section 13 of the Pledge Agreement. *Id.* ¶ 182. That section of the Pledge Agreement contained an agreement by USSM to appoint the Mezz Lender "for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes" of the agreement. Pledge Agreement § 13.

Notwithstanding the series of notices from the Mezz Lender exercising its contractual rights to assume management of USI as a result of the longstanding defaults, USI's management continued to manage Union Station until after this litigation was filed and the Court entered an order directing that they recognize the Mezz Lender's exercise of its remedies. *Id.* ¶¶ 173, 188. Among other things, after Mr. Henrich—the Mezz Lender's designated manager—filed one answer in the Condemnation Action on behalf of USI, the management team of USI affiliated with Mr. Ashkenazy had its separate counsel file papers in the Condemnation Action on behalf of USI. *Id.* ¶ 188-190. And on May 20, 2022, Mr. Press emailed the President of USRC—USI's landlord—

telling her that the lender "was not authorized to act on USI's behalf." SUMF ¶ 191.[12]

### K. The Mezz Lender Forecloses on the Pledged Equity of USI

The final notice that the Mezz Lender issued on May 13, 2022 notified USSM through Mr. Ashkenazy that it intended to foreclose on the pledged equity interests in USI. Dkt. No. 147-II (the "Foreclosure Sale Notice"); SUMF ¶ 184. The Foreclosure Sale Notice notified USSM that the Mezz Lender intended to sell the equity interests in USI pursuant to a public foreclosure sale that was scheduled to take place on June 14, 2022. Foreclosure Sale Notice at 1. The Foreclosure Sale Notice contained a calculation of the amount that the Mezz Lender believed to be owing as of May 13, 2022—$137,897,420, consisting of the original $100,000,000 principal amount of the loan, together with unpaid interest and other fees. *Id.*

The Foreclosure Sale Notice included a "UCC Public Sale Notice." *Id.*; *see also* Dkt. No. 147-NN. The UCC Public Sale Notice provided more information about the sale: it described among other things, the pledged interests in USI that were to be sold and a brief description of the mortgage loan. *Id.* The UCC Public Sale notice stated that the foreclosure would take place on the front steps of the state courthouse at 60 Centre Street, New York, New York, as well as in the offices of Mayer Brown LLP. *Id.* at 2. The notice advised bidders that the Mezz Lender reserved the right to credit bid at the auction. *Id.*

The foreclosure sale was conducted by Cushman & Wakefield, as the marketing and sales agent. SUMF ¶ 195. Cushman & Wakefield marketed the sale in publications like *The New York Times*, *The Washington Post*, as well as several commercial real estate sources. *Id.* ¶ 196. There was substantial interest in the sale: leading up to the sale, 134 confidentiality agreements were signed,

---

[12] Mr. Press's email characterized the lender's action as interference, stating: "Regarding the recent efforts to interfere with Union Station Investco, we are advising you that any effort to commandeer control is invalid. We are going to continue to act in the best interests as managers of Union Station. The lender and its agent (Rexmark) are not authorized to act on USI's behalf." SUMF ¶ 191.

and 70 parties viewed materials on the due diligence data site. *Id.* ¶¶ 197-198.

The foreclosure sale was held as planned on June 14, 2022. *Id.* ¶ 201. No representative of USSM attended the sale. *Id.* ¶ 202. Before the sale moved forward, the coordinator of the sale confirmed that USSM had not obtained an injunction to prevent the sale from taking place, and that USSM had not filed for bankruptcy. *Id.* ¶ 203. And, indeed, neither USI nor USSM had sought court protection or filed for bankruptcy prior to the sale. *Id.* ¶ 204. They took no action to prevent the sale from proceeding. *Id.* ¶ 205.

The Mezz Lender ended up being the only bidder at the foreclosure sale. *Id.* ¶ 207. It credit bid the full amount of the then-outstanding balance of the Mezz Loan—$140,535,334.53—to purchase the pledged equity interests in USI. After the foreclosure sale concluded, the Mezz Lender assigned all of its interests in USI to DAOL Rexmark Union Station LLC ("Union Station Sub").[13] *Id.* ¶ 208; Dkt. No. 146-NN. The following day, the Mezz Lender notified USSM about the change in management and control of USI from USSM to Union Station Sub. SUMF ¶ 210.

USSM refused to recognize the results of the foreclosure sale and that USSM no longer owned the equity interests in USI. *Id.* ¶ 214. USSM and Mr. Ashkenazy argued to the court in the Condemnation Action that the foreclosure sale had "no effect given the pendency of this action." *Id.* ¶ 216. Notwithstanding the foreclosure proceeding, USSM continued to act as if it was the owner of USI. *Id.* ¶ 221. USSM told vendors, the court, the press, and other third parties that it continued to have the authority to speak on behalf of USI. *Id.* Mr. Press "continued to operate USI as usual despite having received notice that Union Station Sub owned the USI Equity." *Id.* ¶ 222.

---

[13] The SUMF contains an uncontested statement that the Mezz Lender assigned its interests in USI to Union Station Sub "[a]fter the conclusion of the Foreclosure Sale." SUMF ¶ 208. The documents reflect a slightly different course of events—namely that Union Station Sub directly acquired the equity interests in USI. A contribution agreement entered into between the Mezz Lender and Union Station Sub was used to contribute the Mezz Lender's "right to purchase 100% of the limited liability membership interests in" USI to Union Station Sub. Dkt. No. 146-56 at 1. Consistent with that, Union Station Sub is listed as the purchaser of the equity interests in the memorandum of sale executed following the foreclosure sale. Dkt. No. 147-47.

And Mr. Ashkenazy's counsel sent a letter to the Mezz Lender's counsel stating that Mr. Ashkenazy "dispute[s] the validity" of the foreclosure on the Mezz Loan. *Id.* ¶ 225. It was not until this Court issued an injunction in this action that Mr. Ashkenazy and USSM ceded management control over USI and Union Station to the Mezz Lender. *Id.* ¶ 231.

## L. Procedural History

Plaintiffs filed their complaint on August 4, 2022. Dkt. No. 1. On the same day, Plaintiffs made an application to the Court for the issuance of an injunction that would require USSM to stop acting as if it were the owner of USI, notwithstanding the Mezz Lender's exercise of remedies and consummation of the foreclosure sale. Dkt. Nos. 6-8.

After briefing by the parties, the Court held a hearing regarding the request for the entry of preliminary injunctive relief on August 23, 2022. Dkt. No. 49 ("PI Tr."). Following arguments by the parties, the Court issued an extensive oral opinion regarding the application. The Court concluded: "Plaintiffs have a substantial and clear likelihood of success on the merits with respect to their assertion that they effectively foreclosed on USSM's equity interests in USI and that the lender under the Mezz Loan Agreement is now the owner of the equity interests in USI." PI Tr. at 56:19-23. The Court observed: "At the outset, Defendant does not contend that the method by which Lender conducted the foreclosure sale of the interests in USI was improper. Their decision not to challenge the procedures used is understandable given the facts presented to me." *Id.* at 56:24-57-3.

> Having reviewed the record of the sale and the build up to it, I conclude that Plaintiff has a substantial and clear likelihood of success to show that its sale complied with Article 9 and that the lender under the Mezz Loan Agreement is the owner of the USI equity interests.
>
> Indeed, Defendants present no argument to the contrary based on the nature of the Article 9 sale. They argue only that Section 5.2.2 of the Mezz Loan Agreement prohibited the lender from exercising its rights as a secured party.

*Id.* at 57:13-21.

26

The Court found that Defendant's argument that Section 5.2.2 of the Mezz Loan Agreement limited the Mezz Lender's rights to exercise its remedies was unsupported by the text of the agreement. The Court pointed out that the various loan documents made clear that the rights of the lender were cumulative, and not limited by the text of Section 5.2.2, as Defendant contended. *Id.* at 58:18-66:18. Referring to the remedial provisions of the various mezzanine loan documents, the Court concluded that

> Defendant's argument that Section 5.2.2 somehow overrides these express grants of authority lacks textual support. And the argument that it prevails by implication ignores the specific language in the agreements addressing the lender's rights during the continuance of an event of default, and, in my view logic. It does not make sense that a lender would agree to standstill notwithstanding a payment default in the face of a condemnation. And the agreements in my view make it clear that the lender did not do so.

*Id.* at 66:8-16.

As a result, the Court issued a preliminary injunction order restraining "USSM, its officers, directors, members, employee, agents, and all those acting in concert with any of them" from "(1) holding itself out as the owner or in control of Union Station Investco, LLC ('USI'); (2) exercising or purporting to exercise any contractual or other legal right of USI; (3) collecting, transferring, seizing, or directing the transfer of any assets or liabilities of USI; and (4) impeding the collection or transfer of any assets to USI that are owed to it." Dkt. No. 39.

It is undisputed that USSM did not acknowledge the results of the foreclosure sale prior to the entry of the preliminary injunction order. SUMF ¶ 214.

Defendant answered the complaint on September 19, 2022. Dkt. No. 45 ("Answer"). In its Answer, Defendant asserted a series of affirmative defenses. The third affirmative defense asserted that Plaintiffs' claims were "barred by its own breach of contract, unclean hands, bad faith, and other culpable conduct." Answer at 31. Defendant asserted that Plaintiffs "and their predecessors

in interest" had "interfered with USSM's efforts to refinance the Loans to enable it to remedy the alleged defaults." *Id.* Defendant pointed to the following facts to support its claim. First, that "Kookmin's predecessors in interest as Lender under the mortgage loan wrongly and unreasonably denied consent to a change in ownership transaction that would have allowed USI and USSM to repay the balance of both the mortgage and mezzanine loans." *Id.* And second, that "Kookmin and its agents, following the purchase of the mortgage loan in January 2022, wrongly interfered with USSM's . . . management of Union Station and existing and prospective contractual relationships." *Id.* The alleged interference included "instructing real estate brokers not to negotiate . . . with representatives of USSM . . . and meeting with existing and prospective Union Station tenants in connection with commercial leasing at Union Station." *Id.*

In its fourth affirmative defense, Defendant asserted that "Plaintiffs are not entitled in law or equity to share in the condemnation award above the amount necessary to satisfy the debt due to the lender." *Id.*

Defendant asserted six additional affirmative defenses in its Answer. But it pleaded no factual support for any affirmative defense other than the third. *Id.* at 30-32.

Following completion of discovery, Plaintiffs filed this motion for summary judgment on May 2, 2024. Dkt. Nos. 141; 142 ("P. Mem."). In their motion, Plaintiffs request that the Court grant their request for declaratory judgment. In support of their motion, Plaintiffs argue that the foreclosure sale was permitted under the terms of the Pledge Agreement and that it was properly conducted pursuant to Section 9-610 of the Uniform Commercial Code. P. Mem. at 4–6.

Much of Plaintiffs' motion anticipates arguments that they expected Defendant to present in its opposition. First, Plaintiffs argue that Section 5.2.2 of the Mezz Loan Agreement does not limit the exercise of the Mezz Lender's remedies during the continuance of a condemnation proceeding. *Id.* at 6–9. Second, Plaintiffs assert that Defendant's equitable defense to the foreclosure proceeding

lack merit as a matter of law.  Plaintiffs first contend that equitable defenses do not apply to this

action for declaratory judgment because the relief requested is legal in nature.  *Id.* at 12.  Plaintiffs

argue that unwinding a foreclosure proceeding following its completion is inconsistent with Section

9-625 of the UCC, which, they argue, only permits a debtor to seek damages—not equitable relief—

after a foreclosure sale has been completed.  And finally, Plaintiffs argue that the Defendant's

equitable defenses lack merit.  *Id.* at 15-21.

Defendant filed an opposition to the motion for summary judgment on May 30, 2024.  Dkt.

No. 166 ("D. Mem.").  In its opposition, Defendant does not challenge the procedures used by

Plaintiffs to conduct the foreclosure sale.  Instead, it argues again that Section 5.2.2 of the Mezz

Loan Agreement limited the ability of the lender to conduct a foreclosure proceeding.  D. Mem. at

7–13.  Defendant also contends that it can assert equitable defenses.  Defendant argues that the

declaratory relief requested by Plaintiffs is equitable in nature, rather than legal, and that, therefore

equitable defenses should apply.  *Id.* at 13-16.

In its opposition, Defendant also asserted that its equitable defenses have merit.  First,

Defendant argues that the decision by the original Mortgage Loan lender not to approve the PIF

deal inequitably limited its ability to refinance the loans.  Recognizing that a different company made

that decision, Defendant argues that the Mezz Lender inherited that alleged taint when it bought the

Mortgage Loan.  *Id.* at 16–19.  Defendant argues that there are disputed issues of material fact

regarding Plaintiffs' alleged "interference" with USSM's management of Union Station following the

exercise of their remedies.  In particular, Defendant asserts that following the acquisition of the

Mortgage Loan in 2022, the Mezz Lender "interfered" with its management of Union Station by

discussing the sale of the Mezz Loan in the presence of potential tenants, *id.* at 21, and also by

disapproving of two leases.  *Id.* at 21–22.  The motion was fully briefed on June 13, 2024, when

Plaintiffs filed their reply.  Dkt. No. 177.

II.      **LEGAL STANDARD**

### A. Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

### B. The Declaratory Judgment Act

The Declaratory Judgment Act provides in pertinent part the following: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A federal court may exercise jurisdiction over an action for declaratory judgment only if there "exists . . . an 'actual controversy.'" *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001) (quoting 28 U.S.C. § 2201(a)). A justiciable declaratory judgment claim must be "'definite and concrete, touching the legal relations of parties having adverse legal interests,'" as well as "'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)).

"The Declaratory Judgment Act by its express terms vests a district court with discretion to determine whether it will exert jurisdiction over a proposed declaratory action or not." *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003).

> [T]o guide the exercise of discretion in Declaratory Judgment Act cases . . . [the Second Circuit has] articulated a simple test that asks (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty. Other circuits have built upon this test, to ask also: ([3]) whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'; ([4]) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and ([5]) whether there is a better or more effective remedy.

*Dow Jones*, 346 F.3d at 359–360 (citations omitted).

Here, there is no dispute regarding the justiciability of this dispute under the Declaratory Judgment Act. As outlined above, the parties dispute the effectiveness of the foreclosure proceeding and the scope of each of their respective rights under the relevant loan documents. A ruling by the Court will clarify and settle the legal issues raised by their dispute.

### C. Contract Interpretation Under New York Law

The Mezz Loan Agreement and the Pledge Agreement are governed by New York law. Mezz Loan Agreement § 11.3; Pledge Agreement § 18(f). Under New York law, "[w]hen interpreting a contract, our 'primary objective . . . is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)). "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotation marks and brackets omitted)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . .").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Conversely, "[a] contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd. v. SBA Comm'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114). "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed as to give full

meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole."). But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). Rather, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (quotation omitted).

In New York, "[w]hile the meaning of a contract is ordinarily a question of law, when a term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact." *Amusement Bus. Underwriters, a Div. of Bingham & Bingham, Inc. v. Am. Int'l Grp., Inc.*, 66 N.Y.2d 878, 880 (1985); *see also JA Apparel*, 568 F.3d at 397 ("[W]here the contract language creates ambiguity, extrinsic evidence as to the parties' intent may properly be considered." (citing, *inter alia*, *Seiden*, 959 F.2d at 429 (stating that where a contract is ambiguous, "extrinsic evidence may properly be considered in the search for the contracting parties' intent")); *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018) (similar). "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder." *JA Apparel*, 568 F.3d at 397.

Moreover, "a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. Ambiguity here is defined in terms of whether a reasonably

intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (citing *Compagnie Financiere*, 232 F.3d at 157–58; *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir. 1993)); *see also Seiden*, 959 F.2d at 428 ("When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity.").

"Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Seiden Assocs.*, 959 F.2d at 428 (citing *Heyman v. Commerce and Industry Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975); *Painton v. Company & Bourns, Inc.*, 442 F.2d 216, 233 (2d Cir. 1971)); *see also Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("[S]ummary judgment when interpreting a contract may be granted only when 'the intent of the parties can be ascertained from the face of their agreement.' 'However, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.'" (citations omitted)); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87–88 (2d Cir. 2015) ("Because facial ambiguity in a contract will require the factfinder to examine extrinsic evidence to determine the contract's effect, and because such extrinsic evidence is most often mixed, a court generally will not grant summary judgment on a contract claim when the operative language is ambiguous.").

Thus, where a court finds that the contract language is ambiguous, "summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of

only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co.*, 526 F.3d at 68 (citing *Compagnie Financiere*, 232 F.3d at 158); *see also New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010) ("Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is 'so one-sided that no reasonable person could decide to the contrary.'" (quoting *Compagnie Financiere*, 232 F.3d at 158).

## III.    DISCUSSION

### A.  The Lender Was Permitted to Conduct the Foreclosure Sale While the Condemnation Action Was Pending

Defendant's argument that the Mezz Lender's exercise of its remedies is limited by Section 5.2.2 of the Mezz Loan Agreement is not supported by the clear, unambiguous text of the Mezz Loan Agreement and the Pledge Agreement. As described above, the Mezz Loan Agreement contains extensive provisions outlining the rights of the Mezz Lender following the occurrence of an Event of Default. There is no dispute that an Event of Default had occurred at the time that the Mezz Lender finally exercised its remedies. Instead, as described above, nearly two years elapsed between USSM's default and the exercise of remedies.

Section 10.2(a) of the Mezz Loan Agreement permits the Mezz Lender to, "*in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Collateral . . . .*" Mezz Loan Agreement § 10.2(a)(emphasis added). Similarly, Section 10.2(b) provides:

> Upon the occurrence of any Event of Default and at any time thereafter while any Event of Default is continuing, all or any one or more of the rights, powers, privileges *and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time*, whether or not all or any portion of the Debt shall be declared due and

payable, and whether or not Lender shall have commenced any foreclosure proceeding or initiated or taken other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Collateral. *Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.*

*Id.* § 10.2(b) (emphasis added). Section 10.4 states that the "rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise . . . ." *Id.* § 10.4.

Sections 8 and 9 of the Pledge Agreement also specifically authorized the Mezz Lender to foreclose on the pledged equity interests in USI following the occurrence of an Event of Default. For example, Section 9(a)(i) authorized the lender to "exercise all rights and remedies of a secured party under the Code . . . including, without limitation, the right, to the maximum extent permitted by law, to exercise all voting, managerial, consensual and other powers of ownership pertaining to the Collateral under Mortgage Borrower's Operating Agreement as if Lender were the sole and absolute owner thereof . . . ." Pledge Agreement § 9(a)(i). And Section 9(b) specifically authorized the lender to conduct a public foreclosure sale of the pledged assets. *Id.* § 9(b). As with the remedial provisions of the Mezz Loan Agreement, the Pledge Agreement specifically provided that the powers granted to the under the agreement were "*cumulative and shall be in addition to* all rights, powers, privileges and remedies available to Lender at law or in equity." *Id.* § 9(c) (emphasis added).

Defendant's argument that Section 5.2.2 deprived Mezz Lender of its right to exercise its remedies is inconsistent with the unambiguous text of the agreements. Defendant argues that "[u]pon notice of the condemnation, the rights and obligations became subject to the specific condemnation-related provisions of Section 5.2.2 of the Mezzanine Loan Agreement." D. Mem. at 7. Defendant argues that the provision "limits the Mezzanine Lender's involvement once a

37

condemnation has been effected to participation in the collection of any award, the negotiation of the settlement, or participation, on their own behalf, in litigation." *Id.* at 8.  And Defendant takes the position that the last sentence of Section 5.2.2 "affirms that following a condemnation of the property, the sole source of payment for the Mezzanine Loan is the condemnation award." *Id.* at 9.

The problem with Defendant's interpretation of Section 5.2.2 is that it has no support in the text.  At the outset, Defendant's argument that Section 5.2.2 operates to the exclusion of all other remedies of the Mezz Lender is contradicted by the express language of Section 10 of the Mezz Loan Agreement and Sections 8 and 9 of the Pledge Agreement, which make it clear that those rights are "cumulative" and "in addition to" all other rights provided under the loan documents and the law.  There is no text in Section 5.2.2 that contradicts those clear statements.  The lender's rights to exercise its remedies are expressly granted to it "in addition to" its other rights under the loan agreements—including those rights provided by Section 5.2.2 of the Mezz Loan Agreement.  Section 5.2.2 does not limit the lender's ability to exercise those "cumulative" rights.

Defendant's argument that Section 5.2.2 operates as a kind of mandatory forbearance provision following a condemnation also finds no support in the text of that provision.  Again, Defendant argues that Section 5.2.2 "limits the Mezzanine Lender's involvement once a condemnation has been effected to participation in the collection of any award . . . ."  D. Mem. at 8.  In support of this argument, Defendant cites the provision of 5.2.2 that reads as follows:  "Borrower shall, at its cost and expense, diligently prosecute or cause Mortgage Borrower to diligently prosecute any such litigations or proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such litigations or proceedings."  Mezz Loan Agreement § 5.2.2.  This sentence, like the remaining portions of Section 5.2.2 does not limit the rights or remedies available to the Mezz Lender; it merely imposes additional obligations on Borrower.

The last sentence of Section 5.2.2 does not establish, as Defendant argues, "that following a condemnation of the property, the sole source of repayment for the Mezzanine Loan is the condemnation award." D. Mem. at 9. That sentence reads as follows: "Subject to the rights of Mortgage Lender under the Mortgage Loan Documents, if the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award or a portion thereof sufficient to pay the Debt in full." Mezz Loan Agreement § 5.2.2.

First, the argument that Section 5.2.2 limits the ability of the Mezz Lender to recover its debt during the pendency of a condemnation proceeding to the proceeds of the condemnation is expressly contradicted by its text. Section 5.2.2 states that "[n]otwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for in this Agreement . . . ." *Id.* This language expressly contradicts Defendant's argument that during the pendency of a condemnation proceeding, Section 5.2.2 limits the lender's recovery to the collection of any condemnation award.

Second, the evidence presented to the Court does not support the conclusion that the last sentence of Section 5.2.2 is applicable at all to the facts of this case. That sentence applies "if the Property is sold . . . ." *Id.* The term "Property" is defined as "the Land, the Improvements now or hereafter erected, situated or installed thereon and all personal property owned by [USI] and encumbered by the Security Instrument . . . ." Mezz Loan Agreement § 1.1; Mortgage Loan Agreement § 1.1. The "Land" is defined by reference to the security agreement entered into by USI to secure the Mortgage Loan.[14] Mortgage Loan Agreement § 1.1. Simply put, there is no evidence in the record that the "Property" has been sold. Because of that, as a matter of fact, the last sentence of Section 5.2.2 does not apply at this time.

---

[14] The parties did not provide this security agreement to the Court.

Third, even if the last sentence was triggered by the pendency of any condemnation proceeding, as Defendant prefers to view the text—rather than by a sale of the Property, as the text actually reads—the last sentence of Section 5.2.2 cannot be construed to limit the right of the Mezz Lender to exercise any remedies, or to limit its recovery to the amount received in any condemnation proceeding.  Again, the agreements expressly provide that the lender can exercise its remedial rights in addition to other rights provided under Section 5.2.2, including its last sentence. The provision is not surplus because it applies even when no Event of Default is outstanding under the Mezz Loan Agreement.  The provision gives the Mezz Lender the opportunity to obtain payment from any condemnation award to repay the amount of the debt in full even at a time when the loan was otherwise fully performing.

Defendant's argument that this last sentence "limits Mezzanine Loan Lender's recovery to the portion of the condemnation award 'sufficient to pay the Debt in full'" following the exercise of the lender's remedies has no basis in the text.[15]  D. Mem. at 23.  Had the Mezz Lender exercised its rights pursuant to that provision of the Mezz Loan Agreement, it would not be able to take more than the amount of the Award "sufficient to pay the debt in full."  Mezz Loan Agreement § 5.2.2. But in this case, the Mezz Lender did not collect on the proceeds of a condemnation award pursuant to this provision of the agreement.  Instead, it exercised its remedies pursuant to the remedial provisions of the Mezz Loan Agreement and the Pledge Agreement.  The last sentence of Section 5.2.2 does not override the broad rights of the Mezz Lender following the occurrence of an event of

---

[15] As context, for the benefit of the reader, a potential motivation for Defendant to present this argument is plain.  If the Condemnation Action yields a valuation of the leasehold interest consistent with the valuation in the PIF deal—$700 million or more—there may be value to the equity of USI in excess of the amount paid by the Mezz Lender to acquire it in the foreclosure action.  By advancing this argument regarding the interpretation of Section 5.2.2, Defendant seeks to require the Mezz Lender to turn over to USSM any amount in excess of the amount that they credit bid to acquire the stock of USI.

default established in the loan documents, which include all of the rights of a secured lender under the UCC, including the opportunity to profit off of the assets acquired in a foreclosure sale.[16]

### B.  The Foreclosure Sale Was Conducted Properly and Was Effective

The foreclosure sale was conducted properly and effectively transferred the shares of USI to Union Station Sub.  Defendant does not present any argument regarding the procedures used in the foreclosure sale or with respect to its effectiveness other than the arguments regarding the application of Section 5.2.2 discussed by the Court above.  Still, the Court has reviewed the procedures used in connection with the foreclosure sale and concludes that it was conducted properly and that it effectively transferred the shares of USI to Union Station Sub.

The Mezz Lender conducted the foreclosure sale pursuant to Section 9-601 of the UCC. Section 9-610 of the Uniform Commercial Code provides the following:

> (a) Disposition after default.  After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing.

> (b) Commercially reasonable disposition.  Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.  If commercially reasonable, a secured party may dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms.

> (c) Purchase by secured party.  A secured party may purchase collateral:

> (1) at a public disposition . . . .

N.Y. U.C.C. Law § 9-610.

---

[16] *See* 10 Anderson U.C.C. § 9-504:413 (3d. ed.) ("When the creditor has made a proper purchase of the collateral, the creditor is free to resell the collateral to third persons on any terms desired.  There is no requirement that the creditor credit the debtor with the proceeds obtained by the creditor when subsequent resale of the collateral is made by the purchasing creditor."); 10 Anderson U.C.C. § 9-504:640 (3d. ed.) ("When the creditor purchases the collateral at a proper sale or properly retains it in satisfaction of the debt, the creditor is the owner of the collateral free of any claim of the debtor.  Consequently, if the creditor thereafter sells the collateral, the debtor is not entitled to any of the proceeds of the resale even though the creditor obtains a surplus in excess of any balance of the debt remaining.").

The foreclosure sale was conducted in a commercially reasonable manner. Notice of the foreclosure sale was reasonable. The Foreclosure Sale Notice was provided to the borrower on May 13, 2022, over a month before the scheduled sale. The UCC Public Sale Notice provided sufficient information regarding the sale to potential purchasers. Notice of the sale was published in *The New York Times*, *The Washington Post* and several commercial real estate sources. The effectiveness of the notice plan is demonstrated by the substantial number non-disclosure agreements entered into by prospective buyers—134—and the large group of prospective buyers who viewed materials on the sale's data site.

The foreclosure sale was conducted by Cushman & Wakefield. It took place in a public location—the stairs of the courthouse at 60 Centre Street. Ultimately, only one bidder participated in the auction. But the fact that only a single bidder participated in the auction does not undermine the conclusion that the sale itself was conducted in a commercially reasonable manner. *See Sumner v. Extebank*, No. 13917, 452 N.Y.S.2d 873, 875 (1st Dept., June 29, 1982) ("The fact that only one bidder appeared does not make the sale commercially unreasonable.").[17]

It is for good reason that Defendant has not challenged the commercial reasonableness of the foreclosure sale. Indeed, all of the facts presented to the Court regarding the conduct of the foreclosure sale are consistent the conditions that USSM agreed in the Pledge Agreement to be presumptively commercially reasonable.[18]

---

[17] There is no indication in the record that the amount that the Mezz Lender credit bid for the equity interests in USI was inadequate. The Mezz Lender credit bid a very large amount for the pledged equity—over $140 million. The equity interests in USI only have value to the extent that the proceeds of the condemnation action exceed the liabilities of USI, including the amount outstanding under the Mortgage Loan, the initial principal amount of which was $330 million. The valuation of the leasehold interest proposed by Amtrak in the Condemnation Action is less than that amount. As a result, it may ultimately be determined that the equity interests in USI have little to no value. A "foreclosure sale will not be set aside for mere inadequacy of the price obtained unless it is so inadequate as to shock the conscience." *Thornton v Citibank, N.A.*, 640 N.Y.S.2d 110, 111, 1996 WL 164311 (1'st Dept., Apr. 09, 1996). Given the uncertainty regarding the value of the equity interests in USI, there is no indication that the amount paid by the Mezz Lender in the sale was inadequate, and there is certainly nothing about the price paid that shocks the conscience.

[18] The record presented to the Court does not contain sufficient facts for the Court to determine that the sale was consistent in all respects with that provision of the Pledge Agreement. The Court is unaware of whether (i) Cushman & Wakefield is licensed in the State of New York, Pledge Agreement § 10(d)(i), (ii) the notice of sale was published for

The foreclosure sale transferred all of USSM's rights in the equity interests in USI to Union Station Sub. Section 9-617 of the Uniform Commercial Code describes the effects of the disposition of collateral as follows:

(a) Effects of disposition. A secured party's disposition of collateral after default:

(1) transfers to a transferee for value all of the debtor's rights in the collateral;

(2) discharges the security interest under which the disposition is made; and

(3) discharges any subordinate security interest or other subordinate lien other than liens created under any law of this state that are not to be discharged.

N.Y. U.C.C. § 9-617. As transferee in the foreclosure sale, Union Station Sub acquired all of USSM's rights in USI.

The Uniform Commercial Code provides a statutory mechanism for the transfer of legal title to assets sold in a foreclosure sale. Section 9-619, entitled "Transfer of Record or Legal Title," provides for the issuance of a "transfer statement," which is defined as

a record authenticated by a secured party stating: (1) that the debtor has defaulted in connection with an obligation secured by specified collateral; (2) that the secured party has exercised its post-default remedies with respect to the collateral; (3) that, by reason of the exercise, a transferee has acquired the rights of the debtor in the collateral; and (4) the name and mailing address of the secured party, debtor, and transferee.

*Id.* § 9-619(a). "A transfer statement entitles the transferee to the transfer of record of all rights of the debtor in the collateral specified in the statement in any official filing, recording, registration, or certificate-of-title system covering the collateral." *Id.* § 9-619(b).

The Mezz Lender issued a transfer statement following the foreclosure sale. Dkt. No. 146-56 (the "Transfer Statement"). The Transfer Statement contained all of the information required by the statute, and was authenticated by the Mezz Lender. It identified Union Station Sub as the

---

seven consecutive days in the New York Times, *id.* § 10(d)(v), and (iii) lender sent notices to others who may have claimed an interest in the collateral, *id.* § 10(d)(vi).

transferee of the equity interests in USI.  The Transfer Statement manifests Union Station Sub's legal title to the equity interests and entitles Union Station Sub to have its ownership interest registered in the records of any official filing system.

It is important to highlight that the foreclosure sale conducted by the Mezz Lender pursuant to Section 9-601 of the Uniform Commercial Code was what is referred to as a "non-judicial" foreclosure, as distinguished from a "judicial" foreclosure sale.  "Judicial" foreclosure sales can be conducted under the auspices of a court pursuant to any available court procedure.  *See, e.g.*, 96 N.Y. Jur. 2d Secured Transactions § 313 ("Judicial foreclosure is governed by other law and not by Article 9 of the Code.").  A foreclosure proceeding pursuant to Section 9-610 of the Uniform Commercial Code, however, is a "non-judicial" proceeding.  That is because a foreclosure sale conducted pursuant to Section 9-610, like the one at issue in this case, does not require court action to be effective.  As described above, the Uniform Commercial Code specifies the effect of the sale, and provides a mechanism for the transfer of legal title to the assets sold without the need for action by any court.

Plaintiffs in this case are not asking the Court to transfer title to the foreclosed property to them—that happened by statute without the need for court action.  Instead, they are asking the Court to force a recalcitrant debtor to recognize the effect of that transfer.  This is an important distinction to keep in mind as the Court turns to a discussion of the next question—namely whether Defendant can assert equitable defenses to this action.

### C.  Defendant Cannot Assert Equitable Defenses in this Action Because the Foreclosure Sale Has Closed

Defendant's affirmative equitable defenses do not prevent the Court from granting Plaintiffs' request for declaratory judgment.  Defendant asserts that the Court should not enter declaratory judgment reaffirming the effectiveness of the foreclosure sale because, it asserts, certain conduct by the Mezz Lender—and the Mortgage Loan lender before it—was "unjust."  Answer at

31.  It asserts this defense notwithstanding the undisputed fact that the Mezz Lender's $100,000,000 loan had remained in payment default for over two years before the Mezz Lender exercised its remedies.  There are several reasons why Defendant's contentions lack merit.

### 1.  Defendant's Assertion of Equitable Defenses Is Inconsistent with the Statutory Scheme

The Uniform Commercial Code does not permit a debtor to seek injunctive relief to unwind a foreclosure sale that has been consummated; instead, its remedy is limited to a claim for damages. Section 9-625(a) of the Uniform Commercial Code permits a debtor to seek an injunction to prevent a secured party from enforcing its security interest in a manner that is inconsistent with the statute. N.Y. U.C.C. § 9-625(a) ("If it is established that a secured party is not proceeding in accordance with this article, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions.").  Section 9-625(a) expressly permits a party to seek injunctive relief to prevent an improper enforcement proceeding.  *Id.*  Official Comment 2 ("under subsection (a) an aggrieved person may seek injunctive relief . . . .").  "However, with respect to injunctive relief, its availability depends on the status of the collateral, and, by its plain terms, in order for an aggrieved party to obtain such relief, section 9-625(a) requires that the secured party presently be proceeding in a manner that is not in accordance with article 9."  *Atlas MF Mezzanine Borrower, LLC v Macquarie Tex. Loan Holder LLC*, 105 N.Y.S.3d 59 (1st Dep't 2019).  "Stated otherwise, a debtor may only seek to enjoin the sale before the sale occurred."  *Id.*

After a foreclosure sale has been completed, however, a debtor's remedies are limited to a suit for damages under Section 9-625(b).  *Id.* ("After disposition of the collateral, the available remedy is money damages.").  This principle is well-established in New York law.  *See, e.g.*, 96 N.Y. Jur. 2d Secured Transactions §§ 368, 371 ("While a debtor may seek to enjoin the sale of its collateral before the sale occurs, where the disposition has occurred, recovery is authorized from the secured party of any loss caused by noncompliance with the default requirements of Uniform

Commercial Code Article 9 relating to collection, enforcement, disposition, or acceptance."). Courts applying other states' adopted versions of Article 9 have also recognized this limitation on the ability of a debtor to unwind a foreclosure sale after it has been consummated. *See, e.g.*, *Figueroa Tower I, LP v. U.S. Bank Nat'l Ass'n*, 2019 WL 1467953, at *14 (Cal. App. 2d Dist., April 3, 2019) (holding that none of the remedies provided under Section 9-625 "permit plaintiffs to have the sale declared void and unwound"); *In re Enron Corp.*, 2005 WL 3873890, at *10 (Bankr. S.D.N.Y. 2005) ("Under a plain meaning of the statute, [Section 9-625(a)] would be applicable in circumstances where the secured party is proceeding to dispose of the collateral and not in a situation where the disposition of the collateral has already occurred. . . . if it were shown that BNP did not comply with the requisite provisions of Article 9, would be an action for damages under section 9–625(b) of the U.C.C. and not an invalidation of the sale.") (emphasis omitted).

This limitation on the remedies available to a debtor following the consummation of a sale is consistent with the overall statutory scheme. Pursuant to Section 9-617(a) a good faith transferee takes "all of the debtor's rights in the collateral" "even if the secured party fails to comply with" the requirements of Article 9. N.Y. U.C.C. § 9-617. Permitting a debtor to unwind a sale after the fact as a result of a creditor's failure to conduct the sale in a manner consistent with the code would undermine that principle. Thus, as the commentary to Section 9-617 states, "[a]n aggrieved person . . . has a right to recover any loss under Section 9-625(b)." N.Y. U.C.C. § 9-617 Official Comment n. 2.

It is clear, therefore, that Defendant cannot seek affirmatively to unwind the foreclosure sale under the Uniform Commercial Code. The result should not be different merely because Defendant is asserting its complaints as an affirmative defense, rather than as an affirmative cause of action. The argument is creative, but it is unsound.

Court endorsement of Defendant's approach would have terrible implications for non-judicial foreclosure proceedings beyond this case. It would encourage debtors to do what Defendant has done here—simply ignore the legal effect of a foreclosure action, and require court action to require them to accept the results of the sale. In this case, the transferee happens to be the secured party, but there is no reason to believe that debtors would not choose to act in the same way with respect to foreclosure proceedings involving third party transferees. Defendant should not be permitted to undermine the simple, clear framework established by the Uniform Commercial Code: a suit for equitable relief from an allegedly improper foreclosure proceeding must be brought before it is consummated, not after it has been completed. The same result should apply regardless of whether the claim for equitable relief is brought affirmatively, or if it is brought, as here, in the guise of an affirmative defense.

### 2. This Declaratory Judgment Action is Legal in Nature Therefore Equitable Defenses are Not Cognizable

As the parties agree, equitable defenses are not available for actions at law. *See Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005) ("Because the SCA seeks damages in an action at law, Aetna cannot avail itself of unclean hands as a defense."). "Actions for declaratory judgments are neither legal nor equitable, and courts have therefore had to look to the kind of action that would have been brought had Congress not provided the declaratory judgment remedy." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 284 (1988) (abrogated in part by statute). The parties dispute whether the case is an action at law or in equity. Defendant takes the position that the "most analogous 'nature of suit' in which an action might be brought is either an action for judicial foreclosure or a quiet title action to finally settle the ownership of disputed property, both of which are equitable in nature." D. Mem. at 14. The Court disagrees for the simple reason that this is not a judicial foreclosure, and because Defendant has no valid claim to the title to quiet. Title to the equity interests at issue was transferred pursuant to the statute without the

need for judicial intervention.  The Court is not being asked to effectuate the transfer of title, but to remedy Defendant's contumacious failure to acknowledge the title.

Therefore, the most analogous "nature of suit" is an action for ejectment.  "In an action for ejectment, plaintiff need only allege that he is the owner in fee and that he has been wrongfully ousted from possession by the action of the defendants."  *State of N. Y. v. White*, 528 F.2d 336, 338 (2d Cir. 1975).  "Possession is the critical determinant."  *Id.; see also Whitehead v. Shattuck*, 138 U.S. 146, 150 (1891) ("The facts set forth in the bill of the plaintiff clearly show that he has a plain, adequate, and complete remedy at law for the injuries of which he complains.  He alleges that he is the owner in fee, as trustee, of certain described lands in Iowa, and his injuries consist in this:  that the defendants are in the possession and enjoyment of the property . . . .").  An ejectment action is an action at law.  *White*, 528 F.2d at 338.

This action is akin to an ejectment action.  Plaintiffs acquired legal title to USI as a result of the foreclosure sale.  As described above, that was a non-judicial proceeding and title to the collateral passed to the purchaser pursuant to the statute without the need for judicial action.  Despite the transfer of title, Defendant, its owner and its agents continued to act as if USSM was the owner of USI and managed the company and its business until the Court ordered them to stop.  While the Mezz Lender was the owner of the property, Defendant continued to "possess" that property.  This declaratory judgment action seeking to dispossess the Defendant from the property is like an ejectment action.

This action is not more akin to a judicial foreclosure proceeding, or to remove a cloud on title, which both arise in equity.  That is because no court order is required to transfer title—it has already happened by operation of the statute.  "The proceeding is not in equity to reform the deed, but is at law to recover possession by virtue of an alleged legal title under it.  We are dealing with the legal title alone in this action; any equities supposed to control it are not the subject of present

consideration, and must be excluded altogether from the discussion." *Prentice v. Stearns*, 113 U.S. 435, 446 (1885).

### 3.  The Evidence Does Not Support Defendant's Equitable Defenses

Even if equitable defenses could be considered in this context, the conduct that Defendant points to in support of its third equitable defense falls far short. "The defense of unclean hands requires the party asserting the affirmative defense to prove that (1) the offending party is guilty of immoral, unconscionable conduct; (2) the conduct was relied upon by the asserting party; and (3) the asserting party was injured as a result." *Sheehy v. New Century Mortg. Corp.*, 690 F.Supp.2d 51, 68 (E.D.N.Y. 2010) (Bianco, J.). The doctrine of unclean hands "is never used unless the plaintiff is guilty of immoral, unconscionable conduct and even then only 'when the conduct relied on is directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." *Nat'l Distillers & Chem. Corp. v Seyopp Corp.*, 17 N.Y.2d 12, 15–16 (1966); *see also Markel v. Scovill Mfg. Co.,* 471 F. Supp. 1244, 1255 (W.D.N.Y. 1979) ("[C]ourts are reluctant to apply the unclean hands doctrine in all but the most egregious situations."). "The burden of proving that unclean hands bars equitable relief is on the party asserting the defense." *Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*, 570 F. Supp. 2d 498, 505 (E.D.N.Y. 2008) (citation omitted). "Application of the 'unclean hands' doctrine rests with the discretion of the court, which is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 969–70 (S.D.N.Y. 1992) (internal citations omitted).

Defendant's evidence of allegedly inequitable conduct by falls short in all three dimensions. First, none of Plaintiff's conduct was immoral or unconscionable. Second, many of the acts of which Defendant complains were taken pursuant to the terms of the Mortgage Loan Agreement, and therefore, were not "directly related" to the exercise of the Mezz Lender's rights under the

separate Mezz Loan Agreement and Pledge Agreement. And, finally, Defendant has presented

insufficient evidence to show that any of the Plaintiff's acts harmed it to a degree that would justify

the application of the doctrine of unclean hands. Although Defendant's equitable defenses are not

entitled to consideration, the Court finds that the evidence presented to the Court construed in the

light most favorable to Defendant does not support Defendant's equitable defenses.

### a. The Mortgage Lender's Decision Not to Consent to the PIF Deal

The Mortgage Loan lender's decision not to consent to the proposed transaction with PIF

does not support the assertion of an equitable defense that would prevent the Mezz Lender from

exercising its remedies. This is because the conduct that Defendant points to in support of its

defense is not immoral or unconscionable, and because it is not directly related to the exercise of

Plaintiffs' remedies under the Mezz Loan Agreement and Pledge Agreement.

Plaintiffs' decision not to approve the proposed deal with PIF was plainly neither immoral

nor unconscionable. Defendant claims that the decision not to consent to the PIF deal was

inconsistent with the provision of the Mortgage Loan Agreement. There are substantial questions

regarding the merit of this assertion.[19]  And in any event, the decision was not immoral or

---

[19] Plaintiffs make two principal arguments that challenge the validity of Defendant's position. First, Plaintiffs argue that the Mortgage Loan lender's decision was not inconsistent with the terms of the agreement because the lender was able to withhold consent "for any reason." The Mortgage Loan Agreement provided that the lenders' consent to a transfer "shall not be unreasonably withheld . . . provided that the following conditions are satisfied: . . . . (ii) no Default or Event of Default shall have occurred and remain outstanding." Mortgage Loan Agreement § 8.2. Because an Event of Default was outstanding at the time of the Mortgage Loan lender's decision, Plaintiffs argue that the lenders had the right to withhold consent for any reason. Second, Plaintiffs argue that consent could have been properly withheld even if the decision was subject to a requirement that the lender act reasonably. (Or a requirement that the lender act in good faith. *Singh v. City of New York*, 40 N.Y.3d 138, 145 (2023) ("It is well settled that '[i]n New York, all contracts imply a covenant of good faith and fair dealing in the course of performance.'") (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)). At the point that Wells Fargo made that decision, the Mortgage Loan had been in payment default for over 11 months. According to Defendant, the PIF deal would have repaid the Mezz Loan in full, and allowed them to remedy any defaults under the Mortgage Loan. Mr. Ashkenazy, a "significantly wealthy man," had promised in his Guaranty that he would "maintain Unencumbered Liquid Assets . . . of not less than $20,000,000 [and] a Net Worth . . . of not less than $500,000,000." Guaranty § 5.1(d); SUMF ¶ 16. Given those facts, a finder of fact could readily conclude that it was reasonable for Wells Fargo to condition its consent on the repayment of some of its outstanding debt.

unconscionable. The Mortgage Loan Agreement provided the lenders the right to consent to the transaction. They exercised rights afforded to them by contract. The facts do not allow the Court to conclude that by refusing to consent to the PIF deal, the lenders acted in a way that was immoral, unconscionable or otherwise inequitable.

Second, the decision not to approve the PIF deal was not directly related to the Mezz Lender's exercise of its rights under the Mezz Loan Agreement and Pledge Agreement: the decision was made by a different entity pursuant to the terms of a different agreement. The Mezz Lender's exercise of its remedies cannot be limited by the conduct of a third party, acting pursuant to the terms of a separate instrument.

There is no direct relation between the purportedly inequitable conduct and the Mezz Lender's exercise of its remedies because two separate instruments are at issue. The decision not to consent to the PIF deal was made under the terms of the Mortgage Loan Agreement. The Mezz Lender exercised its remedies under the terms of the Mezz Loan Agreement and the Pledge Agreement. Each of those sets of agreements were entered into between different lenders and borrowers. To the extent that any violation of the Mortgage Loan Agreement took place, there is no grounds in equity to prevent the Mezz Lender from exercising its rights under the separate Mezz Loan Agreement and Pledge Agreement as a result. The decision not to approve the PIF deal had a place in the extended course of the events that led the Mezz Lender to exercise its remedies, but it was not sufficiently direct.

Moreover, the decision not to consent was made by a different entity. It is undisputed that the decision not to consent to the PIF deal was made by the lenders under the Mortgage Loan Agreement, not the Mezz Lender. The Mezz Lender's consent was not sought. The Mezz Lender actually encouraged the Mortgage Loan lender to consent to the deal, which would have refinanced the Mezz Loan.

51

Kookmin eventually acquired the Mortgage Loan, but the acquisition of the loan does not transfer to it the taint of any purported conduct by the prior owners of the Mortgage Loan. There is no contractual basis for Defendant's position that it does. The Assignment Agreement, pursuant to which Kookmin acquired the Mortgage Loan, provided that it acquired the "liabilities of Assignor under the Purchased Loan Interest *accruing from and after the date hereof* . . . ." Assignment Agreement § 3. And the Mortgage Loan Agreement provided that, as "Co-Lender," its liability was "several and not joint" with those of other lenders. Mortgage Loan Agreement § 11.36(a)(ii). And Defendant points to no principle of equity that would lead the Court to conclude that the Mezz Lender's hands were unclean, or that its conduct in exercising its remedies was unjust, as a result of the decision by another person to which it was unrelated at the time that the decision was made.

### b. Kookmin's Decision Not to Consent to Two Leases Under the Mortgage Loan Agreement

Kookmin's decision to deny consent to two proposed leases presented to it for approval does not provide support for Defendant's asserted equitable defense. That is because the conduct was neither immoral nor unconscionable and because Defendant has not shown that it was damaged in a way that would support the asserted equitable defense. Defendant argues that the Kookmin's decision not to approve two commercial leases violated the terms of the Mezz Loan Agreement and the Mortgage Loan Agreement. At the time, both agreements required USI and USSM to seek the approval of the relevant lender before entering into a lease because an Event of Default was outstanding. However, the agreements provided that consent "shall not be unreasonably withheld, conditioned or delayed . . . ." Mortgage Loan Agreement § 4.1.9(c); Mezz Loan Agreement § 4.1.9(c). Here too, there is a substantial question whether Defendant can establish that the decision not to approve the leases violated the terms of the loan agreements.[20]

---

[20] The decision not to approve an extended, 10-year lease at rock bottom prices was not unreasonable. The lender approved "numerous other lease extensions that were presented by Press in the same time period because the proposals

And in any event, the Mezz Lender's decision to withhold consent was not immoral, unconscionable or otherwise inequitable. At the time that Mr. Press requested the lender's consent to the leases—in February 2022—the Mezz Loan had been in payment default for approximately 22 months. SUMF ¶ 331. The Mezz Lender had the right to consent to leases under the terms of the loan documents, and exercised that right. There is no basis in the facts presented to the Court to conclude that the conduct was immoral, unconscionable or otherwise inequitable.

Nor has Defendant shown that the allegedly inequitable decision not to approve those two leases damaged them. The leases at issue represented a very small fraction of Union Station's commercial space, and the proposed lease rates were dramatically lower than the rates for those spaces before the pandemic. Defendant has not presented evidence demonstrating that the lender's decision had any material impact on the financial performance of Union Station—much less that it would have enabled Defendant to repay the long defaulted Mortgage Loan and Mezz Loan.[21] To the extent that Defendant was harmed at all, the harm would not support the remedy that Defendant seeks.

### c. Defendant's Claims of "Interference"

The Mezz Lender did not "interfere" with Defendant's management of Union Station in a way that supports an equitable defense to the Mezz Lender's exercise of remedies. Defendant points to a grab bag of actions by Kookmin that it broadly characterizes as "interference" with their management of Union Station. These complaints focus on alleged contacts between the Mezz Lender and its agents and leaseholders and potential lessees of space in Union Station. For example, Defendant claims that Cushman & Wakefield was not retained only to market the Mezz Loan, as

---

. . . provided flexibility moving forward." Rebibo Decl. ¶ 128.
[21] The Court does not assume that any increase in the revenues of the station would benefit Defendant. As equity owners, any interest that they might have in the revenues of USSM come after those of its creditors. There is no evidence that the incremental revenue associated with the two leases would have satisfied USSM's creditors.

Plaintiffs assert, but that it was also working to lease space in the station. Defendant points to communications with potential leaseholders in Union Station. Defendant dubs all of these actions "interference," which, it asserts, was so bad that the Mezz Lender should not be allowed to collect on its loan.

This grab-bag of minor complaints does not support Defendant's asserted equitable defenses for several reasons. First, Defendant presents no evidence that demonstrates how the conduct harmed it. Defendant characterizes the conduct as "interference," but fails to present any evidence of concrete injury that resulted from the Mezz Lender's acts. Second, none of the acts were immoral, unconscionable or otherwise inequitable. The lender under the Mortgage Loan Agreement had substantial contractual rights with respect to the operation of Union Station as a result of the extended default. All of the conduct of which Defendant complains took place following the occurrence of an event of default in connection with the exercise of those rights. Defendant fails to identify a contractual provision that was allegedly violated as a result of the conduct that they impeach. And third, again, the conduct of which Defendant complains was not directly related to the exercise of the Mezz Lender's remedies under the Mezz Loan Agreement and the Pledge Agreement.

### d. Allowing Plaintiffs to Retain Any Value of the Foreclosed Equity In Excess of the Amount of the Debt is Not Inequitable

Equity does not bar a party who has properly foreclosed on an asset from realizing value from it in excess of the amount of the debt that led to the foreclosure proceeding. In their fourth affirmative defense, Defendant contends that "Plaintiffs are not entitled in . . . equity to share in the condemnation award above the amount necessary to satisfy the debt due to the lender." Answer at 31. But Defendant points to no legal principle that supports this contention. The Court finds none. Indeed, as described above, it is well-established that following a proper foreclosure sale, the secured

54

party is not required to return any surplus to the debtor. *See, e.g.* 10 Anderson U.C.C. § 9-504:640 (3d. ed.) ("When the creditor purchases the collateral at a proper sale or properly retains it in satisfaction of the debt, the creditor is the owner of the collateral free of any claim of the debtor. Consequently, if the creditor thereafter sells the collateral, the debtor is not entitled to any of the proceeds of the resale even though the creditor obtains a surplus in excess of any balance of the debt remaining."). This is a clearly established principle of law; its application to Defendant is not inequitable.

### e. Allowing Defendant to Invoke Equity to Prevent the Exercise of Plaintiffs' Remedies Would Not Be Just

One profound flaw in Defendant's argument that equity should prevent the Mezz Lender from exercising its remedies stems from Defendant's myopic understanding of the concept of equity. "He who seeks equity must do equity . . . ." *Holdeen v Rinaldo*, 281 N.Y.S.2d 657, 661 (3d Dep't. 1967). The Mezz Lender lent $100,000,000 to USSM. Approximately that amount was distributed out to the equity holders of USSM. Mr. Ashkenazy indirectly owned 95% of the company and controlled its operations. Throughout the entire period in which the Mezz Loan was in default, Mr. Ashkenazy had sufficient resources to repay the loan. He chose not to reinvest any of his own money into the company to cure the default. And when the Mortgage Lender asked for a portion of its loan to be repaid as a condition to consent to the PIF deal, no equity was infused into the company to meet the demand. The decision was made not to place USSM into bankruptcy, which would have prevented the Mezz Lender from the exercise of remedies that led to this litigation. That decision avoided one of the clear triggers of Mr. Ashkenazy's personal guarantee of the loan.

Sitting in equity, the Court need not ignore the fact that the controlling shareholder of USSM is a "significantly wealthy man"—made wealthier with the proceeds of the Mezz Loan—and that he has chosen not to contribute additional money to mitigate the effects of the default on the

lenders.  USSM wants to have its cake and eat it too—both to leave its shareholders with the benefit

of the money generated by the Mezz Loan, and to not have to accept the legal consequences of

USSM's extended failure to repay it.  Defendant seeks, through their faulty invocation of principles

of "equity," to treat the Mezz Loan as if it was equity, rather than a loan.  The Court rejects the

attempt.  In the exercise of its discretion, on these facts viewed in the light most favorable to

Defendant, the Court finds that no reasonable finder of fact could conclude that the equitable

defenses asserted by Defendant are available and that those defenses should not prevent the Mezz

Lender from exercising its remedies or obtaining the value of the collateral that they property that it

properly obtained as a result of the foreclosure proceeding.

### D.  Defendant's Other Affirmative Defenses Lack Factual Support

The other affirmative defenses asserted by Defendant in its Answer lack factual support.  In

their motion for summary judgment, Plaintiffs moved for judgment on Defendant's first, second,

fifth, sixth, seventh and eighth affirmative defenses (the "Unsupported Defenses").  P. Mem. at 23.

In the Local Civil Rule 56.1 statement, Plaintiffs pointed to the absence of evidence presented by

Defendant in support of those defenses.  SUMF ¶¶ 343-345.  In its opposition, Defendant did not

contest this portion of Plaintiffs' motion.  *See generally* D. Mem.  Nor did it point to record evidence

that supported any of the Unsupported Defenses.  SUMF ¶¶ 343-345.

Defendant has abandoned the Unsupported Defenses.  "Generally, but perhaps not always,

a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to

abandon others."  *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014).  "[P]reparation of a

response to a motion for summary judgment is a particularly appropriate time for a non-movant

party to decide whether to pursue or abandon some claims or defenses."  *Id.*  "Where abandonment

by a counseled party is not explicit but such an inference may be fairly drawn from the papers and

circumstances viewed as a whole, district courts may conclude that abandonment was intended."  *Id.*

Defendant failed to respond to the substantive arguments regarding these defenses that were presented by Plaintiffs and Defendant failed to marshal evidence to support the defenses. Defendant actively litigated this case. Therefore, the Court infers that counsel intended to abandon the Unsupported Defenses. Plaintiffs are entitled to summary judgment with respect to the Unsupported Defenses on that basis alone.

Moreover, Plaintiffs are entitled to summary judgment because Defendant has not presented material disputes that remain for trial with respect to the Unsupported Defenses. Defendant bears the burden of proof with respect to these affirmative defenses, but failed to present evidence in support of them to the Court. The Court can easily conclude that the "legal theory" of Plaintiffs' motion has merit—lacking factual support, the Unsupported Defenses have no merit.[22]

## IV.    CONCLUSION

Plaintiffs are entitled to declaratory judgment. The Court declares that (1) Lender is entitled under Section 5.2.2 of the Mezz Loan Agreement to act as USSM's attorney-in-fact with exclusive power to collect, receive, and retain any condemnation award and with exclusive power to make a compromise or settlement in connection with the Condemnation Action; and (2) all of USSM's right, title, and interest in and to USI have been extinguished by the foreclosure sale, and following the foreclosure sale Union Station Sub became the sole owner of USI. Defendant's defenses are dismissed.

The Court will hold a teleconference on March 10, 2025 at 2:00 p.m. to discuss the need for permanent injunctive relief, and the release of the bond securing the temporary injunction issued by the Court on August 25, 2022. The parties are directed to the Court's Individual Rules of Practice in

---

[22] These defenses are not adequately pleaded. The Second Circuit has made clear that "the plausibility standard of *Twombly* applies to determining the sufficiency of all pleadings, including the pleading of an affirmative defense[.]" *GEOMC Co., Ltd. v. Calmare Therapeutics Incorporated*, 918 F.3d 92, 98 (2d Cir. 2019). Hence, a party asserting affirmative defenses must "support these defenses with some factual allegations to make them plausible." *Id.* at 99. Defendant pleaded no facts in support of any affirmative defense other than the third.

Civil Cases, which are available on the Court's website.  Rule 2 of the Court's Individual Rules contains the dial-in number for the conference and other relevant instructions.  The parties are specifically directed to comply with Rule 2(C) of the Court's Individual Rules.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 141.

SO ORDERED.

Dated:  March 3, 2025
New York, New York

GREGORY H. WOODS
United States District Judge